| | | |
|---|---|---|
| LINKEPIC INC, *et. al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 12-cv-09058 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| VYASIL, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Linkepic Inc., GMAX Inc., Veoxo Inc., and Justin London (for convenience's sake, collectively referred to as "London") brought this lawsuit against Defendants Vyasil, LLC d/b/a eWittas, Mehul Vyas, Karl Wittstrom, and Ryan Tannehill d/b/a RMT Enterprises, alleging various state-law claims related to an ill-fated relationship between London's companies and Vyasil, a company with which Tannehill and Wittstrom are allegedly associated.[1] Tannehill and Wittstrom previously moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Because there were material facts in dispute, the Court permitted jurisdictional discovery. After discovery, the parties filed new briefs on the personal jurisdiction issue and, as explained further below, the Court reviewed the video depositions of Tannehill and Wittstrom in lieu of an in-person hearing.

---

[1] The Court has diversity jurisdiction under 28 U.S.C. § 1332. Citations to the docket are indicated by "R." followed by the docket entry.

For the reasons discussed below, the Court holds that it may exercise personal jurisdiction over Tannehill and Wittstrom and denies their motion to dismiss.

## I. Background

### 1. Vyas's Alleged Scheme

Much of this background on the complaint's allegations (the jurisdictional facts are discussed later) comes from the prior Order on Defendants' motion to dismiss. R. 52, 5/22/14 Order. The allegations in this case largely revolve around Mehul Vyas, the registered agent of a software development company called Vyasil, which also did business under the name eWittas. R. 159, Third Am. Compl. ¶¶ 12, 14. Vyas oversaw Vyasil's software development offices in India. *Id.* ¶ 14. Justin London is an Illinois entrepreneur who founded two internet companies called Veoxo and Linkepic, as well as GMAX, a mobile voice recognition technology company. *Id.* ¶¶ 4, 24. In February 2010, London met Vyas in an online conference to discuss the possibility of Vyasil performing development and marketing work for London's companies. *Id.* ¶¶ 25, 27. During that meeting, Vyas represented that Vyasil could handle the complex tasks, and London later agreed to award Vyasil the work. *Id.* ¶¶ 29, 31. London eventually contracted with Vyasil for five development projects: an e-commerce platform development for both Veoxo and Linkepic, a search engine optimization (SEO) for both Veoxo and Linkepic, and a mobile technology development for GMAX. *Id.* ¶ 31. Vyasil began invoicing London for work in March 2010. R. 159-7, London Invoices at 1. Despite Vyas's guarantees that the company could handle the projects, Vyasil did not complete the work. *Id.* ¶¶ 37-

38. Yet Vyasil continued to send invoices to London, who continued to send payments—over $54,000 in total—believing that the work was in progress. *Id.* ¶ 38. Vyas repeatedly assured London that the work would be completed, asking that London trust him. *Id.* ¶¶ 40-41, 58. And London did, even to the point of loaning Vyas $60,000 in April 2011 to ensure that the projects would be finished on time. *Id.* ¶ 60, 88, 92. Vyas signed a promissory note agreeing to repay those funds in the event that he defaulted, guaranteeing repayment from Vyasil. *Id.* ¶¶ 61-62. The loan was not repaid on schedule. *Id.* ¶¶ 63, 94-95. Based on Vyas's continued representations, London loaned Vyas an additional $24,970 in June 2011. *Id.* ¶ 64. Vyas ultimately did not follow through with any promise—he never repaid the loans or gave London any completed work product. *Id.* ¶¶ 65-67, 73-74.

### 2. Tannehill and Wittstrom's Alleged Involvement

The pending motion involves Vyas's two alleged partners in Vyasil, Defendants Karl Wittstrom and Ryan Tannehill, *id.* ¶ 13, both of whom had previously moved to dismiss for failure to state a claim and lack of personal jurisdiction, R. 32. Both Defendants are California citizens. Third Am. Compl. ¶¶ 7-8. According to London, Wittstrom and Tannehill formed a partnership with Vyas in which one of them sponsored Vyas to work in the United States; in return, Wittstrom and Tannehill shared the profits of Vyas's software development venture. *Id.* ¶ 18. On March 25, 2009, Wittstrom and Tannehill signed Vyasil's Amended Operating Agreement as member-managers, each contributing $1000 in return for a 40% ownership interest in Vyasil. *Id.* ¶ 21; R. 159-3, Exh. 3, Amended Operating

