LINKEPIC INC., *et al.*,      )
                                  )
             Plaintiffs,      )      No. 12 C 09058
                                  )
          v.                    )
                                  )      Judge Edmond E. Chang
VYASIL, LLC, *et al.*,       )
                                  )
             Defendants.     )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Linkepic Inc., GMAX Inc., Veoxo Inc., and Justin London (collectively referred to as "London") brought this lawsuit against Defendants Vyasil, LLC d/b/a eWittas, Mehul Vyas, Karl Wittstrom, and Ryan Tannehill d/b/a RMT Enterprises, alleging various state-law claims related to an ill-fated relationship between London's companies and Vyasil, a company with which Tannehill and Wittstrom are allegedly associated.[1] London asserts that he hired Vyasil, a software development company that also does business as eWittas, to perform software development on his internet companies (Veoxo and Linkepic) as well as his mobile voice-recognition technology company (GMAX). According to London, Vyasil charged him for work it never performed and engaged in various acts of fraud. Entries of default have already been issued against Mehul Vyas and Vyasil. R. 17, Entry of Default against Vyas; R. 89, Entry of Default against Vyasil. London now seeks summary judgment on all claims

---

[1] This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1332. Citations to the docket are indicated by "R." followed by the docket entry.

against Tannehill and Wittstrom (the Defendants). The Defendants have cross-moved for summary judgment, requesting that the Court dismiss all of London's claims. For the reasons stated below, the Defendants' motion is granted as to the agency theory of liability and the promissory estoppel claim. It is also granted insofar as London seeks to hold Wittstrom directly liable for sending Brian Swanson's business card to Vyas. But the Defendants' motion is otherwise denied. London's motion is denied in its entirety.

## I. Background

### A. Vyas's alleged scheme

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So, when the Court evaluates London's summary judgment motion, the Defendants get the benefit of reasonable inferences; conversely, when evaluating the Defendants' filing (which the Court interprets as a cross-motion), the Court gives London the benefit of the doubt.

The primary alleged culprit in this saga is Mehul Vyas, who operated Vyasil LLC, a software development company based in India; the company also did business as eWittas. R. 172, Answer ¶¶ 12, 14, 17. Justin London is an Illinois business person who founded two internet companies called Veoxo and Linkepic, as well as GMAX, a mobile voice-recognition technology company. R. 374.1, Pls.' Resp. to DSOF ¶¶ 2-4. In February 2010, London began communicating with Vyas, primarily via Skype, to discuss the possibility of Vyasil performing development and marketing work for

London's companies. R. 373.1, London Dep. II at 11:7-13:21. Based on his Skype conversations with Vyas, London believed that Vyasil could handle all his development needs at a below-market rate.[2] R. 373.2, 2010 London IM at 2-3, 5-6.

London eventually entered into contracts with Vyasil for five development projects: an e-commerce platform development for both Veoxo and Linkepic; a search engine optimization (SEO) for both Veoxo and Linkepic; and a mobile technology development for GMAX. R. 159.8, Linkepic SEO Proposal; R. 159.9, Linkepic SEO Proposal Signature Page; R. 159.10, Veoxo SEO Proposal; R. 159.13 Linkepic Platform Development Project Plan; R. 159.16, Veoxo Platform Development Project Plan; R. 359, London Dep. I at 11:6-10. Vyasil began invoicing London for work in March 2010. R. 372.1, London Invoices at 1.

London asserts that, despite Vyas's guarantees that the company could handle the projects, Vyasil did not complete the work. London Dep. I at 3:21-4:2; 8:16-22;

---

[2]London objects to the use of his instant-message communications with Vyas as hearsay. R. 374, Pls.' Resp. at 7 n.11. London has not meaningfully developed this argument, which is undercut by his own use of Vyas's statements in his briefing. *See, e.g.*, R. 357.1, PSOF ¶¶ 16, 18, 28; R. 357.2, Pls.' Br. at 10, 18. In any event, the majority of Vyas's statements included in the record are admissible because they are not offered to prove the truth of the matter asserted, but rather to show Vyas's state of mind or their effect on the listener—London, Wittstrom, or Tannehill, in this case. Fed. R. Evid. 801. Despite London's protests, Pls.' Resp. at 7 n.11, the fact that the Defendants did not attempt to depose Vyas does not—by itself—prevent them from relying on his statements if they are not offered for their truth or if they are covered by a hearsay exclusion or exception. Fed. R. Evid. 801, 803. Vyas's statements thus cannot be excluded en masse. London is free, of course, to renew objections to *specific* statements from Vyas at trial, whether on hearsay or other evidentiary grounds. London also objects to the use of Vyas's instant messages because the Defendants never verified that Vyas used the Skype name "Countonus." Pls.' Resp. at 7 n.11. In his own Additional Statement of Facts. London undercuts this argument by relying on instant messages from that user, which he himself asserts is Vyas. See R. 374.3, Vyas IM; R. 374.2, Pl. Add. SOF ¶¶ 9, 10, 11. London cannot have it both ways. There is sufficient evidence in the record that the instant messages originated from Vyas. Fed. R. Evid. 901.

12:6-8. The Defendants counter that some of Vyasil's proposed work was completed. R. 373.10, 2010 London IM at 34; R. 373.11, 2010 London IM at 30, 55; R. 373.26, 2011 London IM at 16, 31, 48, 70; London Dep. II at 113:16-117:8. In any event, Vyasil continued to send invoices to London, who continued to send payments believing that the work was in progress. London Invoices at 15-17; London Dep. I at 8:8-22. Vyas repeatedly assured London that the work would be completed, asking that London trust him. R. 373.4, 2010 London IM at 50, 52, 63; R. 373.8, 2010 London IM at 80; R. 373.9, 2010 London IM at 3; R. 373.10, London IM at 78; R. 373.12, London IM at 4-5.