Agreement at 5-6. Under the terms of the Amended Operating Agreement, member-managers were responsible for the administration and regulation of Vyasil's business and assets. Amended Operating Agreement at 1. On April 4, 2009, Tannehill allegedly filed Vyasil's statement of information with California's Secretary of State. Third Am. Compl. ¶ 21. Wittstrom and Tannehill were also listed as officers and members of Vyasil on a Corporation Wiki page. *Id.* ¶ 22. London allegedly relied on the filed statement of information and the Corporation Wiki in deciding to do business with Vyasil, believing that Tannehill and Wittstrom were well-established business people. *Id.* ¶¶ 22-23. Although Tannehill admits that he signed the Amended Operating Agreement and made a capital contribution, he disputes that he had any responsibilities in Vyasil's operations. R. 160-6, Tannehill Dep. 36:8-37:7. Wittstrom does not recall signing the Amended Operating Agreement and denies giving a capital contribution. R. 160-7, Wittstrom Dep. 56:6-59:1.

As to Ryan Tannehill more specifically, London alleges that Tannehill was a member-manager of Vyasil and served as the CFO who was responsible for financial affairs, billing, and account receivables. *Id.* ¶ 13. Tannehill allegedly submitted numerous invoices to London; the signature block of some invoices do show Tannehill's typed name. *Id.* ¶ 37; London Invoices. Tannehill, through RMT Enterprises, also made a personal loan to Vyas and expected to share in the profits in return. *Id.* ¶ 18. As a result, he allegedly pressured Vyas to generate profits and repay the loan. *Id.* ¶ 121. Tannehill generally denies all of these allegations,

testifying that he never prepared any invoices and only "on a very rare occasion" sent an invoice. Tannehill Dep. 116:21-117:7. But he does admit that he loaned Vyas around $150,000 to get Vyasil started. *Id.* 21:7-20.

Karl Wittstrom, the other Defendant in question, was allegedly Vyas's second partner at Vyasil. Third Am. Compl. ¶ 18. London alleges that on March 3, 2010, London presented his company, GMAX, to a number of potential investors at the Four Seasons in Chicago. *Id.* ¶ 42. Vyas and Wittstrom attended the conference remotely through Skype, purportedly to secure a development contract with GMAX, and Wittstrom was introduced as a partner of Vyasil. *Id.* At the end of 2010, Wittstrom also allegedly sent Vyas the business card of a major government contractor's CEO so that Vyas could impress London with his industry contacts. *Id.* ¶ 44. Relying on these apparent business connections, London decided to work with Vyasil. *Id.* ¶ 23. Wittstrom also generally denies all of these allegations; he claims that he was only on the Skype call to help with Vyas's English and denies sending any business card. Wittstrom Dep. 66:6-8, 191:19-25.

### 3. Procedural History

Tannehill and Wittstrom previously moved to dismiss for lack of jurisdiction and failure to state a claim. R. 32. After the Court dismissed some of the claims, 5/22/14 Order, London amended his complaint to include ten counts, Third Am. Compl. Specific to Tannehill and Wittstrom are claims under the Illinois Consumer

Fraud and Deceptive Practices Act, corporate veil piercing,[2] promissory estoppel, common law fraud, and conspiracy to commit fraud. Third Am. Compl. In the earlier Order that dismissed some of the claims, the Court also concluded that jurisdictional discovery was needed to determine the extent of Wittstrom and Tannehill's involvement with Vyasil. 5/22/14 Order. Wittstrom and Tannehill had disputed almost all of the allegations about their participation in Vyas's alleged scheme, and the truth of those allegations was crucial to deciding whether specific jurisdiction applied. *Id.* Around a year later, after jurisdictional discovery finally closed, London submitted a memorandum arguing that personal jurisdiction was proper because (1) Tannehill and Wittstrom purposely directed fraudulent conduct towards London in Illinois; (2) Vyas acted with apparent authority as Wittstrom and Tannehill's agent; and (3) Tannehill and Wittstrom were part of a conspiracy to defraud London. R. 160, Pls.' Br. London also argued that an evidentiary hearing was required. *Id.* at 15-16. Tannehill and Wittstrom responded that an evidentiary hearing would be burdensome given the availability of videotaped depositions, and that in any event the record showed that personal jurisdiction was improper. R. 161, Defs.' Resp.

After reviewing the discovery record, the Court requested that Defendants provide the videotaped depositions of Tannehill and Wittstrom. R. 165, 11/10/2015

---

[2]Veil-piercing is not a cause of action in Illinois, "but rather [is a] means by which a plaintiff may hold a defendant liable for the conduct of another defendant." *United States v. All Meat & Poultry Prods. Stored at LaGrou Cold Storage*, 470 F. Supp. 2d 823, 833 (N.D. Ill. 2007). The Court thus construes this count as part of London's agency theory as a means of imposing liability on Tannehill and Wittstrom for Vyas's actions.