At the same time, in April 2011, London and Vyas entered into a Secured Promissory Note agreement where London agreed to loan Vyas $60,000. R. 373.33, 4/14/11 Secured Promissory Note; London Dep. II at 202:2-10. Under the terms of the Note, the money was due to be repaid in two installments: on May 25, 2011 and on June 25, 2011. Secured Promissory Note at 1. The parties dispute the exact dollar amount that was loaned to Vyas under the note but agree that he did not make his first repayment to London until June 6, 2011. Pls.' Resp. to DSOF ¶¶ 72-74. According to London, he made an additional and separate loan to Vyas in June 2011 for $25,000, which was never repaid. London Dep. at 16:4-11; Pls.' Resp. to DSOF ¶ 73. The Defendants assert, however, that the June 2011 payment was part of the initial loan, which was paid back in its entirety by June 16, 2011. Pls.' Resp. to DSOF ¶¶ 72-74.

As previously mentioned, after service of process, entries of default were entered against Vyas and Vyasil on all claims. Entry of Default against Vyas; Entry of Default against Vyasil.[3]

## B. Tannehill and Wittstrom

The current motions involve the remaining defendants—Karl Wittstrom and Ryan Tannehill. Neither of the Defendants has experience in software development or technology. R. 359.2, 2016 Wittstrom Dep. at 30:13-19; R. 359.1, 2016 Tannheill Dep. at 70:11-71:5. But Wittstrom does not dispute that he is an experienced business person who owns multiple companies. R. 372, Defs.' Resp. to PSOF ¶ 10; 2016 Wittstrom Dep. at 9:10-12:16. It is likewise undisputed that Tannehill and Wittstrom are friends and both signed the initial Vyasil operating agreement in March 2009, after Wittstrom introduced Tannehill to Vyas. Defs.' Resp. to PSOF ¶¶ 3, 4; 2016 Wittstrom Dep. at 113:1-3, 141:23-142:1; R. 372.2, 2015 Tannehill Dep. at 18:6-19:10. Wittstrom owned a 40% stake in Vyasil, while Tannehill owned a 20% stake through his company, RMT Enterprises, LLC. R. 357.3, Vyasil Operating Agreement at 118. Along with their ownership stakes, both men were member-managers of Vyasil. 2016

---

[3]London asserts that the default entries against Vyas and Vyasil mean that "all well-plead allegations against Vyasil are deemed true, including, but not limited to, that Vyasil breached of all contracts and did not perform the work." Pls.' Resp. at 19. London misstates the effect of the entries of default. By themselves, entries of default do not determine rights. *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016). Also, London cites no case for the sweeping proposition that a default against one defendant means that the *non*-defaulting defendants are somehow bound by the other defendant's default. Even "[a] judgment against one Defendant for the want of a plea, or a decree against one Defendant for want of an answer, does not prevent any other Defendant from contesting, so far as respects himself, the very fact which is admitted by the absent party." *Allen v. Destiny's Child*, 2009 WL 2178676, at *3 (N.D. Ill. July 21, 2009) (cleaned up); *see also United States v. Borchardt*, 470 F.2d 257, 260 (7th Cir. 1972)

5

Wittstrom Dep. at 56:15-17, 91:19-24; 2015 Tannehill Dep. at 158:1-3; R. 357.4, Ltr from Cal. Sec. of State at 6.[4]

In March 2010—a few days after London received his first invoice from Vyasil for the Linkepic work—Vyas, Wittstrom, London, and other individuals interested in GMAX all participated in a video conference via Skype. London Dep. II at 61:8-63:5. Wittstrom attended the conference because he believed that the GMAX project was going to be a "big deal" and he wanted to support Vyas and help him win the business. Defs.' Resp. to PSOF ¶ 13; 2016 Wittstrom Dep. at 94:10-14, 101:17-21. During the conference, Vyas introduced Wittstrom as his "partner," which was a misrepresentation of Wittstrom's role in the company. R. 372.9, 2015 Wittstrom Dep. at 214:3-215:15. Wittstrom admits that he never corrected Vyas nor explained to London that he was not, in fact, Vyas's "partner." Defs.' Resp. to PSOF ¶ 12; 2015 Wittstrom Dep. at 215:13-25. London asserts that Wittstrom failed to correct Vyas in order to legitimize Vyasil and its ability to perform London's desired software development. London Dep. at 61:16-24.

Later on, in December 2010, an individual using Wittstrom's email address forwarded to Vyas the business card of Bill Swanson—the former CEO of the large defense and technology company, Raytheon. R. 159.4, 12/23/2010 Email re Bill Swanson. Vyas then forwarded this email onto London and wrote, "I have sent you the business card of william CEO of Raytheon. For your records to make you aware that I have far higher contacts than eric and jim." *Id.* Wittstrom denies that he sent

---

[4]In August 2011, Wittstrom's name was removed from the list of member-managers included in Vyasil's Statement of Information. Ltr from Cal. Sec. of State at 7.

this business card to Vyas. 2015 Wittstrom Dep. at 66:6-69:6. He concedes, however, that although Vyas himself did not know Swanson, at some point Wittstrom did tell Vyas that *he* (Wittstrom) knew Swanson. Def. Resp. to PSOF ¶ 29: 2015 Wittstrom Dep. at 65:19-23; 69:8-14. In any event, London was impressed with the connection, as he believed Raytheon to be one of the largest defense contractors in the United States at the time. London Dep. II at 64:2-13. London argues that, from this email exchange, it was reasonable for him to infer that Vyasil was a capable company with an experienced management team and, further, that it is now reasonable to infer that Wittstrom forwarded the business card with the intention to make London believe those things. London Dep. II at 279:23-280:22, 281:10-13, 313:4-314:4.

For his part, Tannehill was the signatory on Vyasil's bank account, meaning, among other things, that he signed and certified Vyasil's bank-account application with Wells Fargo. 2015 Tannehill Dep. at 176:1-2, 339:18-341:21; 2016 Tannehill Dep. at 300:20-301:7. The application represented that Vyasil had $10,000,000 in sales, which Tannehill admitted was untrue. 2016 Tannehill Dep. at 301:8-302:5. Four of the invoices from Vyasil to London include Tannehill's name, while one lists him as CFO of Vyasil. London Invoices at 1-4. Tannehill testified that he was not the CFO of the company. 2015 Tannehill Dep. at 124:19-22. He also admits that he did not verify the work reflected on the invoices and, to this day, he does not know if Vyasil performed any work for London. 2016 Tannehill Dep. at 65:2-66:13. London asserts that he believed at the time that Tannehill authored his invoices because some of them included Tannehill's name. London Dep. I at 8:8-9:13. Moreover, Tannehill's

email correspondence with Vyas gives the impression that Tannehill directed Vyas to follow up with London about payments, including giving specific instructions on what to say to London. R. 360.1, Tannehill Emails at 1, 3, 6, 10.