Minute Entry. After reviewing the videos, the Court now resolves all factual disputes to decide the personal jurisdiction question.

## II. Legal Standard

Rule 12(b)(2) governs dismissals for lack of personal jurisdiction. Fed. R. Civ. P. 12(b). A complaint need not allege personal jurisdiction, but the plaintiff bears the burden of establishing that jurisdiction is proper once a defendant moves to dismiss on that ground. *Purdue Res. Found v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When a motion is based on the submission of written materials, the plaintiff's burden is only to establish a *prima facie* case of personal jurisdiction. *GCIU Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). But when there is a dispute about material facts necessary to rule on the issue, the Court must grant discovery and hold an evidentiary hearing. *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In the latter scenario, "the plaintiff must establish jurisdiction by a preponderance of the evidence," *Purdue*, 338 F.3d at 783, and "prove what it alleged" at that hearing, *Hyatt*, 302 F.3d at 713.

The appropriate burden here is preponderance of the evidence, because jurisdictional discovery is complete and the Court reviewed the videotaped depositions (as the defense asked the Court to do) in lieu of hearing live testimony at an evidentiary hearing. *See Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1163-64 (7th Cir. 2015) ("The affidavit of the party asserting personal jurisdiction is presumed true only until it is disputed. Once disputed, the party

asserting personal jurisdiction … must prove what it has alleged.") (citing *Hyatt*, 302 F.3d at 713).

### III. Analysis

When a federal district court sits in diversity, it "has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction." *Purdue,* 338 F.3d at 779. An Illinois court has personal jurisdiction over a nonresident when Illinois's long-arm statute authorizes jurisdiction and when asserting personal jurisdiction comports with the Fourteenth Amendment's Due Process Clause. *Hyatt*, 302 F.3d at 713. Illinois's long-arm statute permits the exercise of personal jurisdiction to the limits of the federal Due Process Clause. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010); 735 ILCS 5/2–209(c) ("A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."). The Court will focus on federal constitutional due process principles because "[t]he state statutory and federal constitutional requirements merge." *uBid*, 623 F.3d at 425 (citing *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 757 (7th Cir. 2010)).

The canonical personal jurisdiction case, *International Shoe*, instructs that federal constitutional due process is satisfied when out-of-state defendants "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (citations and quotations omitted). There are two types of personal

jurisdiction: general and specific. *See, e.g.*, *Daimler AG v. Bauman*, 134 S. Ct. 746, 754-55 (2014). General jurisdiction is "all-purpose," existing only when "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit … on causes of action arising from dealings entirely distinct from those activities." *Id.* at 761 (citing *Int'l Shoe*, 326 U.S. at 318). London does not rely on general jurisdiction; rather, he focuses on specific jurisdiction, which is tied to individual instances of in-state activity related to the plaintiff's claim. *Id.* at 754. Specific jurisdiction is proper when a defendant directs his activities at the forum state and the cause of action relates to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

The Seventh Circuit has explained that "the contacts supporting specific jurisdiction can take many different forms." *uBID*, 623 F.3d at 426. These forms include entering a business contract in the forum state (despite never physically entering the state), *Burger King*, 471 U.S. at 476, 478-82; committing an intentional tort outside the forum state but aimed at the forum state, *Calder v. Jones*, 465 U.S. 783, 789-90 (1984); and deploying agents to the forum state and sending goods to buyers within the state, *Int'l Shoe*, 326 U.S. at 313-15, 320. Ultimately, the key is purposefulness: "[t]he due process clause will not permit jurisdiction to be based on contacts with the forum that are random, fortuitous, or attenuated." *uBID*, 623 F.3d at 426 (citing *Burger King*, 471 U.S. at 475). As such, the focus is "whether the

defendant has deliberately engaged in significant activities within the forum state" or "created continuing obligations between itself and a resident of the forum." *Purdue*, 338 F.3d at 780-81 (citations omitted). The required connection to the forum must arise from the *defendant*'s *conduct*, not just the relationship, standing alone, between the defendant and the plaintiff. *See Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014).

Guiding the personal jurisdiction analysis is the previous Order, which held that London has stated only three claims against Tannehill and Wittstrom: (1) Illinois Consumer Fraud and Deceptive Practices Act (ICFA) claims; (2) promissory estoppel; and (3) fraudulent misrepresentation. 5/22/14 Order at 27. Although each of these claims is a tort that may support jurisdiction, the promissory estoppel and ICFA claims depend on a finding of agency between Vyas and each individual Defendant. *Id.* at 9-12. In order to find personal jurisdiction for these claims, Vyas must have been Tannehill and Wittstrom's agent. *Id.* London's fraudulent misrepresentation claim, on the other hand, does not rely upon agency theory but rather focuses on Tannehill and Wittstrom's directly fraudulent conduct. *Id.* at 27-28. So personal jurisdiction for the fraud claim depends on whether they purposely directed allegedly tortious conduct at Illinois. *Id.*[3]

---

[3]The Court evaluates the agency and tort theories separately because specific jurisdiction depends on the facts underlying each asserted claim. *See, e.g.*, *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) ("To support an exercise of specific personal jurisdiction, the defendant's contacts with the forum state must directly relate to the challenged conduct or transaction; we therefore evaluate specific personal jurisdiction by reference to the particular conduct underlying the claims made in the lawsuit.").