Tannehill's own finances were also entangled with the fate of Vyas and Vyasil. Tannehill loaned $150,000 to Vyas, which Tannehill believed would be repaid through Vyasil's revenue. 2016 Tannehill Dep. at 60:17-61:7, 130:23-131:2, 133:21-134:3, 153:19-154:7; 258:22-260:22. London asserts that this loan was not disclosed to him during the relevant events, and if it had been, he would not have done business with Vyasil. London Dep. I at 21:2-6. He also infers from Tannehill's emails to Vyas that all of his payments to Vyasil were used to repay Tannehill, rather than to perform software development work on his projects. PSOF ¶ 26; Tannehill Emails at 8; 2016 Tannehill Dep, 257:13-259:3.

By the summer of 2011, the relationship between London and the Defendants began to sour. In August 2011, London started to ask Vyas to return all of the money London had paid for SEO services. R. 373.28, 2011 London IM at 23, 54-55; R. 373.29, 2011 London IM at 22-23, 77; R. 373.30, 2011 London IM at 30. By Summer 2012, Vyas had still not repaid London in full. R. 373.31, 2012 London IM at 50; R. 373.32, 2012 London IM at 38. London filed this lawsuit in November 2012. R. 1, Compl.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[5] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

## A. Liability Based on Agency

As an initial matter, the Court must address the question of whether Wittstrom and Tannehill can be held liable based on a theory that Vyas was their agent. The Defendants argue that London cannot show either actual agency or apparent authority. R. 371, Defs.' Br. at 19. London's only response to the Defendants'

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citaions have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

argument is that Vyas "did have apparent authority and Wittstrom and Tannehill acted in the capacity as Vyas's principals." Pls.' Resp. at 20. But apparent authority stems from the words or actions of the *principals*, rather than the agent himself. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) ("And only the words or conduct of the alleged principal, not the alleged agent, establish the actual or apparent authority of an agent." (cleaned up)). London makes no allegations that either Wittstrom or Tannehill held out Vyas as their agent to London. Instead, to support his agency theory, London cites evidence about interactions between the Defendants and Vyas, rather than the Defendants and himself. Pls.' Resp. at 20. No reasonable juror could conclude that Vyas had apparent authority to act as Wittstrom's or Tannehill's agent based on this evidence. So London is foreclosed from holding the Defendants liable for Vyas's conduct through any type of agency theory, and the Defendants' motion is granted in that respect.

Having said that, the Defendants may still be held liable for their own actions, whether that is through their own fraudulent behavior or as a member of a conspiracy to commit fraud, both of which are discussed in more detail below.

### B. Common Law Fraud

London argues that the Defendants should be held liable under a theory of fraudulent inducement, which is a type of common law fraud under Illinois law. *Lagen v. Balcor Co.,* 653 N.E.2d 968, 972 (Ill. App. Ct. 1995). In order to state a claim for common law fraud in the formation of contract, a plaintiff must allege that: (1) the defendant made a false statement of material fact; (2) the defendant knew that the

statement was false; (3) the defendant made the statement with the intent to induce plaintiff to act; (4) the plaintiff justifiably relied on the statement; and (5) the plaintiff's damages resulted from the reliance. *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). London moves for summary judgment on his claims that both Wittstrom and Tannehill engaged in fraudulent acts to induce him to contract with Vyas for the development of Linkepic, Veoxo, and GMAX. The Defendants move for summary judgment on this claim as well. For the reasons discussed below, both motions are denied as to both of the Defendants.

### 1. Wittstrom's Failure to Correct Vyas's Misstatement

London seeks to hold Wittstrom liable for two allegedly fraudulent acts: (1) failing to correct Vyas's statement that Wittstrom was Vyas's "partner" during the March 2010 video conference; and (2) sending Bill Swanson's business card to Vyas (who then forwarded the card to London) in order to convince London that Vyas and Swanson were connected. R. 357, Pls.' Mot. ¶¶ 9, 10.

As to the first act—Wittstrom's failure to correct Vyas at the video conference— mere silence ordinarily does not amount to fraud under Illinois law. *Miner v. Fashion Enters.*, 794 N.E.2d 902, 917 (Ill. 2003). To premise liability on an omission, the party that concealed a material fact must be under a duty to disclose that fact to the plaintiff. *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996). A duty like that can arise from a fiduciary relationship between the parties, *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012), but London does not allege that there was any such duty here. His claim, nonetheless, is not foreclosed, because

Illinois courts recognize that silence *combined* with deceptive conduct can create a duty to disclose. *See Henderson Square Condo. Ass'n v. LAB Townhomes, L.L.C.,* 16 N.E.3d 197, 216 (Ill. App. Ct. 2014) ("[S]ilence combined with deceptive conduct or the suppression of material facts results in active concealment."); *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 969 (Ill. App. Ct. 2004).

Although the briefing is somewhat cryptic, London seems to argue that Wittstrom had a duty to disclose that he was not Vyas's partner once Vyas introduced him that way during the video conference. Under these circumstances, the jury may reasonably agree. Although Wittstrom was under no initial duty to disclose if he was a partner one way or the other, once Vyas made the misstatement during the GMAX conference—which was deceptive, *affirmative* conduct during a business transaction—Wittstrom was then under a duty to correct him. "In the face of such concealment, it becomes the duty of the party which has concealed information to speak." *Green v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1375 (N.D. Ill. 2016) (quoting *Hirsch v. Feuer*, 702 N.E.2d 265, 273 (Ill. App. Ct. 1998)) (cleaned up); *see also JPMorgan Chase Bank, N.A. v. E.W. Logistics, L.L.C.,* 9 N.E.3d 104, 120 (Ill. App. Ct. 2014) ("Intentional concealment of a material fact is the equivalent of a false statement of material fact."). A reasonable factfinder could find that Wittstrom was under a duty to correct Vyas's misstatement.