Nevertheless, as the Court will explain below, the tort and agency theories of jurisdiction overlap because "[a]lthough ordinarily the presence of Vyasil as an entity would shield Tannehill and Wittstrom from an agency relationship with Vyas (an employee) … they may be liable if they have some 'direct culpability' in Vyas's actions." 5/14/14 Order at 10 (citing *Meyer v. Holley*, 537 U.S. 280, 286 (2003); *Zahl v. Krupa*, 927 N.E.2d 262, 285 (Ill. App. Ct. 2010)). And because "direct culpability" requires the same conduct as purposely directing tortious conduct at Illinois, the analyses for the two theories lead to the same outcome.

### 1. Evidentiary Hearing

Before explaining the Court's factual findings, there is a threshold issue: is it necessary to hold an in-court, live witness hearing in order to make the factual findings? As detailed below, almost all of the factual disputes relevant to the personal jurisdiction question continue to be disputed after discovery, including Tannehill's involvement in preparing and sending invoices, Wittstrom's involvement in sending an executive's business card to Vyas, and what was said during the Skype call that Wittstrom attended. But the Court resolves the factual disputes without an evidentiary hearing because it is able to make credibility assessments from the videotaped depositions.

London argues that the Court should hold an evidentiary hearing in order to assess credibility and resolve the factual disputes. Pls.' Br. at 15-16; *see Hyatt*, 302 F.3d at 713 ("If personal jurisdiction is challenged under Rule 12(b)(2), the court must decide whether any material facts are in dispute. If so, it must hold an

evidentiary hearing to resolve them, at which point the party asserting personal jurisdiction must prove what it alleged."). But Defendants respond that a hearing would be burdensome on the non-Illinois residents, and that the factual disputes and credibility determinations may be resolved through affidavits, discovery responses, and deposition testimony, especially because Defendants' depositions were video recorded. Defs.' Resp. at 18-19. The Court agrees that because the videotaped depositions are available, it would be needlessly burdensome to require Tannehill and Wittstrom to travel to give live testimony. Thus, the Court may resolve all factual disputes after reviewing the deposition videos.[4]

## 2. Tannehill

## A. Intentional Tort Theory

The Court first addresses the individual tort theory of jurisdiction for Tannehill. This theory, which applies to the fraudulent misrepresentation claim (and as explained later, leads to the same results as the agency analysis), allows a court to exercise specific jurisdiction when "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state … (2) the alleged injury arises out of the defendant's forum-related activities" and (3) exercise of personal jurisdiction does not "offend traditional notions of fair play and substantial justice." *Tamburo v.*

---

[4]On the copy of the video of Tannehill's deposition provided to the Court, there is a 7-minute segment when the screen freezes (from around 1:02 p.m. to 1:09 p.m.), but the deposition transcript sufficiently reflects the questions and answers (and some of the time is taken up by document review, objections, and cross talk), Tannehill Dep. 116-122, so there is no need for further follow-up.

*Dworkin*, 601 F.3d 693, 702, 709 (7th Cir. 2010) (citing *Burger King*, 471 U.S. at 472; *Int'l Shoe*, 326 U.S. at 316).

As to the first prong—purposeful direction—the Supreme Court elaborated in *Calder* that there are three requirements when intentional torts are at issue: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Id.* at 703 (citing *Calder*, 465 U.S. at 789-90). London argues that these elements are met because Tannehill sent numerous Vyasil/eWittas invoices to London in Illinois while knowing that the invoiced work had not been completed. Pls.' Br. at 8-10. Tannehill sent these false invoices because he allegedly wanted to collect money from London so that Vyas could repay Tannehill's loan. *Id.* at 9-10. And London paid Vyas, relying on the invoices to believe the work had been completed. *Id.* Tannehill disputes all of these facts. He claims that Vyas was responsible for invoicing, and that although Vyas might have asked him to prepare an invoice on a "rare occasion," Tannehill never did. Tannehill Dep. 106:9-13. Tannehill also denied ever being the CFO of eWittas or Vyasil, sending invoices to London, or knowing that Vyas sent London invoices displaying Tannehill's name. Tannehill Dep. 124:19-125:12.