Even so, the Defendants claim that the misrepresentation about Wittstrom's role at Vyasil cannot be material because Wittstrom had no technological expertise. Defs.' Br. at 8. A fact "is 'material' if the plaintiff would have acted differently had he

been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 7 (Ill. App. Ct. 2001). Here, the Defendants overlook the non-technology ways in which Wittstrom's involvement could have been material to London. Wittstrom has a long and diverse business background, and his potential day-to-day involvement could have easily persuaded London that Vyasil had an experienced management team. 2016 Wittstrom Dep. at 9:10-12:16; *see also* Pls.' Brief at 6. When viewing the evidence in the light most favorable to London, a reasonable juror could find that the misrepresentation that Wittstrom was a partner in Vyasil caused London to act differently than he would have had he known the truth. Materiality is genuinely disputed, and the trier of fact will need to decide.

Turning to the other elements of common law fraud: first, Wittstrom knew that he was not a partner in Vyasil at the time of the conference. 2015 Wittstrom Dep. at 214:3-217:10. Second is the question of whether Wittstrom intended to induce London to act when he remained silent in the face of Vyas's misrepresentation. Wittstrom testified that he did not believe Vyas's misstatement to be a "big deal" and thought it would be "awkward" to correct him during the conference. *Id.* at 217:8-10. When viewing things in the light most favorable to Wittstrom, this is sufficient to deny London's motion on the fraud count against Wittstrom. But there is also evidence in the record that supports London's claim. As an owner and member-manager of Vyasil, Wittstrom had a motive to win additional business—and make additional money— from London. Vyasil Operating Agreement at 118; Ltr. from Cal. Sec. of State at 6.

Wittstrom also conceded that he attended the conference because it was a "big deal" and wanted to help Vyas win the GMAX business. Defs.' Resp. to PSOF ¶ 13; 2016 Wittstrom Dep. at 94:10-14, 101:17-21. A reasonable juror could find that Wittstrom intended for London to believe he was a partner in Vyasil in order to induce London to award the GMAX project to the company.

Next, a jury could reasonably find that London justifiably relied on Wittstrom's silence. In assessing whether "reliance was justified, we must consider all of the facts that [London] knew, as well as those facts [London] could have learned through the exercise or ordinary prudence." *Cozzi Iron & Metal, Inc.*, 250 F.3d at 574; *JPMorgan Chase Bank, N.A.*, 9 N.E.3d at 121. Justified reliance depends on all the circumstances and considers the information available to a plaintiff. *Siegel Dev., LLC v. Peak Const. LLC*, 993 N.E.2d 1041, 1060-61 (Ill. App. Ct. 2013). Sometimes that means that the plaintiff need not make any additional inquiry: "Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another." *Id.* (cleaned up). Reliance is typically a question of fact, but it can be determined as a matter of law when only one conclusion can be drawn. *Cozzi Iron & Metal, Inc.*, 250 F.3d at 574; *Siegel Dev., LLC*, 993 N.E.2d at 1061.

The Defendants argue that London has failed to show a dispute of material fact on this element because "it could not be reasonable as a matter of law to believe 'an experienced management team' was all that was needed to create GMAX." R. 380, Defs.' Reply at 7. But London does not need to show such a belief was reasonable in order to meet this element—that was *not* the misstatement made by either Vyas or Wittstrom. He instead needs to show that he was justified in believing Wittstrom was a partner and did not enter into his transactions with Vyasil with his "eyes closed." *Cozzi Iron & Metal, Inc.*, 250 F.3d at 574 ("It is an elementary principle of contract law that a party may not enter into a transaction with its eyes closed to available information and then charge that it has been deceived by another.") (cleaned up). Defendants do not dispute that the publicly available information about Vyasil listed both Wittstrom and Tannehill as "members" of the company, which supports London's belief that Wittstrom was Vyas's partner. Defs.' Resp. to PSOF ¶ 7. And even without this corroborating evidence, there was "nothing improbable as to cause doubt" about the truth of the statement that Wittstrom was Vyas's partner, at least from London's perspective. *Siegel Dev., LLC*, 993 N.E.2d at 1061. Even when viewing the facts in the light most favorable to the Defendants, it is clear that London justifiably relied on Wittstrom's silence in the face of Vyas's misstatement. On this issue, then, not only has London successfully resisted the Defendants' summary judgment motion, he has prevailed on his motion so that the jury will be instructed that his reliance was justified.

On the last element, the trier of fact must make a finding as to whether London's injuries really resulted from Wittstrom's silence. The Defendants argue that Wittstrom's and Vyas's behavior during the March 2010 video conference could not have caused London to contract with Vyasil because (1) London decided to hire Vyasil before the conference; (2) London had numerous other communications with Vyas outside of the conference; and (3) London did not make his first payment for GMAX until October 2010, over six months after the conference. Defs.' Br. at 9. The evidence is not conclusive on any of the three arguments and, indeed, the arguments undermine one another. For example, the Defendants say that London had already decided to hire Vyasil for the GMAX project before March 2010, yet London did not actually pay GMAX on the contract until October 2010. And just because London communicated with Vyas on a regular basis does not mean that Wittstrom's involvement in Vyasil did not sway London's decision to move forward with GMAX. Wittstrom was an experienced business person whose involvement would naturally lend credibility. 2015 Wittstrom Dep. at 18:10-19:6, 27:3-28:23, 38:6-19; 200:9-14.

There is, nonetheless, evidence in the record that London was at least strongly considering hiring Vyasil for GMAX *before* the video conference. On March 8, 2010—two days before the conference—London and Vyas had the following exchange on Skype:

> Justin London: I am very excited about LinkEpic and GMAX – this is going to be huge
>
> Contonous: Yeah
>
> Contonous: I am excited for all 4 projects

Contonous: law, veoxo, linkepic and final the gem gmax

Justin London: the law is small potatoes compared to the other stuff, but it can't hurt

Contonous: yeah

Justin London: seo is critical

Justin London: absolutely crticial

Justin London: to the success of these systems

Contonous: that you don't need to worry about

Justin London: I intend to raise serious money for it – that's what the meeting next week is going to address

R. 373.3, 2010 London IM at 83-84. This back-and-forth is sufficient evidence to create a dispute of material fact over whether the misstatements made at the March 10, 2010 video conference caused London to contract with Vyasil for the GMAX project. So London has not prevailed on the issue of damages-causation; the jury must decide that element.