After reviewing the underlying evidence and Tannehill's deposition, the Court finds that London has proven that it is more likely than not that Tannehill did prepare the invoices—and in doing so, committed intentional and allegedly

tortious conduct. The Court hastens to add that this finding is for personal-jurisdictional purposes only, and when the case moves forward, it ultimately will be up to a jury to decide disputed facts (and, indeed, perhaps when full-blown discovery is complete, the factual record might absolve Tannehill). But on the issue of personal jurisdiction, the evidence is in London's favor. First, Vyasil/eWittas sent sixteen invoices to London in Chicago from March 2010 to June 2011, four of which either bear Tannehill's name or the email address ryan@ewittas.com. R. 159-7, London Invoices. On their face, the four invoices with Tannehill's name or email address would have to be, in effect, forgeries if Tannehill did not send them (or authorize sending them). Moreover, it would be highly risky for someone (presumably Vyas) to have sent the invoices bearing Tannehill's name and email address on them *without* Tannehill knowing about it, because the recipient of the invoices could easily contact the purported sender, Tannehill, and then the jig would be up.

Additionally, there is solid circumstantial evidence that Tannehill did send invoices to other customers. Specifically, an email was sent from the ryan@ewittas.com account to a different customer—Paul Pauloni—with an invoice and requesting payment. R. 159-23, 7/1/11 Tannehill Email; Tannehill Dep. 108:8-109:23. Tannehill denies ever using the ryan@ewittas.com email address or sending invoices to Pauloni or other clients, explaining that Vyas was responsible for invoicing. Tannehill Dep. 107:15-23, 109:25-110:13. But in another email from Tannehill's *personal* email address (rtannehill@gmail.com)—which presumably

Vyas would not have any access to whatsoever—Tannehill asked Vyas: "Did you get Justin London and Paul Pauloni taken care of?" R. 160-1, Tannehill Emails (1) at 3. That follow-up questioning suggests that Tannehill was monitoring the collection of client payments and that he likely did send the Pauloni invoice-email. Tannehill also asked, "When will CRMS be online and *should I be sending any invoices out via email.*" *Id.* at 4 (emphasis added). These emails suggest that Tannehill invoiced clients at least some of the time, while Vyas was responsible for following up on payments. Additionally, Tannehill offers no concrete evidence to support the contention that Vyas or anyone else sent emails using Tannehill's eWittas address. This account-hijacking scenario is doubtful given an email from Tannehill's personal email address to Vyas asking "Do I have a 'ryan@ewittas.com' account?" *Id.* at 4. That Tannehill even posed this question shows that he wanted an eWittas email address and intended to use it.

On top of this, there are several emails from Tannehill's personal email address to Vyas about company finances and payment collection. For example, Tannehill managed the company's Wells Fargo bank account, Tannehill Emails (1) at 3, rent and office expenses, *id.* at 4, 6, and taxes, R. 160-2 Tannehill Emails (2) at 1. Tannehill also kept track of incoming payments from clients and gave Vyas positive feedback for collecting payments. Tannehill Emails (1) at 4 ("4. We received money VIA wire from Anishas contact. Congrats! Job wells done. 5. Any word on money transfer from Google. Not showing up from Wells Fargo yet."); Tannehill Emails (2) at 1 ("wanted to let you know we got the 1k deposit from TEVA skin Care

this morning. nice job"); R. 160-3, Tannehill Emails (3) at 1 ("NICE JOB! You are on the way to making that 40k you mentioned."); Tannehill Emails (3) at 1 ("You are really kicking ass right now Mehul. I am proud of you. Keep up the good work and you will have this loan paid back in no time at all. Then we can start making some money!"). All of this is consistent with Tannehill's responsibilities as a member-manager to conduct "the administration and regulation of the affairs, business and assets of [Vyasil]," as provided in Vyasil's Operating Agreement. Amended Operating Agreement at 1.

In addition, Tannehill expressly aimed his allegedly tortious conduct at Illinois with the knowledge that London would feel the effects there. *Tamburo*, 601 F.3d at 703. The evidence supports finding that Tannehill was directing Vyas to collect money from London in Chicago: "Please remind Mr. London that we sent the 30k to him via wire on 6/15 and were supposed to receive 30k back by 6/21 at the latest. Thank him for sending the 25k but as of Monday July 4th the payment will be two weeks late. Collecting this payment is critical." Tannehill Emails (1) at 1. Tannehill gave Vyas multiple directions and reminders about London's account. *See id.* at 2 ("Where is the 5K mehul. Just checked account. No pending wires … I get the feeling London never intended to pay 30k. Only 25k. Whats going on? Did you meet him today?"); *Id.* at 4 ("Any word from J. London on 5k?"); *Id.* at 7 ("Any word from Justin on the 5k?"). Tannehill and Vyas also exchanged a string of emails about London in the spring and summer of 2011—contemporaneous with the time period they invoiced London—about collecting London's payments in person. Vyas