For the reasons discussed, both parties' motions are denied on London's claim of fraud against Wittstrom for his silence at the March 2010 video conference. London has shown as a matter of law that he was justified in relying on Wittstrom's silence in the face of Vyas's statement that he was his partner. But there remain disputes over whether (1) Wittstrom was under a duty to correct Vyas; (2) Wittstrom's failure to explain that he was not Vyas's partner was material; (3) Wittstrom intended for London to act on the silence; and (4) London's injuries were a result of Wittstrom's failure to correct Vyas's misstatement.

## 2. Wittstrom and the Bill Swanson Business Card

London next argues that Wittstrom is liable for fraud because he forwarded the business card of Bill Swanson to Vyas, who then forwarded it onto London. Pl. Mot. ¶ 10. This claim fails as a matter of law because London does not provide evidence that Wittstrom made a false statement of material fact. London concedes that Wittstrom knew Swanson. Pl. Response to DSOF ¶ 67; *see also* 2015 Wittstrom Dep. at 62:18-63:2. This means that Wittstrom's email to Vyas cannot be considered a false statement. Nothing in the record refutes that Wittstrom knew Swanson and that Wittstrom forwarded to Vyas a legitimately obtained business card. As mentioned above, Wittstrom cannot be held liable for Vyas's email to London, because there is insufficient evidence to find an agency relationship between Wittstrom and Vyas. For this same reason, London's claim fails as to the second element of common law fraud—knowledge or belief by the maker that the statement was false. The Defendants' motion, thus, will be granted on this claim because there is no evidence that Wittstrom made a false statement. So London cannot premise the fraud claim on a direct theory of liability against Wittstrom for forwarding Swanson's business card. As discussed below, however, Wittstrom may still be held liable for forwarding the business card as a member of a conspiracy with Vyas to commit fraud.

## 3. Tannehill

London also moves for summary judgment on his fraud claim against Tannehill, asserting that Tannehill prepared, or was at least aware of, false invoices that included material misstatements about the work Vyasil had performed and

Tannehill's role in the company. Pl. Mot. ¶ 11. London additionally asserts that Tannehill failed to disclose that he had provided a personal loan to Vyas for $150,000 and that he was expecting to be repaid through Vyasil's revenue. *Id.*. The Defendants move for summary judgment on this claim and argue that there is insufficient evidence to hold Tannehill liable. For the reasons set forth below, both motions are denied.

Beginning with the first element of fraud, the Court cannot decide as a matter of law that Tannehill either did or did not make material misstatements in the invoices sent to London. On the one hand, at least one invoice sent to London listed Tannehill as CFO of Vyasil, which he concedes is false. London Invoices at 5; 2015 Tannehill Dep. at 123:25-124:22; 2016 Tannehill Dep. at 77:1-2. Had London known that Tannehill was not CFO—and that Vyasil did not even have a CFO or billing department—he likely would have questioned the legitimacy of the invoices. In other words, this is the type of information that a person could be expected to rely on when deciding whether to pay an invoice. On the other hand, Tannehill denies sending the invoice that listed him as CFO and denies knowing that any of the invoices misstated the work performed by Vyasil. 2016 Tannehill Dep. at 65:2-66:13, 289:18-24. The jury will need to make a finding of fact on this element.

The next element is likewise disputed. Tannehill is adamant that (1) he had no knowledge that Vyas did not perform the work reflected on the invoices; (2) he did not send any of the invoices, including the one that listed him as CFO; and (3) the

work reflected on the invoices was, in fact, performed, albeit not satisfactorily.[6] Defs.' Br. at 11-12. But Tannehill's emails with Vyas lead to the reasonable inference that Tannehill was aware that London was receiving fraudulent invoices. Tannehill Emails at 7, 8, 10, 11; 2015 Tannehill Dep at 233:21-234:19. In the emails, Vyas asserts that London is the "hen giving a golden egg every month," while Tannehill repeatedly encourages Vyas to get as much money from London as possible. 2015 Tannehill Dep at 233:21-234:19. And Tannehill admits that he, rather than Vyas, sent at least some of the invoices to London. 2016 Tannehill Dep. at 73:12-15. It is reasonable, when viewing the facts in a light most favorable to London, to infer from the emails and Tannehill's testimony that he knew Vyas was fabricating the invoices, and, indeed, encouraged Vyas to do so. On top of that, Tannehill had reason to suspect that Vyas was not performing the work reflected on the invoices; Vyas was still in debt to Tannehill and payments from London were going directly back to Tannehill in repayment of that loan. *Id.* at 258:22-259:3; Tannehill Emails at 4, 12. This evidence is sufficient to create a triable issue of material fact on whether Tannehill knew the invoices bearing his name were fraudulent.

---

[6]The Defendants assert that Tannehill is liable only if he had knowledge that Vyas had no intent to perform because "fraud requires more than breach of promise." Defs.' Br. at 11 (*quoting U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005)). Defendants are correct that a party cannot be held liable under a theory of fraud for failing to uphold a contractual promise, but that is not what London is alleging here. London instead asserts that he received invoices that falsely reflected completed software development work that—in actuality—reflected work not yet performed. *See* Pls.' Br. at 8 ("By preparing and/or sending itemized invoices to the plaintiffs, Tannehill impliedly represented that the work was and/or had been performed because he expected payment upon receipt of the invoice.").

The next element is easily decided in London's favor. It is difficult to grasp how the invoices from the Defendants were not intended to induce London to act. What is the purpose of an invoice if not to induce the receiving party to make a payment? Not surprisingly, then, the Defendants do not discuss this element in their briefing. Defs.' Br. at 11-12. Defendants do dispute, however, that it was reasonable for London to rely on the invoices to "ascertain where the projects stood," because he was in "near-constant communication with Vyas on the status of the work." *Id.* at 12. Although the Defendants are not factually incorrect—Vyas and London were in close communication throughout 2010 and 2011—it is reasonable to infer from their instant messages that both men viewed the Vyasil/eWittas invoices as the primary method used by both parties to account for the work performed and payment owed. *See* R. 373.4, 2010 London IM at 52; R. 373.5, 2010 London IM at 33-34; R, 373.7, 2010 London IM at 11; R. 373.8, 2010 London IM at 64; R. 373.9, 2010 London IM at 3; R. 373.10, 2010 London IM at 16; 373.11, 2010 London IM at 43. A reasonable juror could determine that London justifiably relied on the invoices, even taking into account his near-daily communication with Vyas. This element, thus, remains disputed.