threatened that "If his payment is not cleared today then I will go to chicago tomorrow and get it" and "I will f--- his ass. Once he will see my face then his father will also make the payment[,]" to which Tannehill responded "LOL Ok. Counting on you." *Id.* at 6-7. In another email, Vyas wrote to Tannehill: "Yes after boston I am coming to paso the fly to chicago to f--- Justin for his 20k[.]" Tannehill Emails (3) at 1. The emails also suggest that Tannehill knew that Vyas was conning London: "I am f---ing every one now one by one. Biggest is justin 16k in two days as he did 8k today same electronic way as her." Tannehill Emails (2) at 1. Thus, London has met the purposeful direction requirement and demonstrated that Tannehill committed intentional and allegedly tortious conduct—creating and sending invoices while knowing they were false—expressly aimed at London in Illinois. *See Tamburo*, 601 F.3d at 704 (allegations that defendants intentionally defamed the plaintiff on websites and blast emails and interfered with the plaintiff's business established intentional and tortious acts in Illinois). Again, the Court emphasizes that at this procedural stage of the case, it is not deciding the issue of liability or concluding that Tannehill acted fraudulently for purposes of liability. Rather, the Court finds that, for personal-jurisdictional purposes only, Tannehill purposefully directed allegedly tortious conduct to Illinois.

Next, the second element of the intentional tort theory of specific jurisdiction is also met here because London's alleged injury arises out of Tannehill's Illinois-related activities. *See Tamburo*, 601 F.3d at 703. There is a split of authority on whether the defendant's contacts with the forum state must be the but-for cause or,

instead, the proximate cause of the plaintiff's injuries—or both. *See Felland v. Clifton*, 682 F.3d 665, 676 (7th Cir. 2012) (citing *Tamburo*, 601 F.3d at 708-09). But there is no need to decide the issue here because the record "is sufficient even under the strictest understanding of the 'arising out of' requirement." *Id.* at 677. The Court already concluded that Tannehill aimed allegedly tortious conduct at Illinois for the purpose of collecting money from London by sending invoices for work Tannehill and Vyas knew would not be completed. Because these contacts with Illinois are the legal cause of London's injury—paying tens of thousands of dollars for nothing in return—London's claim directly arises out of Tannehill's contacts. *See id.* (alleged misrepresentations that met the purposeful direction requirement "were not just incidental but were central to the fraudulent course of conduct alleged in the complaint … [and] are sufficient as evidence of both the factual and proximate cause of [the plaintiff's] alleged injury."); *Tamburo*, 601 F.3d at 708-09 (same).

Finally, traditional notions of fair play and substantial justice are not offended by exercising personal jurisdiction over Tannehill. The Court considers "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 477). "First, Illinois has a strong interest in providing a forum for its residents … to seek redress for tort injuries suffered within the state and inflicted by out-of-state

actors." *Tamburo*, 601 F.3d at 709. Although Tannehill argues that defending suit in Illinois would be an undue burden, his main argument is that he does not have contacts with the state. Defs.' Resp. at 18. But because the Court concludes that Tannehill did establish contacts with Illinois when he purposely directed allegedly-tortious conduct at Illinois, he "should have expected, no less anticipated, defending that conduct herein and thus, cannot be heard to complain of the burden they allegedly invited." *EEI Holding Corp. v. Bragg*, 947 F. Supp. 2d 913, 919-20 (C.D. Ill. 2013). Out-of-state residents always face a burden of defending suit in another state, and "there is no suggestion that [Tannehill's] hardship would be any greater than that routinely tolerated by courts exercising specific jurisdiction against nonresidents." *Felland*, 682 F.3d at 677. So because there is no "'compelling case' that the exercise of jurisdiction would be unreasonable," the Court concludes that it would be fair to exercise specific jurisdiction over Tannehill. *EEI Holding*, 947 F. Supp. 2d at 919 (quoting *Burger King*, 471 U.S. at 477).