Finally, Defendants dispute that London was injured as a result of the invoices from Tannehill. Defs.' Br. at 12. They assert that, because London entered his initial contract with Vyasil prior to any invoice, they cannot be held liable. *Id.* But this fails to account for the money London paid to Vyasil in response to each invoice, which was clearly a detrimental change in position. The Defendants counter this point by

making the unsupported argument that the invoices, even if fraudulent, could not have caused London to make payments to Vyasil, "because there was a contractual obligation to do so." *Id.* This argument is nonsensical. London's obligation to pay all the invoices received does not permit the Defendants to knowingly send fraudulent invoices. And while the Defendants' final argument—that London's business partner Roland Kaeser paid the October 2010 invoice—may serve to diminish monetary damages, *id.*, it does not negate the evidence that London suffered an injury on account of the invoices.

To summarize, both summary judgment motions are denied as to Tannehill. But the trial issues are narrowed: as a matter of law, Tannehill intended to induce London to act when he sent him the invoices and London was injured as a result of the invoices (if all the other elements of fraud are proven). The jury must make findings of fact as to the other elements.

### C. Illinois Consumer Fraud Act

London seeks summary judgment against both of the Defendants on his Illinois Consumer Fraud Act (ICFA) claim. Pl. Mot. ¶¶ 5-7. The Defendants have cross-moved for summary judgment on this claim, arguing that London is not a "consumer" under the Act and that he has not satisfied any of the Act's elements. Defs.' Br. at 16-19.

ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices." 815 ILCS 505/2 (West 2012). A valid claim must allege: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) that the deception occurred in the course of conduct involving trade or

commerce; and (4) actual damage to the plaintiff (5) proximately caused by the deception. *Aliano v. Ferriss*, 988 N.E.2d 168, 176 (Ill. 2013). The Act is "primarily concerned with protecting consumers," but businesses "are able to sue other businesses … in two instances." *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 192 F. Supp. 3d 943, 954-55 (N.D. Ill. 2016). First, a business may sue under the Act when it is a consumer. *Id.* The Act defines a "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e) (West 2012). Second, a business may sue under the act, even if it itself is not considered a consumer, when it can show that "the challenged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *ATC Healthcare Servs.*, 192 F. Supp. 3d at 955 (cleaned up). In other words, the plaintiff must show "a nexus between the complained of conduct and consumer protection concerns." *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 823 (7th Cir. 2018) (cleaned up).

London was a consumer under the Act. He contracted for software development services with the Defendants. R. 372.4, SEO Agreement; R. 372.5, SEO Agreement Sig. Page; R. 372.6, GMAX Resource Management Plan. The invoices themselves are evidence that London was purchasing a service from the Defendants to be used by him for his business. *See* London Invoices. That the services were used by London in his capacity as a business owner, rather than in his personal capacity (as the Defendants argue, *see* Defs.' Br. at 16-17), does not take him outside the Act. It is

undisputed that London purchased services from Vyasil that he did not resell in the ordinary course of his trade or business and this is sufficient to show that he is a consumer covered by the Act. But London has also shown that the Defendants' conduct implicates wider consumer protection concerns. The Defendants do not dispute that Vyasil did business with other entrepreneurs—Paul Paolini and Deborah Oxley—and Tannehill admits that he personally sent invoices to both of them. *See* Def. Resp. to PSOF ¶ 21; 2016 Tannehill Dep. at 83:12-84:15. Tannehill further admits that at least one of these invoices misstated that he was CFO of Vyasil. 2015 Tannehill Dep. at 123:25-124:22; 2016 Tannehill Dep at 77:1-2.

Finally, London found Vyasil on the internet through a general search for software development companies or enterprise web development companies. DSOF ¶ 13; London Dep. II at 10:12-11:24. Any consumer looking for software development services, then, could have come across Vyasil's website and inquired about their services. Vyasil was clearly advertising to the market generally, and London has shown enough to meet the consumer nexus test. *Gold v. Golden G.T., LLC*, 2005 WL 2465815, at *4 (N.D. Ill. Oct. 4, 2005) (explaining that the consumer nexus requirement may be satisfied by showing that the alleged deception was "directed to 'consumers,' as opposed to simply 'customers' of the business plaintiff"); *Pain Prevention Lab, Inc. v. Elec. Waveform Labs, Inc.*, 657 F. Supp. 1486, 1493 (N.D. Ill. 1987) (allegations sufficient to state a claim where plaintiff alleged that defendant made misrepresentations "in the marketplace and to actual and/or prospective customers"); *cf. Thrasher–Lyon v. Ill. Farmers Ins. Co.*, 861 F.Supp.2d 898, 912 (N.D.

Ill. 2012) (allegations insufficient where plaintiff "fail[ed] to allege that the letters and written notices she received concerned anyone other than her or that Defendants made misrepresentations to the general public"); *Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F.Supp.2d 704, 711-12 (N.D. Ill. 2006) (allegations insufficient where plaintiff alleged that defendant had sent letters to seven of the plaintiff's customers as the letters were not directed to the marketplace generally).[7]

Turning to the elements of ICFA, first is whether London has shown that the Defendants committed a deceptive act or practice. *Aliano*, 988 N.E.2d at 176. The ICFA defines a deceptive act as "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact." 815 ILCS 505/2 (West 2012). As to Wittstrom, the Defendants do not meaningfully dispute that he engaged in deceptive acts when he failed to correct Vyas during the video conference or sent the Swanson business card to Vyas. *See* Defs.' Br. at 17-18; Defs.' Reply at 12-13. Instead, they argue that his acts cannot be considered *intentionally* deceptive. Defs.' Br. at 18 ("But these acts fail to support an ICFA claim for much the same reason they are not fraud: the acts were not intentionally deceptive…"). But the ICFA does not require proof of an intent to

---

[7]London argued that the Defendants should be "equitably estopped from denying London is a consumer." Pls.' Resp. at 8 n.13. The Defendants correctly point out that London has cited no authority to support this assertion. Defs.' Reply at 12. It is London's burden to show that he is a consumer under the Act, and the Defendants' alleged fraud does not relieve him of that burden. *Community Bank of Trenton, Inc.*, 887 F.3d at 823 (discussing the plaintiff's burden to show it was a consumer, as defined in the ICFA). It is the right of the Defendants to challenge London's arguments, even if—in the end—they are found liable.

deceive. *Wigod*, 673 F.3d at 574-75. So London has shown that Wittstrom engaged in deceptive acts under ICFA.