### B. Apparent Authority

The Court previously held that personal jurisdiction over London's ICFA and promissory estoppel claims required a finding of agency between Vyas and Tannehill. 5/22/14 Order at 9-12. For these claims, personal jurisdiction exists if Vyas was Tannehill's agent under the theory of apparent authority.[5] *See id.*; *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008) ("[I]n Illinois[,] an agent's contacts with a state may be attributed to the principal for

---

[5]London does not argue that Vyas had actual (express or implied) authority to act on Tannehill's behalf. Pls.' Br. at 13-14; 5/14/14 Order at 23.

purposes of establishing personal jurisdiction.") (citations and quotations omitted); 735 ILCS 5/2-209(a) ("Any person … who in person *or through an agent* does any of the acts hereinafter enumerated, thereby submits" to personal jurisdiction (emphasis added)).

The Court, however, need not address the agency theory separately because the analysis is the same as the intentional torts theory previously discussed. This is because "[a]lthough ordinarily the presence of Vyasil as an entity would shield Tannehill and Wittstrom from an agency relationship with Vyas (an employee), *see Meyer v. Holley*, 537 U.S. 280, 286 (2003), they may be liable if they have some 'direct culpability' in Vyas's actions, *Zahl v. Krupa*, 927 N.E.2d 262, 285 (Ill. App. Ct. 2010)." 5/22/14 Order at 10. Direct culpability means that a defendant personally participated in individual wrongdoing through "knowing or reckless action or omission." *Zahl*, 927 N.E.2d at 283 (holding that defendants—directors and officers of a company—did not act recklessly, and thus were not liable for the fraudulent actions of an employee, when defendants loaned the employee money and gave him responsibility). Because this overlaps with the analysis about whether a defendant has purposefully directed his activities at the forum state by participating in intentional and allegedly tortious conduct, the Court would reach the same conclusion. And London relies on the same arguments and underlying facts for both theories. Pls.' Br. at 14-15. So because it is more likely than not, for personal-jurisdiction purposes, that Tannehill sent invoices to London and directed Vyas to collect money for work that had not been completed, as previously

explained, the agency/direct culpability theory of personal jurisdiction is also satisfied.[6]

### 3. Wittstrom

### A. Intentional Tort Theory

The Court must similarly determine whether Wittstrom purposely directed allegedly tortious conduct at Illinois, whether London's alleged injury arose out of those contacts, and whether exercising personal jurisdiction offends traditional notions of fair play and substantial justice. *See Tamburo*, 601 F.3d at 702. London argues that Wittstrom purposely directed tortious activities to Illinois in two ways: (1) by participating in a conference call, where he was allegedly introduced as Vyas's partner, in an effort to secure a contract with London; and (2) by sending the business card of Bill Swanson, the former CEO of defense-contractor giant Raytheon, to Vyas to lure potential customers. Pls.' Br. at 2-4. The ultimate goal of this conduct, London argues, was to attract potential clients and make them believe in Vyasil's legitimacy. *Id.* Wittstrom also denies all of these facts. Defs.' Resp. at 7-8.

---

[6]London offers a third theory of personal jurisdiction—the conspiracy theory. Pls.' Br. at 11-12. "In recent years, however, Illinois courts have applied the conspiracy theory of jurisdiction more narrowly." *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 712 (N.D. Ill. 2014) (citing *Ploense v. Electrolux Home Products, Inc.*, 882 N.E.2d 653 (Ill. App. Ct. 2007)). The Court need not address this theory, however, because London has established jurisdiction under the intentional tort and agency theories. Given that London has already shown that Tannehill and Wittstrom purposely directed allegedly fraudulent conduct at Illinois, which is more burdensome than showing that Tannehill and Wittstrom merely conspired with others to commit a tort in Illinois, London has also established specific jurisdiction for his conspiracy cause of action.

As for the Skype call, Wittstrom testified that he "vaguely" remembered participating in this video conference that London hosted from the Four Seasons in Chicago. Wittstrom Dep. 195:16-18, 206:11-14. In an email before the Skype call, Vyas appears to have introduced Wittstrom as his partner. *Id.* 213:13-214:5. But Wittstrom denies knowing about the email or that he was introduced as a partner during the Skype call; rather, Wittstrom says that he only said "hi" and that he only participated to help Vyas with his English. *Id.* 190:4-14, 296:21-297:12. The Court finds, by a preponderance of the evidence, that Wittstrom allowed Vyas to introduce Wittstrom as a partner because he wanted Vyasil to get clients. Wittstrom admitted that the purpose of the Skype call was to sign-on clients for Vyasil. *Id.* 177:11-18. Wittstrom had signed Vyasil's Operating Agreement as a member-manager, where he had a 40% share in the company and was entitled to a share of profits. Amended Operating Agreement at 4. As a member-manager, Wittstrom had an incentive to legitimize Vyasil so that it would be successful. Wittstrom recognizes the signature on the Amended Operating Agreement as his, but denies signing the document. Wittstrom Dep. 56:3-14. But it is likely that Wittstrom did sign the Amended Operating Agreement and understood the responsibilities and benefits of being a member-manager, because he was a sophisticated business person who is a part-owner of a winery, owns real estate holdings, and was on the board of directors of a community bank. *Id.* 18:6-19:10. It is reasonable to conclude that as an experienced entrepreneur, Wittstrom was interested in promoting Vyasil when he agreed to participate in the Skype call at Vyas's request. *Id.* 296:21-23. Although Wittstrom

claims that he was only there to help Vyas with his English, Wittstrom never told that to the audience, nor said anything besides "hi" the entire time, suggesting that Vyas did not need language assistance. *Id.* 205:11-14; 297:7-12.