As to Tannehill, though, the analysis is more complicated. The Defendants argue that, even if Tannehill engaged in deceptive acts, they were not directed at London, making them unactionable under the Act. Defs.' Br. at 18. There is no reason to find that Tannehill's acts were not deceptive just because he himself did not make affirmative statements to London. The Act covers misrepresentations and "omission[s] of any material fact" in equal measure. 815 ILCS 505/2 (West 2012). Vyas's outstanding six-figure loan to Tannehill is a potentially material fact that should have been disclosed to London. And the Defendants gloss over the invoices Tannehill sent to London that arguably (at least a jury can so find) misstated the work performed by Vyasil. London Invoices at 1-5; 2015 Tannehill Dep. at 123:25-124:22; Pls.' Br. at 7, 9-11. As mentioned already, though, Tannehill denies sending the invoice that listed him as CFO and asserts he did not know whether the work reflected on the invoices was actually performed. 2016 Tannehill Dep. at 65:2-66:13, 289:18-24. This is enough to send this issue to the jury.

London next must show that Wittstrom and Tannehill intended for him to rely on their deceptive acts. *Wigod*, 673 F. 3d at 575. This element is disputed as to both of the Defendants. As to Wittstrom, he testified that he did not believe Vyas's misstatement to be a "big deal" and thought it would be "awkward" to correct him during the conference. 2015 Wittstrom Dep. at 217:8-10. On the other hand, Wittstrom also conceded that he attended the conference because it was a "big deal"

and wanted to help Vyas win the GMAX business. Defs.' Resp. to PSOF ¶ 13; 2016 Wittstrom Dep. at 94:10-14, 101:17-21. A reasonable juror could find for either side on this element.

Tannehill likewise has put forth sufficient evidence to dispute this element. As discussed below, there is evidence in the record that London had other ways of determining the work that Vyasil had performed and the amount of money he owed—his daily conversations with Vyas. *See* R. 373.2-R. 373.13, London IM. Tannehill also denies having sent the invoice that listed him as CFO, putting into question how he could have intended for anyone to rely on that particular false statement. 2016 Tannehill Dep. at 289:18-24.

The next thing London must show is that the Defendants' deception occurred in the course of conduct involving trade or commerce. *Aliano*, 988 N.E.2d at 176. The Defendants do not dispute this element, and it is obvious why. Illinois law defines "trade" and "commerce" to include the offering for sale, sale, or distribution of any services and any property. 815 Ill. Comp. Stat. Ann. 505/1 (West 2007). This clearly covers Vyasil's sale of software development services to London.

Finally, in order to hold the Defendants liable, London must prove that he suffered damage proximately caused by their deception. *Aliano*, 988 N.E.2d at 176. Illinois courts have held that the determination of proximate cause is usually left to the trier of fact. *Id.* This case is no exception, particularly because the issue is intensely disputed as to both Wittstrom and Tannehill and both sides have put forth enough evidence to survive summary judgment. London asserts that he paid Vyasil

hundreds of thousands of dollars and never received anything in return, defrauding him out of his funds and denying him future profits and intellectual property rights. Pls.' Br. at 14-16. The Defendants counter this by arguing that London cannot show pecuniary loss because the money came from his bank account, rather than the accounts of the corporate defendants. Def. Reply at 11. But this is immaterial. London is a plaintiff in this lawsuit and the Court has already held that he is a qualified consumer under the Act. *See supra.* Viewing things in the light most favorable to London, then, a reasonable juror could find that he suffered damages as a direct result of the Defendants' deceptions.[8]

When the Court views the evidence in the light most favorable to the Defendants, however, it is possible to see that a reasonable juror could decide the other way. It is undisputed that London's day-to-day contact at Vyasil was Vyas, with whom he regularly communicated about all of his projects. Pls.' Resp. to DSOF ¶¶ 15, 16. It is possible that a juror would look at the evidence and determine that the Defendants' deceptions—Wittstrom's silence during the video conference, the Swanson business card, and Tannehill's invoices—were not the proximate cause of London's purchase of Vyasil's services, but that London's conversations with Vyas were instead.

---

[8]The Defendants also argue that London is unable to show proximate cause because he had already contracted with—and made payments to—Vyasil before the deceptions took place. Defs.' Br. at 18. But the Defendants disregard the fact that London entered into additional contracts and made additional payments to Vyasil throughout 2010, after Wittstrom and Tannehill engaged in deceptive acts. SEO Agreement Sig. Page; GMAX Resource Management Plan; London Invoices at 3-17.

As a result, summary judgment is denied for both London and the Defendants on the ICFA claim. The Court has decided as a matter of law that London and the corporate Plaintiffs are consumers under ICFA; that Wittstrom engaged in deceptive acts under IFCA; and that any deceptive acts that took place did so in the course of conduct involving trade or commerce. The jury must make findings of fact on the remaining elements.

### D. Conspiracy to Commit Fraud

Both parties have moved for summary judgment on London's conspiracy claim. Under Illinois law, "[t]he elements of a civil conspiracy claim are: (1) a combination of two or more persons; (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (cleaned up). In other words, a defendant must understand "the general objectives of the conspiratorial scheme, accept them, and agree, either explicitly or implicitly to do its part to further those objectives." *Loggerhead Tools, LLC v. Sears Holding Corp.*, 19 F. Supp. 3d 775, 783 (N.D. Ill. 2013). "Conspiracy alleging a tort as the underlying wrongful act is actionable, as long as it includes additional defendants or new facts not already pled in the underlying tort." *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 725–26 (N.D. Ill. 2017) (cleaned up).