In addition, the Court finds, for personal-jurisdiction purposes, that Wittstrom did send Vyas the business card of a successful CEO so that Vyas could pass it on to potential clients and appear well connected. First, there is the email from Wittstrom's personal email address, karl@apwinery.com, to Vyas with the scanned business card of Bill Swanson attached. R. 159-4; 12/23/10 Business Card Email. Vyas forwarded this email to London with the message: "Hi Justin, I have sent you the business card of william CEO of raytheon. For your records to make you aware that I have far higher contacts then eric and jim. MV[.]" *Id.* But Vyas did not personally know Swanson or have any such "high" contacts, Wittstrom Dep. 188:24-189:3, so Vyas was associating himself with Wittstrom and Wittstrom's contacts—and with Wittstrom's knowledge. Wittstrom's testimony that he "highly suspects" the genuineness of this email is less believable given that he denies the authenticity of almost all written documents, including his signature on Vyasil's Amended Operating Agreement. *Id.* 68:7-18. What is more, Wittstrom also admits that he did indeed know Bill Swanson, that karl@apwinery.com is a *personal* email address he often used (and thus not readily accessible to Vyas), and that he kept Swanson's business card in his office. *Id.* 62:18-25, 67:17-68:6, 70:13-15. Yet he denies sending this email and suggests that Vyas sent it to himself using Wittstrom's credentials. *Id.* 70:13-71:3. Although Vyas was in Wittstrom's office

"from time to time" and "had ways of getting" Wittstrom's personal email credentials, this set of facts is simply unlikely. *Id.* 70:16-71:6. In order to have sent the email, Vyas would have had to let himself into Wittstrom's office around 9:36 PM when the email was sent, 12/23/10 Business Card Email, scanned the card to Wittstrom's computer, and logged in to Wittstrom's email account. When asked about the plausibility of this scheme at his deposition, Wittstrom does not give a direct answer. *Id.* 71:11-18 ("Q. … [Y]ou acknowledge that in order to have -- for [Vyas] to have sent this, he would have had to take your business card, scan it and then log into your e-mail account to send it. Do you -- do you understand that? …. A. No, I do not understand what you're asking.").

Again, the Court emphasizes that a fuller discovery record on the merits might absolve Wittstrom, or a reasonable jury might conclude otherwise, but here the evidence shows that Wittstrom knew that Vyas was misrepresenting Vyas's contacts and skills to clients. By participating in the Skype call as a partner and by sending Swanson's business card to Vyas, Wittstrom aimed allegedly tortious activities at Illinois, knowing that London would feel the effects of these actions in the state. Additionally, the analyses for the second and third prongs of the *Tamburo* test—that London's injury arose out of Wittstrom's contacts with the state and that fair play and substantial justice are met—are the same as the analyses for Tannehill, as previously described. *See supra* Section III(2)(A). Wittstrom's activities—helping portray Vyasil's legitimacy to London—was also a legal cause of London's decision to enter into contracts with Vyasil and continue paying for non-

existent work. *Id.* And due to these allegedly tortious actions aimed at Illinois, it would not be unfair and overly burdensome to subject Wittstrom to suit in this forum. *Id.*

## B. Apparent Authority

As previously explained with Tannehill, the analysis for personal jurisdiction under the intentional tort theory is the same as the analysis under the agency theory (for the ICFA and promissory estoppel claims). *See supra* Section III(2)(B). Because the Court has concluded that London has shown by a preponderance of the evidence that there is specific jurisdiction over Wittstrom under the former theory, the Court reaches the same conclusion under the latter.

## IV. Conclusion

For the reasons discussed above, Wittstrom and Tannehill's motion to dismiss for lack of personal jurisdiction, R. 32, is denied. Defendants Wittstrom and Tannehill shall answer the Third Amended Complaint by December 8, 2015. The parties shall confer on a discovery schedule, restart settlement negotiations, and be ready to state whether another settlement-conference referral would be appropriate. The status hearing of December 3, 2015 is reset to December 10, 2015, at 10:15 a.m.

ENTERED:

        s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 17, 2015