In support of their motion, the Defendants argue that the conspiracy claim should be thrown out because it is duplicative of London's fraud claim. Defs.' Br. at

12-13. London fails to address this argument head-on in his response brief, and the Defendants now assert that he has altogether waived his conspiracy claim. Def. Reply at 10. Although London did not directly take on the Defendants' duplicity argument in the response brief, he does make conspiracy-based arguments in both his Local Rule 56.1 Statement of Additional Facts and in various parts of the response brief. Specifically, in London's Statement of Additional Facts, he alleges that Vyas directed him where to make his payments, Pl. Add. SOF ¶ 8, but also that Wittstrom and Tannehill were in close communication with Vyas about the status of London's contracts and payments, *id.* ¶¶ 9, 10, 20, 24, 33. In his response brief, London likewise argues that the Defendants "assist[ed] and encourage[ed] Vyas to mislead and deceive customers," and that Vyas was "an individual the defendants knew was dishonest and a thief." Pls.' Resp. at 2; *id.* at 2 n.1. London further asserts that there is "overwhelming undisputed documented evidence of numerous discussions between Vyas and Tannehill in which Vyas tells Tannehill he is conning and defrauding the plaintiffs and other customers." *Id.* at 2. He finally states that "[b]oth defendants were willing to perpetrate the lie and deceit that Vyasil was successful with an experienced management team to get money from the plaintiffs and other customers." *Id.* at 3.

These assertions all support the theory that Vyas, Wittstrom, and Tannehill conspired to commit fraud against London through Vyasil and its primary agent, Vyas. London also supports these assertions with facts and evidence *distinct* from that on which he relies for his direct liability claims, including instant messages from

Wittstrom and additional emails from Tannehill. *See e.g.,* London Dep. II 237:21-238:7; 2009 Vyas IM at 47, 57; R. 375, Tannehill Emails at 144, 354, 753, 793; 2016 Wittstrom Dep. at 320:10-19. The Defendants' duplicity argument fails for the additional reason that London's conspiracy claim includes Vyas, where as his other remaining claims do not. *Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996) (allowing a claim of conspiracy to tortiously interfere with a contract to proceed, even though the same underlying tort had been pled, because it included a different defendant). If Wittstrom and Tannehill escape direct liability, the jury still may find them liable as co-conspirators with Vyas.[9]

The Defendants also argue that London's conspiracy claim fails for the independent reason that he has not shown sufficient evidence of an agreement. Defs.' Br. at 13-14. London may demonstrate an agreement by establishing that the Defendants "underst[ood] the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *McCann v. Mangialardi*, 337 F.3d 782, 789–90 (7th Cir. 2003) (cleaned up) (emphasis removed). London must point to acts that are "sufficient to raise the inference of mutual understanding (*i.e.*, the acts performed by the members of a conspiracy are unlikely to have been undertaken without an agreement)." *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (cleaned up). Critically, "[b]ecause conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use

---

[9]There is one qualification to this ruling. Double-recovery damages cannot be awarded against Wittstrom and Tannehill under both counts, and the Court will instruct the jury not to do so.

circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015).

When viewing the evidence in the light most favorable to London, there is a genuine dispute on whether there was a conspiratorial agreement between Vyas and the Defendants. As for Wittstrom, he and Vyas discussed the status of London's payments and contracts with Vyasil throughout 2010. 2009 Vyas IM at 38, 43, 46, 47, 50. Wittstrom also testified that he helped "get some clients" for Vyasil, 2016 Wittstrom Dep. at 64:3-23, and conceded that he was trying to monitor Vyas's repayment of his loan to Tannehill, 2016 Wittstrom Dep. at 320:8-19. There is also evidence that Wittstrom was a key player in Track-N-Locate, a separate endeavor started by Wittstrom, Tannehill, and Vyas, that raised capital by using the payments London made to Vyasil ostensibly for software development work that—in reality— was never performed (or at least a jury could so find). 2015 Tannehill Dep. at 237:9-238:10. Wittstrom sent emails to Vyas's developer, Jay Patel, asking about equipment that he was shipping to the Defendants for Track-N-Locate, emphasizing that he had "invested a lot of time and effort and money in [the] project." R. 374.8, 3/10/2011 Tannehill Email at 8-12.

With regard to Tannehill, there is substantial evidence that he was in frequent communication with Vyas about the status of London's projects and encouraged Vyas to get money from London. R. 360.1 Tannehill Emails at 1, 3, 6, 10; R. 375, Tannehill Emails at 93, 96, 144, 162, 267, 305, 321, 333. Moreover, Tannehill made a $150,000 personal loan to Vyas, believing that it would be repaid through Vyasil's revenue.

2016 Tannehill Dep. at 60:23-61:7, 130:23-131:2, 133:21-134:3, 153:19-154:7; 258:22-260:22. This circumstantial evidence against Wittstrom and Tannehill is enough to raise an inference that the parties agreed to defraud London. Both motions are, thus, denied as to London's conspiracy claim.

### E. Promissory Fraud / Promissory Estoppel

London's final claim is for promissory estoppel. "Promissory estoppel makes a promise binding where all the other elements of a contract exist, but consideration is lacking." *Wigod*, 673 F.3d at 566 (cleaned up). "It necessarily follows that where there is no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill." *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (cleaned up). London does not contest the validity of his contracts with Vyasil in this case. He does not allege that any of them lacked consideration. For this reason, his promissory estoppel claim fails, and the Defendants' motion is granted as to this claim.[10]

### V. Conclusion

For the reasons discussed, the Defendants' motion for summary judgment is granted on London's agency and promissory estoppel claims. It is also granted in the respect that he cannot hold Wittstrom directly liable (as distinct from conspiratorial

---

[10]In his response brief, London appears to shift his claim from one for promissory estoppel to one for promissory fraud. Pls.' Resp. at 12-13. As the Defendants correctly point out, London "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." Defs.' Reply at 10 (*citing Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012)). To allow London to do so would deprive the Defendants of fair notice and an opportunity to defend against the claim.

liability) for forwarding Bill Swanson's business card to Vyas. The Defendants' motion is denied as to all other claims and London's motion is denied in its entirety. The parties shall commence settlement negotiations immediately. At the next status hearing, the parties shall report on those discussions and otherwise be ready to set a trial date.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 27, 2019