# EXHIBIT A

D-23716

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINKEPIC INC., a Nevada company, GMAX, INC., a Nevada company, VEOXO INC., an Illinois company, JUSTIN LONDON, an Individual, | ) |
| Plaintiffs, | ) No. 12-ev-9058<br>) District Judge Chang |
| vs. | ) Magistrate Judge Valdez |
| VYASIL, LLC, a California company, d/b/a eWITTAS, MEHUL VYAS, an individual, KARL WITTSTROM, an individual, RYAN TANNEHILL d/b/a RMT ENTERPRISES, an individual, | ) |
| Defendants. | ) |

Deposition of JUSTIN LONDON, Plaintiff herein, pursuant to the applicable provisions of the Federal Rules of Procedure governing the taking of depositions, taken before Janet L. Galasso, CSR No. 84-002176, on Tuesday, June 14, 2016, at 10:07 a.m., at 970 Oaklawn Avenue, Elmhurst, Illinois.

Page 150

agreement? Or that comprises the GMAX agreement.
Let me rephrase. Is there a single document that has the signature, your signature on behalf of GMAX and Mehul or anyone else's signature on behalf of Vyasil that is one of the documents that you're referring to that comprise the GMAX agreement?
A. No, not with written signatures. And this is what I'm saying. The agreement was -- I believe there was an agreement that comprises -- certainly the technical documents comprise what is the work that's supposed to be done, okay.
And clearly you'll see there's a document that says GMAX operating system and one for the GMAX application.
Basically there was an agreement -- while it's not signed, there was an agreement onto the resources that were to be put onto this for these projects.
Now, these -- this was a massive project. This was -- the OS was a two-year project. The application was supposed to I believe have taken minimum several months, maybe up to a year at least, for the first module. It was a multi-phase project

Page 151

because of it's size.
So there was basically an agreement on both projects, but, as I said, there is not one comprehensive agreement that is signed.
Q. If you look at Exhibit 12 at PLA63, there is a section at the bottom for date and signature; right?
A. Yes, I see that.
Q. But that's unsigned; correct?
A. That is correct.
Q. And it's your understanding that it's never been signed; correct?
A. Correct.
Q. But it is your testimony that this Exhibit 12 is one of the documents comprising the GMAX contract?
A. Once again, this document states what it is. It says -- it doesn't say contract. It says "GMAX Mobile Web Resource Management."
This document contains -- if you look at what it contains, it talks about the -- it clearly shows OS and application development resources hierarchy, application resources requirement -- and I'm looking on PLA00056 -- OS

Page 152

development resource requirement, project timeline, budget, and details.
This document was one of the documents that was produced as part of this project. So once again, it was relied upon as far as what resources were going to be used, time frames, and budgets.
You have to understand, this was a multi-phase project. It wasn't like -- this project was to be done in phases and to be paid over time.
It wasn't -- you know, if you look at -- for example, you see there's a budget details for the OS and there is one for the application.
There were two separate -- and I believe I explained that before. GMAX composed two -- basically two large projects, the operating system and the application.
So, as I said, there are multiple documents. There are written communications. There's certainly many Skype communications. There are invoices and whatnot. But as I said, there is not one comprehensive document signed by myself and Mr. Vyas.
Q. Who prepared Exhibit 12?

Page 153

A. Mr. Vyas.
Q. He provided this to you?
A. Yes, he did. And, in fact, I believe I forwarded the email to Mr. -- one of the lawyers at Sperling Slater.
Q. And since this document comprises one of the written documents that's part of the GMAX contract, you agreed to the terms of this document; correct?
A. No. What -- as I said, this document -- there were subsequent discussions regarding the time frames, costs, and whatnot. This was an initial -- this was an initial estimate. But it was to be done in phases.
So the first phase was the first -- to do the first module for the application. And that's exactly -- if you recall, a document was produced -- I believe I provided you the cost estimate from ViaSem. There was an estimate between 700,000 and a million to do that first module.
So the entire cost had it been completed, probably, yeah. Probably to build the OS and the application, yeah, probably -- as the different phases were done. I mean, this was a

Page 174

$350,000 price for the application for GMAX, did you?
A. I could have, but that would have burned up a lot of capital. I can -- it was more than I could realistically allocate.
Q. You personally had $350,000 to pay --
A. Yes.
Q. -- for the GMAX application development?
A. Yes.
Q. And at the time did you personally have $250,000 to pay for the operating system development?
A. Yes. But I want to be very clear. The fact that I had it doesn't mean that I'm in a financial -- using -- that would have used a significant amount of my resources, and I wasn't in a financial -- the fact that I had it, that doesn't mean that I could actually -- I could have funded a lot of that, but it would have put a lot of financial strain on me to do it.
Q. You went to Roland Kaeser to ask him to pay for the monthly SEO; correct?
A. He helped. He wanted to help out, yes.
Q. And he was committing at one point

Page 175

$3,000 a month toward that SEO; correct?
A. Correct.
Q. If you had all this capital, why did you need him to pay?
A. I was funding multiple things. I have multiple expenses. This isn't my only expense. I'm running a law firm. I have a mortgage. I have a lot of payments. I have -- my monthly expenses are enormous.
So while 3,000 may not seem like a lot, relatively speaking to my overall expenses it adds a lot to it.
Q. And at one point in time you indicated you couldn't even afford the 3,000 and you needed Mr. Kaeser to go ahead and pay all of the SEO; correct?
A. Where? Show me.
Q. We'll get to that.
A. Show it to me.
When you're fronting the type of costs that I am, paying for expert witness in personal injury cases, paying orthopedic surgeons and experts the way I have, it adds up.
Q. How much money did you pay to Vyasil for

Page 176

the GMAX app?
A. I don't know the total amount. You'd have to look. I know that I paid -- did pay whatever I was invoiced for.
Q. As you sit here today you don't know how much money you paid to Vyasil pursuant to your understanding of the GMAX contract; correct?
A. I believe it would have been probably between 7,500 to 10,000.
Q. Did you receive invoices from Vyasil for the GMAX app?
A. Yes. I just told you --
Q. I keep saying that. Under the GMAX contract.
A. I just told you where you could see the invoices, yes.
Q. And have you produced all invoices that you received from Vyasil?
A. I believe I have.
Q. Are all payments that you made to Vyasil, were those made pursuant to invoices?
A. Yes.
Q. Could you go to PLA1435.
A. Sure.

Page 177

Q. Thank you.
A. Okay.
Q. Starting with the second entry there, December 1, 2010, 3:19:45 p.m., it references $1.5 million in development. What was that for?
A. Without reading this I don't -- I don't know. I don't know the specific -- I mean, this was from December. I don't know specifically what this was.
Q. If you move down a little bit, December 1, 2010, 3:20:59 p.m.
A. December 1st. Okay.
Q. You said, GMAX is easily several million, probably 10 million plus.
A. That's the value of the IP, absolutely.
Q. That's the value of IP?
A. The finished -- the completed system would be worth several million easily.
Q. Not the development cost?
A. It depends. I mean, the -- it depends on who's building it. I mean, the -- well, as I said, ViaSem quoted 750,000 to a million just for the first module. So I guess if ViaSem was building everything, yes, it would be several million. But

Page 322

Mr. Wittstrom's knowledge. Why don't you limit it to what you know.

BY PLAINTIFF LONDON:

Q. My next question. Is there money still owed on the loan that was made to Mr. Vyas, the secured loan made to Mr. Vyas and Vyasil?

MR. BULLARD: Objection; asked and answered.

BY PLAINTIFF LONDON:

A. The answer is yes. I believe an additional 25,000, less the wire fees, was paid. I don't believe it was fully repaid.

Q. Next question. What are the damages that the plaintiffs are seeking in this case?

A. The plaintiffs are seeking not only the moneys that were paid, but they're seeking -- that were paid for the work, but they're seeking their expectation damages and for the replacement cost. In other words, what the value -- what it would cost to replace what they should have received.

So, for example, the GMAX technology, what it would cost to have received the operating system and the application that they contracted for.

Likewise, for Linkepic, they're

Page 323

also seeking reimbursement for the SEO that was never performed.

They're also seeking punitive damages on the fraud count and the deceptive practices act to the extent that the statute allows for such damages.

Q. Next question. Was there any basis -- was there any reason why the plaintiffs did not contact Karl Wittstrom and Ryan Tannehill before the fraud was ultimately discovered?

MR. BULLARD: Objection; form and calls for legal conclusion.

BY PLAINTIFF LONDON:

A. The answer is there was no reason to -- there was -- the fact that Mr. Vyas was entering into the contracts on behalf of Vyasil did not change -- did not -- there was still no reason to believe that he couldn't, especially since he did -- was a manager and/or owner of some sort in the company.

He did represent that at least he had started the Indian operations. The corporate records as reflected by corporate wiki and other sites showed that Mr. Karl Wittstrom and Mr. Ryan

Page 324

Tannehill were member managers.

So at least the plaintiffs believed that there was a management in place, believed that they were experienced business people.

It's been the plaintiffs' experiences that just because someone's a member manager that doesn't mean that they're involved in every transaction.

Most management -- plaintiffs believe they were basically involved with managing and running Vyasil.

Second, Mr. Wittstrom was repeatedly referred to by Mr. Vyas as his partner. Likewise, for Mr. Tannehill.

When Mr. Wittstrom appeared in the video conference, I believe on March 17th, 2010, at the Four Seasons, he was introduced -- he introduced himself or he was introduced by Mr. Vyas as a partner. He knew that to be false, and yet he wanted -- he didn't correct that.

MR. BULLARD: Objection as to foundation.

BY PLAINTIFF LONDON:

A. Therefore, the fact of the matter that he is -- was involved, he was participating in a

Page 325

conference which was to strategize about the getting GMAX developed and funding on behalf of Vyasil, along with Mr. Vyas, strongly suggested that in fact he was a member manager and he was involved with that business.

Therefore, the fact that -- therefore -- going back to the question, there was no reason to believe that -- to have to have discussions or communications given.

It was the plaintiffs' belief that he was involved with Vyasil and a member manager. Likewise, for Mr. Tannehill.

Therefore, while the plaintiffs did have -- the bulk of their communications did come through Mr. Vyas, that never changed the plaintiffs' belief that Mr. Vyas was not the only one involved in this company.

Typically in companies, it's the plaintiffs' experience that -- in understanding that in companies people have different roles and responsibilities and --

MR. BULLARD: Objection; speculation, hypothetical.

D-23716

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINKEPIC INC., a Nevada )
company, GMAX, INC., a )
Nevada company, VEOXO )
INC., an Illinois company, )
JUSTIN LONDON, an )
Individual, )
) No. 12-ev-9058
Plaintiffs, ) District Judge
) Chang
vs. ) Magistrate Judge
) Valdez
VYASIL, LLC, a California )
company, d/b/a eWITTAS, )
MEHUL VYAS, an individual, )
KARL WITTSTROM, an )
individual, RYAN TANNEHILL )
d/b/a RMT ENTERPRISES, an )
individual, )
)
Defendants. )

This is to certify that I have read my deposition taken on Tuesday, 06/14/2016, in the foregoing cause, and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached hereto.

____________________________
JUSTIN LONDON

No errata sheets submitted (Please initial) _____
Number of errata sheets submitted__________ (pgs.)

Subscribed and sworn to before me
this_____day of ____________ 2016.

______________________________
Notary Public



STATE OF ILLINOIS )
) SS:
COUNTY OF DU PAGE )

I, Janet L. Galasso, CSR No. 84-002176, do hereby certify that JUSTIN LONDON was first duly sworn by me to testify the truth; that the foregoing deposition, Pages 1 through 331, was recorded stenographically by me and computer-transcribed under my personal direction; and that the said deposition constitutes a true record of the testimony given by the deponent at the time and place aforesaid.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way, directly or indirectly, interested in the outcome thereof.

This certification applies only to those transcripts, original and copies, produced under my direction and control; and I assume no responsibility for the accuracy of any copies which are not so produced.

IN WITNESS WHEREOF I have hereunto set my hand this 5th day of July, 2016.

______________________________
Certified Shorthand Reporter

# EXHIBIT B

Expert Report of Jordan R. Cohen
September 2016

Dear Mr. London

I have been asked to render an expert opinion on

1 The efficacy of the plans presented by Vyasil for the creation of GMAX.
   a. The technical presentation and documents produced by Vyasil and Viasem.
   b. The required technical capabilities required to deliver a similar product
2 The viability of GMAX, including a value for such a product in 2010/2012

**My review of the technical documents describing the creation of GMAX (details below) and the viability of GMAX are summarized as:**

> The Vyasil GMAX proposals fail to say how the functional specification of GMAX will be implemented, what elements of current technology will be used, what the interaction of current operating systems will be, and which applications will be supported. It offers no relevant details of any application, nor does it discuss the infrastructure used for creating a software product. It fails completely to account for the fact that the system requires a database infrastructure, a speech and language analysis effort, the ability to manage natural language, and the elements of conversation. The specification does offer a very high level functional description of GMAX, but does not offer insight into the design procedures, software platforms, delivery timelines, or integration issues critical to actually delivering a product. The proposed description of a GMAX operating system does not even contain a functional description, and is entirely vacuous.
>
> I judge that a subset of the GMAX applications (without natural language) could have been built in 2010. Properly planned, engineered, and marketed, it is clear that this application might have been worth more than $300M. On the other hand, there was substantial competition for these services, and given the plans and descriptions available from Vyasil I would judge their probability of success to be very low.

I have read and reviewed a substantial number of documents provided by J. London. A complete listing of those documents are attached as Appendix A. I have also consulted outside articles and people, and these are listed in Appendix B.

**I have been an expert witness in 5 cases in the last five years:**

Exhibit 1
Cohen 3.3.17
(WITNESS) (DATE)
Holly Thuman, CSR 6834

a. Sorenson Communications and Caption Call in Civil Action No 3:14-CV-66-BBC. Wrote invalidity report for Sorenson/Caption Call. Settled by summary judgment. I was deposed in this case.

b. Motorola Mobility vs Apple, Consolidated Cases 1:10-cv-23580-RNS and 1:12-cv-20271-RNS. Wrote and submitted invalidity report for Apple. Settled. Reopened by the Appeals court - pending

c. Schwarts, et al. v. The Village Center Community Development District, et al. Case 5:12-CV0177-MMH-TBS. This is a suit under the American Disabilities Act, and I am defending Village Center et al. The initial expert report has been written and submitted to the court.

d. Allvoice Developments US, LLC v. Microsoft Corp., Case 2:10-cv-02102-RAJ – Settled by Summary Judgment of Non-Infringement. 2010 – 2013. I wrote the invalidity report on behalf of Microsoft, and it was delivered to the court prior to the summary judgment. I was deposed in this case.

e. Nuance Communications, Inc v. Vlingo Corp, Case 09-11414-RWZ – settled by jury trial. I wrote both the non-infringement and invalidity reports, and testified during trial on the behalf of Vlingo. The jury found Vlingo not guilty of infringement on all 30 counts by unanimous decision. I was deposed in this case.

**Compensation paid for this report**

I am being compensated at the rate of $250/hour for this technical report. My fees for depositions and court appearances will be billed at $600/hour.

**I have authored or co-authored several publications in the past 10 years:**

1 H. Hermansky, J. R. Cohen, and R. M. Stern, "Perceptual Properties of Current Speech Recognition Technology", Proceedings of the IEEE, September, 2013, Vol 101 No 9, p. 1968.

2 M Gilbert, A Acero, J Cohen, H Bourlard, SF Chang, M Etoh, "Media Search in Mobile Devices", Signal Processing Magazine, IEEE 28 (4), 2011, 12-13

3 B Erol, J Cohen, M Etoh, HW Hon, J Luo, J Schalkwyk, "Mobile media search",ICASSP, 2009, 9, 4897-4900

4 J Wilpon, ME Gilbert, J Cohen, " The Business of Speech Technologies", Springer Handbook of Speech Processing, 2008, p. 681-704

5 M Harper, A Acero, S Bangalore, J Carbonell, J Cohen, B Cuthill, C Espy… Report on the NSF-sponsored Human Language Technology Workshop on Industrial Centers , 2007/6/22, pdf available from umd.edu

**In addition, I have given several public talks on topics of interest:**

1 "Simple Speech Morphing: A Story" presented to the Boston chapter of AVIOS and Brandeis University, October 17, 2013.

2 "OUCH (Outing Unfortunate Characteristics of HiddenMarkovModels) or What's Wrong with Speech Recognition and What Can We Do About it?", Johns Hopkins University, Sep 14, 2012 (see http://www.clsp.jhu.edu/seminars/1335/)

3 "Embedded speech recognition applications in mobile phones: Status, trends and challenges", in Proceedings of the International Conference on Acoustic Speech and Signal Processing 2008, April, 2008, p. 5352 – 5355

4 "The GALE Project: a description and an update", in Proceedings of the IEEE Workshop on Automatic Speech Recognition and Understanding, 9-13 December, 2007

**Qualifications:**

My resume is attached as Appendix C.

A summary of my career is that I have been engaged in either research or management of speech, language, and signals technology since 1971, including work with mobile speech systems. I started work for NSA in 1971 in speech and signals research, then did research for the Continuous Speech Recognition Group of IBM from 1982-1985. I joined the Institute for Defense Analyses (Princeton) in 1986 as a member of the Technical Staff, then was the Director of Business Relations at Dragon Systems from 1999-2000. I served as CTO of Voice Signal from 2000 to 2006, and as the Principal Investigator for GALE (a DARPA program called Global Autonomous Language Exploitation) at SRI, from 2006 to 2009. I have been an independent consultant since that time, and offer consulting and expert witness services through my LLC named SPELAMODE, located in North Carolina.

I currently have part time positions in two start up companies. I am the co-CTO (with Alex Rudnicki of CMU) for Kextil, a Pittsburgh company providing voice interfaces for the field services industry, and I am the VP of Technology for Semantic Machines, a company building conversational systems and platforms.

Of particular interest for this report, Voice Signal designed and delivered embedded speech interfaces for cell phones, including voice dialing, voice navigation, voice messaging, status, and music management. Semantic Machines is creating

conversational interfaces for various vertical applications, and I write patents and other documentation for our inventions.

I am co-author of more than 14 patents in speech and language and human interfaces, listed in my resume (Appendix C).

**A Review of the specifications for GMAX**

J London developed a basic idea for a conversational system for mobile devices prior to 2010, and I have been provided with several documents describing the creation of the various elements of the GMAX products.

In general there are two product lines – one a series of applications which offer speech interfaces to various capabilities on mobile platforms, and a second which is an "operating system" for these mobile platforms. One portion of the application offerings included an offer to build an Ontological Semantics appropriate for the voice interfaces.

There are five documents which describe the proposal by Vyasil and Viasem for work in response to Justin London. I describe and analyze these here:

**a. Viasem costs.pdf – the document which describes the ongological work in support of GMAX:**

> "An ontology is defined as "In information technology, an ontology is the working model of entities and interactions in some particular domain of knowledge or practices, such as electronic commerce or "the activity of planning." In artificial intelligence ( AI ), an ontology is, according to Tom Gruber, an AI specialist at Stanford University, "the specification of conceptualizations, used to help programs and humans share knowledge." In this usage, an ontology is a set of concepts - such as things, events, and relations - that are specified in some way (such as specific natural language) in order to create an agreed-upon vocabulary for exchanging information." (from http://whatis.techtarget.com/definition/ontology).

Thus an ontology is generally a listing of all the entities for a given topic, as well as the characteristics of those entities, and the syntactic relationships (parts of speech) between those entities.

Ontological Semantics is a process which also adds the semantics associated with entities, where "semantics" is meaning. In information technology "meaning" is taken to be a relationship between elements in the space of discourse (for instance, "to Boston" has a "meaning" relationship to the "flight to" field in a process that creates an airline ticket). Meaning may also be a description of an action. ("book that" in a flight context means "by a ticket").

A Semantic Ontology can be created for any particular task or domain of discourse, according to the management at Viasem. They offered to create 3 task domains ontologies at a time, over the course of a year, in the document "Viasem costs.pdf", provided by JLondon. In this document, the total offering is to create 14 domains over 2 years for $2,332,500.

In **Viasem costs.pdf,** the company offers this table to describe the work required for creating ontologies:

**Personnel for ontological semantics work**

| | RATE | HRS/WK | $/WK | WKS/YR | $/YR | OVERHEAD (OFC, BENEFITS, ETC.) | $/YR fully loaded |
|---|---|---|---|---|---|---|---|
| Prof. Dr. Victor Raskin | $400/hr | 10 | $4,000 | 50 | $200,000 | 50% | $300,000 |
| Dr. Julia Taylor | $200/hr | 10 | $2,000 | 50 | $100,000 | 50% | $150,000 |
| Dr. Christian Hempelmann | $200/hr | 10 | $2,000 | 50 | $100,000 | 50% | $150,000 |
| Brian Buck (ViaSem CEO) | $250/hr | 10 | $2,500 | 50 | $125,000 | 50% | $187,500 |
| Programmer 1* | $45/hr | 40 | $1,800 | 50 | $90,000 | 50% | $135,000 |
| Programmer 2* | $45/hr | 40 | $1,800 | 50 | $90,000 | 50% | $135,000 |
| Master Acquirer | $50/hr | 20 | $1,000 | 50 | $50,000 | 50% | $75,000 |
| Acquirer 1 | $25/hr | 20 | $500 | 50 | $25,000 | 35% | $33,750 |
| Acquirer 2 | $25/hr | 20 | $500 | 50 | $25,000 | 35% | $33,750 |
| Acquirer 3 | $25/hr | 20 | $500 | 50 | $25,000 | 35% | $33,750 |
| TOTAL | | | $15,600 | | $780,000 | | $1,166,250 |

The work involved in creating ontologies for restricted domains vary according to the number of relationships which are captured in the ontology, and according to the number of entities. In the Ontological Semantics ontologies offered by Viasem, there is an additional layer of "meaning", which makes the creation of an ontology more expensive than the standard ontology. Note that no description of the complexity of the domains to be built is offered in the document, nor is it possible to derive such since the domains are not described at all.

I tried to estimate whether the costs involved in this estimate were reasonable. In the article "ONTOCOM: A reliable cost estimation method for ontology development projects", the authors analyze the costs of 152 ontologies of various complexities. On the average, these ontologies took 10.22 man months to compile. These ranges from simple (600 entries) to complicated (76,000 entries) ontologies. The time estimate is for compiling a straightforward ontology without the semantic annotation like that offered by Viasem. Since the Viasem work does not indicate the complexity of the ontologies to be built, we use this average of 10.22 man months of work as a proxy. Thus we predict that the simple ontologies which underly the Viasem semantic ontologies should take (10.22 * 14 = 144) man months to create. The Viasem proposal offers to deliver 200 man hours per week, or 1.25 man months per week. They charge $15,600 per week. Thus we estimate that the cost of the basic ontologies associated with the Viasem project are 144/1.25 months, or about 115 months. Thus the underlying ontologies should cost about $1,800,000. Adding the semantic component will increase the cost, but it appears that the $2.3M proposed cost would cover this part of the project.

I note that a cost estimate for work which simply lists the number of ontological domains and the kinds of people to be hired is a sub-standard statement of work. It will not allow the funder to manage the work to be done, nor does it allow for an evaluation of the work which is delivered, if any. In the current case, no work was delivered, so it is easy to argue that the work described by Viasem, whatever that was, was deficient.

It is common practice in human/machine dialog or conversational systems to couple ontologies from restricted domains with a "knowledge engine", which is in effect a representation of world knowledge not specific to a domain. The dialog algorithms cannot function or compute logical information without this collection of information. This world knowledge is often represented as a large ontology, which "knows" things about how the world works. For instance, the "knowledge engine" would know that water is a liquid, that cars move along roads, that Hamburger is made of beef, and a host of other facts about the standard words describing the world and their parts of speech, categories of inclusion and exclusion, and for verbs their selectional restrictions, and any other relationships. There is no sign that the Viasem proposal included the capture of any such world knowledge, nor that the authors even considered the essential ingredient of such knowledge in a product which communicates with people.

**b. Gmax_Application_srs.pdf – GMAX application software requirement specification**

GMAX consists in part of a collection of applications that are to be developed. The general description of GMAX may be found in the Introduction of the specification, where it says

> "GMAX is an Internet web-based software application (apps) that runs/works on the iPad handheld mobile devices such as iPhones, Blackberry, and Palm Pilots, mobile web phones/smart phones, while GMAX's OS when released, is expected to work with and be compatible with the hardware of the major Smartphone manufacturers like Motorola, Sony-Erickson, Nokia, LG, Samsung, and HTC. The system is intended to be one of the first, if not the first, "intelligent" multimodal dialogue interface application that can interact with users by responding to commands, asking questions to users, giving answers to users, accepting queries and questions from users.

The software specification document offers a table of the applications to be developed, which are:

a. Initiation
b. Voice Calling
c. Voice Ringtone
d. Voice SMS
e. Voice Search
f. Voice Email
g. Voice Camera
h. Voice Youtube

i. Voice Maps
j. Voice Notes
k. Voice Weather
l. Voice Conversation
m. Voice Reading
n. Voice Wireless Controls
o. Voice Security Settings
p. GMAX Applications
    a. Medical
    b. Gaming
    c. Legal
    d. Other embedded solutions
q. Voice Projection System
r. Voice Settings
s. Voice GMAX Chat

Each item in the chart is accompanied by a very sketchy listing of the functions that the system should accomplish. Each list is later expanded with a crude diagram with a few more details. In general, these descriptions are skeletal, and even the highest level details are missing essential components.

I will describe in some detail two of the elements – Voice Calling (b) and Voice Conversation (l). (There seems to be some confusion, as p, "GMAX Applications", does not appear in the expanded discussion, and all of the earlier topics are listed later under GMAX Applications in the discussion.)

**Voice Calling:**

In the chart listing the functions of Voice Calling, the authors list
>>Voice Calling
>>Voice Answering Call
>> Silent OR Decline Call
>> Voice Activate Loudspeaker
>> Voice View Recent/Missed/Received Calls
>> Voice Call Waiting
>> Voice Conference Call
>> Voice Emergency Calling
>> Voicemails

These elements are further expanded in the following figure:




Note that no attention was given to the details of "make voice call", but, in fact, the details here are all important. Is the voice call by number or by voice? Does the calling routine read the local phone book? Is there a network phone book? Is the system trained for all speakers or must it be trained by the local speaker? If there are duplicate phone numbers in the phone book for a particular person, how does the user choose the right number? How does the user set the language of the voice call interface? Does the voice call system echo the person to be called before making the call? Is there a confirmation before calling? What happens if the spoken name is misrecognized? (in the voice dialing system which Voice Signal fielded, we offered the three best matching names in order) Does the system give advice if the speech is noisy? Where is the speech recognized (locally or on the network)? Is there a network phonebook?

It is clear that the authors did not give ANY serious consideration to the application that they claim to be building. Certainly, the description in this "software requirements specification" is an ill-considered and defective description of what it means to make a voice call.

The same observation holds for each of the other elements in voice calling. Voicemail has many modes and options, and they are not described. Voice conference call does not list creating, entering, managing the microphone, leaving, scheduling, or any other element of voicemail use.

**Voice Conversation**

The function listed in the chart for Voice Conversation is:

>>Voice conversation (Application supports the intelligent voice conversation

facility in addition to just voice search, between app and the user.)

The diagram later in the specification is equally uninformative:




In this case, the authors do not even begin to describe what is, by London's account, the essential ingredient of GMAX which makes it different than SIRI and the other voice activated assistants which were beginning to be available. London has described the function of GMAX as:

> "The core engine of GMAX technology utilizes voice recognition technology in conjunction with artificial intelligence, natural language processing (NLP), and ontological semantics that enable meaning, context, and semantics to be applied to speech input to give natural language speech output. Using voice recognition software, voice commands and queries are translated into data used in natural language and ontological semantic processing and voice results provided to the users. The system is intended to be the first "intelligent" application that can interact with users by responding to commands, asking questions to users, giving answers to users, accepting queries and questions from users." (GMAX Business Plan_v3.0.pdf)

The Vyasil "software specification" for the conversational agent, the essential ingredient in GMAX, is a joke. The specification writers have not offered any information about the natural language interface, about the operating system interactions, about the management of the analysis of information to offer a verbal response to the question, about the management of the dialog between the person and the mobile device, or a host

of other details which make this task particularly difficult. There is no indication that the proposers plan to support more than one platform, that the audio systems and software environments in each platform were different, or that the permissions in each were not the same. (In particular, Apple, in its Iphone software environment allows no access to the messaging platform. They do that for security purposes, and I know of no way to interface with an application so that one could read or write messages in an Iphone). In fact, no one to this day (September, 2016) has been able to deliver on London's vision of an automatic system with which to have an unrestricted dialog. Viasem failed to describe such a system except at the very highest level of abstraction and, had they offered a description, they could not have possibly delivered the product.

**Overall impression of the "software requirement specification"**

This document is a slap-dash listing of some of the possible applications in GMAX. It does not discuss software, nor does it discuss the applications in enough detail to convince the reader that the authors understand the applications, nor that the authors understand the operating systems in which these applications will run, nor that they have analyzed the languages to use, the computing system on which these applications will run, the networks involved, or any relevant details of the software requirements of these applications. This is a slipshod work that offers no relevant details of the development to be done or the requirements to be met. It is simply a list of potential applications. It fails as a requirement specification.

**c. GMAX_os_srs.pdf – GMAX Operating System Software Requirement Specification**

The Operating System Software Requirement Specification states that:

> "The main objective is to illustrate the requirement of the project "GMAX- THE MOBILE WEB SYSTEM". The goal of preparing this document is to present the systems outlay in an understandable manner. The document gives the detailed description of the both functional and non functional requirements proposed by the client." (Operating System Software Requirement Specification, Page 10)

It further states:

> "The software components of the application would utilize (1) voice recognition software; (2) relational databases; (3) algorithms to convert the voice commands into search commands; (4) artificial intelligence, artificial neural networks data mining utilities, and web crawlers to search on web pages for information; (5) algorithms/neural networks to return the correct search results; and (6) software to convert the results into computerized voice and/or to return pre-programmed human-voice results (=natural language converter that sounds more human than computer-like). The Application will work in different languages, e...g Chinese, French, Italian, Spanish, German, and Japanese by initially just English." (OSSRS, Page 10 and 11)

The document then lists 6 different existing operating systems in a table, (Black Berry, IPhone OS, Java ME, Palm, Symbian), along with some characteristics of each system. The document reiterates the applications that are expected to run on GMAX (essentially a repeat of the table reviewed in the GMAX Application Software Specification above), along with a slightly expanded description of each application in prose and pictures. In every case these are functional descriptions as before, without any indication of the software implementation or operating system interactions.

This functional review takes up 35 pages. The remainder of the 289 page document is a cut-and-paste selection of operating system details from the various systems. I sampled many of the paragraphs in the document, and each could be found word-for-word in other documents available by Google search. For instance, in the Symbian Operating System description, the following sentences are offered:

"Uikon was originally created as a refactoring of the Eikon user interface library, which was part of the earliest versions of the operating system. Uikon was created to support easier user interface customization, including 'pluggable' look-and-feel modules." (**GMAX_os_srs.pdf,** page 36)

Google finds the identical text in a book, "The Symbian OS Architecture Sourcebook: Design and Evolution of a Mobile", By Ben Morris ISBN: 978-0-470-01846-0, July 2007. I sampled 20 or so other paragraphs throughout the remaining "operating system" portions of the GMAX document, and in every case Google was able to find the exact text in some existing document. It is clear that this is simply a "cut and paste" exercise, and its content is merely details about operating systems.

There is NO information about how a GMAX operating system would be designed or built, what its characteristics should be, how it would be tailored to the various platforms and cell-phone systems, nor does the document describe which elements of modern operating systems (email, ring tones, security, etc.) are native to the OS and which are overlays.

In short, this document has NO INFORMATION about an operating system which would be GMAX based. It is a misrepresentation to call it an "Operating System Software Specification".

**4. GMAX Resource Contract.pdf – GMAX Mobile Web Resource Management, June, 2010**

The next document in the series of GMAX proposals is the Resource Management document. It lists a very crude 4-phase description of the amount of work to be done, a flow chart of the titles of people working on the contract and their area of expertise, a listing of the kind of people engaged in Applications, a listing of the kinds of people engaged in development of the OS (each listing including the number of such people and their expected experience level), and a GANT chart of the timing of the work to be done.

There is no listing of deliverable elements, of intermediate milestones, nor of the actual work which each group or person was to deliver. The gant chart does not pass the smell test for project planning, as it requires the documentation for the project to be delivered in the first month, and then requires simultaneous development of the OS and the applications from 7/12/10 to 6/30/2011. I reproduce the gant chart here to illustrate the skeletal nature of the presentation, and its lack of reasonable information.




The final section of the document simply reproduces the listings of job categories of people employed to create the OS and to create the applications, with the number of each type of people, and a dollar figure of $350,000 for the Applications Development and $250,000 for the OS development, for a total cost of $600,000. The document calls for 50 people for Application Development and 44 people for OS development for the less-than one year project listed in the GANT chart.

**5. gmax_techdoc_123.pdf - Technical Specification for GMAX Mobile Web, June, 2010.**

Finally, the GMAX proposal is wrapped up with a Technical Specification for the GMAX Mobile Web. This document is simply a discussion of the wonderful things that a mobile interface can do, followed by a rehash of the functional description of the applications supported (essentially a copy of the descriptions in the Application Software Specification reviewed above). It is sprinkled with pictures.

The first 56 page rehash of the functional uses of GMAX are then followed by a cut-and-paste pastiche of parts of articles and books and course material about the algorithms which are the foundation of AI today. It includes these topics:

- Bayesian Network Inference
  - Inference via Bayesian Networks
  - Developing a Bayesian Network
  - Markov Blanket
  - D-Separation
  - Causal Networks
  - Bayesian Algorithms
  - Bayesian Probability
  - Bayesian Network Analysis
  - Score and Search Based Approach
  - Bayesian Analysis
  - Probabilistic Algorithm
- Pattern Recognition
  - Supervised Learning
  - Unsupervised Learning
  - Reinforcement Learning
  - Dynamic Programming
  - Pattern Recognition Chart
- Biometric Technology
- Ontological Semantics
- Natural Language Processing
- Heuristics
- Artificial Neural Networks
- Voice Recognition
- Web Crawlers
- AI
- Other Functionalities
- References

This collection of random articles from computer science, AI, algorithms, computer science, biometrics, and natural language processing are not discussed in relationship to GMAX, nor are they specified as essential or even interesting in the pursuit of this product. It is simply a collection of articles and text and, as I found in the Software Requirements document, each article is easily found with a Google search as part of a book, paper, classroom notes, or other document available on the internet. In other words, it was plagiarized through a cut-and-paste job. There was no independent thought or analysis by Vyasil. Vyasil clearly did not have the capabilities, resources, know-how, or expertise to develop GMAX. Based on my review of Vyasil's work product, it is my opinion with a reasonably degree of certainty that Vyasil could not have delivered GMAX to London and it is a misrepresentation for Vyasil to claim that they could. This is further supported by the fact that based o not a single line of code was developed for GMAX.

On the other hand, it is my opinion that parts of GMAX could have been developed in 2010 and 2011 by a firm that did have such expertise and resources in NLP processing.

Of interest in this document is the stated requirement that

> "In addition to responding to voice commands, GMAX is intelligent enough to know where and how to obtain knowledge and information it needs to respond to users including structured databases, web crawlers, third-party databases, and data/text repositories. GMAX "learns" by building up its knowledge base via a Knowledge Acquisition Database Editor containing stored information obtained from other sources that can be used in future queries. The information and knowledge is given meaning through a proprietary ontological semantics engine so that GMAX knows what a user means and can respond appropriately." (Technical Specification, page 19)

So we see that GMAX requires not only a knowledge database, but the capacity to learn as it is used. In addition, the specification notes:

> "The most advanced feature of the app is the ability of the user to focus questions to obtain specific info the user needs. The app can ask follow-up questions to gather additional information it needs to process info. For example, if a user asks general questions that are not specific enough for the app to process, the app is "smart" enough to ask additional questions to obtain the information is needs to respond to the general question" (Technical Specification, page 22).

Again, we see that GMAX must have a conversation/dialog manager which understands the world. In practice, such a manager must also maintain a history of both the recent history and past history of interactions, and be able to infer information from those histories. No system which can accomplish these functions is proposed or described.

**The GMAX proposal – a summary**

The five GMAX proposal documents together are a slipshod cut-and-paste rehash of the functional description of the GMAX project. It is entirely lacking in details of the work to be done, the facilities to do the work, the characteristics of the operating system to be built, or the intermediate deliveries of the project. Thus the only specification is that of the functional capabilities of the GMAX project when completed, and the number of hours and types of people to accomplish this project. All details are left up to the proposer.

Nowhere in the description of work from the proposers are the following essential elements:

1. Speech capture, recording, and data analysis. Speech data is different from text data, and any real speech dialog/conversational system must be able to

capture and analyze thousands of hours of speech data to help design and tune these systems.

2. Database infrastructure. The system must have fast access to a great deal of data about the world and about conversation/dialog. Discussion of an appropriate infrastructure for this capacity is entirely missing
3. Natural Language infrastructure – how is this to be accomplished? Current systems use rule-based interactions or grammar-based probabilistic analysis, but neither is appropriate for conversational systems.
4. Localization – how does the system incorporate the information about different languages?
5. The dialog/conversational manager – any system with GMAX's functional specifications must have some way to manage the conversations with a human user, including the semantic interpretation of the discussion, language and speech generation in the conversation, and a sense of how to carry out a conversation. This topic is entirely missing from the specifications.

The GMAX proposals fail to say how the functional specification of GMAX will be implemented, what elements of current technology will be used, what the interaction of current operating systems will be, and which applications will be supported. It offers no relevant details of any application, nor does it discuss the infrastructure used for creating a software product. It fails completely to account for the fact that the system requires a database infrastructure, a speech and language analysis effort, the ability to manage natural language, and the elements of conversation. The specification does offer a very high level functional description of GMAX, but does not offer insight into the design procedures, software platforms, delivery timelines, or integration issues critical to actually delivering a product. The proposed description of a GMAX operating system does not even contain a functional description, and is entirely vacuous.

**What capabilities would be required to deliver a product like GMAX?**

From 2000 to 2006 I served as the CTO of Voice Signal. At that startup we developed a speech-enabled embedded application suite for use in feature phones and cell phones. The Voice Signal capabilities are described as follows: "We were one of the first companies to successfully introduce Speaker Independent Continuous Digit Dialing and Speaker Independent Command and Control, or Menu Navigation, on a phone. In addition, we are about to launch a new Speaker Independent Name Dialing application with our own Text-to-Speech engine, and we are about to launch Dictation (Speech-to-Text) on a handset. In addition to these product breakthroughs, we have ported our speech recognition solutions to a number of platforms, including Qualcom's CDMA platform, Motorola's TDMA, TI's OMAP, ADI's MSP 430 and Intel's Xscale, as well as to a number of operating systems including Microsoft's Stinger OS, the Symbian OS, and Nokia's Series 60 UI. We also offer a global language portfolio that is constantly growing." From http://www.speechtechmag.com/Articles/Editorial/Q-&-A/Dan-Roth-CEO-Voice-Signal-Technologies-31281.aspx

In the terms of GMAX, we delivered voice dialing, both by number and by name if the name was in the phone book of the device; we delivered SMS by voice; we interfaced with a mapping service; and we delivered phone status by voice. (These are items b, d, I, and r in the list of applications in the GMAX application software requirement specification). Since the application was cell phone based it required the speech services to be available in 20 languages.

One indication of the capabilities required to create a mobile speech system may be determined from the makeup of Voice Signal just before it was sold to Nuance. We had 80 people on our staff, allocated as follows:

10 researchers were developing speech recognition
6 people in application design
30 engineers did integration, software support, customer support and other services
10 people were engaged in language creation, data collection, and data management
6 people were in marketing and sales
4 people in Quality Control and Testing
8 people were in management
1 person as HR
1 person as CFO

The company was a lean startup, and spent $23M to create these services and sell them to Samsung, Rim, Motorola, Palm, and other vendors. The company was sold to Nuance in 2006 for $293M, and it had live customers and about $15M/yr revenue.

SIRI, the application which is found in Apple operating systems, was the result of a start-up spun off from the SRI project CALO. It, too, had a simple conversational style, and the system has interfaces to several different web services such as messaging, maps, restaurant guides, and stock quotes. Siri was likewise developed by a lean start-up company, and was sold to Apple for about $200M. (The actual number is not publicly available).

The applications from these companies were quite simple compared with the GMAX specification because the language was scripted and not natural language. The interfaces were multimodal, and they reminded the users what to say and when to say it. There was no allocation of people to ontologies, because the semantics of the processes were built into the embedded processes – you could build a straightforward flow chart of the possible conversations.

The GMAX specification calls for natural langue, with a wide ranging semantic ontology, and the semantic ontology description lays out the types of information required in such a resource. No one has created such an ontology (in fact, no one has created an ontology to cover all web resources and applications, never mind human interactions, pragmatic information about the world, and the rules of dialog).

An example of the difficulties in creating and using an ontology, other than dealing with natural language itself, is the dependence of word meanings on the topic of a discussion. For instance, the word "card" might refer to a playing card in a gaming application, or to a board with many spikes in a farming discussion ("carding" cotton), or a single-page cardboard message carrier in the post office (post card), or an entry in a large catalog in a library. Each of these meanings carries with it an understanding of the rules of interacting with the card, and of its physical capabilities. Whatever ontological system might be used, the application using it would at least have to understand the field of discourse and the intent of the user – a large order.

The support of natural language remains a difficult pursuit. The MIT Technology Review recently published an article on natural language and AI. They said "Machines that truly understand language would be incredibly useful. But we don't know how to build them. (AI's Language Problem, Will Knight, MIT Technology Review, August 9, 2016). I judge that the GMAX required ontology is not possible given our current technology – a much more limited information source (Google's Knowledge Engine, for instance) is available, but the interactions between the user and the system would be constrained to those fields covered in such a resource. It does not cover natural language.

The cost of developing a GMAX-like system, which would entail expertise in speech recognition, speech synthesis, scripted dialogs, "world modeling" or ontologies, engineering implementation, sales, marketing, data collection and management for languages, and management would range from about $30M to about $50M, based on the two examples above. It would not contain the natural language interface. The increased scope of a GMAX system could increase these expenses substantially, especially if the system is to be fielded in many languages with various cultural and government concerns. This estimate reinforces the inadequacy of the GMAX proposals, both as to the manpower and to the technologies covered.

**The viability of GMAX, including a value for such a product in 2010/2012**

A product such as GMAX could not have been delivered in 2010, as the ontologies required and the natural language support were not available. In fact, such ontologies or natural language support are not available today, some 6 years from the GMAX project.

On the other hand, the more closely scripted but somewhat stilted applications which are exemplified in the specification examples were possible to build (although the details of those applications may only be derived by implication). Both SIRI and Voice Signal built some subset of the described applications and delivered them before 2011. Both systems were voice driven and ran on mobile phone platforms. Both systems were sold into the marketplace – Voice Signal's applications were sold for $293M, but came with a paying customer base. SIRI had only free customers, and was sold for $200M.

I judge that a subset of the GMAX applications (without natural language) could have been built in 2010. Properly planned, engineered, and marketed, it is clear that this

application might have been worth more than $300M. On the other hand, there was substantial competition for these services, and given the plans and descriptions available I would judge their probability of success to be very low in light of Vyasil's inability and lack of expertise to develop what was specified to be developed.

I was also asked how much it would have cost to deliver a mobile operating system. Such a system would have to provide mobile telephone and web services, email, messaging, security, data manipulation and storage, and display, audio, tactile, and biometric support. Creating such a system is a huge undertaking, similar to creating any computer operating system, and we use as a model the creation of Linux: "2008 estimate for Linux operating system: The total development cost represented in a typical Linux distribution was $1.2 billion."
(From
https://www.google.com/search?q=cost+to+develop+mobile+operating+system&oq=cost+to+develop+mobile+operating+system&aqs=chrome..69i57.6855j0j4&sourceid=chrome&ie=UTF-8#q=cost+to+develop+mobile+operating+system&start=20)

In short, the creation of the operating system would be substantially larger than the creation of an automated assistant, and is measured in the billions of dollars. In a mobile system, an additional complication is the large number of computing platforms and hardware arrangements found in cell phones, and the support needed to keep up with new networks, platforms, and applications in this very dynamic environment. I think a reasonable estimate for creating a new cell phone operating system today would be 2 billion dollars.

Creating a business of such an operating system today is particularly difficult, and would have been difficult in 2010. Google is giving away its cell phone operating system (Android), while Apple and Microsoft have developed systems which are particularly well suited to their hardware and software offerings. The Android operating system was offered through the Open Handset Alliance starting in 2007, and the first Android phones appeared in 2008.

Jordan Cohen
Technologist
Spelamode Consulting

**Appendix A: Documents provided by the Lawyer which have been reviewed:**

1 20100305 317pm ViaSem, LLC Mail - Fwd_ Follow-up.CV_JuliaMTaylor.docx

2 20100305 503pm ViaSem, LLC Mail - Fwd_ Follow-up.pdf

3 20100305 1251pm ViaSem, LLC Mail - Fwd_ Follow-up.pdf

4 Business plan for Viasim, Number 3, 2009-2010

5 20100305 1251pm ViaSem, LLC Mail - Fwd_ Follow-up.ViaSem-BusinessPlan-20100122.docx

6 20100305 1251pm ViaSem, LLC Mail - Fwd_ Follow-up.ViaSem-ExecutiveBiographies-20100118.docx

7 20100305 1251pm ViaSem, LLC Mail - Fwd_ Follow-up.ViaSemLLC_JustinLondonVeoxoCorp(dba_GMAX)_SignedNDA_3-5-10.pdf

8 20100311 335pm ViaSem, LLC Mail - Fwd_ Follow-up.pdf

9 20100314 ViaSem, LLC Mail - Re_ Talk on phone_.pdf

10 20100315 927am ViaSem, LLC Mail - Justin London Meeting - Four Seasons - Tuesday March 16, 2010 - 2_30 - 5 PM.pdf

11 ✓ 20100315 940pm ViaSem, LLC Mail - Follow-up.GMAX_v2.pptx

12 20100315 940pm ViaSem, LLC Mail - Follow-up.pdf

13 20100315 940pm ViaSem, LLC Mail - Follow-up.ViaSem Content.doc

✓ 14 20100315 1044pm ViaSem, LLC Mail - ViaSem - Ontological Semantics powerpoint for GMAX.pdf

✓ 15 20100315 1044pm ViaSem, LLC Mail - ViaSem - Ontological Semantics powerpoint for GMAX.ViaSem-Costs-rev.xlsx

✓ 16 20100317 ViaSem, LLC Mail - Meeting Follow-up.pdf

✓ 17 20100317 ViaSem, LLC Mail - Simmonet email for his paper request.pdf

✓ 18 20100317 ViaSem, LLC Mail - Tuesday Meeting.pdf

✓ 19 20100412 ViaSem, LLC Mail - Re_ Differentiator.pdf

✓ 20 20100418 ViaSem, LLC Mail - New draft.pdf

✓ 21 20100418 ViaSem, LLC Mail - What do you think of this, with a quote from you_.pdf

✓ 22 20100419 ViaSem, LLC Mail - Fwd_ COMMENTS ON COMMENTS.pdf

✓ 23 20100421 ViaSem, LLC Mail - Fwd_ Meeting TIme.pdf

✓ 24 20100428 723pm ViaSem, LLC Mail - Termination of NDA.pdf

✓ 25 20100304 Brian J Buck Mail - Agenda.pdf

26 20100306 Brian J Buck Mail - signed NDA.ATTACHMENTS.zip ←

✓ 27 20100306 Brian J Buck Mail - signed NDA.pdf

✓ 28 20100315 Brian J Buck Mail - GMAX Figures.pdf

✓ 29 JustinLondonGMAXSignedNDA3-5-10.pdf

✓ 30 TerminationOfNDA_JamesRegan_20100428.docx

✓ 31 TerminationOfNDA_JustinLondon_20100428.docx

✓ 32 TerminationOfNDA_MehulVyas_20100428.docx

✓33 ViaSem_Mutual_NDA_Vyasil.scanned.pdf

✓34 20100428 Brian J Buck Mail - The files.ATTACHMENTS.zip

✓35 20100428 Brian J Buck Mail - The files.pdf

✓36 20100525 Brian J Buck Mail - certification.ATTACHMENT.JPG

✓37 20100525 Brian J Buck Mail - certification.pdf

✓38 20100525 Brian J Buck Mail - gmax link issue.pdf

✓39 20100525 Brian J Buck Mail - Re_ Documents Removed.pdf

✓40 20100531 Brian J Buck Mail - Certification.pdf

✓41 20141002 540PM Brian J Buck Mail - Email and Document requested by Subpoena.ATTACHMENTS.zip

✓42 20141002 540PM Brian J Buck Mail - Email and Document requested by Subpoena.ATTACHMENTS.zip

✓43 20141002 540PM Brian J Buck Mail - Email and Document requested by Subpoena.pdf

✓44 20141002 1030PM Brian J Buck Mail - Email and Document requested by Subpoena.pdf

✓45 20141002 Brian J Buck Mail - Email and Document requested by Subpoena.ATTACHMENTS.zip

✓46 20100315 1044 ViaSem, LLC Mail - ViaSem - Ontological Semantics powerpoint for GMAX.Costs-rev.xlsx

✓47 20141002 Brian J Buck Mail - Email and Document requested by Subpoena.pdf

✓48 GMAX Resource Contract .pdf

✓49 Gmax_Application_srs.pdf

✓50 Gmax_os_srs.pdf

✓51 Sanjay Patel IM.pdf

52 GMAX Business Plan_v3.0.pdf- Technical Specification for GMAX Mobile Web, June, 2010.

http://whatis.techtarget.com/definition/ontology

**Appendix B: Other Documents Reviewed**

http://soda.swedish-ict.se/2401/1/SICS-T--2007-06--SE.pdf

Beyond Proof-of-Concept: Implementing Ontological Semantics as a Commercial Product Christian F. Hempelmann1 1 This paper reports on research in collaboration with several colleagues at hakia Inc. (1) and Purdue University (2): Victor Raskin (1, 2), Katrina E Triezenberg (1, 2), Chris Gates (1), Sean Harrigan (1), and Riza C. Berkan (1). hakia Inc. 39 Broadway New York, NY 10006 (found at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwi7zd6So9DOAhXDKCYKHQBJAwMQFggeMAA&url=http%3A%2F%2Fciteseerx.ist.psu.edu%2Fviewdoc%2Fdownload%3Frep%3Drep1%26type%3Dpdf%26doi%3D10.1.1.95.1311&usg=AFQjCNEbO9vnjTXe7bfv4psRUMWcE2ETRw)

http://ii.uni.wroc.pl/~lukstafi/pmwiki/uploads/AGI/OntoSem.pdf

http://thesai.org/Downloads/Volume6No1/Paper_16-An_Intelligent_Natural_Language_Conversational_System.pdf

http://www.vlingo.com

ONTOCOM: A reliable cost estimation method for ontology development projects, Elena Simperla, Tobias B¨urgerb, Simon Hanglc, Stephan W¨orgld, Igor Popove, Article in Journal of Web Semantics 16:1-16 · November 2012

http://www.speechtechmag.com/Articles/Editorial/Q-&-A/Dan-Roth-CEO-Voice-Signal-Technologies-31281.aspx

AI's Language Problem, Will Knight, **MIT Technology Review, August 9, 2016**

http://whatis.techtarget.com/definition/ontology

https://www.google.com/search?q=cost+to+develop+mobile+operating+system&oq=cost+to+develop+mobile+operating+system&aqs=chrome..69i57.6855j0j4&sourceid=chrome&ie=UTF-8#q=cost+to+develop+mobile+operating+system&start=20

http://whatis.techtarget.com/definition/ontology

http://www.speechtechmag.com/Articles/Editorial/Q-&-A/Dan-Roth-CEO-Voice-Signal-Technologies-31281.aspx

Appendix C: Resume of Jordan Cohen

**Jordan R. Cohen**

209A North 4th Avenue, Kure Beach, North Carolina 28449 **Phone:** 339-298-1008

**E-mail:** jordan@spelamode.com; www.spelamode.com

FUNCTIONAL SUMMARY

**Practical Applications of Technology**

- As independent SPELAMODE consultant
  - Co-founder of Semantic Machines, exploring machine learning in the space of intelligent assistants (November, 2014)
  - Named an expert witness in 5 cases
  - Created a research organization at Cisco and a support group for Audience
  - Solved speech recognition signal processing issues for Audience and Telenav.
  - Testified as expert witness for Vlingo (Nuance vs Vlingo, Boston, 2011),
  - Retained for Intellectual Property search and analysis by several firms
  - Serve as CTO of Kextil and as Chief Scientist of Speech Morphing
- As Principal Investigator for GALE at SRI
  - Applied speech and language technology to military applications ($12M annual budget with 14 sub-contractors).
  - Advised the SRI Commercialization Board speech technology applications to mobile devices.
- As CTO of Voice Signal

- Developed and managed intellectual property program, including patent production, pursuit, litigation, and strategy, which created more than 40 patents in 3 years.
- Co-authored 13 granted patents, several more pending.

- As a staff member at the Institute for Defense Analyses
  - Designed, funded, and co-chaired two summer workshops in the application of speech recognition techniques to realistic environments at CAIP/Rutgers in Summers, 1993 and 1994. (DARPA funded, 30 researchers for 6 weeks). Program continues annually at Johns Hopkins.
  - Developed Vocal Tract Length Normalization, now used in all major speech systems.
- While a staff member at IBM
  - Developed the first successful auditory front end for a large scale speech recognition system.

## Speech, Signals, and Algorithm Development in Department of Defense and related industries

- 24 years experience at NSA and IDA
  - Areas of expertise: Hillclimbing, Dynamic Programming, Signal Processing, Probabilistic Analysis, Speech and Language Technology
  - Two Letters of Commendation and NSA Special Achievement Award
  - Four awards for development and application of novel cryptanalytic techniques at IDA

## Corporate Advice and Governance

- Reviewed papers and proposals for DARPA, NSF, IEEE, Eurospeech, European Union Framework 6
- Serve on the Industrial Advisory Committee, IDIAP (Swiss Government Research Institute)
- Serve on the Industrial Advisory Board of Sensory, Santa Clara, CA
- Serve on the Technical Advisory Board, Center of Excellence in Human Language Technology, JHU
- Former consultant advisor to Yap (now part of Amazon), a speech recognition company in Charlotte, NC
- Past member of Board of Directors at the International Computer Science Institute, Berkeley, CA
- Served as advisor to CLSP (Center for Speech and Language Processing, JHU) and CAIP at Rutgers

EMPLOYMENT DETAILS

2014 - **Semantic Machines**
Title: VP Technology

- Co-founded Semantic Machines
- Created a patent portfolio
- Technical assistance for speech recognition and speech synthesis

2011 – **KEXTIL**
Title: Co-CTO

- Developed plans for using speech for field service interfaces
- Continuing to produce demonstrations and white papers

2009- **SPELAMODE** (SPEech, LAnguage, and MObile DEvices) **Consulting**, Kure Beach NC

Title: Founder and Technologist

- Designated Expert Witness in 5 cases
- With Patti Price, created a research organization for Cisco in Speech and Language Technology.
- Created robust signal processing solutions for Audience to enhance Speech Recognition performance.
- Resolved performance problems in Telenav speech processing systems.
- Participated in the design of the audio system for the RIM7 as a consultant for DASH
- Advised and managed Automatic Speech Recognition portion of a potential multi-million dollar proposal for Basis Technologies.
- Currently serving as Chief Scientist of Voice Morphing, a California start-up, and co-CTO of Kextil, engaged in voice-centric interfaces for the field service industry.
- Continuing with legal prior art and expert witness work for various customers in speech recognition and human interfaces, including successful defense against patent infringement in Nuance vs Vlingo in Boston, 2011.
- Co-CTO of Kextil, providing voice interfaces for the Field Services industry
- Co-founder of Semantic Machines in Boston, Massachusetts in 2014. Serve as Vice President and technical contributor.

2006-2009 **SRI International**, Menlo Park CA

Title: Senior Scientist

- Principal Investigator for GALE, Global Autonomous Language Exploitation, DARPA program.
- Created new business opportunities, including BALTIC, a virtual institute for language innovation which required negotiations with the staff of the House Armed Services Committee and various representatives.
- Technical Advisor to the STAR laboratory for speech and language processing.
- Advisor to the SRI Commercialization Board on embedded speech systems.
- Created new algorithms for machine translation.

2000 - 2006 **Voice Signal Technology**, Woburn MA

Title: Chief Technology Officer

- Recruited technical members of core technology team.
- Guided speech, language, and user interface technology and business development in cell phones and other mobile devices. Tracked emerging opportunities.
- Presented Voice Signal technology and marketing strategy at conferences and in popular articles.

1999 - 2000 **Dragon Systems**, Newton, MA

Title: Director of Business Relations

- Developed business opportunities in Audio Mining.
- Identified and negotiated government contracts, including $6M of research from DARPA.

1985 – 1999+ **Institute for Defense Analyses CCR**, Princeton NJ - continuing relationship as adjunct

Title: Member of the Technical Staff

- Developed novel signal processing and speech algorithms.
- Developed cryptanalytic techniques and applications.
- Assisted DARPA in bringing speech technology to use in government applications, including founding Summer Workshops in Speech Recognition (now JHU CLSP summer program in speech and language).

- Chair of Arpa workshop in Spoken Language Technology, Barton Creek, TX.
- Received four special awards for development and application of novel cryptanalytic techniques.

1982 - 1985 **International Business Machines**, Yorktown Heights NH
Title: Member of the Technical Staff

- Developed practical applications for discrete recognition.
- Wrote front end for TANGORA, the IBM Recognizer (auditory model)

1974 - 1982 **National Security Agency**, Fort Meade MD
Title: Research Engineer

- Developed novel statistical processes for signal analysis.
- Created new applications of mathematical search algorithms.
- Certified as Cryptanalytic Mathematician and Engineer.

1970-1974 US **Air Force**, Served at Chanute Air Force Base and at Fort Meade MD and at NSA (from 1971)
Final Rank: Captain

EDUCATION

| | | |
|---|---|---|
| 1975 - 1982 | University of Connecticut Storrs, CT | PhD, Linguistics (PhD Dissertation not-in-residence) |
| 1968 - 1970 | University of Illinois Urbana, IL | MSEE, Electrical Engineering |
| 1964 - 1968 | University of Massachusetts Amherst | BSEE, Electrical Engineering |

MEMBERSHIPS
Member, Acoustical Society of America
Member, ISCA
Senior Life Member, IEEE

CASES IN WHICH I WAS NAMED AS AN EXPERT:

f. Sorenson Communications and Caption Call in Civil Action No 3:14-CV-66-BBC. Wrote invalidity report for Sorenson/Caption Call. Settled by summary judgment.
I was deposed in this case.

g. Motorola Mobility vs Apple, Consolidated Cases 1:10-cv-23580-RNS and 1:12-cv-20271-RNS. Wrote and submitted invalidity report for Apple. Settled.

h. Schwarts, et al. v. The Village Center Community Development District, et al. Case 5:12-CV0177-MMH-TBS. This is a suit under the American Disabilities Act, and I am defending Village Center et al. The initial expert report has been written and submitted to the court.

i. Allvoice Developments US, LLC v. Microsoft Corp., Case 2:10-cv-02102-RAJ – Settled by Summary Judgment of Non-Infringement. 2010 – 2013.

I wrote the invalidity report on behalf of Microsoft, and it was delivered to the court prior to the summary judgment. I was deposed in this case.

j. Nuance Communications, Inc v. Vlingo Corp, Case 09-11414-RWZ – settled by jury trial. I wrote both the non-infringement and invalidity reports, and testified during trial on the behalf of Vlingo. The jury found Vlingo not guilty of infringement on all 30 counts by unanimous decision. I was deposed in this case.

k. Nuance Communications Inc. v. Voice Signal Technologies, Inc, Case 1:07-CV-10363. 1994 – 1996. I was deposed as the CTO of Voice Signal in this case. The case was dismissed when Nuance bought Voice Signal. I was deposed in this case.

REFEREED PUBLICATIONS

H. Hermansky, J. R. Cohen, and R. M. Stern, "Perceptual Properties of Current Speech Recognition Technology", Proceedings of the IEEE, September, 2013, Vol 101 No 9, p. 1968.

M Gilbert, A Acero, J Cohen, H Bourlard, SF Chang, M Etoh, "Media Search in Mobile Devices", Signal Processing Magazine, IEEE 28 (4), 2011, 12-13

B Erol, J Cohen, M Etoh, HW Hon, J Luo, J Schalkwyk, "Mobile media search",ICASSP, 2009, 9, 4897-4900

J Wilpon, ME Gilbert, J Cohen, " The Business of Speech Technologies", Springer Handbook of Speech Processing, 2008, p. 681-704

M Harper, A Acero, S Bangalore, J Carbonell, J Cohen, B Cuthill, C Espy... Report on the NSF-sponsored Human Language Technology Workshop on Industrial Centers , 2007/6/22, pdf available from umd.edu

Jordan Cohen[1], Terri Kamm[2], and Andreas G. Andreou, "Vocal tract normalization in speech recognition: Compensating for systematic speaker variability", J. Acoust. Soc. Am. Volume 97, Issue 5, pp. 3246-3247 (1995)

J. Cohen, J Flanagan, "A Welcome to the Special Edition on Robust Speech Recognition, A Summer workshop - 1993", IEEE Trans on Speech and Audio Processing, 2, 4, 551-553.

J. Cohen, "Application of an auditory model to speech recognition", JASA, 85, June 1989

J. Cohen, "Segmenting speech using dynamic programming", JASA, 69, 1980

J. Cohen, T. Crystal, A. House and E. Neuburg, "Weighty voices and shaky evidence", JASA, 68, 1980

**Many popular short articles and presentations**
**More than 20 Classified Publications**
**Co-author of more than 13 Patents granted**
**Clearance: TSSI**

PATENTS:

| | |
|---|---|
| 8,019,324<br>September 13, 2011 | Extendable voice commands<br>Roth; Daniel L., Reiner; Chris, Furnari; Mark, Cohen; Jordan |
| 7,873,390<br>January 18, 2011 | Provider-activated software for mobile communication devices<br>Cohen; Jordan, Roth; Daniel L. |
| 7,809,574<br>October 5, 2010 | Word recognition using choice lists<br>Roth; Daniel L., Cohen; Jordan R., Johnston; David F. , Porter; Edward W. |
| 7,797,157<br>September 14, 2010 | Automatic speech recognition channel normalization based on measured statistics from initial portions of speech utterances<br>Zlokarnik; Igor, Gillick; Laurence S., Cohen; Jordan |
| 7,716,058<br>May 11, 2010 | Speech recognition using automatic recognition turn off<br>Roth; Daniel L., Cohen; Jordan R., Johnston; David F. |
| 7,634,403<br>December 15, 2009 | Word recognition using word transformation commands<br>Roth; Daniel L., Cohen; Jordan R., Johnston; David F. |
| 7,577,569<br>August 18, 2009 | Combined speech recognition and text-to-speech generation<br>Roth; Daniel L., Cohen; Jordan R., Johnston; David F., Grabherr; Manfred G., Porter; Edward W. |
| 7,562,019<br>July 14, 2009 | Automated testing of voice recognition software<br>Cohen; Jordan, Barton; William, Ploumis; John, Ely; Douglas J. |
| 7,526,431<br>April 28, 2009 | Speech recognition using ambiguous or phone key spelling and/or filtering<br>Roth; Daniel L., Cohen; Jordan R., Johnston; David F. |
| 7,505,911<br>March 17, 2009 | Combined speech recognition and sound recording<br>Roth; Daniel L., Cohen; Jordan R., Johnston; David F., Porter; Edward W. |
| 7,444,286<br>October 28, 2008 | Speech recognition using re-utterance recognition<br>Roth; Daniel L., Cohen; Jordan R. |
| 7,313,526 | Speech recognition using selectable recognition modes |

| | |
|---|---|
| December 25, 2007 | Roth; Daniel L., Cohen; Jordan R., Johnston; David F., Grabherr; Manfred G. |
| 7,225,130 | Methods, systems, and programming for performing speech recognition |
| May 29, 200 | Roth; Daniel L., Cohen; Jordan R., Johnston; David F., Grabherr; Manfred G. |
| 8,880,396 | Spectrum reconstruction for automatic speech recognition |
| Nov 4, 2014 | Cohen: Jordan, Laroche:Jean |

SELECTED INFORMAL PRESENTATIONS AND ARTICLES

"Simple Speech Morphing: A Story" presented to the Boston chapter of AVIOS and Brandeis University, October 17, 2013.

"OUCH (Outing Unfortunate Characteristics of HiddenMarkovModels) or What's Wrong with Speech Recognition and What Can We Do About it?", Johns Hopkins University, Sep 14, 2012 (see http://www.clsp.jhu.edu/seminars/1335/)

"Embedded speech recognition applications in mobile phones: Status, trends and challenges", in Proceedings of the International Conference on Acoustic Speech and Signal Processing 2008, April, 2008, p. 5352 – 5355

"The GALE Project: a description and an update", in Proceedings of the IEEE Workshop on Automatic Speech Recognition and Understanding, 9-13 December, 2007

"The summers of our discontent." *Proceedings of the International Conference on Spoken Language Processing*. 1996.

"Handheld Multimodal Interfaces Technology, Markets, and Opportunities" Johns Hopkins, Baltimore, 2005

"Is Embedded Speech Recognition Disruptive Technology?" in Information Quarterly, Volume 3, Number 5, 2004, p. 14-17

"Practical Manipulation of Local Data – An Update", At Wireless Internet Data and Enterprise Applications, UCLA, Los Angeles, CA, September 2003

"Putting Speech Technologies in your Hands", LangTech 2003, Paris, 24-5 November 2003

"Voice Signal Overview: The Case for Embedded Speech Recognition", VOX 2002, Kelsey Group, San Francisco, CA (July, 2002)

"Speech recognition in the real world: An Embedded Viewpoint" Center for Language and Speech Processing Workshop at Johns Hopkins, July 26, 2001

"Some musings on systematic variability and speech recognition", J. Acoust. Soc. Am. Volume 105, Issue 2, pp. 1158-1158 (1999)

"The Challenge of Spoken Language Systems: Research Directions for the Nineties", Co-author, IEEE Transactions on Speech and Audio Processing, Vol 3, No. 1 1-20 Jan 1995.

"The hub and spoke paradigm for CSR evaluation" (co-author), Proceedings of the 1994 Human Language Technology Workshop, Plainsboro, NJ, March, 1994

"Robust speech processing", Jordan Cohen, Chair "The Summers of our Discontent", a talk In Speech and Natural Language: Proceedings of a Workshop Held at Harriman, New York, February 23-26, 1992

"A Pitch measurement algorithm for speech" Acoustics, Speech, and Signal Processing, IEEE International Conference on ICASSP '82.

# EXHIBIT C

# Expert opinion on GMAX Questions

Deborah Dahl, Ph.D.
September 11, 2016


1 Questions to be addressed ..... 2

1.1 What would the likely cost estimate to develop GMAX today be, both the application and mobile operating system? ..... 2

1.2 What would the likely value of the GMAX technology be worth if it had been developed according to the specifications? ..... 2

1.3 A critical analysis and assessment of the technical specifications produced by Vyasil ..... 2

1.4 An opinion as to whether ontological semantics was necessary to extract meaning as opposed to use statistical machine learning. ..... 2

2 Statement of Opinions ..... 2

2.1 Background: Description of GMAX ..... 2

2.2 Background: Spoken Dialog Systems ..... 3

2.3 Background: State of the speech industry 2009-2010 ..... 4

3 Cost estimate to develop GMAX today ..... 5

3.1 Cost to develop a mobile operating system ..... 5

3.2 Cost to develop the GMAX application today ..... 6

3.3 The type of resources required to develop the application ..... 6

3.4 Note on Organizational structure: ..... 9

3.5 How many companies have the expertise to develop the technology? ..... 9

4 Likely value of the GMAX technology ..... 10

5 Assessment of the technical specifications produced by Vyasil ..... 10

5.1 Exhibit D: Technical specification ..... 10

5.2 Exhibit E: GMAX Mobile Web Resource Management (June 2010) ..... 11

6 Necessity of using ontological semantics for extracting meaning ..... 12

7 Summary ..... 13

8 Exhibits ..... 13

9 Qualifications ..... 13

9.1 Experience ..... 13

9.2 Education ..... 14

9.3 List of all publications authored in the previous 10 years ..... 14

9.4 Other cases in which, during the previous 4 years, the witness testified as an expert at




EXHIBIT NO. 1
3/1/16
A. M. Mitchell

trial or by deposition ..... 15
10 Compensation ..... 15
11 References ..... 15

# 1 Questions to be addressed

1.1 What would the likely cost estimate to develop GMAX today be, both the application and mobile operating system?

1.1.1 The type of resources which would be required to develop it.
1.1.2 How many companies have the expertise to develop technology?

1.2 What would the likely value of the GMAX technology be worth if it had been developed according to the specifications?

1.3 A critical analysis and assessment of the technical specifications produced by Vyasil

1.3.1 An opinion as to whether the specifications were a cut and paste job from third party sources or represented independent thought.

1.4 An opinion as to whether ontological semantics was necessary to extract meaning as opposed to use statistical machine learning.

# 2 Statement of Opinions

## 2.1 Background: Description of GMAX

Based on my review of the GMAX business plan, the requirements document and the technical specification, GMAX was envisioned as an intelligent conversational assistant for mobile devices. It was to be similar in concept to current (2016) systems such as Apple Siri, Google now, Microsoft Cortana, Sound Hound Houndify, artificial solutions, API.AI assistant, Anboto Sherpa, artificial solutions, PandoraBots, Mind Meld, Cluzee, for example. To quote from the business plan [Exhibit A].

*"Using voice recognition software, voice commands and queries are translated into data used in natural language and ontological semantic processing and voice results provided to the users The system is intended to be the first "intelligent" application that can interact with users by responding to commands, asking questions to users, giving answers to users, accepting queries and questions from users."*

The GMAX system was designed to accept free-form spoken, natural language, inputs from

users using a mobile device, and to get information in a wide variety of domains and present it back to the user in spoken and graphical form. In addition, according to the requirements [Exhibit B] the capability to control the mobile device functions almost entirely by speech was also envisioned.

### 2.2 Background: Spoken Dialog Systems

As an intelligent conversational assistant, GMAX was intended to be a type of *spoken dialog system* (https://en.wikipedia.org/wiki/Spoken_dialog_systems ), where users and systems interact through speech using natural language.

Providing the functionality of a spoken language dialogue system requires the integration of a number of technologies including speech recognition, natural language understanding, dialogue management and text-to-speech. In addition, in order to provide information of the planned GMAX functions, the spoken dialogue system envisioned in GMAX would need to be integrated with device functionalities and applications (email, text messaging, camera, speaker, GPS, telephony functions, and microphone, for example). Finally, in order to provide information about local restaurants, stock quotes, news, sports, the spoken dialogue system needs to be integrated with external information resources found on the Internet which make this information available.

Research has been conducted in spoken dialog systems for many years; for example, the early DARPA speech understanding project [2] mentioned above, and a later DARPA-sponsored effort beginning in 1989, described in [3]. More recent research systems include MIT Jupiter [4], the University of Rochester TRIPS [5, 6] and others. GMAX differs from these systems in that it was intended to be a commercial product, while the DARPA programs were intended to promote research. Commercial spoken language systems began to be developed in the mid to late 1990's [7, 8], and were (and continue to be) primarily applied to customer service applications. They are now in widespread use.

#### 2.2.1 The GMAX System compared to traditional commercial systems

Commercial systems like GMAX are in general simpler than research systems in terms of the sophistication of the dialogs they are able to conduct because commercial systems need to be much more reliable and robust than research systems, they must accommodate many more users and they need to be much more thoroughly tested. Thus, the proposed GMAX system must be compared to other commercial systems, rather than research systems.

Commercial spoken dialog systems, began to appear in the late 1990's. (See [8, 9] for descriptions of these early systems). The GMAX system differs from traditional commercial spoken dialog systems in several respects, all of which increase the complexity and technical risk of development.

1. Traditional systems focus on very narrow application domains, such as stock trading, banking or travel reservations. GMAX was planned to cover a much wider set of domains. Adding domains to a system increases the complexity of the system significantly because (1) it introduces the problem of *domain disambiguation*, or figuring out which domain the user is talking about and (2) each domain must be developed individually. Moreover, support for multiple domains dramatically increases the size of the vocabulary that a speech recognizer must be able to interpret, with the consequence of decreasing recognition accuracy, which increases the need for error handling.

2. Similarly, traditional systems typically are connected to only one back-end server, such as a banking database, while GMAX was intended to connect to many applications. This also significantly increases the complexity of the planned GMAX system, since the back-end integration process has to be repeated for each application.
3. Traditional systems use a *system-initiated* dialog style, where the system asks questions of the user, and the user does not have the opportunity to initiate a topic. In contrast, GMAX had a goal of supporting a *mixed-initiative* dialog style [10], where both the system and the user can initiate a dialog. This introduces complexity into the architecture because it requires the system to be able to decide when to initiate an interaction, to keep track of the dialog state when the user interrupts the system, and to be prepared to return to an earlier state of the dialog. This functionality is still very limited in commercial systems.
4. Traditional systems run on large servers and are accessed over the telephone, while GMAX was to run on a mobile device. Memory and CPU limitations are important considerations for applications that run on mobile devices, especially the mobile devices of 2009.
5. Traditional systems, since they are largely telephone-based, do not support control of a device by voice, a planned feature for GMAX. This feature is complicated by the fact that an application needs to have permission from all the planned devices (or ultimately by the manufacturers of the devices) to control them. Obtaining this permission from device manufacturers like Apple can be extremely time-consuming and complex. This is a a technical problem as well as an obvious business. The technical problem may be less obvious, but an application such as GMAX would need to be of very high quality (in terms of functionality, robustness, and usability) in order for the manufacturer to give GMAX permission to control the device, in order to protect the manufacturer's brand.
6. Since traditional systems are voice-only, they do not include components such as face recognition, which was proposed for GMAX. Face recognition software was not available commercially in 2009. As a consequence, this capability would have to have been either omitted from the eventual GMAX product, or the GMAX team would have had to engage in extensive R&D involving very specialized researchers, without being certain of success.

For all of these reasons, the GMAX application as envisioned would have been technically very difficult to achieve in in 2009. Even removing some of the more difficult requirements, such as face recognition) it would have been extremely complex, ambitious and risky, and would have taken much longer than the approximately one year time frame planned for GMAX [Exhibit A]. It would have been necessary to recruit a large team of very highly specialized, highly paid, engineers and scientists. The CALO team which developed much of the technology behind Siri (see below) was an example of such a team, including team members from 22 organizations (http://www.ai.sri.com/project/CALO ).

## 2.3 Background: State of the speech industry 2009-2010

Around 2007, development began on a new type of spoken language system, a *virtual assistant*, with goals very similar to those of GMAX. The DARPA CALO project [11] was one of the earliest efforts at developing software that could act as a helpful personal assistant and that users

could interact with using spoken natural language.
At the time of the initiation of the GMAX work (2010) several personal assistants similar to the GMAX concept were in development. Siri [12], based on the DARPA CALO project [11] has been the most successful, but other systems with similar functionality have been developed as well. Microsoft Cortana development began in 2009 [13]. Some less well-known examples include Anboto [12], VoiceBox (which began in 2002) [14], NewINTERACTIONS, Inc. (which began in 2007 [15], Artificial Solutions, and ejTalk (which began in 2001) [16]. Clearly, the goals of GMAX were under discussion at a number of companies and organizations in the 2009-2010 timeframe, and even well before, if you consider visionary ideas such as the 1987 Apple Knowledge Navigator [1]. However, the value of any of these efforts depends on how well these goals are achieved. In order to develop a product with the features of GMAX, very specialized engineering resources are required, as discussed below. In the documentation with which I was provided, I do not see any evidence that Vyasil had access to any of these resources, or, in fact, showed any awareness of the need for them.

# 3 Cost estimate to develop GMAX today

Developing a system like GMAX today would be less costly than developing it in 2007 because there have been many significant improvements in the underlying technology.
We can divide these costs into (1) the cost to develop the proposed mobile operating system and (2) the cost to develop the proposed GMAX application

## 3.1 Cost to develop a mobile operating system

I do not have specific expertise in developing mobile operating systems, but based on my knowledge of general software development, I believe mobile operating system development is expensive and difficult due to many factors. Some of these factors include: the complexity of integration with the telephone network, including regulatory requirements, security considerations, and the complexity of integration with hardware. It is worth noting that organizations with many resources such as Mozilla and Microsoft are finding it extremely difficult to gain market share [17] or have abandoned their efforts to build mobile operating systems [18]. Another point to note is that the Google Android operating system has been under development since 2003 [19] and Google is still releasing new versions, after 13 years of development. Similarly, the Apple iOS operating system, released in 2007 [20], would have been under development for at least a few years before that, and Apple also is still releasing new versions. So, in neither case of these two popular mobile operating systems does the vendor consider the mobile operating system to be complete. Based on my experience in software project management, it is possible to very roughly estimate that this effort would require at a minimum a 30 person team of engineers working for at least three years to develop a minimal viable product (MVP). Thus, the engineering cost alone of development of a functioning mobile operating system is estimated to be in the neighborhood of $10-15 million up to the point of a released product, followed by many years of ongoing maintenance and improvements, with at least half of the original staffing level. This assumes an average annual salary of $100,000 [21] of the original engineers, with 50% overhead, without taking into account any costs associated with sales, licensing or marketing. Sales and marketing costs can be estimated to be about double the cost of engineering (http://tomtunguz.com/saas-spend-allocation-benchmarks/), to bring the total cost over three years of bringing a MVP product to market to $60M, with a continuing

annual budget of $10M. Whether a minimal product could effectively compete in today's mobile operating system is problematic. Apple and Google are continually releasing updates with more and more advanced features, and a new mobile operating system would have to be able to keep up.

## 3.2 Cost to develop the GMAX application today

These estimates assume that the goal of GMAX application development is to develop a Minimal Viable Product (MVP); that is, a product with sufficient features that it can be offered to customers. It does not have to include all the ultimate envisioned capabilities. For the purposes of this estimate, we assume that the MVP of GMAX only covers the English language and only includes one application.

The GMAX application includes a standard spoken dialog system as well as interfaces to device functions and external web functions via API's.

## 3.3 The type of resources required to develop the application

A project like the GMAX application as envisioned would require highly specialized expertise in artificial intelligence, in particular, natural language understanding, ontologies, dialog processing and speech recognition. At the time it was conceived, it would have required a non-trivial amount of applied research to produce. In fact, this research would still be the case if the product were to be developed in 2016 for several of the GMAX product's key features

### 3.3.1 Architecture

#### *3.3.1.1 Spoken Dialog System*

Assuming a typical spoken dialog system architecture, the spoken dialogue system will contain components for:

1. Speech recognition
2. Natural language understanding
3. Dialog management
4. knowledge and reasoning, including ontologies for both general world knowledge and domain specific knowledge
5. natural language generation
6. text to speech

Items 1, 3, 5, and 6 can be achieved to a satisfactory extent with current technologies; thus they would not require additional R&D investment. The state of the art for items 3 and 4 is much less mature, so a system incorporating those technologies would probably also require some additional R&D. To some extent, reduction in functionality can be achieved in these areas to make the technical development more achievable; however, that would compromise the overall capabilities of the system. Deciding how to balance these concerns would require a very careful analysis involving the tradeoffs between cost and functionality. Both engineering and marketing judgement would be required.

#### *3.3.1.2 Other AI technologies*

Other technologies would also be needed for the GMAX application as envisioned.

7. Face recognition
8. Emotion recognition from face

Face recognition and emotion recognition from faces are existing but fairly experimental

technologies. Developing these from scratch or from open source resources would be technically complex.

#### *3.3.1.3 External functions proposed in Exhibit A include:*

Additional application functions outside of the spoken dialog system or the other AI technologies include:

1. device control (telephony, camera, messaging)
2. jokes
3. web search
4. movies
5. local business search

#### *3.3.1.4 Ability for 3rd parties to develop applications*

This is surprisingly difficult and no one has fully achieved it. The closest anyone has come to achieving it is Amazon, with the Alexa Skills Kit. Apple, Microsoft and Google have software development kits (SDK's) but we have yet to see widespread instances of applications using these development tools. This task would involve both designing the programmatic interfaces to the GMAX application itself as well as SDK's for all of the planned devices as well as a generic SDK for HTML applications.

### 3.3.2 Team

Each of these components must be developed by one or more specialists in the particular areas of expertise. In addition, spoken dialog system components 1, 2, 5 and 6 are language specific, so a new development effort for each of these components is required for each new language. While the development effort for a new language does not require complete development from scratch, it is a significant effort particularly with statistically trained systems that require annotated training data. For the purposes of this estimate we will only estimate the effort for one language, English, as specified in the technical requirements document [Exhibit B] as the first language.
In comparison with systems that have similar goals, such as Microsoft Cortana, we can note that the Cortana development took at least five years (2009-3014) [13].

#### *3.3.2.1 Development resources*

##### 3.3.2.1.1 Spoken Dialog System

**Speech recognition:**
The business plan proposes to use Hierarchical Language Models for speech recognition to improve accuracy. This rules out off-the-shelf speech technology, and necessitates a speech recognition development effort. For this, I believe at least 3 speech recognition engineers would be required to implement the speech recognition component. Reported Glassdoor salary ranges for speech engineers begin at $97,000 [22].
**Natural Language Understanding**
Three computational linguists would be required.
Computational linguist salaries are currently around $92,000 [23].
**Dialog Management:**
This component could be implemented by two AI engineers with an $80K salary.
https://www.glassdoor.com/Salaries/artificial-intelligence-salary-SRCH_KO0,23.htm or by a computational linguist
**Ontology Engineer:**

One ontology engineer would be required.
https://www.glassdoor.com/Salaries/ontology-engineer-salary-SRCH_KO0,17.htm $74K
**Natural language generation:**
One computational linguist would be required.
Text to speech
One speech engineer would be required.

3.3.2.1.2 Other technical team members:
Other AI:
Machine vision and emotion recognition.

3.3.2.1.3 Mobile developers:
The project needs at least two mobile developers per platform. Assuming that the intended devices are iOS and Android, four mobile developers are required. The salaries for senior mobile developers are around $105,000 http://www.indeed.com/salary/q-Mobile-Application-Developer-l-United-States.html

*3.3.2.1.3.1 External Function Developers*
Each external function (for example, getting movie reviews) would take a minimum of an estimated 4 person/months to develop, and the developer would not need special AI skills. Developers could be back-end server-side developers, with an average salary of about $100,000 [24].
Information Technology staff: These are staff who support the computer systems that underlie the technical work of the developers. In addition, they maintain the customer-facing website. The project requires 3 IT staff at $45,000
http://www.payscale.com/research/US/Job=Information_Technology_(IT)_Support_Specialist/Salary

*3.3.2.1.3.2 User interface and testing*
UI design: 1 required at $105,000 (http://www.indeed.com/salary/Ui-Designer.html)
System Testing: GMAX would require a great deal of testing because of its large number of functions and different mobile platforms. 4 required at $75,000.
(https://www.glassdoor.com/Salaries/mobile-test-engineer-salary-SRCH_KO0,20.htm)
Usability test: 2 required at $80,000/year. This is very important for a product where the user interface is as novel as that of GMAX.

3.3.2.1.4 Non-technical team members
Engineers comprise a minority of the resources required for building a viable business. Many non-technical positions are required.
Project Manager: $83,000
http://www.payscale.com/research/US/Job=Project_Manager,_Software_Development/Salary
Marketing: 2 at $84,000 (http://www.indeed.com/salary/q-Startup-Marketing-Manager-l-New-York,-NY.html)
Human Resources: 3 human resources specialists are required for such tasks as recruiting and benefits management. The average salary is $59,619
https://www.glassdoor.com/Salaries/human-resources-salary-SRCH_KO0,15.htm

#### 3.3.2.1.5 Executives

CEO: 1 at $150,000 http://www.businessinsider.com/salaries-startup-founders-pay-themselves-2014-4

CTO: This is very important in a company that utilizes so many complex technologies. 1 at $150,000 http://www.payscale.com/research/US/Job=Chief_Technology_Officer_(CTO)/Salary

.

#### 3.3.2.1.6 Overhead

Overhead is estimated to be 2.7 times base salary (http://web.mit.edu/e-club/hadzima/how-much-does-an-employee-cost.html)

#### 3.3.2.1.7 Non-staff costs

Facilities rental for 36 employees needs to be taken into account, but this is difficult to estimate because the cost of facilities varies widely among geographic locations.

Licenses: Many of the backend functions will require data licenses. We can conservatively estimate $1,000/month for these costs.

Other costs such as costs for workstation, servers, furniture, electricity, and travel, would need to be taken into account in an actual business plan, but the largest cost will be in salaries.

#### 3.3.2.1.8 Total Cost

Considering the factors discussed above, I estimate the total cost of developing a GMAX style application today at about $35M. See Exhibit I 2016 Cost Estimate, for details.

## 3.4 Note on Organizational structure:

Note that these costs are based on the development effort if the company developing the product is a startup. If the company is structured in some other way, for example as a contract to an existing company, the costs to the contractor will probably be comparable because the contractor needs to cover its costs. In addition, the contracting company will need to make a profit in addition to recovering its costs. We can assume a minimum 10-15% markup to the total cost if the work is contracted.

## 3.5 How many companies have the expertise to develop the technology?

Development of this product would require significant input from experienced researchers, including researchers with advanced degrees in computer science, linguistics, and artificial intelligence; that is, it would not be realistic for a general software development organization to complete this task.

Very few companies could develop this product today entirely with internal resources. It is more likely that it would have to be developed by a prime contractor which would act as a system integrator. For example, the DARPA CALO project which resulted in SIRI required the participation of more than 20 organizations [11].

1. System integrators with expertise in this area and with the ability to coordinate subcontractors include IBM, BBN, SRI, SAIC, Mitre, AT&T, and DFKI.
2. Other companies with the capability to develop some of the components of the application who could act as subcontractors include ejTalk, CMU, Sensory, and api.ai.
3. There are several companies developing similar applications which would have the expertise but probably not the motivation to develop the technology as a contractor to a

competitor. These include: VoiceBox, Semantic Machines, SoundHound, Microsoft, Apple, Google, Nuance, Facebook and Viv.

# 4 Likely value of the GMAX technology

The only point of comparison we have for the value of the GMAX technology is the estimated price that Apple paid for Siri, a similar technology, which was $200M. There is no reference for a product exactly like GMAX but Siri is roughly comparable. Had the project resulted in a general conversational personal assistant, it would probably have been worth $200M, the price estimated to have been paid for Siri by Apple (https://techcrunch.com/2010/04/28/apple-siri-200-million/)

We can note an additional point.

1. The technology would very likely have found a buyer at some price. Not only was Siri sold, but similar companies such as Cognition Technologies have been purchased recently as well

https://web.archive.org/web/20140816183425/http://cognition.com/). Cognition Technologies was purchased by Nuance in 2013 for an undisclosed amount.

# 5 Assessment of the technical specifications produced by Vyasil

## 5.1 Exhibit ~~D~~ E: Technical specification

This document is not a technical specification. A technical specification is a document that could be provided to developers which would include sufficient information for an implementation. A technical specification would include an overall system diagram delineating the system components and their functionalities, a description of the interfaces between components, and the communications between the components. This document is no more than a description of various technologies that would be used in the system. There is no overall system diagram, no description of interfaces, only a list of technologies. It appears that the authors of the document simply prepared a technical survey of the technologies that were planned to be used, similar to a literature survey that might be written as part of a student project.

### 5.1.1 Section 7 Biometric Technology

This section discusses different forms of biometric technology, including fingerprint recognition, face recognition and speaker recognition. It begins with a review of the different forms of biometric technology available at that time. Section 7.0 "Application Implementation" does not describe an implementation, but rather describes how the user would interact with it, and then describes an algorithm for face recognition. This is not sufficient for an implementation.

### 5.1.2 Section 12 Speech Recognition

This section is about speech recognition, a critical technology for the success of GMAX. It begins by describing what speech recognition is. To quote "Voice Recognition is an alternative to typing on mobile keypad. The user can simply talk to the mobile and your words appear on the

mobile screen. That is, it's an ability of a mobile to get the voice input, identify the words and phrases in a spoken language and convert them into mobile-recognizable format using algorithms and artificial intelligence to get the results." (p. 548). Following the description of what speech recognition is, the document describes a number of different types of speech recognition (pp. 549-551). A list of companies in the speech recognition space follows (pp. 551-552). Speech recognition is defined again and the stages of speech recognition are described (pp. 552-555). Different types of speech recognition and issues such as vocabulary size are then described (pp. 555-557) and possible solutions such as grammars and statistical models, acoustic models and HMM's are described in great detail (pp. 557-675), in a fashion that might be expected in an introductory book on speech recognition. In fact, some of the exact wording in this discussion appears to have been taken from the 1997 book *Survey of the State of the Art in Human Language Technologies* [25], indicating that the wording was plagiarized from this well-known book on human language technologies.There is no discussion of how these technologies would be applied in GMAX, which would be necessary in a proper technical specification.

## 5.2 Exhibit ~~E~~ F: GMAX Mobile Web Resource Management (June 2010)

It appears that the purpose of this document is to describe the resources that will be used in the development of the GMAX product. This is the only document provided to me seems to be presented as any kind of a project plan, but it is not adequate for that purpose. This plan is not sufficient for even a routine software development project to succeed, much less a complex, cutting edge, and technically difficult project such as GMAX. Looking more closely at the document, we can consider it section by section.

Pages 1-5 describe a general approach to software project management that will be used in the project. There is nothing specific here about the GMAX project. This appears to be Vyasil company boilerplate and does not give any evidence of GMAX-specific effort.

Section III "GMAX Application resources requirement" and Section IV "OS Development Resource Requirements" list a set of very generic software project resources ("developer", "tester", etc.), which again are not specific to the GMAX project. The GMAX application in particular requires very specialized resources, as described above, such as "natural language processing engineer", "speech recognition engineer", and "artificial intelligence engineer". None of these specialties are listed. Section III simply lists 30 "developers". Moreover, the organization chart shown in Section II "OS and Application Development Resources hierarchy" is not consistent with the list of resources listed in Section III. For example, Section III does not include a "Project Coodinator", "Engineering Manager" or "Project Leads". Three "Project Managers" are listed in Section III, but only one is listed in Section IV. This discrepancy is not explained. It is also not explained why the application development requires three project managers, but the larger OS development project only requires one project manager. Normal practice would have only one project manager, since projects need to have one person with the final responsibility for the overall project. In addition, on projects of this size the developers would be normally be divided into multiple teams with distinct responsibilities. The fact that this was not done suggests that the team which prepared the document was not making a good faith effort to plan a realistic project.

Section V "Project Timeline" shows a high level schedule for the major tasks of an approximately 14 month project. There are some anomalies in the schedule which are inconsistent with a typical software project. Most notably, it is normal for requirements analysis

to precede technical specifications; however, in this case the schedules for both tasks overlap, with the technical specification work largely preceding the requirements. This would indicate that the technical specification was prepared without reference to the requirements. In other words, the technical specification of the product was prepared without reference to what the project needed to accomplish. This would greatly reduce the probability of success. It is also to be noted that the development tasks timelines cover the work of 75 developers over a 261 day period without any subtasks or milestones. Remarkably, both the duration and schedule for both development tasks (OS Development and Application Development) are exactly the same. This is extremely unlikely in any realistic project planning and is strong evidence that neither task was thought through before this chart was prepared. Finally, there is no time budgeted for system integration between the application and OS. This system integration would have been rather complex because the organization would have had no experience integrating something like the GMAX application with an operating system.

Section VI "Budget Details" is missing subtotals for the budget to be spent on all the different resource types. This makes it difficult to evaluate the cost realism of the budget and also suggests that the overall totals presented were not based on the actual cost of the resources but were just a guess.

# 6 Necessity of using ontological semantics for extracting meaning

Extracting meaning from text is the central task of natural language understanding and has been accomplished with numerous methods over the many decades of research and commercial development of this technology (for example, see the research published in journals such as *Computational Linguistics*, *Computer Speech and Language* and *Natural Language Engineering*). Raskin and Nirenburg's Ontological Semantics [26] is only one of many approaches. Rule-based syntactic parsing and semantic analysis [27, 28], rule-based semantic parsing [29], hybrid rule-based and machine learning approaches and pure machine learning approaches have all been used for this task. Ontological Semantics is by no means the only possible approach.

Moreover, Nirenburg and Raskin's approach does not seem to have gained any traction in the research community -- it has been cited by few if any other researchers in the field. In addition, there do not seem to be any descriptions of working systems based on this approach in the technical literature, despite the fact that it was initially published in 2004, which would have given developers twelve years to use it in developing working systems. The fact that there are no known working systems based on Ontological Semantics is an indication that it has not been successful in appealing to developers and researchers.

"Ontological semantics" can also be used in a generic sense, in which case it simply means that ontologies, or hierarchical structures representing the relationships among concepts, are used in the process of extracting meaning from texts. Many natural language processing systems make use of ontologies in semantic processing, so Ontological Semantics is not at all unique in this respect. Some examples of natural language understanding systems using ontologies include [30-34].

It is the case that the GMAX application would certainly require natural language processing in some form, because the application is intended to be able to understand free-form user input in

natural language. However, Nirenburg and Raskin's Ontological Semantics is by no means the only approach to semantic analysis in natural language understanding. Other well-established options would include systems where the semantics is extracted as part of the speech recognition process [29], frame semantics [35] or first order logic [36]. Various types of machine learning approaches can also be used [37, 38], either in combination with the rule-based approaches, or by themselves.

# 7 Summary

In summary, based on my review of the documents provided to me, Vyasil was not capable of developing the GMAX system. The documents did not demonstrate (1) an understanding of the problem (2) recognition of the resources required or (3) the requisite know-how to implement a system of this complexity. The technical description of at least one critical component (speech recognition) appeared to be plagiarized from the existing technical literature. Moreover, Exhibit E (Technical Specifications for GMAX Mobile Web) and Exhibit F (GMAX Mobile Web Resource Management) the technical description of the proposed system and the project plan for implementing the system respectively, do not demonstrate even a rudimentary understanding of the principles of general software architecture or technical project planning. This lack of understanding of the software development process is consistent with either an inability to perform on any complex software project, or an explicit intention not to attempt to implement the GMAX system, or both.

# 8 Exhibits

Exhibit A: GMAX Business Plan
Exhibit B: GMAX Requirements
Exhibit C: GMAX Operating System Software Requirements Specification (undated)
Exhibit D: GMAX Application Software Requirements Specification (June 14, 2010)
Exhibit E: Technical Specifications for GMAX Mobile Web (June 2010)
Exhibit F: GMAX Mobile Web Resource Management (June 2010)
Exhibit G: Powerpoint description of Ontological Semantics
Exhibit H: GMAX Investor Presentation updated (undated)
Exhibit I: Cost Estimates

# 9 Qualifications

## 9.1 Experience

I have worked in the area of natural language understanding by computers for over 30 years, and with speech recognition for over 25 years. My experience includes basic research in natural language understanding at the University of Minnesota and the University of Pennsylvania (1983-1984) applied research (funded by DARPA, the National Science Foundation and

internally) at Unisys Corporation (1984-1995), spoken dialog system product development at Unisys (1995-2002) and as a consultant (2002-).

As an independent consultant since 2002, I have assisted clients in understanding the capabilities of speech, natural language, and multimodal technologies and in applying these technologies to innovative applications.

I am an expert in the state of the art of these technologies, giving frequent presentations at industry events such as the Mobile Voice Conference and SpeechTEK. I am frequently interviewed by *Speech Technology Magazine* on questions having to do with the state of the speech and language technology industry. I write a bi-annual column for *Speech Technology Magazine* and a report on current developments in speech standards for *ASR News*.

At Unisys, I directed many development teams, and was a project manager for a number of projects. My tasks as a project manager included estimates of costs and the level of effort required for artificial intelligence software development for many projects, including formal proposals to funding agencies and to commercial customers. In addition, I spent three years managing development projects as Vice President of Engineering at NewINTERACTIONS, Inc., a startup which developed advanced conversational multimodal applications similar to GMAX for senior users and for mobile shopping. Thus my experience includes both technical development of spoken language systems as well as management of development teams in this area.

I am an inventor on three United States patents in the area of natural language understanding and computational dialog processing.

## 9.2 Education

University of Pennsylvania, Philadelphia, Pennsylvania, Alfred E. Sloan Foundation Postdoctoral Fellow in Cognitive Science, 1983-1984
University of Minnesota, Minneapolis, Minnesota, Ph.D., Linguistics, 1984
University of Minnesota, Minneapolis, Minnesota, M.A., Linguistics, 1980
University of Illinois, Urbana, Illinois, B.S., Psychology, magna cum laude, 1975

## 9.3 List of all publications authored in the previous 10 years

### 9.3.1 Books, book chapters, and technical papers

1. Dahl, D. A. (Ed.). Multimodal Interaction with W3C Standards: Towards Natural User Interfaces to Everything. New York: Springer, in press.
2. Beals, K., Dahl, D., Fink, R., & Linebarger, M. Speech and Language Technology for Language Disorders. Berlin, Boston: De Gruyter, 2015.
3. Deborah A. Dahl, (Ed.) Practical Spoken Dialog Systems. New York: Springer-Verlag. 2005
4. D. A. Dahl, "A Standard Portal for Intelligent Services," in Multimodal Interaction with W3C Standards: Toward Natural User Interfaces to Everything, D. Dahl, Ed., ed Berlin: Springer, in press.
5. Dahl, D. A. and B. Dooner, "Audio Alignment for Multimedia Language Learning: Applications of SRGS and EMMA in Colibro Publishing," in Multimodal Interaction with W3C Standards: Toward Natural User

Interfaces to Everything, D. Dahl, Ed., ed Berlin: Springer, in press.

6. Dahl, D. A. "Integrating Natural Language Resources in Mobile Applications". In N. Shaked & U. Winter (Eds.), A Synergetic Approach to the Design of Multimodal Mobile Interfaces. Berlin, Boston: De Gruyter, 2016.
7. Dahl, D.A., "The W3C multimodal architecture and interfaces standard", Journal of Multimodal User Interfaces, April, 2013.
8. D. A. Dahl, E. Coin, M. Greene, and P. Mandelbaum, "A Conversational Personal Assistant for Senior Users" in Conversational Agents and Natural Language Interaction: Techniques and Effective Practices, D. Perez-Marin and I. Pascual-Nieto, Eds., eds. Hershey, PA, USA: IGI Global, 2011.
9. Deborah A. Dahl, "Extensible Multimodal Annotation (EMMA) for Intelligent Virtual Agents", 10th Annual Conference on Intelligent Virtual Agents, Philadelphia, PA, USA, September 20-22, 2010.
10. Deborah A. Dahl. "Standards for Multimodal Interaction". In Handbook of Research on Multimodal Human Computer Interaction and Pervasive Services: Evolutionary Techniques for Improving Accessibility. Patrizia Grifoni, ed. IGI Global, May, 2009.

### 9.3.2 Column

Deborah A. Dahl, "Standards". Twice-yearly column for *Speech Technology Magazine* on current activities in standards applicable to the speech industry, 2008-

### 9.4 Other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition

None

# 10 Compensation

My compensation is at the rate of $200.00 per hour for all tasks performed under this agreement, including but not limited to analysis, calculations, conclusions, preparation of reports, and necessary travel time. Fees have been billed by the tenth of an hour, with a minimum charge for any discrete task of two tenths of an hour. For testimony at deposition or trial, I shall be paid at the rate of $300.00 per hour, to be billed in hourly increments.

# 11 References

[1] (2016, August 4). *Knowledge Navigator*. Available: https://en.wikipedia.org/wiki/Knowledge_Navigator

[2] W. A. Lea, *Trends in Speech Recognition*: Prentice Hall PTR, 1980.

[3] L. Hirschman, "Overview of the DARPA Speech and Natural Language Workshop," in *Speech and Natural Language: Proceedings of a Workshop Held at Philadelphia, Pennsylvania*, Philadelphia, PA, USA, 1989.

[4] V. Zue, S. Seneff, J. Glass, J. Polifroni, C. Pao, T. J. Hazen, *et al.*, "Jupiter: A Telephone-Based Conversational Interface for Weather Information," *IEEE Transactions on Speech and Audio Processing,* vol. 8, pp. 85-96, January 2000.

[5] J. Allen, D. Byron, D. Costello, M. Dzikovksa, G. Ferguson, L. Galescu, *et al.*, "TRIPS-911 system demonstration," in *Proceedings of the ANLP/NAACL 2000 Workshop on Conversational Systems*, ed Seattle: Association for Computational Linguistics, 2000, pp. 33--35. partial

[6] G. Ferguson and J. Allen, "TRIPS: An Intelligent Integrated Problem-Solving Assistant," in *Proceedings of the Fifteenth National Conference on Artificial Intelligence (AAAI-98)*, Madison, WI, 1998, pp. 567-573.

[7] O. Pilcher. (1996, accessed August 3, 2016). UNISYS UNVEILS UNIQUE NATURAL LANGUAGE UNDERSTANDING PROGRAM. *Google Groups comp.speech.* Available: https://groups.google.com/forum/#!topic/comp.speech/f6wDR14qbcE

[8] Nuance Communications. (1997, Nuance Technology Enables First Speech Recognition Trading Service Deployed by Schwab. *PR Newswire*. Available: http://www.prnewswire.com/news-releases/nuance-technology-enables-first-speech-recognition-trading-service-deployed-by-schwab-77359102.html

[9] D. A. Dahl, L. M. Norton, and K. W. Scholz, "Commercialization of natural language processing technology," *Communications of the ACM,* vol. 43, pp. 7-es, 2000.

[10] M. Walker and S. Whittaker, "Mixed initiative in dialogue: an investigation into discourse segmentation," presented at the Proceedings of the 28th annual meeting on Association for Computational Linguistics, Pittsburgh, Pennsylvania, 1990.

[11] L. Beckerson. (2007, August 4). SRI's CALO Project Tackles Artificial Intelligence - See more at: http://www.dailytech.com/SRIs+CALO+Project+Tackles+Artificial+Intelligence/article9860.htm#sthash.bQOtkzyi.dpuf. *Daily Tech*. Available: http://www.dailytech.com/SRIs+CALO+Project+Tackles+Artificial+Intelligence/article9860.htm

[12] I. González. (2010, August 3, 2016). Anboto has developed the first 5th generation virtual assistant. Available: http://www.anbotogroup.com/old/english/anboto-creates-the-first-5th-generation-virtualassistant-eitb.php

[13] (2016, August 4). *Cortana (software)*. Available: https://en.wikipedia.org/wiki/Cortana_(software)

[14] VoiceBox Technologies. (2002, August 4). *Welcome to VoiceBox Technologies*. Available: https://web.archive.org/web/20020529182325/http://www.voicebox.com/

[15] D. Dahl, "Voice-Enabled M-Commerce," ed: YouTube, 2013.

[16] ejTalk. (2001, August 4).
*Hello from ejTalk*. Available:
https://web.archive.org/web/20011201185829/http://www.ejtalk.com/Home/Home.htm

[17] T. Warren. (2016, July 28). *Windows Phone is Dead*. Available: http://www.theverge.com/2016/1/28/10864034/windows-phone-is-dead

[18] I. Lunden. (2015, July 28). *Mozilla Will Stop Developing And Selling Firefox OS*

*Smartphones*. Available: http://www.theverge.com/2016/1/28/10864034/windows-phone-is-dead
[19] Wikipedia. (2016, July 28). *Android (operating system)*. Available: https://en.wikipedia.org/wiki/Android_(operating_system)
[20] Wikipedia. (iOS, July 28). Available: https://en.wikipedia.org/wiki/IOS
[21] Indeed. (2016, July 28). *C Developer Salary*. Available: http://www.indeed.com/salary/C-Developer.html
[22] Glassdoor. (2016). *Speech Engineer Salaries*. Available: https://www.glassdoor.com/Salaries/speech-engineer-salary-SRCH_KO0,15.htm
[23] PayScale. (2016, August 4). *Average Salary for Skill: Natural Language Processing (NLP)*. Available: http://www.payscale.com/research/US/Skill=Natural_Language_Processing_(NLP)/Salary
[24] J. Kraus. (2015, August 4). *Front End vs Back End vs Full Stack: Web Developers & Demand*. Available: http://www.skilledup.com/articles/front-end-vs-back-end-vs-full-stack-web-developers-demand
[25] R. A. Cole, J. Mariani, H. Uszkoreit, A. Zaenen, and V. Zue, *Survey of State of the Art in Human Language Technology*. Cambridge: Cambrige University Press, 1997.
[26] S. Nirenberg and V. Raskin, *Ontological Semantics*. Cambridge, MA, USA: MIT Press, 2004.
[27] D. A. Dahl, "Pundit: Natural Language Interfaces," in *Logic Programming in Action*, G. Comyn, N. E. Fuchs, and M. J. Ratcliffe, Eds., ed Heidelberg, Germany: Springer-Verlag, 1992, pp. 176-185.
[28] J. Dowding, J. M. Gawron, D. E. Appelt, J. Bear, L. Cherny, R. C. Moore, *et al.*, "Gemini: A Natural Language System for Spoken-Language Understanding," in *Proceedings of the 31st Annual Meeting of the Association for Computational Linguistics*, Columbus, Ohio, USA, 1993, pp. 54-61.
[29] S. Seneff, "TINA: A Natural Language System for Spoken Language Applications," *Computational Linguistics*, vol. 18, pp. 61-86, March 1992.
[30] M. Palmer, D. A. Dahl, R. Passonneau, L. Hirschman, M. C. Linebarger, and J. Dowding, "Recovering implicit information," in *Proceedings of the 24th Annual Meeting of the Association for Computational Linguistics*, New York, NY, USA, 1986.
[31] L. M. Norton, D. A. Dahl, L. Li, and K. P. Beals, "Integration of large-scale linguistic resources in a natural language understanding system," in *COLING/ACL-98*, Montreal, Quebec, Canada, 1998, pp. 980-984.
[32] P. Cimiano, C. Unger, and J. McCrae, *Ontology-Based Interpretation of Natural Language* vol. 24: Morgan & Claypool, 2014.
[33] D. Estival, C. Nowak, and A. Zschorn, "Towards ontology-based natural language processing," presented at the Proceeedings of the Workshop on NLP and XML (NLPXML-2004): RDF/RDFS and OWL in Language Technology, 2004.
[34] B. Loos, "Scaling natural language understanding via user-driven ontology learning," presented at the ScaNaLU '06 Proceedings of the Third Workshop on Scalable Natural Language Understanding, 2006.
[35] C. J. Fillmore and C. F. Baker, "Frame Semantics for Text Understanding," in *Proceedings of WordNet and Other Lexical Resources Workshop*, 2001.
[36] H. Cunningham, D. Maynard, K. Bontcheva, and V. Tablan, "GATE: A framework and

graphical development environment for robust NLP tools and applications," in *Proceedings of the 40th Annual Meeting of the Association for Computational Linguistics*, Philadelphia, PA, USA, 2002, pp. 168-175.

[37] T. Paek and R. Pieraccini, "Automating spoken dialogue management design using machine learning: An industry perspective," *Speech Communication,* vol. 50, pp. 716-729, 2008.

[38] J. Hirschberg and C. D. Manning, "Advances in natural language processing," *Science,* vol. 349, pp. 261-266, July 17, 2015 2015.

Deborah A. Dahl

Deborah A. Dahl, Ph.D.

# EXHIBIT D

# EXPERT OPINION

I have been asked by Justin London to submit and prepare a written report in the matter of *Linkepic, et. al. v. Vyasil, et. al. 2012-cv-9058.* Our company was asked to evaluate the replacement cost to develop the Linkepic system, to review Vyasil's technical specifications, to evaluate disk image files, and to evaluate Mr Hochman's opinion.

I am the Director of Consulting Services at DMC, Inc., an engineering and software development company based in Chicago, Illinois. DMC has been in business for 20 years. We have extensive experience developing mobile and web applications using technologies including PHP and Microsoft .NET. We have worked on a range of projects across many industries, including Legal, Recruiting, Consulting & Professional Services, Non-profits, Associations, Product Development, Telecommunications, Consumer Goods, Building Technology, Defense Contracting, Energy and Utilities, Food and Beverage, Green Technology, Aerospace, Automotive, Pharmaceutical & Medical, and Specialty Machinery, as well as many others.

We have approximately 70 software developers & engineers and have successfully completed and performed work on numerous enterprise web development projects.

I was asked to review the specifications for Linkepic to provide a cost estimate to develop Linkepic based on the technical and system specificatons provided to me. I was provided five documents that I reviewed that were prepared by Vyasil for Mr. London:

(1) Linkepic SRS and Contract
(2) UML Diagrams
(3) Linkepic component/functionality document
(4) Jonathan Hochman Report
(5) Gary Hunt Report

Based on my review and analysis of these documents, I estimate that version 1.0 of the system would cost between $602,000 and $1,053,500 to develop. The attached "*Linkepic Estimate.pdf*" document provides additional details into how this estimate was derived. This estimate assumes that the eCommerce, Video, Mail/Messaging, Forum, Learning Management System components are licensed and integrated with the system - not built from scratch. I base this opinion on my experience in the software development industry.

This system would likely require approximately 3,440 and 6,020 hours of development, with the following specialized resources allocated: a project manager, a business analyst, a technical architect, a user experience designer, four developers, and two quality assurance analysts.

As a software consultant, I would typically proceed with a project like this in phases: Requirements, Design, Build, Test, and Deploy. As each phase is completed, the next phase is re-estimated since more is known about what needs to be delivered during the next phase. If the cost estimate for the next phase goes up, the client is given an



EXHIBIT 1 Rietz 3-2-17 RP
PENGAD 800-631-6989

opportunity to decide if they want to accept the cost increase or cut features from scope to stay within the budget previously estimated.

The documents reviewed suggest Vyasil does not have the expertise to deliver a web application of this scope and complexity. Vyasil did not provide the documentation that is typically needed to successfully deliver a web application of this scope and complexity. While the documentation provided describes the high level functional design of this system, to build a web application it is best practice to document the technical requirements & design (e.g. performance, network, bandwidth, hosting, architecture, and security requirements), UI wireframes (e.g. user interface design), data schema (e.g. database design), test plans (e.g. scripts to test the functionality), and operations guide (e.g. procedures for operating and maintain the system).

The cost of $7,000 that Vyasil quoted for the development was completely unrealistic based on the amount of man-hours, allocated resources, and work that is required to build a system of Linkepic's complexity. For instance, the design (not including implementation) of a custom video conferencing module alone would likely cost more than $7,000, which is likely to be true even after adjusting for reduced offshore labor costs.

I was also asked to review any of the existing code that was previously developed by Vyasil residing on Mr. London's servers related to the Linkepic project and to determine its quality, state, and reusability. We are unable to use or review the disk file images because they are not in their native format and therefore we cannot load, compile, and run them in their current state. However, based on the representations that the code was written 2010 or 2011 in .NET, the code would likely be outdated and not desirable for re-use since the .NET technology framework has evolved from the 3.5 edition in 2010 to the 4.6 edition today.

Mr. Hochman's Report

I have reviewed Mr. Hochman's expert report and disagree with him on several points. Based on his resume, Mr. Hochman has web marketing experience, but does not seem to have experience managing large web development projects like those of the plaintiffs.

I believe the issue at hand is not whether the company would have succeeded or not, but whether the plaintiffs received the systems they contracted for. The plaintiffs' damages are predominately based on expectation or replacement costs as well as lost intellectual property, not lost profit.

Hochman also states that "Plaintiff would need to have staff with time to supervise the work in India, maintain software specifications and documentation, and maintain safe custody of digital assets in case the Indian team failed and needed to be replaced." It should not be the client's responsibility to manage the development team—that is the job of the project managers of the software development firm.

Large software development projects are typically done in phases. Usually on fixed bid contracts, deposits for part of the total cost is paid upfront prior to the completion of any

deliverables. Thus, Mr. Hochman's assertion that "plaintiff should have received deliverables (documents and or code) into Plaintiff's custody, prior to paying invoices" is incorrect. My understanding is that the plaintiffs did receive documents that were prepared by Vyasil before paying them any money.

I also disagree with Mr. Hochman's assessment that the plaintiff should be to blame. It appears that Vyasil has breached its contract by not delivering the solution for $7,000. As a professional software development company, Vyasil should have known how to evaluate a software project and to provide a cost estimate that reflected the complexity, its scope, and resources it would have to provide to successfully complete the project. The plaintiffs responsibilities include providing systems requirements and providing a budget, not estimating the cost. While project costs can be negotiated, if a software development company cannot undertake a project that falls within a client's budget or because it is beyond the scope of their capabilities, then they should not be entering into such a contract obligating them to do so and representing to clients that they can do the work for such an amount.

**Testimony:**
I have not served as an expert witness in any cases in the past 10 years or been deposed in any cases.

**CV:**
My ciricullum vitae is attached herein as an exhibit.

**Compensation:**
Our firm charges $195 per hour.

Signature

## Linkepic High Level Workplan

| Project High Level Workplan | Staffing | Estimated Hours | Comments |
|---|---|---|---|
| **Requirements (~1 month)** | PM+BA+TA | | |
| Functional Requirements | | 160 | 9 modules, 12 to 16 hours each, document/review/refine |
| Technical Requirements | | 80 | Security, Peformance, Availability, Data Backup, Network/Infrastructure |
| Project Management | | 60 | Provide status updates, track and manage issue resolution, schedule meetings, and review deliverables. |
| **Design (~2 months)** | PM+BA+TA+UX | | |
| Functional Design | | 280 | 28 Features, 8 hours each, document/review/refine |
| Technical Architecture Design | | 160 | Select hosting (16), Select 3rd Party Components (60), Design Integrations (40), Design Security (40) |
| Data Tier Design | | 80 | Design the database and data access layer |
| User Experience Design | | 160 | Branding/Style Guide, 9 modules, review/refine |
| Project Management | | 170 | Provide status updates, track and manage issue resolution, schedule meetings, and review deliverables. |
| **Build (~3 months)** | PM+BA+TA+4 DEV | | |
| Infrastructure Setup | | 40 | Setup server and network infrastructure |
| Data Tier | | 160 | Build database schema and data access layer |
| Backend Services | | 160 | Security, Service Maintenance/Scheduled Jobs, Logging and Monitoring, Integration of Custom Components |
| Third Party Service Integrations | | 160 | eCommerce, Video, Mail/Messaging, Forum, Learning Management System |
| Frontend | | 840 | 14 Custom Features, 40 hours + 14 Integrated Features, 20 hours |
| Administration Tools | | 80 | Manage data, users, site features |
| Project Management | | 360 | Provide status updates, track and manage issue resolution, schedule meetings, and review deliverables. |
| **Test (~2 months)** | PM+BA+2QA+TA+2 DEV | | |
| Deploy to Test Environment | | 8 | Migrate site from dev environment to production |
| Author and Execute Test Scripts/Fix Defects | | 672 | 28 Features, 24 hours per feature |
| Module Communication Testing/Fix Defects | | 40 | Test and fix issues with integrate modules |
| User Acceptance Testing/Fix Defects | | 168 | Fix issues identified by the client |
| Project Management | | 222 | Provide status updates, track and manage issue resolution, schedule meetings, and review deliverables. |
| **Deployment (~1 month)** | PM+BA+2QA+TA+1 DEV | | |
| Deploy to Production Environment | | 8 | Migrate site from test environment to production |
| Test Production Environment | | 80 | Test and fix issues |
| Train Support Staff | | 40 | Prepare documentation to operate the system and train support staff |
| Project Management | | 32 | Provide status updates, track and manage issue resolution, schedule meetings, and review deliverables. |
| Go Live | | 80 | Perform final deployment activities and provide support for unexpected issues during go-live week |
| | Total: | **4,300** | Using a blended rate of $175, the estimated cost would be 4,300 x $175 = **$752,500** |

## Linkepic Cost Estimate Scenarios

| Scenario | Estimated Hours | Estimated Cost |
|---|---|---|
| Low End (-20% effort) | 3,440 | $ 602,000 |
| Expected | 4,300 | $ 752,500 |
| High End (+40% effort) | 6,020 | $ 1,053,500 |

# EXHIBIT E

# In the Matter of:

*Veoxo*
*vs.*
*Vyasil*

---

## *Jordan R. Cohen*

### *March 3, 2017*

---

DTI Court Reporting Solutions

105 W. Adams, Suite 1200, Chicago, IL 60603
Phone: 312.386.2000 - Fax: 312.386.2275

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

---oOo---

VEOXO, INC., et al., )
)
Plaintiffs, )
)
vs. ) No. 12-9058
) Hon. Judge Edmund E. Chang
VYASIL, LLC, et al., )
)
Defendants. )
)

TELEPHONIC DEPOSITION OF

JORDAN R. COHEN

FRIDAY, MARCH 3, 2017

REPORTED BY: HOLLY THUMAN, CSR No. 6834, RMR, CRR

(CH-117598)

INDEX

INDEX OF EXAMINATIONS


| EXAMINATION BY: | PAGE |
|---|---|
| MR. FRIEBUS | 4 |
| MR. LONDON | 101 |


--o0o--

EXHIBITS MARKED FOR IDENTIFICATION


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Jordan R. Cohen, September 2016 | 4 |
| Exhibit 2 | Cohen Expert Report Appendix A References (Volume I) | 4 |
| Exhibit 3 | Cohen Expert Report Appendix A References (Volume II) | 4 |
| Exhibit 4 | A Rebuttal to the Expert Witness Reports of Mr. Hochmann and Dr. Stec, Jordan Cohen, October 10, 2016 | 4 |
| Exhibit 5 | Expert Report of Jonathan E. Hochman | 4 |
| Exhibit 6 | Printout of article, "90% Of Startups Fail: Here's What You Need To Know About The 10%" | 4 |
| Exhibit 7 | Expert Report of Jeffery A. Stec, Ph.D., September 12, 2016 | 4 |


**Reporter's note: Original exhibits have been returned to counsel for Defendants and are not attached to deposition transcript.



--o0o--

Deposition of JORDAN R. COHEN, taken by the Defendants, at DTI, 285 Battery Street, Suite 250, San Francisco, California 94111, commencing at 9:14 A.M., pursuant to notice and agreement of the parties, on FRIDAY, MARCH 3, 2017, before me, HOLLY THUMAN, CSR, RMR, CRR.

--o0o--

APPEARANCES

(VIA VIDEOCONFERENCE)

FOR THE PLAINTIFFS:

LONDON LAW GROUP
1920 North Maud, Suite A
Chicago, Illinois 60614
By: JUSTIN J. LONDON, Attorney at Law
jlondon@ameritech.net

(VIA TELEPHONE)

FOR DEFENDANTS RYAN TANNEHILL AND KARL WITTSTROM:

BAKER & HOSTETLER LLP
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
By: DAVID M. FRIEBUS, Attorney at Law
dfriebus@bakerlaw.com



SAN FRANCISCO, CALIFORNIA; FRIDAY, MARCH 3, 2017

9:14 A.M.

--o0o--

JORDAN R. COHEN,

______________________________

called as a witness, who, having been first duly sworn, was examined and testified as follows:

---oOo---

EXAMINATION BY MR. FRIEBUS

(Deposition Exhibits 1 through 7 were marked for identification.)

MR. FRIEBUS: All right. This is the deposition of Jordan Cohen taken pursuant to notice and agreement of the parties in Case No. 12-9058, Linkepic, or Veoxo, versus Vyasil, pending in the US District Court for the Northern District of Illinois.

The deposition is being taken pursuant to the Federal Rules of Civil Procedure and all applicable local rules.

**Q. Dr. Cohen, could you please state and spell your name for the record?**

A. My name is Jordan Cohen, spelled J-O-R-D-A-N, Cohen, C-O-H-E-N.

**Q. Okay. Have you given deposition testimony before?**



A. I have.

**Q. How many times?**

A. I think four.

**Q. Four times? Any other sworn testimony of any other kind?**

A. No. Well, I was in court, so I --

**Q. In-court testimony?**

A. Yeah. I testified in a lawsuit, so that was not a deposition.

**Q. Okay. So but that would have been -- how many times have you testified in court?**

A. Once.

**Q. And was that in your capacity as an expert witness?**

A. Yes, it was.

**Q. All right. So I just -- before we get started, I want to go over a couple ground rules. I'm sure you're familiar with them.**

**First, my role is to ask you questions, and your role is to answer them truthfully and completely. If you could -- we talked about this a little bit before the deposition got started, but if you could wait until a question is finished before answering --**

**(Discussion off the record; audio issues.)**

BY MR. FRIEBUS:
**Q. All right. So just to get back to kind of ground rules, if you could please give a verbal response rather than a shake of the head or an "uh-huh," "huh-uh," it'll be easier for the court reporter to take down.**
**This is very important for today: If you don't hear or understand a question I ask, could you please tell me?**
A. Yes.
**Q. Okay. Thank you.**
**If you answer a question, I'm going to assume that you both heard it and understood it. Is that fair?**
A. That's fine.
**Q. And again, if you answer a question, I'm going to assume that your answer is complete.**
**Is that fair?**
A. Yes.
**Q. Any reason you're not able to testify truthfully today? On medication, strange medical condition, something like that?**
A. No.
**Q. Okay. Great.**
**So let's take a look at what's been previously**



**marked as Exhibit 1.**
A. I have it.
**Q. Is this the expert report that -- the first expert report you prepared in this case?**
A. Yes, it is.
**Q. And are all the facts and data that you considered in reaching your opinions, are they disclosed in this report?**
A. I believe that they are.
**Q. How many hours did it take you to prepare the expert report in Exhibit 1?**
A. I don't actually remember. My guess is between 10 and 20, but I'm not sure.
**Q. Okay. Do you recall how much you charged the plaintiffs to prepare the report?**
A. I charged the plaintiff at an agreed-upon rate. I don't remember what the bill was.
**Q. You don't remember what the total bill was?**
A. I don't.
**Q. Do you remember what the rate was?**
A. I believe we agreed on a rate of $250 an hour.
**Q. Now, does this report reflect all of the matters in which you've served as an expert?**
A. I'm sorry, I don't understand the question.
**Q. Sure. I -- at the bottom of the first page,**



**there's a -- in a bold type, it says, "I have been an expert witness in five cases in the last 5 years." And then on the following page, there are five cases listed.**
**Do you see that?**
A. Yes.
**Q. In the last 5 years, are there any additional matters that you would add to this list?**
A. I'm currently an expert witness in a patent litigation suit between Apple and another -- another company, which I don't remember, because I don't pay attention to that.
So there's -- I'm currently engaged in another lawsuit.
**Q. Okay. I'm going to guess that you're being engaged by Apple and not the company of which you can't remember the name?**
A. Actually, I'm being engaged by the lawyers who work for Apple. So it's once removed.
**Q. Okay. Well put.**
**And do you know where that case is pending?**
A. The lawyer's office is in Chicago, so that's my guess. I don't actually know.
It's -- the current case is a patent review. It's an IRB review, and not a litigation.



**Q. Oh, I see. So this isn't a -- you're not being retained in connection with a lawsuit. You're being retained in connection with a review of a patent.**
A. That's correct. And I believe that it's preparation for a lawsuit. I've been led to believe that.
**Q. All right. Are there -- if we went further back in time than the past 5 years, would there be additional matters that you would add to this list?**
A. I don't believe so. I have been in this business about 6 years, and my early work was technical work, not litigation work.
**Q. Okay. Have you ever had any portion of an expert report or your testimony excluded by a court?**
A. I have not.
**Q. And just looking at this list here, does it reflect -- well, let's do this.**
**You said that you had given deposition testimony four times before?**
A. I believe that's right.
**Q. Okay. And were those -- the depositions that you're referring to, are they all reflected in this list, (a) through (e) here?**
A. Yes. They are. Or they should be.
**Q. And then -- and then the -- you said you**

Page 10

**testified once in court.**
**Which of these cases did you testify in court, or is it some other case?**
A. Nuance versus Vlingo, which is e on the list.
**Q. All right. Switching gears just slightly, what did you do to prepare for your deposition today?**
A. I went back and reviewed my expert report and Deborah Dahl's expert report and Hochman's expert report, and I looked at some of the documents from Vyasil that I had.
**Q. When you say the documents from Vyasil that you had, would those be documents that were identified in your first expert report?**
A. Yes. I also reviewed some notes from Mr. London.
**Q. You said you reviewed notes from Mr. London?**
A. Yes.
**Q. Did those notes discuss the compensation that you were to be paid in this case?**
A. No.
**Q. Okay. Did the notes discuss any of the facts or data that you were provided to prepare your opinion?**
A. There were reminders about some of the facts.
**Q. And did the notes reflect any assumptions that you were asked to make by counsel?**

Page 11

A. No.
**Q. All right. Did you speak with anybody to prepare for your deposition?**
A. I spoke with Mr. London before I did my prep.
**Q. Anybody else?**
A. No.
**Q. Okay. So just so I can summarize the list, you reviewed your expert report, and I assume that when you say your expert report, you mean both your initial report and your rebuttal report?**
A. I actually reviewed my initial report.
**Q. But not the rebuttal report?**
A. Well, I have the rebuttal report here, but -- no, I didn't review that last night.
**Q. But you didn't -- oh, all right.**
**And then when you say Dr. Dahl's report, he only issued one.**
**When you say Mr. Hochman's report, is that just the initial report or any of the others?**
A. Just the initial one.
**Q. Okay. And then to add to that list, we have some documents that were identified in your first expert report and some notes from Mr. London.**
A. Uh-huh.
**Q. Are those all the documents?**

Page 12

A. Yes.
**Q. Okay. About how long did you -- how long did you take to prepare for your deposition today?**
A. About 3 hours.
**Q. Okay. Just -- 3 hours?**
A. Yes.
**Q. Thanks.**
**(Discussion off the record.)**
BY MR. FRIEBUS:
**Q. Okay. All right. Dr. Cohen, how do you know Mr. London?**
A. He was introduced to me by Debbie Dahl.
**Q. How do you know Dr. Dahl?**
A. I have been a member of the speech and language community for a very long time, and she shows up at meetings, and we work together in DARPA, so I have a known her for a long time.
**Q. In what connection -- what capacity were you introduced to Mr. London by Dr. Dahl?**
A. She dropped me a note and said I had an interesting lawsuit that they were looking for a second opinion.
**Q. Other than the work that you've done in connection with this lawsuit, have you worked with Mr. London or any of his companies in any other**

Page 13

**capacity?**
A. No, I have not.
**Q. Okay. You're not in San Francisco right now in connection with some work that you're doing with Mr. London or any of his companies?**
A. I'm the Vice President of Technology for Semantic Machines, and we have offices in Berkeley and Boston. And I do patent disclosures for them, mostly from North Carolina. I'm here on Semantic Machines business.
**Q. Okay. To your knowledge, does Semantic Machines do any work with Mr. London or any of his companies?**
A. I can assure you that they do not.
**Q. Okay. The only reason I ask is, I thought that Mr. London had had told me that you were out there doing some work in connection with one of his companies. So I don't --**
MR. LONDON: I'm going to object. I never -- excuse me. I -- I'm going to object on the record that I never said that, and you mischaracterize anything I said. That's absolutely false.
MR. FRIEBUS: Okay. My misunderstanding.
**Q. All right. Do you know what -- the rates you charge the plaintiffs for your work? I think you said**

Page 14

**250 for the report earlier.**
A. As I remember, that's what it was, yes.
**Q. Okay. And then do you have a separate rate for your deposition testimony?**
A. I do.
**Q. And what's that rate?**
A. $600 an hour.
**Q. Okay. And that's disclosed in your report. Right?**
A. I believe it is.
**Q. So I'm looking at the first portion of your report. And I think what we'll do today is, we'll just -- you know, we'll start with the report, and I think we'll work mostly with this document. We'll just kind of work through it and talk about some of the opinions that you've reached.**
**So let's start right at the top, where it says, "I have been asked to form an expert opinion," and there are two primary points and then two subpoints, as I understand it. And I'll just read them and ask if you agree with me that those are the opinions you are going to provide.**
**One is "The efficacy of the plans presented by Vyasil for the creation of GMAX." And then there appear to be two subpoints, one of which is "The**

Page 15

**technical presentation and documents produced by Vyasil and Viasem." The second is "The required technical capabilities required to deliver a similar product."**
**And then the final opinion has to do with "The viability of GMAX, including the value for such a product in 2010/2012."**
**Are the answers to those questions the opinions you will present at trial?**
A. Yes.
**Q. Okay. So let's start -- we'll flip past the previous expert experience, the publications and qualifications, and start at page 4, under "A Review of the Specifications for GMAX."**
**Do you see that?**
A. I do.
**Q. Now, you write in your report, "J London" -- and I assume by J London, you mean Justin London.**
A. That's correct.
**Q. Okay. And you go on to say, "developed a basic idea for a conversational system for mobile devices prior to 2010, and I have been provided with several documents describing the creation of the various elements of the GMAX products."**
**And then you go on to say that there would be two product lines: One would be a series of**

Page 16

**applications, and the second product line was an OS for mobile platforms. Is that right?**
A. Yes.
**Q. Okay. What does it mean to -- I'll quote you here -- "develop a basic idea"?**
A. Show me where I said that? I'm sorry.
**Q. Sure. It's under the heading that says, "A Review of the Specifications for GMAX."**
**Do you see that that in bold?**
A. Uh-huh.
**Q. And then you say, "J London developed a basic idea for a conversational system."**
**So I'm asking, what do you mean there when you say, "developed a basic idea"?**
A. So I think of a basic idea as a description of the capabilities of something. So he developed an idea of what he thought was doable in the current technology, and he described what such a thing should do.
**Q. I just want to make sure I understand you.**
**Part of your response was, what he thought was doable under the current technology?**
A. Yes. That means what it's possible to develop given the state of the technology today. Or in 2010.
I don't want to suggest that the technology

Page 17

was all available. I want to suggest that it was a sensible place to start.
**Q. Okay. So it was a -- all right.**
**What would it take to turn -- describe for me in your understanding or opinion what it would take to turn a basic idea into a commercially successful product?**
A. It would take -- there are two things. One is, you would need to extend the technology where necessary, and you would need to develop an engineering team that could actually implement whatever it was you have decided to build.
**Q. What are all the steps that you would need to take -- you know, kind of, to get to that place?**
**I mean, I understand those are two things you would need to do. But what are all the interstitial steps?**
A. I -- let me describe to you the steps in the -- in the infrastructure, which is a startup organization. I believe that's what you might like.
The first thing to do is to figure out what it is you're going to do and to write down a specification of the things you want to create.
Then you need to figure out how to get to -- from where you are today to those things. And that

would include deciding what technologies you need to develop and, for the things you don't need to develop, deciding what engineering resources you need to apply to actually make those things happen.

And then you might or might not want to figure out how to market those things. The marketing decision depends on what the definitions are. And in a startup, those definitions can be quite flexible. So you start with something, and then you refine it as you go.

So the -- the planning process in a startup is not a straight-line process. It's a process where you start with an idea, and then you go a little bit and then refine the idea, and then go a little bit. And somewhere in the middle, you have to decide if you have something that's marketable and how to market it.

**Q. Okay.**

A. Or sell it.

**Q. I did -- but was your answer complete, or would there be other steps?**

A. It depends on the level of detail which you want. I mean, this -- I can talk about it all day if you want. But I think, in general, it's complete.

**Q. Well, I guess what I mean is, I didn't hear anything in there about engineering or design or development or capital, for example.**



A. Ah. Well, I did say engineering. I said you needed an engineering team, and you need to decide how you are going to implement things. So that includes design, of course.

**Q. Okay.**

A. Capital was not -- that wasn't the purview of my expert report. You need to fund things, but that's not what I was talking about in my report.

**Q. Okay. So let me see if I understand this correctly.**

**You would agree that to take -- to take a basic idea to a commercially successful product, you would need capital.**

A. Yes. Absolutely.

**Q. Okay. But that the -- that aspect of taking a product from a basic idea to a commercially successful product is not something that you are opining about in this case.**

A. That's correct.

**Q. And that's -- because it's outside of the scope of your expertise.**

A. Right. I do talk about how much such products were worth in the marketplace, but I did not talk about how to raise such capital or anything like that.

**Q. Okay. Is it fair to say that there would be a number of contingent steps between taking something from a basic idea to a commercially successful product?**



MR. LONDON: Object on the term "contingent." Vague and ambiguous.

BY MR. FRIEBUS:

**Q. You can answer.**

A. I did say that this was not a straight-line process, and it gets refined along the way.

If you think of those as contingent steps, I guess there are refinements that happen in every company as they build things.

**Q. Well, I just mean that you don't jump from a basic idea to a commercially successful product in one step, do you?**

A. I only know of one circumstance where that happened. And that --

**Q. Oh, really? What's that?**

A. It was the development of Android, the operating system that's now in all the Google phones.

**Q. They went from an idea to a commercially successful product without any intermediate steps?**

A. They had an incredibly short development, and they sold it to Google.

**Q. All right. But for the most part, putting aside Android for now, there are generally a number of steps that you would need to take between going from a basic idea to a commercially successful product, and that success among each of those steps is not guaranteed.**



A. That's my experience.

**Q. Okay. So let's talk about -- I'm -- just, again, we're going to just kind of work through the document here that's your expert report. And we'll go to the next section.**

**And if -- as I understand the report -- and tell me if I'm wrong -- that you say, "There are five documents which describe the proposal by Vyasil and Viasem for work in response to Justin London," and then you go on to describe and analyze them.**

**Do you see that portion of your report?**

A. I do.

**Q. Okay. So we're going to -- maybe we can do this. We can work in conjunction with the -- with the expert report and the documents that you describe in your expert report. All of them should be found in the binders that we marked as Exhibits 2 and 3.**

A. Okay.

**Q. So I say that because I don't know -- I may or may not refer to the underlying document. But if you would like to refer to the underlying document in**

**answering any questions, we -- that's available to you there, and we can make that happen.**
A. Okay.
**Q. So the first section here, the first document, is a document called "Viasem Cost PDF."**
**Do you see that?**
A. I do.
**Q. Okay. And then the next section, immediately following that, it appears to be an analysis of that document. Right?**
A. That's right.
**Q. What is your understanding of the relationship, if any, between Viasem and Vyasil?**
**And just for the court reporter, Viasem a V-I-A-S-E-M, and Vyasil is V-Y-A-S-I-L.**
A. So I know that there was a relationship and that Mr. London started with a recommendation from Viasem, and that ultimately ended up with a request for design and other products from Vyasil.
Viasem was in the business of creating ontologies. They were a roughly -- I think it was mostly an academic -- academic group that was trying to figure out how to write ontologies; in particular, semantic ontologies. And those ontologies were supposed to be part of the Vyasil product definition.



**Q. So it's your understanding that the ontologies provided by Viasem were supposed to be part of the product definition for Vyasil?**
A. That's correct.
**Q. And when you say that -- does that mean that Vyasil was expected to code or otherwise develop software using the ontologies provided by Viasem, or how does that work? Is it integrating a technology?**
A. What I saw was that Mr. London apparently asked Vyasil to do development work in this space. And I did not see any development work, so I can't answer that question. I don't know.
**Q. But I guess what I'm asking is, what do you think -- what was your understanding of the intent? How was Vyasil supposed to use the ontologies provided by Viasem?**
A. They were going to build a conversational system or an interactive system of some sort.
**Q. Okay. Well, maybe I -- I'm -- it could just be my lack of understanding here.**
**Would they be using a software product that Viasem was supposed to create?**
A. The Viasem product -- the Viasem product was an ontology. An ontology is a subpart of what you would need -- "need" is the wrong word -- of what you



might use to build an interactive system.
So you need the information that you can find in an ontology, although that's not the only way to represent that information.
**Q. Sure. But does the ontology -- the embodiment of the ontology in the physical world, is that a piece of paper, is that a piece of software, is it code?**
**That's what I'm trying to understand, is whether Vyasil would take a document, or would it take a piece of code or something like that.**
A. I'm not an ontology expert. But my -- my understanding of ontologies is, it's basically a database of relationships and entities. And there needs to be some interface to that database. And it depends on the level at which you code. So it can be more database and less code or more code and less database. There are some engineering choices there.
But in any sense -- in any case, the ontology is about the entities in a particular domain, and about their relationships. And maybe about the language that's used to talk about those things.
**Q. Okay. But it's -- the form or the physical embodiment would be a database of some sort.**
A. Or --
**Q. Is that fair to say?**



A. That's one way. Another way to instantiate an ontology is as code containing the same information. If there's an engineering choice -- you don't have to decide. The Viasem people were basically talking about a database, as far as I can tell.
**Q. Okay, thanks, that's helpful. Like I said, I'm just trying to understand what this thing looks like; you know, if it's a duck or a piece of paper or something else. All right.**
**So let's sit down and talk about the next document in your report, the GMAX application software requirement specification. And this section of your report goes on for several pages. And I think we can just cut to the bottom line here on page 10, for where it says, "Overall impression of the 'software requirement specification.'"**
A. Okay. My pages aren't numbered -- yes, I see it.
**Q. And it says -- and I'm just going to read this paragraph here into the record and then ask you for your reaction to it. You say (as read):**
**"This document is a slap-dash listing of some of the possible applications in GMAX. It does not discuss software, nor does it discuss the applications in enough detail to convince**

the reader that the authors understood the applications, nor that the authors understand the operating systems in which these applications will run, nor that they have analyzed the languages to use, the computing system on which these applications will run, the networks involved, or any relevant details of the software requirements of these applications."
So I -- is it fair to say that based on your review of the document you're talking about here, that the authors had no idea what they were talking about?
A. They certainly didn't indicate that they knew what they were talking about in that document.
Q. Okay. And you are not -- in forming your opinion here, you're not distinguishing between the authors of the document and the entity that would develop the software. Right?
A. Oh, that's correct.
Q. So I want to focus on the phrase in what I just read, "not enough detail to convince the reader."
Do you see that there?
A. I do.
Q. Okay. Now, when you say "reader," you mean the person reading the document. Right?



A. Yes.
Q. Okay. You're not limiting this to just you. It didn't convince you. Right?
A. It did not. Right.
Q. Okay. So as far as I understand your opinion, this would have been -- well, let me ask you this: The conclusion that you reached, would that -- or should that have been obvious to any reader to whom the document was directed?
A. I would have thought so.
Q. Now, and I would say -- I think this goes hand-in-hand, but you would say that the -- your evaluation of the document -- well, strike that.
So let's go on to the next document that you reviewed, which is the GMAX Operating System Software Requirement Specification.
A. Yes.
Q. Okay. And so again, you have a section of your report analyzing this document, but I want to direct you to the end of that section.
A. Okay.
Q. All right. And again, I'll just read what I think is your conclusion about the document into the record, and I'll ask you some follow-up questions on that.



So these are the last two paragraphs on -- which is the 11th page of your report that -- right before Section 4 that starts, "There is NO," capital N-O, "information about how a GMAX operating system would be designed or built, what its characteristics should be, how it would be tailored to the various platforms and cell phone systems, nor does the document describe which elements of modern operating systems (email, ring tones, security, et cetera) are native to the OS and which are overlays. In short, this document has," all caps, "NO INFORMATION," end all caps, "about an operating system which would be GMAX based."
Do you see that?
A. I do.
Q. Okay. Obviously, you're trying to emphasize "no information" in your opinion.
A. I am.
Q. All right. Again, is it fair to say that it's -- maybe to put this in layman's terms, it's your opinion that the authors had no idea what they were talking about?
A. I think that's not the right implication here.
The document is not an operating system software specification. And my intent was to say, this is not a specification for software.



Q. Okay. Well, then if -- what -- is it your understanding that the document was intended to be an operating system specification for software?
A. My understanding is that Mr. London had asked for an operating system software specification, and this was purported to be that but is in fact not.
Q. Okay. And it failed at that task. Right?
A. That's correct.
Q. Okay. So if the objective is to provide an operating system specification, this document fails to provide that.
A. That's correct.
Q. Okay. And is it your opinion that the person putting together this document -- I mean, tell me why you would disagree with the characterization that -- of your opinion as saying that the authors of this document don't know what they're talking about; that they fail to put together a specification -- what would you -- if that was the intent -- strike that. Let me start over.
If the intent of the document and the goal here was to provide an operating system specification, and this is what came back in response, why is it not fair to say that the authors of the document don't know what they're talking about?

A. You lay out a hypothetical, but it's not the only hypothetical.
So for instance, if the authors of the document knew how to design an operating system and decided not to do that and were attempting to defraud Mr. London, this is the kind of document they might have made.
**Q. Okay. You say that the document contains -- and again, all caps -- "NO INFORMATION about an operating system which would be GMAX based." Right?**
A. Yes.
**Q. And is that apparent -- sorry.**
**Is that apparent from the face of the document?**
A. I don't remember what the face of the document looked like. We can look at it if you want.
**Q. Well, I guess what I'm saying is that, did you have to do any independent research to determine that the document didn't contain any information about an operating system?**
A. No.
**Q. Okay. So you concluded based on your review of the document that it had no information. And that was apparent to you without doing any external research.**



A. No information about the software. That's correct.
**Q. Right. And what I'm asking is that -- should that have been apparent to anyone with a computer science background?**
A. I would have thought so. Yeah.
**Q. Okay. And again, when you are -- going back to what you described in your report about the document not having any information, you're not distinguishing between the author of the document and the entity that would develop the software in your opinion.**
MR. LONDON: I'm going to just make one objection. This assumes that this is the only document that discusses the GMAX operating system. But subject to that, go ahead.
In other words, it assumes there is not other GMAX operating system documents --
MR. FRIEBUS: Sure.
**Q. Just to be clear, what I'm asking about is, in the conclusion in Dr. Cohen's expert report about the document being referred to here, which is the GMAX operating system software requirement, when you're opining, rendering your opinion about that document, you're not drawing a distinction between the author of the document and some other entity that might develop**



**the software being discussed.**
MR. LONDON: And I'm also going to make another objection. It assumes that somebody in -- somebody who has a background in computer science is necessarily a software engineer. There's different -- software engineering is a subset of computer science.
(Reporter requested clarification; audio issues.)
MR. LONDON: I'm objecting it assumes facts not in evidence, that -- what I was saying is that it assumes -- it is assuming that all -- that all people with a background in computer science also have backgrounds in software engineering.
MR. FRIEBUS: Just for the record -- and this is the third deposition in 3 days that we've had, Mr. London -- I will once again ask you please not to make any speaking objections. I have no problem with you making objections for the record. But the commentary that follows most of your options that we've had for the last 2 days and which follows right there is a speaking objection. And I'm going to ask you not to do that because, as far as I'm concerned, what you're trying to do is coach the witness, and that's inappropriate.
So I would ask, once again, like I said, for



the third time in 3 days, please, just make your objection succinctly for the record so that we can move on and just skip the commentary. All right?
MR. LONDON: I have to say, nobody's coaching the witness. I am stating objections.
BY MR. FRIEBUS:
**Q. All right. So let's get back to the question.**
**The question on the table -- and I'll restate it, because it's been a little while here -- the portion of the report that we're discussing, right, about your -- your description of the GMAX operating system software requirement, in reaching your opinion that the document doesn't have any information about the operating system, you are not distinguishing between, say, the author of the document and some other entity that might develop the software.**
A. I'm not.
**Q. Okay. So we'll go on to the next document, which is the GMAX Resource Contract. And I want to direct your attention to the second full paragraph of the section, which starts on the following page, the one with the -- but I won't call it a Gantt chart, because I think you have some -- some -- you've expressed some skepticism of it. But I think we're oriented to the right page here. So I want to again**

**read a portion of your report into the record and then ask for comment on it.**
**You say at the top of the page:**
**"There is no listing of deliverable elements, of intermediate milestones, nor of the actual work which each group or person was to deliver. The gant chart does not pass the smell test for project plan."**
**So same question as before: Is it fair to say that the author of this particular document, or authors of this particular document, didn't know what they were talking about with respect to project planning?**
A. Again, you make a hypothetical, and that's only one of many possibilities.
They certainly didn't make a project plan, and this document isn't one.
**Q. Okay. Now, you say that the Gantt chart doesn't pass the smell test for project planning.**
**Is that obvious from the face of the -- from the Gantt chart itself?**
A. Yes, it is.
**Q. And it's your opinion that it should have been obvious to anybody looking at this Gantt chart that it would not pass the smell test?**
A. If they knew anything about project planning,



it would certainly be obvious.
**Q. Did the failure -- let me ask you this: Would a failure to notice that this Gantt chart did not, to use your words, pass the smell test, suggest a low probability of success of anyone who thought that they could build something with this?**
A. It's a hypothetical -- I have no idea. It depends on all kinds of relationships.
If this was the only document they saw, yes, I'm sure that that's true. But otherwise, I have no idea.
**Q. Okay. All right. So let's move on to the next document, the "Technical Specification for GMAX Mobile Web."**
**And I just again will do the same drill. I'll read a portion of your report into the record and then ask for comment. And so I want to start with the -- the first paragraph of this section, which is on the 12th page of your report. It starts -- the one that starts "Finally." Are you there?**
A. Yes.
**Q. Okay. So I'll read it:**
**"Finally, the GMAX proposal is wrapped up with the technical specification for the GMAX Mobile Web. This document is simply a**



**discussion of the wonderful things that a mobile interface can do, followed by a rehash of the functional description of the applications supported (essentially a copy of the descriptions in the application software specification reviewed above)."**
**And this is my favorite part of your report:**
**"It is sprinkled with pictures."**
**I -- is it fair to infer from that description that you don't have a very high opinion of this document?**
A. I think that's fair.
**Q. Okay. Similar question. I expect I'll get a similar answer.**
**But is it fair to say that based on your review of the document, that the authors of this document had no idea what they were talking about?**
A. It's not a technical specification. So it's certainly true that they had -- that there is nothing in it that makes up a technical specification.
**Q. And that -- is that obvious from the document itself?**
A. I think anyone that introspected about what they were trying to do would find it obvious, yes.



**Q. Okay. So then I want to go on. You -- turn to the next page of your report. And you list a -- you're describing, in effect, are you not, the document itself, where you talk about the first 56 pages, and that it's a cut-and-paste of articles and books and course material about certain subjects, and then you list them in your report.**
**Is that right?**
A. That's correct.
**Q. Okay. And then in the paragraph at the bottom of this page, it starts -- you say: "This collection of random articles from computer science, AI, algorithms, computer science, biometrics" -- you said that twice, I guess -- "biometrics and natural language processing are not discussed in relationship to GMAX, nor are they specified as essential or even interesting in the pursuit of this product."**
**How did you determine that the portions of the document that we're discussing, this GMAX technical specification, how did you figure out that these are cut-and-pastes of other articles and books and course materials?**
A. I took several samples of those articles and did a Google search. And in every case where I tried to do that, there was some document for which that text

was an integral part that had nothing to do with GMAX.
**Q. Okay. Now, were you directed by anybody to do that?**
A. I was not.
**Q. Okay. Why did you -- why did you do that?**
A. Because that's what they looked like. They looked like pieces of other documents. And there's a -- in the engineering domain in which I work, there's always an issue with plagiarism, and a way to find out whether something is plagiarized or not is to look it up. And so that's what I did.
**Q. Okay. And so if I -- let me see if I'm understanding you correctly, and you can tell me if I'm mischaracterizing what you've just said.**
**But there was something about this document that led you to believe that it was, in effect, plagiarized from other articles and books and course materials, and then you took steps to investigate that.**
A. I -- yeah, I'm not sure "plagiarized" works with something that's not published, but it was copied.
**Q. Okay, fair enough. But there was something about the document that made you think, this looks like somebody cobbled together a bunch of other material, and something about it doesn't seem right to you?**
A. That's correct.



**Q. Okay. Now, do you think that somebody with a mathematics or computer science degree would -- or should, rather, reach the same conclusion?**
MR. LONDON: I'm going to object. Calls for speculation. Object that it's assuming that there's no -- that this is the only document that discusses the GMAX technical specifications, and that the document wasn't mis -- wasn't a misnomer as to what the type of document was.
BY MR. FRIEBUS:
**Q. Go ahead.**
A. Is there a pending question?
**Q. Yeah. Did you get the -- if you need to have it read back or I can just reask the question.**
**(Record read as follows:**
QUESTION: Okay. Now, do you think that somebody with a mathematics or computer science degree would -- or should, rather, reach the same conclusion?)
THE WITNESS: I think someone who is used to looking at any kinds of technical documents would come to the same conclusion. I don't think mathematics has anything to do with it.
BY MR. FRIEBUS:
**Q. Well, some of these -- right -- Bayesian**



**probability, that's a mathematical concept. Right? They are mathematical --**
**Justin wanted to talk.**
**(Discussion off the record; reporter expressed concerns about audio quality with Mr. London on a cell phone.)**
MR. FRIEBUS: We can just start over. How about we do that.
THE WITNESS: Okay.
BY MR. FRIEBUS:
**Q. So the question was, Bayesian probability is a mathematical concept. Right?**
MR. LONDON: Actually, I'm going to object. It's a statistical. But go ahead.
THE WITNESS: Yes, it is.
BY MR. FRIEBUS:
**Q. Okay. Is Markov Blanket, is that a mathematical concept?**
A. Markov what?
**Q. You have a notation here, the first one in the list, "Markov Blanket."**
A. So Markov processes are kinds of statistical models.
**Q. But you -- when did you learn about Markov -- these Markov statistical models?**



A. I think -- I think I've known about them since 1975. But they are widely -- I knew about them because I worked with the intelligence community. But they were widely discussed in the speech community starting in 1982 -- except at IBM, who had been doing them since the '70s without much notice to the community.
So they've been around a long time.
**Q. Do you know if that -- these Markov statistical models are things that are taught in college math courses?**
A. It wouldn't surprise me, but they're certainly taught in college speech and language and engineering courses.
**Q. Oh, okay. All right. Similar question: Bayesian probability, is that something that's generally taught in a college math course?**
A. Absolutely.
MR. LONDON: I -- I have to just state my objection. Your question is vague and ambiguous, "college math course."
Do you mean all college course -- all math classes?
BY MR. FRIEBUS:
**Q. Okay. I think, just to be clear -- we have the objection for the record, but I believe your answer**

Page 42

**was "absolutely"?**
A. Yes.
**Q. Okay. All right. So let's continue working through your report here.**
**So the next section, which is -- I believe it says -- the section is -- it's on the 14th page of the report. It says, "The GMAX proposal - a summary."**
**Do you see that?**
A. Yes.
**Q. Okay. And if I -- I understand this correctly, what you're doing is, you're summarizing the opinions that you reached with respect to the five documents that preceded this in the report. Is that right?**
A. That was my intent.
**Q. Okay. So I'm just going to quote a few portions of this section and then ask for comment.**
**So the first section, it's just the opening paragraph here, the opening few sentences, you say, quote (as read):**
**"The five GMAX proposal documents together are a slipshod cut-and-paste rehash of the functional description of the GMAX project. It is entirely lacking in details of the work to be done, the facilities to do the work, the**

Page 43

**characteristics of the operating system to be built, or the intermediate deliveries of the project."**
**You then go on to say, slightly further in the report, "Nowhere in the description of work from the proposers are the following essential elements." Then you list five of them.**
**And then the conclusion of the follow paragraph is, "The proposed description of a GMAX operating system does not even contain a functional description, and is entirely vacuous." All right.**
**So let me ask you this: You can't build anything from these five documents, can you?**
A. There is a description of -- of the things that you might want to do. So there's a description of what a system would do if it were built. That's what I saw.
**Q. Okay. And -- but is that any further along than, you know, a picture on a napkin of a flying car?**
MR. LONDON: I'm going to object. I'm going to object that -- to your -- first of all, your question is -- is vague, ambiguous; it mischaracterizes and misstates testimony, the form of the question, assumes facts not in evidence.

Page 44

BY MR. FRIEBUS:
**Q. So I think the question is, is it any further along than a picture of a flying car?**
**Your objection is noted --**
MR. LONDON: I'm going to object that -- I don't know if -- I don't know if the opposing counsel intends to be funny, but the question is completely nonsensical.
THE WITNESS: Let me answer this way: For any project, anything you want to do, it's helpful to know what it does. And I think there is in this specification a sense of what a GMAX thing would do if you built it.
The specification doesn't tell you how to do it.
BY MR. FRIEBUS:
**Q. Okay. So it might be the -- I think it's going back to your -- you know, our earlier discussion of a basic idea.**
**Is it anything more -- does it advance the ball towards the completion of a project any further than the basic idea that we discussed at the beginning of your deposition?**
A. There are -- there are a bunch of things that the system might do, and there are some scenarios that

Page 45

might -- it might be active in.
So yeah, I think it advances the ball somewhat.
**Q. Okay. So just so I'm understanding your answer, starting from the basic idea, it's your opinion that the five documents we've just discussed advance the ball, so to speak, from that basic idea in some capacity?**
A. Yes. Let me -- can I be explicit?
**Q. Please.**
A. The basic idea, I think, was to have a conversational system. And then you want to understand what the conversational system is to do.
So it -- this document -- these documents do in fact talk about what the system should do. That's where we are.
**Q. So is it then fair to say -- and it's your understanding that Vyasil prepared these documents?**
A. It is.
**Q. Okay. So then would you say that Vyasil provided some value in preparing these documents towards the idea of a GMAX project?**
MR. LONDON: I'm going to object. Vague and ambiguous. What do you mean by "value"?
THE WITNESS: I don't think I can answer the

question, because I don't know where the information about what the things that GMAX was supposed to cover comes from. I don't know if that was provided by Mr. London to Vyasil or not. So I don't know.
BY MR. FRIEBUS:
**Q. Well, I guess what I'm having a hard time understanding is that it has been -- again, tell me if I'm misunderstanding any component piece of your testimony -- but that the -- that the GMAX -- just for shorthand, we'll refer to the five documents identified in your report as the GMAX documents. Is that fair?**
A. Okay.
**Q. And just at least for purposes of these questions.**
**So if I'm understanding you correctly, that the GMAX documents do advance the ball somewhat, or at least to some degree, from the basic idea that Mr. London has proposed, but you can't say whether the documents provide some value to GMAX.**
A. I -- I don't know how to -- I'm not a value guy. I don't know how to estimate the value.
What I don't know is how much of the stuff in the documents Mr. London told Vyasil and how much they produced by themselves. So I just -- I don't know who was the producer here.



**Q. Okay. So it -- let me see if I understand this.**
**It's your opinion that the GMAX documents -- and sorry to shorthand it like this, and I hope it's okay -- advanced the ball somewhat from the basic idea. But without knowing who provided the information in the documents, whether it was Mr. London or Vyasil or who knows who, you can't say whether Vyasil is adding any value. Is that right?**
A. I think that's fair.
**Q. Okay. So -- and just to make sure I'm clear, you don't know who provided the information -- I think this is a corollary to your testimony, but I just want to make sure it's clear for the record -- you don't know who provided the information that's in these GMAX documents.**
A. Well, I know Mr. London provided some, and there was a business plan of some sort. But I don't know about this -- about the things that appeared in these particular documents, that's right.
**Q. Okay. We've been going for a little over an hour. Do you want to take a short break or keep going, or what would you like to do?**
A. It's always good to pee.
**Q. All right. We'll take a 5-minute break.**



A. Fine.
(Recess from 10:16 A.M. to 10:22 A.M.)
MR. FRIEBUS: All right. We can go back on the record.
**Q. All right. Dr. Cohen, we're going to continue to work through your expert report here. We'll jump around a little bit.**
**So I want to jump forward a few pages to -- it's the -- it's the penultimate page of the report before you get to the materials you considered, in the section that starts, "The viability of GMAX, including the value for such a product in 2010/2012."**
A. Okay.
**Q. All right. Excuse me.**
**And so I'm going to talk about a couple -- some of your statements in this section, and then in the section that immediately precedes it.**
**So you say at the beginning of the section that a project such as -- excuse me:**
**"A product such as GMAX could not have been delivered in 2010, as the ontologies required in the natural language support were not available. In fact, such ontologies or natural language support are not available today, some 6 years from the GMAX project."**



**And then if you work two paragraphs up from there into the previous section, in the middle of the second full paragraph on this page, you write, "I judge that the GMAX required ontology is not possible given our current technology."**
**Do you see that?**
A. I do.
**Q. Okay. And then if you go, kind of working back a few paragraphs, to the paragraph on the -- at the end of the previous page, you write:**
**"The GMAX specification calls for natural language, with a wide-ranging semantic ontology, and the semantic ontology description lays out the types of information required in such a resource. No one has created such an ontology (in fact, no one has created an ontology to cover all web resources and applications, never mind human interactions, pragmatic information about the world, and the rules of dialogue)."**
**Okay. So the reason I want to draw your attention to those three pieces of the report, is it fair to say that, as envisioned, GMAX -- and when I say GMAX, I mean both the operating system and the application -- that technology didn't exist in 2010?**

A. That's true. It did not.
**Q. Okay. And as envisioned, the GMAX technology -- again, both the operating system and application components -- does not exist today.**
A. Yeah, I think -- I think you need to be -- we need to partition.
What I meant to say here was that the broad GMAX overview of doing everything was impossible. That's not to say that some of the pieces weren't possible, and I'm sure I said that in my report.
So you can do some subdomains, and you can find appropriate ontologies. In subdomains these days, most of the ontologies are instantiated in code, not in databases. But you can certainly do pieces of what GMAX envisioned, just -- it's the whole thing that you couldn't do.
**Q. Right. So but just focusing on the whole thing, GMAX, as envisioned, I think to use the word that you did, is impossible.**
A. Well, it's not done.
**Q. Okay. So it didn't exist -- to use a shorthand, GMAX, as envisioned, didn't exist in 2010. Right?**
A. Right.
**Q. And GMAX, as envisioned, doesn't exist today.**



**Right?**
A. For the whole thing, that's correct.
**Q. Okay. So there really isn't anything that you could point to in the world today and say, that's a replacement for GMAX as envisioned.**
A. For the entire process, that's correct.
**Q. Okay. And then I -- I think this is where you were going with one of your previous answers. But if we flip back a few pages -- I tell you what. You can stay where you are in your report, and I'll just read you certain portions.**
**In your report at page 14, you say: "It is my opinion that parts of GMAX could have been developed in 2010 and 2011 by a firm that did have such expertise and resources in NLP processing" -- excuse me.**
**And then the section we were just in -- let me make sure I'm at the right page here. Oh, here we go.**
**In the section under "The viability of GMAX," you say, "On the other hand, the more closely scripted but somewhat stilted applications which are exemplified in the specification examples were possible to build."**
**And then you also -- a little further down in that same section, you say, "I judge that a subset of the GMAX applications (without natural language) could have been built in 2010."**



**So when you're talking about the -- it's a long way of saying -- I'm trying to set up a question that's -- when you talk about the viability of GMAX, what you're really talking about is a subset of some of the features of GMAX. Right?**
A. That's correct.
**Q. Okay. And if I'm understanding your report correctly -- and again, tell me if I'm not -- you're saying that a company like Voice Signal, which I think was your former company --**
A. That's right.
**Q. -- or an entity like Siri, could have created a product that contained a subset of the GMAX features.**
A. I believe I pointed out, in fact, that Voice Signal did produce a subset of the things that were described in GMAX, although you have to worry about the details of what they actually are.
But certainly we covered several of the topics in the GMAX topic list. That's right.
**Q. Okay. So I -- so I think what you're saying in your report is, what I see here are a couple companies that exist that had created products -- a couple companies being Voice Signal and Siri -- that have created products that share certain features that GMAX was supposed to have.**



**And so that -- that's the basis for your opinion about the viability of a portion of the GMAX -- I don't know what they call it -- a product like GMAX, I think is one --**
A. How about say, some functions of GMAX?
**Q. Some functions of GMAX. Okay.**
A. Yeah, that's right.
**Q. All right. And just to be clear, the two companies -- you only identified two companies in your report. Right? And that's Voice Signal and Siri.**
**Those are the companies that you use as the basis for comparison here?**
A. That's true. I think so. I don't think I talked about anybody else.
**Q. Okay. And so then --**
A. Excuse me?
**Q. Go ahead.**
A. Siri is a name for an Apple thing, and it was also a company prior to Apple buying it. So I don't know if you need to identify one or the other.
But Siri was an app that was available for free before Apple bought it in 2010 or '11.
**Q. Okay. In my previous question, I was referring to Siri as the company, the corporate entity that was acquired by Apple. Did you understand that**

Page 54

**when you were answering the question?**
A. The answer stays the same. Yes.
**Q. Okay. All right. So let's talk about, you provide an opinion here about the cost to deliver the GMAX application. And again, this is -- I'm sorry, I want to make sure I get the phrase right.**
**You said, functions -- some functions of GMAX?**
A. Yes.
**Q. Okay. So is it fair to say that you provided an opinion -- you're not providing an opinion in this report about the cost to deliver the GMAX application as envisioned. Right?**
A. That's correct.
**Q. Okay. You're providing an opinion on the cost to deliver some features of the GMAX application.**
A. That's still correct.
**Q. Okay. So I want to -- in the paragraph that is the last paragraph of the section, the title of the section doesn't actually include the word "cost," but this is where I find your opinion about it.**
**So the last paragraph right before the section that starts, "The viability of GMAX"?**
A. Uh-huh, I see it.
**Q. Okay. So you say that, quote (as read):**
**"The cost of developing a GMAX-like**

Page 55

**system, which would entail expertise in speech recognition, speech synthesis, scripted dialogues, 'world modeling' or ontologies, engineering implementation, sales, marketing, data collection and management for languages, and management would range from about 30 million to about 50 million based on the two examples above."**
**Those two examples, that's the Siri and Voice Signal. Right?**
A. Right.
**Q. Okay. And again, correct me if I'm wrong, but what I understand you to be doing in preparing this cost estimate is, you're drawing parallels between a certain subset of the GMAX functions and current technology, and then estimating what it would cost to create that current technology. Namely, Voice Signal and Siri.**
A. Current à la 2010, that's right.
**Q. Okay. Can you be any more precise than 30 to 50 million dollars?**
A. Well, it depends on what subset you choose, and I didn't specify, so I don't think so. I mean, it depends on what you decide to do.
**Q. Okay. Now, so let me understand this. Would**

Page 56

**the success of developing -- if I'm understanding your opinion here -- and I'm just going to walk through what I just read -- but the success of developing a product that had some of the features of GMAX would depend on the successful acquisition of expertise in things like speech recognition, speech synthesis, scripted dialogues, world modeling, or ontologies. Is that correct?**
A. That's right.
**Q. And it would depend on the successful engineering implementation?**
A. Certainly so.
**Q. Okay. And it would depend on successful sales and marketing?**
**(Inaudible sound from phone.)**
A. Yes.
THE REPORTER: I'm sorry. If there was an objection, I missed it.
THE WITNESS: There was an objection.
MR. LONDON: If you could repeat -- if the court reporter could repeat the question. The prior question.
(Record read as follows.
QUESTION: Okay. Now, so let me understand this. Would the success of

Page 57

developing -- if I'm understanding your opinion here -- and I'm just going to walk through what I just read -- but the success of developing a product that had some of the features of GMAX would depend on the successful acquisition of expertise in things like speech recognition, speech synthesis, scripted dialogues, world modeling, or ontologies. Is that correct?)
MR. LONDON: Go ahead.
THE WITNESS: Justin, we couldn't hear whatever you said.
MR. LONDON: Oh, I was trying to -- the underlying question is the value of the cost of replacement?
MR. FRIEBUS: I'm sorry, are you asking me a question?
MR. LONDON: No, I'm asking the -- go ahead. Just proceed.
BY MR. FRIEBUS:
**Q. Okay. So just so that we can sort of restart this a little bit, but the question I was asking you is the success of developing a product with some of the features of GMAX. And we ran through a couple of -- a couple factors.**

**But the one we were just on would depend on the successful sales and marketing?**
A. It's a mixed picture. So for instance, for Voice Signal, it's certainly true that we had to market. And we marketed to Samsung and Motorola to start, and then other places.
With Siri, the group developed an application which they gave away for free, and that was then bought by Apple. So they didn't do any sales and marketing, except for the incidentals of making a free product.
So I think the implication that it must have sales and marketing is not quite so clear.
**Q. Okay. And then just moving down through the rest of the portion of your report, it would depend on successful data collection and management for languages?**
A. That's certainly true.
**Q. Okay. And maybe this is just stating the obvious, but I'll do it anyway.**
**It would depend on successful management of the company as well.**
A. Yes. Let me back up a second to make a complete answer for the previous question about data and other things.
Circa 2010, that's the correct answer. That



would not be the answer today. Not necessarily.
**Q. What would be different?**
A. There are free services of speech recognition and other kinds of things, speech synthesis, that are offered by various companies. So you could mount such a product without ever doing the speech recognition. Google offers an API that's available.
And so there's lots of things that happened in this technology marketplace that makes this product easier to build today.
**Q. Understood. Okay.**
**Well, let me ask you -- you've raised a good question. When you provide your cost estimate of 30 million to 50 million -- and maybe I just don't have it in my notes -- but was that a cost estimate for 2010 or 2016?**
A. 2010.
**Q. Okay. Would that be more or less in 2016? Or is it just hard to say?**
A. There are so many details, it's hard to say. The -- there's network services and all kinds of other stuff that get in the way. I just can't tell. I'm sorry.
**Q. Okay. That's fine.**
**Now, you don't provide an opinion on the**



**probability of success of developing a GMAX-like system or a system that has some of the functionality of GMAX in this report, do you?**
A. I think by implication I do, because I cited two companies that did very similar things. So you can do it.
**Q. Right. But you don't assign a probability to that outcome, do you?**
A. I don't think I do.
**Q. Okay. Do you think it's possible to assign a probability to an outcome like that?**
A. Every product that I've been associated with that's similar to this was a startup. And the probability of a startup that succeeds is one in ten, maybe.
So that's the only probability that I know that has anything to do with this.
**Q. Okay. And when you say one in ten, is that a probability -- and we'll get to this a little later in connection with your second report -- but do you -- is the basis for that probability the Forbes article that you cited in your second expert report?**
A. Well, I don't remember that. I'll have to look at it.
**Q. Okay. What's the basis for you saying one in**



**ten sitting here right now?**
A. That's what's -- that's how startups work. I mean, I think it's a widely known -- it's an everybody-knows statistic that's one in ten startups.
**Q. One in ten, everybody knows -- sorry, go ahead.**
A. Yeah. One in ten startups survives.
**Q. That seems awfully high to me.**
A. It might be. In my circles, that's what we see.
**Q. Okay. I don't know. I mean, I'm a lawyer sitting in an office in Chicago, so what do I know?**
A. That doesn't mean they make a lot of money. Just that they survive.
**Q. Okay. Right. We could qualify that. One in ten doesn't mean that one in ten are going to be Apple or Google or anything.**
A. That's right.
**Q. Okay. All right.**
**So let's move on to the -- I think, actually, we're sticking to the same section of this report. But you go on to say -- and this is right at the bottom of the page in page number -- or page 17 of the report, where you say (as read):**
**"Properly planned, engineered, and**

**marketed, it is clear that this application might have been worth more than $300 million. On the other hand, there was substantial competition for the services, and given the plans and descriptions available I would judge their probability of success to be very low in light of Vyasil's inability and lack of expertise to develop what was specified to be developed."**
**I just want to ask you, so in that first sentence, you say, "this application might have been worth more than 300 million." You mean a product like Voice Signal or Siri, a product that has a subset of the features of GMAX?**
A. Yes. That's what I meant.
**Q. Okay. And that more than 300 million estimate is based on the prices that companies paid to acquire Voice Signal and Siri?**
A. That's also correct.
**Q. Okay. Does that take into account any other factors, or are those acquisitions the data or the facts, or however you want to put it, the basis for your conclusion?**
A. The acquisitions were the basis.
**Q. Okay. Now, when you say more than $300**



**million, do you mean in 2010 or the present, or when the report was written?**
A. Voice Signal was sold in 2006, I believe, for $293 million. And I think prices go up over time. There was actually inflation then. So that's --
**Q. What a concept.**
A. So that's where the 300 million comes from.
**Q. Okay. But just to be clear, when you say 300 million, do you mean in 2010 dollars or 2016 dollars?**
A. 2010 dollars.
**Q. Okay. And I think you might have answered this in part of -- as part of your previous answer. But would that number go up in 2016?**
**In other words, would a product like Voice Signal or Siri be more valuable in 2010 or more valuable in 2016?**
A. Yeah, that's an interesting question.
The real answer is, it depends on what it did that was novel and how easy it was to use and what platform it was in. There's just so much -- I have no idea how to answer that in generalities.
**Q. Now, just to be clear, the 300 million figure represents revenue that would have been earned, you know, presumably by Voice Signal or the company that**



**owned Siri, from the sale of the application.**
**It's not -- 300 million isn't the cost to replace the application. Right?**
A. I -- it is certainly the number that comes from the sale, and I assigned it that value. So I don't know what you're replacing. I mean, am I replacing --
**Q. No, I guess what I'm saying is -- just to clarify the question, when you say 300 million, that figure, it's a revenue -- it's -- it represents the amount of money that a company would pay to acquire that product from another company. Right?**
A. That's correct.
**Q. Okay. All I mean to say is, that's not necessarily the cost to develop the product that gets sold. That's the distinction I'm trying to draw.**
A. I didn't -- I didn't opine about -- well, I did -- I think I said something about how much it would cost to make such a company, which was I thought in the 30- to 50-million-dollar range.
But the 300 million was certainly about the sale, yes.
**Q. Okay. And I think, as you point out in your report, the 300 million figure is contingent on, as you put it, proper planning, engineering, and marketing.**



**Right?**
A. Right.
**Q. And again, you don't quantify the probability of success of such an endeavor in this report.**
A. I think that's correct. I don't.
**Q. Okay. Now, staying on the last page of your report here, you were also asked to prepare an opinion about the cost to deliver a mobile operating system.**
A. Yes.
**Q. And your opinion here is, "I think a reasonable estimate for creating a new cell phone operating system today would be $2 billion."**
**And you also say, "Creating a business of such an operating system today is particularly difficult, and would have been difficult in 2010."**
**So I just want to understand how you prepared the cost estimate, how you got to $2 billion. And as I understand from your report, the basis for that number is the cost to develop Linux in 2008.**
A. Right.
**Q. Right?**
A. Yes.
**Q. Okay. So what you're doing is, you are drawing a comparison or analogy from a mobile operating system to Linux, which is a computer operating system.**

**Right?**
A. Yes.
**Q. And then making some determination about the price or the cost to develop Linux in 2008 versus, you know, the fact that it's 2016 today.**
A. Right.
**Q. Is that sort of a fair summary of how you prepared your opinion?**
A. Yes, it is.
**Q. Okay. Just to be clear, in your report, you don't go into the similarities or differences between a computer operating system and a mobile operating system, do you?**
A. I do not. Although you should think that a mobile phone today is a computer. That -- if you think of it as anything else, you're making a mistake. It is a computer.
**Q. Sure. Okay. So do you see any differences between a computer operating system and a mobile operating system?**
A. They all have to deal with the same issues. So they have to deal with file systems and input/output and displays and -- I -- they're essentially the same.
**Q. Okay. And you say that even though they -- I'll say obviously; maybe it's not so obvious -- that**



**they have different hardware restraints or constructions to deal with?**
A. You might think that, but it's not as different as you think. Things that we -- for instance, at Voice Signal, we built a 40,000-word continuous dictation system that ran on an ARM9, which was the 2002 chip in a mobile phone.
So the mobile phones have tremendous capabilities and lots of things to attach to.
**Q. Okay. So you're not -- you don't see a lot of differences between creating a desktop operating system versus a mobile operating system?**
A. I don't.
**Q. Okay. Do you have any experience in developing mobile operating systems?**
A. No, and I'm sure I said that.
**Q. Okay. Do you have any experience in developing what I'll call desktop operating systems?**
A. No. I am not an operating system guy.
**Q. Okay. So is it fair to say that you're not really an expert on the costs to develop an operating system?**
A. That would certainly be fair.
**Q. Okay. Well, you can put this exhibit to the side. I think we're done with your first expert**



**report.**
**All right. So let's move on to your second expert report.**
A. Okay.
**Q. So if you could take a look at what's been marked as Exhibit 4.**
A. I have it.
**Q. Great. Is this the rebuttal expert report you prepared in this case?**
A. It is.
**Q. Okay. And are all the facts and data you considered in forming the opinions in this report disclosed in the report?**
A. I believe that they are.
**Q. Okay. How many hours did it take you to prepare your rebuttal expert report?**
A. You know, I just don't remember. It wasn't a lot. Five or ten.
**Q. And similar question as earlier today: Was the rate that you charged plaintiffs for preparing this report the 250 an hour?**
A. It's the same as it was, yes.
**Q. All right. So I -- we'll do the same drill. We'll just walk through this expert report, and I'll ask you some questions about each section. And we'll**



**start with the section that begins on the second page of the report, "The GMAX specification and the GMAX idea."**
**Do you see that?**
A. I do.
**Q. Okay. So running from this heading to the next heading in the report on the following page titled "Intellectual property," does this section essentially purport to summarize the opinions in your first expert report?**
A. I don't know the answer to that. Let me look.
**Q. Sure.**
A. Yes. I think I did.
**Q. Okay. So I do want to focus on something that I didn't see as part of your first expert report, and that's on the -- it's the second-to-last paragraph before the section that starts "intellectual property"?**
A. Uh-huh.
**Q. And it's about halfway through the paragraph. And I'll read the section I want to draw your attention to. You write (as read):**
**"However, had a GMAX mobile OS been developed, GMAX would have had valuable IP in the OS code base that could have been sold or licensed to another company that would have**

Page 70

**been worth at a minimum several million dollars (if not tens of millions). For instance, Palm's mobile OS failed, but the company and OS was acquired by HP for 1 billion."**
**Do you see that?**
A. I do.
**Q. Now, you didn't say anything in your first report that we just looked at about any intellectual property that would have been generated in connection with a mobile operating system. Right?**
A. That's right. I didn't.
**Q. Okay. And you didn't provide any kind of estimate of the value of such intellectual property in your first report. Right?**
MR. LONDON: Objection. The exhibit -- if I could just -- assumes -- it assumes that the figures don't include -- that he gave don't include intellectual property.
Go ahead.
THE WITNESS: Justin makes a point. So for instance, assigning a value to a company includes intellectual property.
BY MR. FRIEBUS:
**Q. Okay. But you don't specifically value any**

Page 71

**specific intellectual property in your first report. Right?**
A. I did not assign a number to it. That's correct.
**Q. Okay. Now, here, correct me in I'm wrong, but it doesn't appear to me that you explain how you arrive at your conclusion that the intellectual property in the operating system code base would have been worth, at a minimum, several million dollars. Right?**
A. That's true. I gave an example of an OS that was similar to what GMAX should have been that sold for a lot more than that.
**Q. Okay. Now, any intellectual property would have been contingent on developing technology. Right? Actual technology?**
MR. LONDON: Assumes facts not in evidence. Assumes intellectual property --
MR. FRIEBUS: Mr. London, I'm just going to state for the record, no speaking objections.
THE REPORTER: This is the reporter. I'm not sure that I heard the entire objection.
MR. LONDON: I said, assumes facts not in evidence, and assumes that intellectual property was not including patents.
MR. FRIEBUS: Okay. Mr. London, once again,

Page 72

I'm treating your speaking objections as coaching of the witness. I'm going to ask you to stop.
MR. LONDON: Once again, I object to your characterization of me coaching the witness.
MR. FRIEBUS: I'm sorry, Mr. London, but the objection is, "assumes facts not in evidence" -- excuse me, Mr. London. The objection is, "assumes facts not in evidence." When you continue to speak and provide additional information, that's coaching the witness.
MR. LONDON: No, it's not, when it's not clear from the record what's not assumed in the -- or assumes -- what facts are not assumed.
MR. FRIEBUS: And Mr. London, your job is not to perfect my questions. Your job is to make objections. And if I feel that the objection -- that my question is fine, then I assume the risk that it's not. And the judge will later strike the question and the answer if he feels it doesn't meet the required form.
But again, I feel like you were providing the witness with certain information that you'd like him to consider, and I -- I will ask once again, as I've asked in the other depositions and earlier today, that you confine the objection to the objection itself, without the commentary. All right?

Page 73

**Q. So we'll start the question again.**
**Any intellectual property in the OS code base, that's -- that would have been contingent on actually developing specific technology. Right?**
A. Yes. My experience is in -- is in patents. And in patents, you have to show that you could have made something happen. So you can have a patent without actually doing it. I don't know how to value those things.
**Q. Okay. But in this case, you talk about an OS code base that could have been sold or licensed. Right?**
A. Yes.
**Q. Okay. But in the report, you don't identify any specific technology that could have been sold or licensed.**
A. That's true.
**Q. Okay. And you don't -- again, similar question to what we've asked earlier today -- you don't opine or estimate the probability of generating any kind of specific technology.**
A. I don't.
**Q. Okay. Now, in the following section that starts "intellectual property," so -- and you can flip to the following page, is where I want to draw your**

Page 74

**attention.**
A. Okay.
**Q. So it's the first full sentence at the top of the page there.**
**You say, "It is sensible to assume that some intellectual property would have been generated."**
**And then a little lower down, you say, "As my own experience would attest, any venture like GMAX would have created valuable intellectual property."**
**Do you see that?**
A. Yes.
**Q. Okay. Now, again, in your first report, you didn't say anything about intellectual property being generated in connection with the GMAX application, did you?**
A. Not that I remember.
**Q. Okay. Now, you say, "any venture like GMAX would have created valuable intellectual property."**
**Do you see that?**
A. Yes.
**Q. Isn't that a bit of an overstatement?**
A. No.
**Q. Okay.**
A. I've been -- I've been associated with two startups. In the first startup, I was personally

Page 75

responsible -- or coauthor for 14 patents. In my current startup, I just submitted Patent No. 11. We've been in existence for 2 years.
It's entirely -- patents turn out to be a substantial part of the infrastructure of building small companies in the United States. So it's --
**Q. Sure. But are you saying that all startup ventures create valuable intellectual property?**
A. I can't speak for all of them. Certainly every one in my experience has done that.
**Q. Okay. And your experience would be two?**
A. I personally have been involved in two.
**Q. So were you involved in the GMAX project?**
A. I was not.
**Q. Okay. So they don't get to take advantage of your great batting average. So that's why I guess I say, when you say any venture like GMAX, it leaves me -- you're not saying, just to be clear, that all startup ventures create valuable intellectual property.**
A. That's true. The reason for my statement --
MR. LONDON: Object. Just so -- I'm going to object. It's -- the report speaks for itself, "any venture like GMAX."
MR. FRIEBUS: So I'm going to ask the question again.

Page 76

**Q. You're not saying that all startup ventures create valuable intellectual property, are you?**
A. I am not claiming that.
**Q. Okay. Now, I can direct you to the portion of your report, but I'll just state it, and if you're comfortable with it, we can go to the question.**
**But you said in your first report that you would judge their probability of success to be very low in light of Vyasil's inability and lack of expertise to develop what was specified to be developed.**
**So if you say in your first report that the probability of success is very low, aren't you contradicting yourself here in the second report when you say that GMAX would have created valuable intellectual property?**
A. I'm --
MR. LONDON: Objection. Assumes facts not in evidence. Hold on. It assumes facts not in evidence.
THE WITNESS: So my second report was about a GMAX-like company that would have been successful. I think the Vyasil issue is a separate issue. So --
BY MR. FRIEBUS:
**Q. Okay. So this -- sorry, go ahead.**
A. No, go ahead.
**Q. I didn't mean to interrupt you.**

Page 77

A. I'm done.
**Q. Okay. All right. So this section is -- in this portion of your report, you're talking about a GMAX company that would have been successful?**
A. Yes.
**Q. Okay. And that's somehow different than what you were describing in your first expert report?**
A. In my first expert report, I was reviewing the documents that purported to be the design documents for GMAX. And I -- I found that they were not sufficient.
That doesn't mean you couldn't have built such a company.
**Q. Okay. So is it -- let me make sure I'm understanding your answer.**
**In this section of your report titled "Intellectual property," are you making the assumption in rendering your opinions that GMAX would have been successful?**
A. Yes.
**Q. Okay. So when you say it's sensible to assume that some intellectual property would have been generated, you're assuming at least some success for the GMAX endeavor.**
A. Or at least some -- some movement toward a success, that's right.

**Q. Right, okay. So if GMAX failed, you wouldn't expect intellectual property to necessarily come out of -- if it never got off the ground, it wouldn't create any intellectual property?**

MR. LONDON: Objection. Assumes -- hold on. It assumes facts not in evidence. You've already addressed this. You're mischaracterizing what intellectual property is.

THE WITNESS: So my answer is, if there is intellectual movement toward a company, you develop intellectual property along the way.

The fact that the company fails doesn't mean there's no property.

BY MR. FRIEBUS:

**Q. Sorry. I guess -- when I meant failure, I guess I meant when there wouldn't be any actual movement toward the product, you wouldn't expect there to be intellectual property generated.**

A. I guess that that's true. It is -- as I said, it's possible to create a patent that you can prove is executable without actually doing the execution. So it's conceivable to make intellectual property in that case without actually having the company go forward.

But -- but by and large, I think, as the company goes, then you develop new things. And



that's --

**Q. Okay. Did you see anything that was patentable in the -- what we have been calling earlier the GMAX documents that you reviewed in connection with your first expert report?**

A. I did not.

MR. LONDON: Objection. Calls -- objection. Calls for speculation. The witness already testified he's not an expert in patents -- go ahead.

(Audio issue; reporter requested clarification.)

THE WITNESS: I'm certainly not a lawyer, but I didn't strike anything that would be patentable from the documents that were there.

BY MR. FRIEBUS:

**Q. Okay. Now, getting back to the -- to this section of your report titled "Intellectual property," you don't identify any -- you don't identify any specific intellectual property that would have been generated in this report. Right?**

A. That's --

**Q. You don't identify any specific patents or trademarks or other forms of intellectual property, do you?**

A. I do not.



**Q. Okay. So as we move ahead here, we're on to the next section that starts, "The report of Mr. Hochmann."**

**Do you see that?**

A. I do.

**Q. Okay. And this section of your report, if I understand it correctly, is intended to address Mr. Hochman's expert report?**

A. That's correct.

**Q. Okay. And just for the sake of clarity, the report to which you're responding is the report that's been marked as Exhibit 5?**

A. Yes.

**Q. Okay. Now, if you want to take a minute, I don't -- it sounds like you might not have reviewed this report in connection with preparing for your deposition. But if you just want to take a look through this section, I'm going to ask you a few questions about it.**

A. (Examining document.) Okay.

**Q. All right. So I want to focus on the second, third, and fourth paragraphs of this section of your report, where you're describing Mr. Hochman talking about Veoxo and Linkepic.**

**Do you see that?**



A. Yes.

**Q. You understand that Veoxo and Linkepic are different companies than GMAX. Right?**

A. Yes.

**Q. Okay. Why are you responding to Hochman's assessment of Veoxo -- strike that.**

**It appears to me, based on reading your report, that you're responding to Hochman's assessment of Veoxo and Linkepic by referencing GMAX.**

**I guess my question would be, why are you doing that?**

A. Hochman was complaining about the GMAX management.

**Q. Where does Hochman complain about the GMAX management?**

A. He -- he starts talking about Vyasil in paragraph 32. I mean, this is -- Vyasil are the people that GMAX had asked to do development for them. It says, "London's" -- 24: "London's companies were involved in technology markets that were highly competitive, with entrenched competitors."

So he doesn't exclude GMAX. Just talking about London's companies. And he's talking about Vyasil -- the only relationship that I know between London and somebody who was to do work is in Vyasil or

Viasem. So it -- if the Vyasil reference wasn't to GMAX, then that's something I didn't know.
**Q. Okay. Now, one of the -- on the next page of your report -- and this is a paragraph that kind of breaks over the fourth and fifth pages of your report.**
**But you say -- and it starts in the middle of the top paragraph:**
**"Mr. Hochman's assumptions are simply wrong - in a highly competitive environment with entrenched competitors the chance for a smart, forward-looking startup is not only very fertile, but the competitive market allows the start-up to sell itself to a large competitor who sees the competitive advantage of the startup's advances."**
**Do you see that?**
A. I don't, but that's okay. Let me look.
**Q. Sure.**
A. Where are you?
**Q. It's on the fifth page of your report. So this is still in the section titled "The report of Mr. Hochman," and it's the paragraph that kind of starts on the previous page, breaks over the page, and it -- the it's right before the --**
A. Yes, I see it. I see it.



**Q. -- paragraph that says "Microsoft"?**
A. I see it.
**Q. All right. So just to orient you back to that conclusion.**
**Now, that conclusion assumes that the startup has something to sell. Right?**
A. Certainly so.
**Q. Okay. So any sale would be contingent on either developing specific technology or some other -- something else of value. Right?**
A. That's correct.
**Q. Okay. Now, you don't identify, again, any specific technology that would have been developed by GMAX. Right?**
A. I do not.
**Q. Okay. And you don't estimate the probability or calculate the probability of generating specific technology or something else that could be sold. Right?**
A. That's correct. I do not.
**Q. So then you just -- you want to look at -- direct your attention to the last page -- or excuse me, the last paragraph of this section, where you say (as read):**
**"As to the value of the GMAX company had**



**it succeeded, I showed that similar companies in similar times sold for about 250 million. Not all companies succeed -- in fact, Forbes notes that 'Nine out of ten startups will fail.'"**
A. There's my one-out-of-ten number.
**Q. Right. And then you say: "Taking this failure probability into account I judge the expected value of the GMAX startup to be" -- well, I'll add the "be" -- "between 25 million and 250 million."**
A. Yeah.
**Q. Right?**
A. Right.
**Q. Didn't you previously estimate the value at more than 300 million?**
A. I did.
**Q. In your first report?**
A. Uh-huh.
**Q. Why are you backtracking now?**
A. Just sloppy.
**Q. Okay.**
A. That -- my -- the implication in this paragraph is that because there's a probability of failure, it would be less. So the 250 million is justifiable. But it's just sloppy writing.



**Q. Okay. So then why don't you take a look at what's been marked as Exhibit 6, the document with the smiling gentleman on it.**
A. Oh, yeah.
**Q. And is this the -- this is the article to which you're referring in your expert report?**
A. I guess it is. Although it's in a terrible form, because lots of stuff isn't filled in.
**Q. If you'd like, I can try and get a --**
A. No, that's okay. I can read it.
**Q. -- better copy. Okay.**
**Now, if you want to take a look at it, but -- correct me if I'm wrong, but the Forbes article doesn't reveal the methodology by which it arrives at the nine-out-of-ten figure, does it?**
A. No, it does not.
**Q. Okay. And it -- the article doesn't cite any studies that support the conclusion that nine out of ten startups fail, does it?**
A. I don't think so.
**Q. Okay. Let's keep moving through your report.**
**The next section of your report is titled "Expert Report of Jeffrey Stec." I'm going to go out on a limb and say this section of your report addresses Dr. Stec's expert report.**

A. Yes.
**Q. Okay. And if you can just take a look at what's been previously marked as Exhibit 7, is that the expert report to which you're responding?**
A. I think it is.
**Q. Okay. All right. So I want to direct your attention to the second full paragraph in the section. About halfway through the paragraph, the section that starts, "While the potential IP."**
**Do you see that?**
A. Yes.
**Q. So I'm just going to read it and then get a reaction.**
**So you write, quote (as read):**
**"While the potential IP was not specifically noted in the GMAX documents, it is clear from the business plan that Mr. London's vision exceeded the state of the art in mobile voice interfaces (and, in fact, the vision that he discussed in the natural language interface for any topic using a mobile device remains an elusive target) and IP should have been expected."**
A. Right.
**Q. Do you see that?**



A. I do.
**Q. Now, you reviewed the GMAX business plan in connection with your first report. Right?**
A. Right.
**Q. Okay. And you didn't say anything in your first report specifically -- I think we already have an answer to this, but I'll ask it again -- you didn't say anything in your first report about any specific intellectual property being generated in connection with the GMAX application. Right?**
MR. LONDON: Objection. Objection. Asked and answered.
THE WITNESS: I did not say anything about it.
BY MR. FRIEBUS:
**Q. Okay. Now, at this last phrase, when you say "IP should have been expected," do you see that?**
A. I do.
**Q. Is the IP that you're talking about in that sentence the patents and the trademarks that you then go on to discuss in the next paragraph?**
A. That's certainly what I was thinking about, yes.
**Q. Okay. But you're not thinking about something else.**
A. No.



**Q. Okay. All right. Well, let's talk about that paragraph, then.**
**So you say -- and I'm just continuing through the report -- quote (as read):**
**"I believe there is a very high probability that the GMAX work would have resulted in one or more patents and the speech interface/application space. Such patents, in my experience, have sold for between 100,000 and several million dollars. The patents which would have been created by GMAX should have been worth at least several hundreds of thousands of dollars."**
**All right. Now, you'd agree with me that any patents would have been contingent on developing some kind of specific technology. Right?**
MR. LONDON: Objection. Assumes facts not in evidence. It mischaracterizes the previous testimony.
THE WITNESS: So what I said was, you would at least have to have described things that were new that were implementable. So the development is not necessary per se. But if there were a development, then I would expect this kind of thing to happen, and, in my experience, does happen.



BY MR. FRIEBUS:
**Q. Okay. Now, you don't identify any specific technology that would have been patentable. Right?**
A. I do not.
**Q. Okay. And you don't estimate or quantify the probability of generating technology that would have been patentable. Right?**
A. I do not.
**Q. Okay. And you don't identify comparable patents from which a value can be derived, do you?**
A. I don't, but I -- part of my work in the past has been to help identify and value patent portfolios, and this is the range that I see things being worth in those identifications.
I must say, there's a problem with characterizing technology in patents. Patents are often details about technology. So just understanding a technology doesn't mean you understand what is patentable and what isn't.
So there tend to be -- patents tend to be much more fine-grained than identifying technologies.
**Q. Okay. So any patents that would have -- maybe ask this a different way. It's -- maybe put a different way, any patents would have been contingent on creating an adequate description of technology?**

Page 90

A. That's certainly true. And it's also true that the development of the technology will naturally generate patentable material.
**Q. Okay. All right. So you talked about patent portfolios that you have experience with?**
A. Uh-huh.
**Q. Okay. Sorry, you have to say "yes" for the court reporter.**
A. I'm sorry, yes.
**Q. Now, you don't identify those patent portfolios in your report, do you?**
A. I don't. That's part of my experience.
**Q. Okay. And what experience -- tell me about the patent portfolios now.**
A. Tell you -- what would you like me to tell you?
**Q. Well, I'd like you to tell me how they informed your opinion as to the value of -- well, I should say, how they informed your opinion with respect to the section of the report we've been discussing.**
A. I was asked by a large company, which I'll -- I will name if you force me to -- to look -- the company was being sued by Nuance. It had been sued by Nuance and was about to be sued again. And they asked me to take a portfolio of 250 patents and find out

Page 91

which of those were possible to buy as protection against a further Nuance suit. So I did identify a collection -- small collection of patents.
And the negotiations ended up in sales of those -- in cost to buy those patents from the hundreds of thousands of dollars to the millions of dollars.
**Q. Okay. So those are -- and in your experience, these are -- these are actual patents that you identified in connection with your other engagement. Right?**
A. Yes.
**Q. Meaning they got patent numbers?**
A. Yes. And they -- they negotiated prices for them. Right.
**Q. Okay. So it would have been possible for you to identify by patent number the patents you had in mind in writing this section of your report. Right?**
A. I could identify a superset. I wasn't -- the project was ultimately canceled, and they didn't buy any. So I -- yes. I know -- I know a set of patents that includes those patents, but I don't know which ones in detail they were.
**Q. Okay. So let me ask you this. Let me just make sure I'm understanding you.**
**As part of a previous engagement, you were**

Page 92

**asked to review a set of 250 patents and see what could be bought. You identified a subset of those patents that you thought were ripe for sale or could be purchased --**
A. No, I thought they were correct -- I'm sorry?
**Q. Sorry, go ahead.**
A. I thought they were the correct patents for the company to own if they were going to be sued again.
**Q. Okay. And that there -- you were aware of discussions -- but you had identified a subset of or a collection of patents that you thought the company should own if they were going to get sued again. Right?**
A. That's correct.
**Q. Okay. And you're aware of discussions or negotiations for the acquisition of the patents that give you a value range for those -- that provide a value range for what the structure of those were negotiations were. Right?**
A. That is correct.
(Reporter requested clarification.)
BY MR. FRIEBUS:
**Q. The structure of the -- I think what I was trying to get at is -- I forget exactly what I said, but that you were aware of negotiations that provided**

Page 93

**you with a range of figures for the acquisition of those patents.**
A. That is correct.
**Q. Okay. And that's what you had in mind when you wrote this section of your report.**
A. It is.
**Q. Okay. And so -- and I think just to tie all this up with a bow, you could have -- I mean, you had the information available to you to provide those specific patent numbers in this subset of patents in connection with this report. Right?**
A. I could have done that, yes.
**Q. Okay. Now, Mr. London had raised an objection earlier that you were not an expert in patents.**
**Would you agree that -- with Mr. London that you're not an expert in patents?**
A. My expertise is in support for patent litigation. So I'm not a lawyer, and I'm not an expert in the business of patents. I do do expert witness work supporting people who have been sued to either rebut the suit or advance the suit.
**Q. Okay. So let's go -- you go on in this same paragraph in your report to talk about trademarks.**
A. Uh-huh.
**Q. All right. So same drill. I'll read you a**

Page 94

**portion of the report then ask for a reaction. You write (as read):**
**"The trademark(s) also would have had value of at least several tens of thousands of dollars (and likely higher) given that GMAX would have acquired distinctiveness in the market as an innovative company in the mobile speech recognition/NLP space."**
**Do you see that?**
A. Yes, I do.
**Q. Now, you didn't say anything in your first report about trademarks in connection with GMAX. Right?**
A. That's correct.
**Q. Okay. Now, I think this goes without saying, but I'll say it anyway.**
**Any trademarks would have depended on the success of the company. Right?**
A. Absolutely, yes.
MR. LONDON: Objection. That's -- objection. Let me -- objection. Calls for speculation and mischaracterizes the testimony.
BY MR. FRIEBUS:
**Q. You can answer.**
A. I'm not an expert in trademarks. They

Page 95

certainly have some value.
**Q. Well, I mean, a trademark -- the value of a trademark would depend on the success of the company, at least in part. Right?**
MR. LONDON: I'm going to once again object. It assumes facts not in evidence, it mischaracterizes his testimony, and it calls for speculation.
THE WITNESS: Yeah, so the answer is, I don't know. Trademarks are associated with things. I don't know that they need to be successful to be valuable, although certainly success would enhance the value.
I'm trying to think of a case where there's a trademark that came from a nonsuccess. I'm sure I could come up with one with enough thought.
But anyway, trademarks -- trademarks are valued because they allow you to identify something with a broad brush. And they have value if you have something that is useful to whatever customers you have that's identified that way.
BY MR. FRIEBUS:
**Q. Well, I mean, correct me if I'm wrong, but a trademark needs to be used in trade. Right?**
A. Yes.
**Q. Okay. So you need to actually have an active company in order to have a trademark -- or an active**

Page 96

**brand, or something active --**
A. Something --
**Q. -- in trade --**
A. Something active.
MR. LONDON: Objection. Assumes facts not in evidence.
(Reporter requested clarification.)
THE WITNESS: So I agree with you, although active doesn't imply success. That's all.
Yes, it has to be used in trade, but it doesn't have to be used in successful trade.
BY MR. FRIEBUS:
**Q. Okay. Now, you don't -- you don't provide any -- or you don't quantify the probability of the success of a mark in this case. Right?**
A. I do not.
**Q. And you don't identify comparable trademarks from which a value could be derived.**
A. That's true.
**Q. Okay. Do you have any experience in valuing trademarks?**
A. No.
**Q. Would you consider yourself to be an expert in the valuation of trademarks?**
A. I would not.

Page 97

**Q. All right. I tell you what. I think that I am done, but if you will give me a minute just to make sure -- I am going to ask you just to take a look at the two binders that were -- that are there in Exhibits 2 and 3, and I can tell you what we've done is taken the documents that we were provided by Mr. London -- strike that. Start over.**
**We asked Mr. London to provide us with the documents that are identified in Appendix A to your report. And what we've done is print out -- we've numbered them and then printed them out in numeric order and put them into the binders that are in Exhibits 2 and 3.**
**So while I'm taking a minute on my end to make sure I've gotten everything and wrapping up, if you wouldn't mind taking a moment to look through the binders in Exhibits 2 and 3 and just confirm for me that they contain the documents referenced in Appendix A to your first expert report.**
A. Okay.
**Q. Okay?**
A. I'm going to take a minute to pee first.
MR. FRIEBUS: Okay.
(Recess from 11:30 A.M. to 11:48 A.M.)

Page 98

BY MR. FRIEBUS:
**Q. So Dr. Cohen, I just have two questions for you.**
**The first one is, would you please confirm that the binders that have been marked as Exhibits 2 and 3 contain the documents identified in Appendix A of your first expert report?**
A. I do.
**Q. Okay. And then I'm going to ask you an unfair question. But I'm going to ask it anyway.**
**You know Dr. Dahl. Right? You're familiar with her work?**
A. I do.
**Q. Okay. Between the two of you, who is better qualified to provide an expert opinion in this case on the GMAX application?**
MR. LONDON: I'm going to -- I'm going to object to that line of questioning, especially since you didn't ask the question of Dr. Dahl. And it's also irrelevant.
(Reporter requested clarification.)
They both have been -- they both have been identified as experts, and -- you don't have to answer that question, Dr. Cohen. It's a -- a question that makes absolutely -- completely irrelevant.

Page 99

MR. FRIEBUS: I'm sorry, Mr. London, are you actually directing the witness not to answer that question?
MR. LONDON: You don't have to answer a question -- you're asking -- well first of all, it calls for speculation and assumes that he knows everything about Dr. Dahl.
They each have a different skill set. So ...
MR. FRIEBUS: I just -- look, Mr. London, I just want to be perfectly clear for the record, as -- you know as well as I do, I'm not asking for any privileged information. I'm not asking for material that's protected from disclosure by the Federal Rules.
You know, I -- I would like Dr. Cohen to provide an answer to that question. If you're going to direct him not to answer, then I think you're putting him at risk of having to be brought back to another deposition to answer that question.
MR. LONDON: Well, no. The question -- the question is -- it calls for speculation, so the -- the deponent doesn't have to speculate.
Well, actually, could you read back -- could the reporter read back the question?
(Record read as follows:
QUESTION: Okay. Between the two of you,

Page 100

who is better qualified to provide an expert opinion in this case on the GMAX application?)
MR. LONDON: Yeah, I'm going to -- what does that mean, "better qualified"? They both have doctorates, and they both have different skill sets related to natural language processing.
MR. FRIEBUS: Mr. London, I'm going to ask you once again, if you want to state an objection for the record, that's fine. But, you know, the speaking objections, I'd like them to stop.
I'd like Dr. Cohen to provide an answer to that question so we can move on.
MR. LONDON: With respect to what? With respect to what? GMAX with respect to what? Regarding patents? Regarding what?
MR. FRIEBUS: Are you done with your objection, Mr. London?
**Q. You can go ahead and answer the question unless Mr. London directs you not to answer.**
A. I am willing to answer the question.
Is that okay, Justin?
MR. LONDON: Yes, go ahead.
THE WITNESS: Debbie Dahl has lots of experience in dialogue systems; I have lots of experience in implementation of conversational systems

Page 101

in intellectual devices in markets. So our expertise, I think, are complementary.
So I have been doing speech and language, and I've managed a bunch of language stuff. And she's been developing language systems. So if you were building a team to do GMAX, you would like us both.
MR. FRIEBUS: I'll accept that as your answer.
Thanks very much for your time, Dr. Cohen. I appreciate it very much. I don't have any other further questions for you.
MR. LONDON: I -- I have some questions for you.
(Discussion off the record.)
EXAMINATION BY MR. LONDON
BY MR. LONDON:
**Q. Okay, if you could take a look -- going back to the GMAX technical specifications. I want -- there's a --**
A. Tell me how to find the GMAX technical specification.
**Q. Yeah, it's a document that is -- it's the document that has all the copy and pasted stuff?**
A. Yeah. You don't know what number it was, do you?
**Q. No.**

Page 102

MR. FRIEBUS: Mr. London, if you could -- we provided you with an exact copy of what it is that we sent to Dr. Cohen in San Francisco. So if you could refer to documents you're going to ask Dr. Cohen about by exhibit number. And if you're asking about the two binders by tab number, for the record, that would be very helpful.
BY MR. LONDON:
**Q. Okay. If you would take a look at No. 53.**
A. Okay.
MR. FRIEBUS: And for the record, that's Tab 53 in Exhibit 3?
MR. LONDON: Yeah.
THE WITNESS: Okay.
BY MR. LONDON:
**Q. Now, this document, if you would turn to page -- if you'd take a look at pages 24, 25, 26, 27, 28, 29 -- basically, 25 through 64.**
A. Yes.
**Q. Now, prior -- so the -- this stuff -- I just want to be clear.**
**This stuff is not -- would not be copied and pasted. Correct? This is not -- this -- does this appear to you to be actual work product of Vyasil?**
A. Of -- it's not copied and pasted. That's

Page 103

true.
**Q. So and you see that it talks about -- it's -- these are basically use cases that -- I'm starting on page 20 -- actually, from the very -- starting on --**
**(Reporter requested clarification.)**
BY MR. LONDON:
**Q. Basically, I just want to be clear. From page 13 through -- 13 through 54. If you could just look at that, make sure --**
A. Uh-huh.
**Q. -- you have a chance to -- okay. I just want to be clear.**
**Is that -- that part of this document, does that appear to be the work product of Vyasil, as opposed to something that might have been copied and pasted from a third party?**
A. It's the work product of someone -- it's the work product of someone.
**Q. Right. And you see that there are numerous tables from 24 through -- there are -- as you look in that document, you see how there are use cases, and there are also actually use case diagrams, some use case diagrams?**
A. Yes.
**Q. Does that -- the various use -- the various**

Page 104

**use cases, and you -- let's -- let's kind of back up.**
**If you'd look starting on page 24, in the blue lines, in the areas, it talks about -- you see where it says "Class of Use Cases"?**
A. Yes.
**Q. And it says, like, "Application Loading," "Voice Dialing," "Voice Calendar," "Voice Log," "Voice Internet," "Voice Messaging."**
A. Yes.
**Q. "Voice Gallery", "Voice" -- okay. And so on. And under each one, there are use cases.**
**Do you see those?**
A. I do.
**Q. Okay. Is it fair to say that while they don't provide the level of details that one would expect, that further documentation, obviously, would be needed that they were documenting the -- at least the core functionality of what the application -- the features and the functionality in the use cases here of what the application would have in it?**
A. It is a functional description of what the application would have. That's right.
**Q. Right. And is it -- is it -- let's see here.**
**And if you look on page -- is it fair to say looking at -- based on your expertise, that back in**

Page 105

**2010, that the functionality that is documented on these pages could have been developed?**
**And take your time to look at it. Let me know if there's any functionality that you see in these tables from pages 24 through 37 that you believe could not have been developed back in 2010.**
A. Could not have been developed?
**Q. Yes. In other words, is there anything on here that was ahead of its time that -- or that with competence and proper software engineering with one -- with those who had the expertise to develop the list of functionalities that are documented in the use cases here in this table, in these tables?**
MR. FRIEBUS: Just object to the form of the question.
THE WITNESS: So I think the answer is, in a command control scenario, all of these could have been supported.
BY MR. LONDON:
**Q. Right. And so -- and so it is -- so there's nothing that's in this -- that you look at here that could not have been developed in 2010, just to be clear, by a team of competent people that had the skill and knowledge to develop this.**
MR. FRIEBUS: Objection to the form of the

Page 106

question.
THE WITNESS: Like I said, as a command and control kind of scenario, these are all supportable functions. There's no natural language in this specification.
BY MR. LONDON:
**Q. I'm sorry, could you -- I didn't hear the last thing you said.**
A. There's no natural language in this specification.
**Q. Right. The -- the -- and is it your -- based on your expertise, is complex software development, and specifically the type of stuff that -- for natural language processing, are those typically built over time in phases?**
**In other words, you start with one knowledge domain, and then you add on more. You add on more functionality over time. It's not built all at once. Correct?**
A. It's correct that our current understanding of how to do natural language has that kind of development path, yes.
**Q. Right. And so even if -- is it -- is it your understanding that the Siri today has been -- additional features has -- would you say it's much more**

Page 107

**advanced than it was when it first came out back in 2011?**
A. It is certainly -- it works better than it did in 2011. I'm not privy to all of the things under the cover.
**Q. Right. Right. Right. And so it's -- it's possible that GMAX -- was it your understanding that GMAX was going to be built over time? In fact, over a period of months -- well, with the OS and the application, it wasn't going to be built in a month or two months.**
**Was it your understanding it would have been built over possibly a year, 2 years, or longer?**
MR. FRIEBUS: Objection to the form.
THE WITNESS: From what I saw, there was an intention to build a couple of applications over the first year and then extend it, yes.
BY MR. LONDON:
**Q. Right. The -- the second part of this document, which refers -- which has the -- the stuff that you believe was cut and pasted, that may be cut and pasted, is it fair to say, though, that at least the stuff, if you look at Bayesian network inferences -- the type of, basically, statistical models that are documented here are the type of -- are**

Page 108

**the type of algorithms and tools and -- such as, you know, Bayesian network learning, are basically -- in this documentation, are these the type of algorithms that one might see in a speech recognition natural language processing application?**
A. Certainly the things could have been applied, although they don't necessarily have to be applied in natural language.
**Q. Right. So if these were -- is it possible that if -- assuming -- is it -- well, let me rephrase it.**
**Is it possible that the type -- that the -- that -- that developers with the proper expertise could utilize these documents -- these type of statistical methods here using neural networks, Bayesian inference and so on, in the development of the GMAX application for natural language processing and speech recognition?**
MR. FRIEBUS: Objection to the form of the question. Also object on foundation, and beyond the scope of the report.
I'll also add that it's been asked and answered.
THE WITNESS: I think this is a list of tools. It doesn't say how to use the tools.

Page 109

BY MR. LONDON:
**Q. Right. No, that's correct. I understand it doesn't -- but I'm saying, if the developers knew how to utilize the algorithms that are documented, the description of these -- these are the type of methods, statistical methods, that one could use in the GMAX application.**
A. It's a --
MR. FRIEBUS: Objection. Asked and answered. Dr. Cohen's already given his opinion on this in the form of the report.
MR. LONDON: Well, you asked him questions about this. So let's back up.
**Q. In fact, the type of documentation, whether it came from -- regardless of where it came from, is exactly the type of mathematics and statistics that one with a background in math, statistics, and computer science would be able to understand for -- if it was to be used in the GMAX application. Correct?**
A. These are things that would be either known or easily understood by any competent speech or language person, yes.
**Q. And in fact, it's -- the average layman, somebody without a background in computer science and mathematics and statistics, likely wouldn't be able to**

**understand this. Would that be a fair assumption?**
A. No. Physicists would understand it just fine. All kinds of other people --
**Q. Right.**
A. All kinds of other science and computer science people would understand it.
**Q. Right. Somebody with a quantitative mathematical engineering background could possibly understand this.**
**So my question is, is, in fact, while the documentation is not -- may not have provided the detail of -- well, first of all, it is -- the document is referred to as a GMAX technical specification. But in fact, the part -- the first part of this document that you looked at from pages 13 through -- through 54, what would you characterize that?**
**What type of -- what do you think a proper name for what type of documentation this is?**
A. It's a list of -- of functions that a system might do.
**Q. Right. And is this -- is this -- so this is basically a -- would it be your understanding or based on your experience, each of the -- if the -- is it your understanding that each of the use cases would probably have its own separate documentation?**



**In other words, the -- each of these could be considered a separate module with its own set of specifications. Correct?**
MR. FRIEBUS: Objection. Form, foundation, beyond the scope of the report.
THE WITNESS: I have no idea how you would do the engineering for this. It might be.
BY MR. LONDON:
**Q. Okay. Well, let me ask you, are you familiar with any software development methodologies?**
A. Familiar, yes, in passing. I'm not an expert in that space.
**Q. Right. Would it be also fair to say, just because somebody has a background in mathematics and computer science, that doesn't mean they necessarily have a background in software development methodologies and project management. Correct?**
A. That's true.
**Q. And so if you would turn to -- if you -- did you have a chance to look at the Skype communications with the individual named -- purportedly named Sanjay Patel?**
A. I did.
MR. FRIEBUS: Sorry, Mr. London, just -- excuse me, for the record, could you please identify



that?
MR. LONDON: Yes. On Tab 51, in the other binder.
MR. FRIEBUS: That's Exhibit 2, Tab 51?
MR. LONDON: Yes.
THE WITNESS: I should have caught up with my weight lifting before I came.
BY MR. LONDON:
**Q. Did you have any opinion -- when you read the conversation with Sanjay Patel, did he -- did you have any opinion one way or the other as to -- well, strike that.**
**If -- from the conversation, it appears that Sanjay -- an individual named Sanjay Patel was telling me that they were recruiting the development team. Correct?**
A. Yes, that's true.
MR. FRIEBUS: Objection. Sorry.
THE WITNESS: I'm sorry?
MR. FRIEBUS: Objection. Form, foundation, beyond the scope of the report.
BY MR. LONDON:
**Q. If you look on page 13, on June 30th, 2012, at 12:57:33 A.M., where it says -- Sanjay Patel says, "Did you receive the GMAX document?" Do you see that?**



A. Yes.
**Q. And I say "yes." And I say (as read:)**
**"It is hardly a technical document and it seems like it was written in a few minutes, and it is simply descriptive, containing some basic features. This is not the type of documentation I need. With all due respect, I would expect detailed technical documents provided by the engineer working on this that clearly show how GMAX is more powerful than Siri and clearly diagrams and details the unique proprietary features that make it unique. There's absolutely nothing I read in this document that suggests GMAX is unique or different than Siri. I have told you numerous times features that make it unique but they are completely missing. For example, I told you that unlike Siri, you should not have to touch the microphone every time you want to do a query. GMAX should be able to speak back to you, and you should be able to have a conversation and be able to, quote, 'do' things like trade by voice, book a trip by voice, etc. Things you could not do with Siri or Google phones. Moreover, nobody is going**

Page 114

**to use GMAX on the iPhone. IPhone already has Siri. GMAX competes with Siri. For technology that is supposed to be ahead of the competition, it is certainly not conveyed in this document. Please get me the requested document."**
**On June 30th, 2012, at 1:05, I state (as read):**
**"I need to file patents and the patent lawyers need detailed specifications that detail the unique proprietary features and how it works."**
**Did you -- had you seen this conversation before?**
A. I had.
**Q. All right. So based on this documentation, is this the type of -- is it apparent from here that I am telling Mr. Patel that based on my review of documentation, the technical documentation, it's basically unacceptable?**
**Do you see that?**
A. I do.
MR. FRIEBUS: Objection. Form.
THE WITNESS: Sorry, I'll try to be -- I'll try to make more space.

Page 115

MR. FRIEBUS: Okay, thank you. Sorry, if you're just asking if he sees it, I don't have an objection to that. Go ahead.
MR. LONDON: Right.
**Q. And in fact, it's -- I'm telling him that it -- I'm telling him that it doesn't provide the details, basically, that are needed, and that I need detailed specifications for the patent for the patent lawyers.**
**Do you see that?**
A. I do.
**Q. Okay. And so -- and nothing in the documentation that was provided or that you reviewed had the detailed -- had the detailed specifications that one would need to actually develop the GMAX system. Correct?**
A. I would agree with you.
**Q. Right. So -- so there was -- so if -- if all this documentation, if there were representations by -- well, let's backtrack.**
**You previously had -- it was your understanding that VSM could provide the ontological semantics engine portion of GMAX?**
A. It was my understanding that they claimed to be able to do that, yes.

Page 116

**Q. Right. Have you had a chance to do any background research on Dr. Victor Raskin?**
MR. FRIEBUS: Objection. Beyond the scope of the report.
THE WITNESS: No.
BY MR. LONDON:
**Q. Okay. So you don't -- do you have any opinion one way or the other whether VSM could have delivered the ontological semantics portion of the GMAX application?**
A. I have -- I have no experience in that particular aspect. I would ask Debbie Dahl, and her report says that they would not.
**Q. Okay. So if VSM -- if VSM and Vyasil made affirmative representations prior to the -- about their capabilities, would it have been readily apparent -- would it have been readily apparent that if -- that -- strike that.**
**If Vyasil said that they were in the process of recruiting people with the expertise to develop the GMAX application, would it have been reasonable to rely on that if that's what they said they were doing?**
MR. FRIEBUS: Objection. Form, foundation, beyond the scope of the report, and calls for a legal conclusion.

Page 117

THE WITNESS: Yeah, I have no clue.
BY MR. LONDON:
**Q. Right. So -- exactly. So you -- so it's possible that -- that it -- it wouldn't be readily apparent that Vyasil was engaging in fraud necessarily from the documentation and the conversations. Correct?**
MR. FRIEBUS: Objection. Form, foundation, beyond the scope of the report, calls for a legal conclusion.
THE WITNESS: I have no clue. I don't know.
BY MR. LONDON:
**Q. Right. Well, the point is this: People with mathematics -- people -- just because somebody has a technical background or has advanced degrees doesn't mean that they can't be defrauded. Correct?**
MR. FRIEBUS: Objection. Form, foundation, beyond the scope of the expert report, and calls for a legal conclusion.
THE WITNESS: I guess what you said is true.
BY MR. LONDON:
**Q. And it is possible that had -- it is possible that had a -- if a -- a -- if there had been a team in place with the competency and skill to develop the GMAX application, it is possible that there would have been -- that there could have been patentable features,**

Page 118

**but you don't know necessarily what they are, because no patents were filed. Correct?**
MR. FRIEBUS: Objection. Asked and answered.
THE WITNESS: Yes. I had said that -- that was my experience in such companies, yes.
BY MR. LONDON:
**Q. Right. And is it fair to say that the -- based on your skill and expertise, that the -- a completed system, that the code base just itself can be valuable intellectual property, irrespective of whether the company is successful?**
**In other words, what I'm asking is, if somebody develops a -- something that -- something like a GMAX-like application, would the code base itself have value as intellectual property?**
MR. FRIEBUS: Objection.
BY MR. LONDON:
**Q. Assuming it worked as it was intended to?**
MR. FRIEBUS: Objection. Form, foundation.
THE WITNESS: I don't think I know the answer to the question that you asked.
A code base certainly has value; but whether it's valued as intellectual property or not, I don't know.

Page 119

BY MR. LONDON:
**Q. Okay. Well, when Apple bought Siri, would you presume that the -- the -- that the code for Siri and any patent that they came -- that came along with Siri, I guess, and I guess they also would have gotten the developers, would have -- would have contributed to the bulk of the value that was being paid for them?**
MR. FRIEBUS: Objection. Form and foundation. Also beyond the scope of the report.
THE WITNESS: It's my understanding that Apple rewrote everything. And the thing that they fielded as Siri was substantially different than the thing that was bought.
BY MR. LONDON:
**Q. Well, going back to Voice Signal. When Voice Signal was bought, was the -- was it being bought primarily for its code and intellectual property, or --**
A. Voice Signal was bought because it had a -- had very interesting code, and it had customers. So our code was embedded in the phones of our customers.
I believe it's still true that the Voice Signal code is embedded in the iPhone.
**Q. Is it -- there are companies -- are you familiar with companies that have -- that are, I guess -- some people would call them patent trolls.**

Page 120

**But they don't actually have a product, but they have patents of portfolios, and they use those portfolios to generate licensing fees from competitors?**
A. I know of such companies.
MR. FRIEBUS: Objection -- sorry, just -- objection to the form of the question and beyond the scope of the expert report.
BY MR. LONDON:
**Q. I didn't hear the answer.**
A. I said, I know of such companies. I do.
**Q. Right. So I guess what I'm getting at, it's possible for a company to not even have a product and yet be quite valuable based on the intellectual property of its patents.**
A. That's true.
**Q. So it's possible for a company to never even develop a product, but if they have patents that are important to what a competitor is doing, they can derive potential licensing fees from those patents.**
A. That's a very active area in which the law is changing quickly. But yes, basically, you're right.
**Q. Right, okay. Going back, if you'd take a look at Exhibit 50, same binder.**
A. Yes.
**Q. And if you'd look at the pages 11 through --**

Page 121

**or just review 11 through 35.**
A. Yes.
**Q. You see that they also here have -- provide use cases that are directly related to the GMAX system.**
**Do you see that?**
MR. FRIEBUS: Objection to the form of the question.
BY MR. LONDON:
**Q. So I just want to be clear that part of the documents, they do provide -- part of this document does provide some documentation for what the OS is supposed to do. Some of the core functionality of the OS. Correct?**
A. This is an applications list, not an operating systems list.
**Q. Okay. So it looks like they combine the applications -- one second.**
**Let me ask you, do you know what Symbian is?**
A. Yes.
**Q. What is Symbian?**
A. It was an operating system for the -- oh, for a Finnish company's phones.
**Q. I'm sorry, for whose phones?**
A. It was a Finnish company. Nokia.
**Q. Okay. And just to be clear, a company -- is**

**it your understanding that a company can have intellectual property without -- valuable intellectual property, irrespective of whether the company ultimately would have succeeded or failed in the marketplace?**
A. Yes, it can.
MR. FRIEBUS: Object to the form.
THE WITNESS: Sorry.
MR. FRIEBUS: All right.
MR. LONDON: I didn't hear his answer.
THE WITNESS: He said he objected to the form.
BY MR. LONDON:
**Q. Right. No, I -- did you answer the question?**
A. I said "yes."
**Q. Oh, okay. Give me one second.**
**Are you familiar with offshore development? In other words, do you have any experience or knowledge of offshore development in countries like India?**
MR. FRIEBUS: Objection. Beyond the scope of the report.
THE WITNESS: We -- at Voice Signal, we did attempt to have an application developed by people in India. That's my experience.
BY MR. LONDON:
**Q. And were they able to successfully develop**



**what you needed to develop?**
A. I would say it was an unmitigated disaster.
**Q. It was a what?**
A. Unmitigated disaster.
**Q. Okay. So your -- so it's fair to say you had issues -- well, back up.**
**Were they incompetent?**
MR. FRIEBUS: Object to the form of the question. Beyond the scope of the expert report.
THE WITNESS: We found it not possible to manage the people in India from a remote location.
BY MR. LONDON:
**Q. Aside from the management, did they have -- did they have the skill and -- did you believe they had the skill and expertise to do the work you needed done?**
MR. FRIEBUS: Objection to the form of the question. Beyond the scope of the expert report.
THE WITNESS: As far as we could tell, they were smart people, and they did have the expertise to do the work. We could never get them in line.
BY MR. LONDON:
**Q. Right. So at the time you contracted with them, you didn't think you were going to have an unmitigated disaster, did you?**
A. We did not.



MR. FRIEBUS: Object to the form. Sorry, objection to the form of the question, assumes facts not in evidence, and beyond the scope of the expert report.
MR. LONDON: I'm sorry, say it again?
MR. FRIEBUS: You're asking for my objection or his answer.
MR. LONDON: No, I'm asking -- I didn't hear if he answered the question or not.
THE WITNESS: No. We wouldn't have done it had we thought it was impossible.
BY MR. LONDON:
**Q. Did you hear the question?**
THE REPORTER: No. Actually, we did not hear anything after the witness's last answer.
(Discussion off the record.)
MR. LONDON: I think -- I'm sorry, it might have been muted. I'll say the question.
BY MR. LONDON:
**Q. At the time you -- is it fair to say that experienced and educated people can enter into contracts with companies that lead to unforeseeable, unmitigated disasters?**
MR. FRIEBUS: Objection. Form, foundation, calls for a legal conclusion, and it's beyond the scope



of the expert report.
THE WITNESS: It's my opinion that they can.
BY MR. LONDON:
**Q. Right. And would you blame somebody -- would -- is it unreasonable to rely on people that purport to have or -- the skill and experience to do something?**
A. I don't think I can answer that question.
MR. FRIEBUS: Objection. Form -- sorry. Objection. Form, foundation, calls for a legal conclusion, beyond the scope of the expert report.
THE WITNESS: I don't know the answer.
BY MR. LONDON:
**Q. Okay. Is it your -- is it your -- is it -- based on your skill and expertise involving speech recognition software development, is it typically the developers who do the work that are responsible for quoting what the cost of the work will be?**
**In other words, the client -- is it your understanding that the client provides the requirements, and based on those requirements, the software development company or the team that's going to be involved has the responsibility of scoping out the amount of work that is required to perform that work?**

Page 126

MR. FRIEBUS: Objection to the form of the question, and beyond the scope of the expert report.
THE WITNESS: The answer that I would give to that question is, there are a lot of different ways to do business. And you suggested one, but there are many different ways to do it.
So I don't have a sensible answer to the question you asked.
BY MR. LONDON:
**Q. Okay. Dr. Dahl in her report had referred a minimal viable product.**
**Would that -- would -- based on the -- based on the features that were outlined in Document 51 -- I'm sorry, hold on a second.**
**Based on the use case features, I just want to be clear.**
**Would that constitute a minimum viable product if it had the -- not all the features that were initially envisioned, but at least the ones that were document -- documented in the technical specs that were prepared?**
MR. FRIEBUS: Objection. Form. Beyond the scope of the expert report.
THE WITNESS: I actually noted in my expert report that the Voice Signal offerings covered four of

Page 127

the functions. And it was certainly a minimal viable product, because we sold it.
BY MR. LONDON:
**Q. So just to be clear, it's your opinion that a minimal viable product could have been developed after 2010 to do the -- to develop -- basically, a GMAX minimal viable product could have been developed. Is that your --**
MR. FRIEBUS: Objection to the form. Asked and answered also.
THE WITNESS: It's certainly possible, yes.
BY MR. LONDON:
**Q. Okay. Is it also your understanding that the cost of labor in development in India is much cheaper than in the United States, and in fact many factors or multiples cheaper?**
MR. FRIEBUS: Objection to the form of the question. Beyond the scope of the expert report.
THE WITNESS: When I looked at that data in 2006, Indian labor was substantially cheaper than American labor, yes.
BY MR. LONDON:
**Q. All right. So if a system quoted -- if the GMAX application had been quoted by Vyasil as a quarter of a million dollars, that would be with -- would that**

Page 128

**be -- fair to say, that would be in the United States many times that. Correct?**
MR. FRIEBUS: Objection. Form, foundation; beyond the scope of the expert report.
THE WITNESS: Yes. I would say it would be worth more if it was a successful project.
BY MR. LONDON:
**Q. So is it also fair to say that it wouldn't be -- you can't compare -- it would be like comparing apples and oranges to compare the cost of development in the United States versus the cost in, say, India?**
MR. FRIEBUS: Objection to form. Foundation. Beyond the scope of the expert report.
THE WITNESS: I don't understand that question. I'm sorry.
BY MR. LONDON:
**Q. Well, let me rephrase it.**
**If Siri could have been built in India -- let's just assume -- I believe Siri was developed initially as part of DARPA. Correct?**
A. Siri was a product that was built by people who were involved in the CALO project, which was a DARPA project at SRI.
**Q. Right. Is it fair to say it was developed predominantly in the United States?**

Page 129

A. To the best of my knowledge, it was entirely developed in the United States.
**Q. Okay. Based on your skill and expertise, if Siri had been developed in India, assuming that the -- where the experts in India who could have done the work, is it fair to say that the cost of developing Siri would have been much cheaper in India than in the United States?**
MR. LONDON: Objection. Form, foundation, beyond the scope of the expert report.
THE WITNESS: I would say it's certainly possible for that to be true, yes.
BY MR. LONDON:
**Q. Okay. You had an opportunity to review the GMAX business plan. Correct?**
A. Yes.
**Q. Based on your review of the business plan, putting aside whether GMAX would have been successful or not, did it appear there was a business strategy to have a -- to have -- so that GMAX could be potentially successful?**
MR. FRIEBUS: Objection to the form of the question. Lacks foundation, and beyond the scope of the expert report.
THE WITNESS: I would say that it was possible

to form a product out of the things that were described functionally in the GMAX business plan, yes.
BY MR. LONDON:
**Q. You had an opportunity as part of the documents you were provided to review correspondence between Dr. Victor Raskin and Brian Buck. Correct?**
A. I did. Yes.
**Q. And in one of those conversations -- actually, in several conversations -- well, let's --**
**(Reporter requested clarification.)**
MR. LONDON: I'm sorry, the speaker went off. That's why. I'm sorry.
(Discussion off the record.)
BY MR. LONDON:
**Q. So I was going to say, Dr. Cohen, you had an opportunity to review the correspondence between Victor Raskin and Brian Buck. Correct?**
A. I did.
**Q. And did -- based on -- and at some point -- and in several discussions, Brian Buck tells him that he's not -- that he -- he really doesn't care about the GMAX application; he just wants to take -- he just wants the money.**
**Do you recall that?**
MR. FRIEBUS: Objection. Form.



THE WITNESS: I do.
MR. FRIEBUS: Beyond the scope of the expert report.
THE WITNESS: I do.
BY MR. LONDON:
**Q. And in fact, he tells him that -- in one discussion that he just wants to take the money and run and go to the Cayman Islands. Do you recall that?**
MR. FRIEBUS: Objection. Form. Beyond the scope of the expert report.
THE WITNESS: Yes, I do recall that.
BY MR. LONDON:
**Q. It appears from -- it appears from these conversations that VSM, or at least Brian Buck, had ulterior motives -- well, I don't expect you to speculate as to what his intentions were.**
**Based on his discussions, it appeared that he only cared about one thing, and that was money. Correct?**
MR. FRIEBUS: Objection. Form, foundation. Beyond the scope of the expert report.
BY MR. LONDON:
**Q. Basically, he indicated he was interested in getting GMAX's money. Or my money.**
MR. FRIEBUS: Objection. Form, foundation,



beyond the scope of the expert report.
THE WITNESS: I believe what you said is correct.
BY MR. LONDON:
**Q. Right. And obviously, and similarly, you had an opportunity -- have you seen any -- had a chance to -- did you ever see the third amended complaint in this case?**
A. Not except for a snippet that you sent me at one point.
**Q. Right. And in the snippet that I may have -- you may have seen, there were conversations between the management of Vyasil also talking about getting my money and, quote, f'ing me.**
**Do you recall that?**
A. I do.
**Q. If the -- and would it -- since these conversations were -- I was not privy to them at the time, is it -- if the intentions of these companies ultimately was just to get money, and -- just to get money, and not to do the work or -- is it fair to say that it wasn't readily apparent -- it wouldn't have been necessarily readily apparent?**
MR. FRIEBUS: Objection. Form, foundation, calls for a legal conclusion, beyond the scope of the



expert report.
THE WITNESS: Yeah, I have no opinion on that question.
BY MR. LONDON:
**Q. Okay. All right. Just give me a little -- I'm going to pull up ...**
A. I'm going to fill my coffee cup.
(Discussion off the record.)
THE WITNESS: I'm back.
MR. LONDON: Okay. We could go back on the record.
**Q. You had an opportunity to review Jeffrey Stec's expert report. Correct?**
A. Yes, I think I did.
**Q. Okay. And he -- in his report -- I'm not sure which exhibit that is.**
A. We have it here. Right? Yes, I have it as Exhibit 7.
**Q. All right. Exhibit 7 is -- in Point 11, he says that -- he basically states that whether IP -- that -- basically, that there is no evidence as to what the patent application would have covered, its claims, whether prior art would have prevented the award of a patent, whether a marketable product would have resulted, whether the product would have been**

Page 134

**successful, and what proportion of that success could be attributed to the alleged lost patent. To claim that a patent was lost due to the wrongdoing is speculative and to attribute a value to the lost patent is even more speculative.**
**Do you see that?**
A. I do.
**Q. Based on your experience, it's your understanding that a patent claim can -- when you file -- well, let's back up.**
**You have -- you've had, I believe, 12 or 14 patents. You have coauthored 12 or 14 patents. Correct?**
A. Yes. Probably double that number by now.
**Q. Okay. And based on your experience, is it your experience typically that the patent examiner will raise objections?**
**In other words, they're seldomly initially granted. Correct? They usually raise prior art and objections that you respond to through office actions. Correct?**
A. Yes, that's correct.
MR. FRIEBUS: Objection. Beyond the scope of the report.

Page 135

BY MR. LONDON:
**Q. Correct. So it's -- but it's -- so it's -- so is it your experience that even if there is prior art, a claim can be narrowed or amended to address any objections or issues raised by a patent examiner. Correct?**
MR. FRIEBUS: Objection. Beyond the scope of the expert report.
THE WITNESS: My experience is that most often, you can find accommodation with the patent examiner so that there is a valid claim. Yes.
BY MR. LONDON:
**Q. Okay. So do you agree -- as far as his opinion here, do you agree with it or do you disagree with it?**
A. His opinion seems to have two parts. One part is that there's no specification for what a patent would be, in this case, of GMAX. And I think that's correct.
On the other hand, I have stated in my testimony that in my experience, all small development companies produce intellectual property in the form of patents. And that has been my experience.
So I expect, without being specific about what the patents would be, there should be patents in any

Page 136

sensible new technology development.
**Q. Okay. I had previously asked you about the -- the value of the code as intellectual property.**
**Would it be fair to say the code that was developed at Voice Signal and currently, say, at Semantic Machines, that that is proprietary and does -- and -- is proprietary to those companies and has value independently of the intellectual cost to create it?**
MR. FRIEBUS: Objection.
BY MR. LONDON:
**Q. Correct?**
MR. FRIEBUS: To the form of the question.
THE WITNESS: It's certainly true that the code has value, yes.
BY MR. LONDON:
**Q. And in fact, you -- would it be fair to say that -- that the value exceeds the cost of development?**
MR. FRIEBUS: Objection. Foundation. Beyond the scope of the expert report.
THE WITNESS: Yeah, I have no -- I have no opinion about that. I can tell you that when it's sold, it can certainly have value beyond the cost, but I don't know.
BY MR. LONDON:
**Q. Okay. All right. So going to Point No. 12 in**

Page 137

**Dr. Stec's report, if you could just look at what he states there. Point 12.**
A. Uh-huh.
**Q. Okay. You -- I guess this is just following up. I assume -- do you have any opinion or -- what is your -- you agree or disagree with what he says here?**
A. I disagree, because I found -- in my experience, every company has created IP, and a development should be expected to create IP of this form.
**Q. How about number -- now, 13. We're almost done here. If you would just take a look at -- same thing with respect to 13 and 14. Let's start with just -- read 13.**
A. Uh-huh.
**Q. I guess my -- before I ask you a question on that, I guess, is it fair to say that you reviewed -- if you look at the very end of his report, on page -- the last page, 32.**
A. 32?
**Q. Yeah. The last page of -- it's a -- expert report of Jeffrey Stec. It's 32.**
**Do you see that? The very last page.**
A. No. I see 5. Let's see. The very last page.
**Q. Okay. You know what? Okay. They didn't**

attach --
A. I have an exhibit starting on page 6.
**Q. Yeah. Do you have Exhibit 3 to his report?**
A. Well --
**Q. The last -- it would be the last page.**
A. The last page is a chart. Hang on. I do have Exhibit 3, yes.
**Q. All right. And it says "Documents and Information Reviewed and/or Relied Upon"?**
A. Yes.
**Q. Okay. Just take a look at the list of documents there and compare it to what you reviewed.**
**Is it fair to say you -- he didn't review -- he -- for example, he didn't review the GMAX business plan. It doesn't appear he reviewed any of the GMAX technical documents that you did. Correct?**
A. That's correct.
**Q. And in fact, you reviewed significantly more documents than him. You reviewed all the -- he didn't review any technical documents. Correct?**
MR. FRIEBUS: Objection.
BY MR. LONDON:
**Q. Based on what he did here?**
MR. FRIEBUS: Objection to form.
THE WITNESS: Yes. Based on my quick reading,



that's correct.
BY MR. LONDON:
**Q. Okay. And without reviewing the technical documents, the business plan, in doing -- having your expertise in the speech recognition space, wouldn't it be fair to say that his own opinions are speculative, because they're -- there's no factual basis behind them?**
MR. FRIEBUS: Objection to form and beyond the scope of the --
THE WITNESS: Yeah, I don't know the answer to that. I'm sorry.
BY MR. LONDON:
**Q. Okay. Well, let me ask you this: The documents that you were provided, is it fair to say that in order to -- you needed to review those documents, in other words, to give an accurate opinion about -- basically, to give the facts in your -- to give your opinion, you needed -- there had -- you needed those documents as a -- as a factual basis?**
MR. FRIEBUS: Objection to the form.
THE WITNESS: I certainly did give an opinion based on those documents, yes.
BY MR. LONDON:
**Q. Okay. You could -- would your -- if you**



**didn't have those documents -- for example, if you didn't have GMAX technical specifications, if you didn't have all that, would your opinions -- would you have been able to render the same opinions?**
A. Certainly not.
**Q. Okay. We're almost done here. I just -- just a few more questions.**
**If you turn to page -- on Hochman's rebuttal report. I don't know which number that is.**
A. I don't have --
MR. FRIEBUS: I don't believe Dr. -- excuse me, Hochman's rebuttal report was an exhibit.
BY MR. LONDON:
**Q. Well, have you seen Hochman's rebuttal report -- I believe you have, because you responded to -- in your -- does he have it?**
MR. FRIEBUS: Just for the sake of clarification, what was marked as Exhibit 5 was Mr. Hochman's first expert report.
MR. LONDON: I'm asking him to look at his third report.
MR. FRIEBUS: If you want him to look at it, please mark it as an exhibit.
MR. LONDON: Do we have -- the question -- I'm sorry, this would have been his -- I apologize. This



would have been his second expert report of Jonathan Hochman. Does he have that?
MR. FRIEBUS: I didn't give it to him or mark it as an exhibit.
MR. LONDON: I would like to have it -- well, his -- his -- give me one second.
**Q. Let me ask -- okay. I'm going to read a paragraph.**
**Well, going back, let me ask a follow-up question to one I asked, and this is also to clarify.**
**It's -- it's -- is it the client's responsibility to -- is it the client's responsibility to be figuring out what the cost to develop the system is -- the cost to develop the system is, based on requirements given to the software development company?**
MR. FRIEBUS: Objection. Form, foundation, and beyond the scope of the expert report.
THE WITNESS: Yeah. As I said before, there are lots of different ways to do business, and I don't know how to answer that question.
BY MR. LONDON:
**Q. Can you give me an example? Can you just give me an example of -- well, based on -- let me ask you this:**
**Based on your experience, what has been the**

**typical way in which you dealt with software development contracts?**

MR. FRIEBUS: Objection. Beyond the scope of the expert report.

THE WITNESS: I mostly don't. So I haven't.

BY MR. LONDON:

**Q. All right. Are you familiar -- let me ask you this: Are you familiar with the difference between a fixed -- a fixed-price contract and a time-and-materials basis contract?**

A. I am.

**Q. Okay. Is it your understanding that if it's a fixed-quote contract, that it's -- well, strike that.**

**What is your understanding of the difference between the two?**

A. A fixed-price contract, there's a price for the -- whatever it is, and the person who has the contract is supposed to deliver it.

And on a time-and-materials, the contract pays for the time plus the materials but overhead or whatever, profit.

There are a million different contracts, so ...

**Q. Right. In Mr. Hochman's report, he says, the gulf between the market rate value and Vyasil's**



**proposed budget is so large that no reasonable technology entrepreneur with a computer science education would have hired Vyasil or relied upon Vyasil's proposal.**

**And my question is, given that the -- if you had -- as we previously stated, the discrepancy in cost of labor between India and the US can be quite substantial.**

**Is it fair to say that it -- do you agree with that?**

MR. FRIEBUS: Objection. One, for purposes of clarification, are you reading from Exhibit 5, or some other document?

MR. LONDON: I'm reading from his -- the second -- and I'd like to get the document to him -- the second expert report of Jonathan Hochman, which, just to be clear, Dr. Cohen's report does address. I'm just asking him a specific --

THE WITNESS: It does.

MR. LONDON: -- part of that document.

MR. FRIEBUS: Well, I'll object to the form of the question. Foundation. Beyond the scope of the expert report; mischaracterizes the witness's prior testimony.

You can go ahead and answer, Dr. Cohen.



THE WITNESS: There wasn't a question. I don't know how to answer.

BY MR. LONDON:

**Q. Okay. All right. I guess -- I guess -- I guess -- let me -- I'll make -- let me try to make this more clear and simple.**

**Is it -- is it -- would it be reasonable to expect that the cost of a software development project done in India could be significantly less than the cost done in the United States?**

A. If it were --

MR. FRIEBUS: Objection.

THE WITNESS: -- a successful project, the answer is yes.

I'm sorry, there was an objection.

MR. FRIEBUS: Thank you. Beyond the scope of the expert report.

BY MR. LONDON:

MR. LONDON: And so would it be -- based on your expertise and experience dealing with Indian-based companies, would it be reasonable to rely on a quote given by an Indian-based company on a number -- on a cost that would be significantly lower than in the United States?

MR. FRIEBUS: Objection to form, foundation,



beyond the scope of the expert report.

THE WITNESS: I know of successful overseas developments. In my own experience, I have not seen any that work. But there have been some.

BY MR. LONDON:

**Q. Right. But is it fair to say that the -- do you know if any of those projects involved fraud?**

MR. FRIEBUS: Object.

BY MR. LONDON:

**Q. In other words, let me be clear.**

**The projects that you're aware that failed, were any of those failures due to fraud?**

MR. FRIEBUS: Objection. Beyond the scope of the expert report.

THE WITNESS: No.

BY MR. LONDON:

**Q. Okay. Is it -- let me ask you this: Any information that you didn't have that you would have liked to have that would affect your opinion in any way?**

**In other words, were you given all the information that you needed to render your -- to give an opinion that you believe is supported?**

A. I'm sorry, I don't know how to answer that question.

Page 146

**Q. Well, let me rephrase that.**
**Any -- when you wrote your report, was there -- do you recall if there was any information that you didn't have that you would have liked to have had?**
A. I didn't have a full understanding of the contractual details of the business. So it would have been helpful.
**Q. When you said -- just to be clear, the -- are you talking about the contract between GMAX and Vyasil?**
A. Yes.
**Q. The -- well, you had a -- you saw the resource document. Correct?**
A. Yes.
**Q. There was a -- and that -- that -- that basically identifies the -- the resources, the costs, and so on.**
**Did you see that?**
A. Yes.
**Q. Is it -- is it -- well, was it -- did you have -- was it your belief that Vyasil produced or created the -- the various specifications and resource documents that you reviewed?**
MR. FRIEBUS: Objection. Asked and answered.
THE WITNESS: They were identified to me as

Page 147

that, yes.
BY MR. LONDON:
**Q. Okay. Is it -- and also in your -- based on your expertise and experience, is it possible for a software development company to subcontract part of the work to obtain, say, developers who have scientific expertise that it may need?**
**In other words, what I'm asking is, is it possible for a software development company to undertake a project and then find developers with the expertise they need to perform the work?**
MR. FRIEBUS: Objection to form. Foundation. Beyond the scope of the expert report.
THE WITNESS: You're asking me a business question. The answer is yes.
BY MR. LONDON:
**Q. Let me ask you, do you have any -- can you give any opinion -- did you have a chance to look at the VSM Power Point presentation about the ontological semantics?**
A. I'm sure I looked at it at some point.
(Discussion off the record; audio issues.)
BY MR. LONDON:
**Q. As part of the documents you received, some of them were the CVs of some of the developers at Viasem.**

Page 148

**Do you recall if you reviewed any of those?**
A. I looked at them briefly, yes.
**Q. Give me one second.**
**Do you have any opinion one way or the other regarding whether the ontological semantic portion of this could have been developed in 2010?**
A. I don't have an opinion. Ontologies are very difficult to create, and they cost a lot of money. So I -- I don't know.
**Q. Did -- have you ever seen a book that Dr. Raskin had coauthored with Sergei Nirenburg called "Ontological Semantics"?**
A. I know of the book, and I've seen some descriptions of it.
**Q. Do you know whether any of that -- any of those concepts or any of that are used in any systems today, or is that more in -- or is it -- basically, how would -- basically, is -- is any of the work that was described in those publications -- do you know if they're used in any commercial speech recognition systems?**
MR. FRIEBUS: Objection. Beyond the scope of the expert report.
THE WITNESS: Yeah, I -- I don't know of any systems that used ontological semantics.

Page 149

BY MR. LONDON:
**Q. Okay. Are you familiar with machine learning?**
A. Somewhat.
**Q. Okay. Is -- do you know whether -- are there alternatives -- as far as the ontologies, can -- are there alternatives to using ontological semantics to handle the natural language processing part of a speech recognition application?**
MR. FRIEBUS: Objection. Beyond the scope of the expert report.
THE WITNESS: Yes, there are.
BY MR. LONDON:
**Q. Can you identify some, or any?**
MR. FRIEBUS: Again, objection. Beyond the scope of the expert report.
THE WITNESS: Again, a natural language system, you need to have a dialogue manager and information about the world, and an ontology can be helpful. Sometimes the ontology is instantiated in the software; sometimes it's not.
There is an ontology that was built under DARPA's sponsorship called OntoNotes; and in fact, in Semantic Machines, we use OntoNotes. It doesn't have any semantics; it's just syntax. But it's very helpful.

Page 150

I don't know of any use of an ontology of the form that ontological semantics was suggesting.
BY MR. LONDON:
**Q. Okay. Just -- I want to clear up another thing.**
**The 35 -- the 35 to -- 35- to 50-million-dollar cost that you estimated -- I believe that's the estimate for -- to develop the GMAX application. Correct?**
A. That was my estimate.
MR. FRIEBUS: Objection. Asked and answered.
BY MR. LONDON:
**Q. Right. I want to be clear. That is -- that -- that is not -- that is -- is that a minimum viable product, or is that with all the features?**
MR. FRIEBUS: Object.
BY MR. LONDON:
**Q. Or something in between? I'm just -- I understand. I just want to be clear.**
MR. FRIEBUS: Sure. Objection. Asked and answered.
THE WITNESS: My recommendation -- when I was writing that number, I was looking at a minimal viable product.

Page 151

BY MR. LONDON:
**Q. Okay. So if you -- if you went back to the -- the GMAX -- the features that you had mentioned and that Vyasil had put in the use cases, I just want to be clear, was that to -- and you can look back at that; I believe it's Exhibit 50 -- if it was a command system, not conversational, but if it had the command features that were documented in -- if that -- would that also be between 30 and 50 million?**
A. That was --
MR. FRIEBUS: Beyond the scope. Beyond the scope of the expert report.
THE WITNESS: That's what I was assuming when I wrote that number.
BY MR. LONDON:
**Q. Okay. And also to be clear, that -- would that be -- if -- if this was characterized as a personal assistant, if GMAX was characterized as a personal assistant, would you come to the same conclusion, or do you think that would be a different number?**
MR. FRIEBUS: Objection to the extent it's beyond the scope of the expert report.
THE WITNESS: I don't -- I -- if it was a natural language personal assistant, then that is

Page 152

substantially beyond what I was recommending -- what I was estimating.
BY MR. LONDON:
**Q. So it would be -- in other words, if it -- it would be above 50 million.**
A. Yes, that's correct.
**Q. Okay. Could a working prototype be developed? Could -- could -- if you took some features out, could you get to a cost -- could -- let me ask you this:**
**Could a prototype be done or something done for less than that? Could a person -- let me make this -- could a personal assistant that could understand -- just do voice commands, could it be done between 30 and 50 million?**
A. Yes.
**Q. Do you -- can you -- do you have any opinion of the lowest amount that it could be done for?**
MR. FRIEBUS: Objection to the extent it's beyond the scope of the expert report.
BY MR. LONDON:
**Q. I'm not asking you to speculate. If you don't know, then --**
A. No, I don't know.
**Q. Okay. Now, another question: The number you gave, the 30 to 50 million, that's assuming it was done**

Page 153

**in the United States. Correct?**
A. Yes, that's correct.
**Q. Okay. So if it -- okay.**
**What -- can you also -- as far as Mr. Hochman characterizes that GMAX required the development of novel technology as of 2010, do you agree with that characterization?**
MR. FRIEBUS: Objection. Asked and answered.
THE WITNESS: It depends on what you mean by GMAX. If it's a command and control system, then you need some -- some novel data. If it's a natural language system, you certainly need novel technology.
BY MR. LONDON:
**Q. As of today, are there any systems that are -- as of today, there are no systems that you're aware of that can do what GMAX can do?**
MR. FRIEBUS: Objection. Asked and answered.
THE WITNESS: It's basically true, yes. There are no such systems.
BY MR. LONDON:
**Q. So and is that because the technology hasn't advanced, or what -- can -- if you have any opinions as to the reason why, that would --**
A. The reason that I'm a vice president of technology at Semantic Machines is because we're

developing a natural language assistant. So I'm actually actively involved in doing that.

**Q. And is it your understanding that as -- as technology advances, so that what is possible now, or in 2010, that may be different than what's possible in the future. Correct?**

A. I -- yes, that's right.

**Q. Well, do you -- let me ask you this: Do you believe that -- do you have any reason to believe that at some point there will not -- that there will not be conversational systems, truly conversational systems?**

A. Like I said, I'm the vice president of technology of such a company trying to do that.

**Q. Right. So let me ask you, do you -- can you -- can you assign a -- I understand you're trying to do it.**

**Opposing counsel asked you about probabilities. Do you -- could you assign a probability that you think Semantic Machines will be able to do it?**

MR. FRIEBUS: Objection. Beyond the scope of the expert report.

THE WITNESS: If it didn't have a high probability, I'd do something else.



BY MR. LONDON:

**Q. I'm sorry, I didn't hear the last part.**

A. If it didn't have a high probability, I would be doing something else.

**Q. Right. So I guess -- is it fair to say that -- that with the proper competent resources and expertise, that at least a large part of GMAX could be developed today?**

**Or -- obviously, that would take time, but it could -- the vision, in other words, would be -- it could -- you'd be able to incorporate -- it would be more likely you could incorporate the conversational aspect today than back in 2010.**

MR. FRIEBUS: Objection to form. Beyond the scope of the expert report.

THE WITNESS: That's true.

BY MR. LONDON:

**Q. And is that because there's been new -- new ways to think about conversational technology?**

MR. FRIEBUS: Object.

THE WITNESS: Yes.

MR. FRIEBUS: Are you done with the question?

MR. LONDON: Yeah.

MR. FRIEBUS: Object to the form and beyond the scope of the expert report.



THE WITNESS: Yeah. It's an active area of research, so there certainly are new things happening every day.

BY MR. LONDON:

**Q. And I guess this leads to another question.**

**Just because there are large companies that exist, like Google and Apple, that doesn't mean that a new competitor like Semantic Machines couldn't be successful. Correct?**

MR. FRIEBUS: Objection to the extent it's beyond the scope of the expert report.

THE WITNESS: I believe it's true that either Google or Apple buys a company every 2 weeks. So there's plenty of room for people to build small companies and be successful.

BY MR. LONDON:

**Q. Right. So do you agree with Mr. Hochman's characterization that GMAX -- basically, it was virtually certain that it would have failed because it would not have been able to -- basically, from competition from large companies like Apple and Google?**

MR. FRIEBUS: Objection to the extent it's beyond the scope of the expert report.

THE WITNESS: I don't agree with that opinion.



BY MR. LONDON:

**Q. And is it also fair to say that the -- whether -- whether GMAX -- is it fair to say that whether GMAX would have been successful or not has -- would have no bearing on the replacement cost to develop it?**

MR. FRIEBUS: Objection. Form. Beyond the scope of the expert report.

THE WITNESS: Yeah, I don't have an opinion about that.

BY MR. LONDON:

**Q. Okay. So when he says that -- when Hochman says in his second report in his conclusions, he says that GMAX had an extremely high risk of commercial failure due to competition from Apple and Google, just to clarify, you wouldn't agree with that?**

MR. FRIEBUS: Objection. Beyond the scope of the expert report.

THE WITNESS: I believe that he's wrong.

BY MR. LONDON:

**Q. Okay. And also, to be clear -- this is basically my last question or two -- the characterization that GMAX was impossible, or virtually impossible, to build, that isn't accurate, is it?**

MR. FRIEBUS: Objection. Form and beyond

the -- object to the form.
THE WITNESS: I believe that some parts of GMAX were possible.
BY MR. LONDON:
**Q. Right. And even the impossible parts, as -- could have been potentially achieved at a later time.**
**In other words, let's say -- is it possible that GMAX could have started out with the features -- excuse me, the features and the technical documents, the command parts which you said were feasible, and then, over time, even years later, incorporated the conversational piece as the research improved?**
MR. FRIEBUS: Objection to the form, and goes beyond the scope of the expert report.
THE WITNESS: Yeah, it's speculative, but I -- I agree with the speculation.
BY MR. LONDON:
**Q. Okay. Finally, you had a chance to review Dr. Dahl's report. Correct?**
A. I did.
**Q. And in fact, is there any part of her report that you agree -- I'm sorry, that you disagree with or that you have a different opinion about?**
MR. FRIEBUS: Objection. Beyond the scope of the expert report.



THE WITNESS: I thought Dr. Dahl's cost estimates for developing an operating system were quite low, although I don't --
BY MR. LONDON:
**Q. Okay.**
A. -- I don't think that's her expertise.
**Q. Okay. Anything else?**
A. No.
MR. LONDON: Very good. I don't have any further questions. Thank you so much for your time.
MR. FRIEBUS: I'm all done here. Thanks Dr. Cohen. Appreciate it.
MR. LONDON: Thank you, Dr. Cohen. Have a good trip back to North Carolina.
THE WITNESS: Oh, I'd like to be able to review the transcript, just for accuracy, please.
MR. LONDON: Sure.
MR. FRIEBUS: Sure. So just to be clear, the witness is not waiving signature.
THE WITNESS: Right.
(Time noted, 1:24 P.M.)
--o0o--
//
//
//



I declare under penalty of perjury that the foregoing is true and correct. Subscribed at ________________, California, this ____ day of ___________ 2017.

__________________________
JORDAN R. COHEN



CERTIFICATE OF REPORTER

I, HOLLY THUMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, to the best of my ability to hear telephonic participants; and that the testimony of said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition review of the transcript [X] was [] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:_____________________

___________________________

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

\- - -

| | | |
|---|---|---|
| VEOXO, INC., et al., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| VYASIL, LLC, et al., | : | |
| Defendants. | : | NO. 12-9058 |

\- - -

March 1, 2017

\- - -

Oral deposition of DEBORAH A. DAHL, PhD, taken pursuant to notice, was held at the law offices of BakerHostetler, Cira Centre, 12th Floor, 2929 Arch Street, Philadelphia, Pennsylvania, beginning at 10:39 a.m., on the above date, before Ann Marie Mitchell, a Federally Approved Certified Realtime Reporter, Registered Diplomate Reporter and Notary Public.

\- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

APPEARANCES:

LONDON LAW GROUP
BY: JUSTIN LONDON, ESQUIRE
1920 N. Maud Avenue
Suite A
Chicago, Illinois 60614
(773) 528-1433
jlondon@ameritech.net
Representing the Plaintiffs
(via teleconference)

BAKERHOSTETLER
BY: DAVID M. FRIEBUS, ESQUIRE
191 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
(312) 416-6200
dfriebus@bakerlaw.com
Representing the Defendants Karl Wittstrom and Ryan Tannehill
(via video teleconference)

\- - -



\- - -
I N D E X
\- - -

Testimony of: DEBORAH A. DAHL, PhD
By Mr. Friebus 5, 262
By Mr. London 190

\- - -
E X H I B I T S
\- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Expert Opinion on GMAX Questions | 5 |
| 2 | Dahl Expert Report Section 8 Exhibits (Volume I) Binder | 142 |
| 3 | Dahl Expert Report Section 8 Exhibits (Volume II) Binder | 143 |
| 3F | GMAX Mobile Web Resource Management June, 2010 | 180 |
| 3I | Spreadsheet | 181 |
| 4 | Dahl Expert Report Section 11 References | 176 |
| 5 | Second Expert Report of Jonathan E. Hochman | 197 |
| 6 | Personnel for ontological semantics work | 214 |



\- - -
DEPOSITION SUPPORT INDEX
\- - -

Direction to Witness Not to Answer

Page Line

Request for Production of Documents

| Page | Line |
|---|---|
| 156 | 21 |
| 174 | 7 |

Stipulations

Page Line

Question Marked

Page Line



\- - -

(Deposition Exhibit No. 1, Expert Opinion on GMAX Questions, was marked for identification.)

\- - -

DEBORAH A. DAHL, PhD, after having been duly sworn, was examined and testified as follows:

\- - -

MR. FRIEBUS: This is the deposition of Deborah Dahl taken pursuant to notice and agreement of the parties in Case Number 12-9058, pending in the Northern District -- excuse me, the US District Court for the Northern District of Illinois. The deposition is being taken pursuant to the Federal Rules of Civil Procedure and all applicable local rules.

\- - -

EXAMINATION

\- - -

BY MR. FRIEBUS:

Q. Dr. Dahl, could you please state and spell your name for the record?
A. My name is Deborah Dahl, D-E-B-O-R-A-H, Dahl, D-A-H-L.
Q. And have you given deposition testimony before?
A. No, I haven't.
Q. Okay. Have you given any other kind of sworn testimony before?
A. I was a witness in a traffic accident, so very marginal.
Q. Just out of curiosity, when? Can you give me a year?
A. I think that was about 1992.
Q. So recently? All right. So I'm going to go over just a few kind of ground rules for the deposition that will hopefully make everything go smoother today.
My role is to ask you questions, and your role is to answer them truthfully and completely.
I'm going to ask -- and a lot of these are particularly important



because we're on a video connection, and sometimes the audio, there's a lag or it's a little bit more difficult because Mr. London is dialing in remotely as well; but if you could please wait till a question is finished before answering, that will make it a lot easier for the court reporter to take it down.
Also, if you could give a clear verbal answer for the court reporter, again, that will be easier. She can't take down a nod of the head or an uh-huh or an uh-uh.
And this is very important. If you don't hear a question or you don't understand a question I've asked, can you please tell me?
A. Yes.
Q. Sorry.
A. Yes.
Q. Yes, okay. Thank you.
And if you answer a question, I'm going to assume that you both heard and understood it. Is that



fair?
A. Yes.
Q. And again, if you answer a question, I'm going to assume that your answer is complete. Is that fair?
A. Yes.
Q. Okay. Is there any reason you're not able to testify truthfully and completely today, any medication or unusual medical condition or something like that?
A. No.
Q. Okay. So let me show you what we've marked previously as Exhibit 1.
Do you have that in front of you?
A. Yes.
Q. Okay. Is this the expert report you prepared in this case?
A. Yes, yes. This is the report I prepared.
Q. And are all of the facts and data that you considered disclosed in



that report?
A. Yes, that's correct.
Q. And are all of the assumptions that you were asked to make by counsel disclosed in that report as well?
MR. LONDON: I'm going to object. You're talking about some assumptions.
Do you want to be clear what you mean by that?
BY MR. FRIEBUS:
Q. Dr. Dahl, were you asked to make any assumptions in arriving at your opinions that are disclosed in your report?
A. No. I don't remember anything like that.
Q. How many hours did it take you to prepare that report?
A. I think it was approximately 15 hours.
Q. And how much did you charge the plaintiffs to prepare that report?

A. I believe it was $200 an hour.
Q. So that would be around $3,000 then for 15 hours at $200 an hour?
A. It might have been a few more hours than that then. It might have been more like 20 hours.
Q. So you think around $4,000?
A. That's approximately what I remember.
Q. What did you do to prepare for your deposition today?
A. I reviewed the reports from -- my report, some of the documents that Mr. London had provided, the background documents of his interactions with Vyasil and with ViaSem. And I reviewed Mr. Cohen's report and I reviewed your expert's report.
Q. When you say our expert's report, whose report was that?
A. Let me check.
Mr. Hochman.
Q. Which reports of Mr.



Hochman's did you review?
A. I reviewed his second expert report.
Q. Okay. Any other reports prepared by experts retained by the defendants in this case?
A. No. That was the only one.
Q. So for Mr. -- you said you had reviewed Mr. Cohen's report?
A. That's correct.
Q. Which one did you review or which ones did you review?
A. I reviewed the one that's dated September 2016. It's titled "Expert Report of Jordan R. Cohen."
Q. You also mentioned some documents that Mr. London had provided.
Were those documents disclosed in your expert report? Are those the documents identified in Exhibit 1?
A. Yes.
Q. Okay. I guess what I'm trying to get at is, did you review



anything other than the documents that you identified in your report in preparing for your deposition?
A. The other -- anything else that I reviewed would have been publicly available papers in -- technical papers.
Q. And again, were those all disclosed in your expert report?
A. Yes.
Q. So let me just make sure I've got this -- I understand the list.
In order to prepare for your deposition, you reviewed your expert report, the materials identified in your expert report that were both provided by Mr. London as well as the materials and reference materials. You reviewed Mr. Cohen's September 2016 report, and you reviewed the second expert report of Mr. Hochman.
Is that an accurate summary?
A. That's correct.
Q. Anything else in addition to what I've just listed to prepare for your



deposition today?
A. No. That's all.
Q. Did you meet with counsel to prepare for your deposition, either telephonically or in person or via e-mail?
A. Yes. We talked on the phone.
Q. About how long did you talk on the phone?
A. I think it was about 15 minutes.
Q. Did you talk with anybody else in order to prepare for your deposition today?
A. No.
Q. Okay. Other than what we've just gone over in terms of the documents reviewed and the short phone call you had with Mr. London, did you do anything else to prepare for your deposition today?
A. No. I can't think of anything.
Q. About how long did it take

you to prepare for your deposition today? How much time did you spend in preparing for your deposition?
A. I would say it was about two hours.
Q. How do you know Mr. London?
A. Mr. London had contacted me, I think it was about three years ago, to help him prepare a patent application on some technology that he had been interested in developing into a virtual assistant application. I helped him with review of the prior art in that area, and I helped prepare the patent.
Q. Was there a patent application that was ultimately submitted?
A. Yes, there was.
Q. Just one application or several?
A. There was just one.
Q. Do you know what the status of that patent application is?
A. My recollection was that the



patent was awarded in maybe the fall of 2015. I'm not sure about the exact date.
Q. And what was the patent for?
A. The patent -- the subject of the patent was an intelligent personal assistant that would kind of serve as an assistant for a small business, in particular a law office, that might not be able to always afford to have someone on the phone. And so that the system would take calls when the -- when there wasn't anybody else available to take calls, help customers or help clients with their -- with whatever they were interested in finding out about.
Then Mr. London also noted that that kind of technology could also be applied to any small business, like it could take pizza orders in a pizza parlor. It could also have other applications. I think home control was one of the ones that he was interested in. He thought that the technology could be applicable to home control.



Q. Sorry. Go ahead. I don't mean to cut you off.
A. No. I think that was the essence of the patent.
Q. Was the original intention or the scope of the patent to be larger than that or did it start as a patent for the kind of small business application that you've described?
A. I don't -- I believe the scope was always pretty much as I've described it. I don't think it changed particularly.
Q. I mean, you understand the question. I guess what I mean to ask is, you know, did it start with a product like the GMAX application that we'll discuss today and it was winnowed down to what you just described. That's the question I'm getting at.
A. I can't really speak to Mr. London's thinking and how he decided to pursue the patent in between the GMAX time and the time that I met him and



started working with him on the patent.
When I first started working at it, it wasn't as broad as the GMAX, in my opinion.
Q. Understood. Thank you for -- that's what I'm trying to get at, when it was presented to you first, what was the scope of the project.
Okay. So then other than the patent application that you've just described, and obviously the expert report, have you done any other work with Mr. London or any of his companies?
A. No, I haven't.
Q. Have you served as an expert witness in any other capacity other than this lawsuit?
A. No, I haven't.
Q. And can you tell me a little bit about your job? You're a consultant, as I understand it; is that right?
A. That's right.
Q. Can you tell me a little bit about what that entails?

A. Okay. So my -- the purpose of my consulting business is to help usually small businesses or start-ups, sometimes larger companies, who have an idea for some innovative application of speech and language technology. And they're not necessarily knowledgeable about the state of the art in the field. I help them figure out to what extent their ideas are feasible, and then I also do reports. I help them with prototyping and exploring ideas for products that use speech and language technology.

Q. Just out of curiosity, when you are approached by a client, at what stage is the -- I might use the wrong word here, so correct me, but you said an idea for speech technology or application? What do they come to you with? Is it a basic piece of software? Is it something on the back of a cocktail napkin? What do you see when you're engaged in this process?

A. I see all kinds of things.



I'll give you two examples. At one extreme, it was -- the idea was not even a cocktail napkin. The potential client wanted to -- he was a speech presentation coach. He wanted a system that could listen to his customers and tell them -- give them tips on how to present -- make their points in a more cogent fashion.

So he wanted it to be able to count if they used jargon or if they were saying "um" too often. He wanted speech technology to do that, and I think that is on the extreme of not feasible with today's technology. So I pretty much told him that would be too hard.

The other end of the spectrum is a customer that I had who had developed a software for aphasia rehabilitation for people who have had strokes and then have trouble speaking after their stroke. They had a complete software developed, but it didn't have -- it didn't use speech technology. They wanted to know if that was possible, for



a speech recognizer to listen to the users and tell them if they said the right word or not. So that was very feasible. It was a much simpler application than the first one, and so I actually added a component to their software.

So there's a big range in between the different kinds of things that people are interested in having me do.

Q. But typically, regardless of the kind of product, is there a way that you can say are you typically provided with at least a, you know, beta piece of software or like I said -- I guess it's not so much -- which is the form in which you are engaged by your client? What do they have that they ask you to improve upon? Is there something typical I guess is what I'm trying to get?

A. I would say it's very rare that it's anything like a beta. But really, I can't think of too many



examples of that. The speech therapy software would be one example. But typically it's an e-mail, somebody says I want to do this, apply this technology, what's involved. It's usually very -- very much at the conceptual stage.

Q. Okay. And is this generally full-time employment for you, part-time employment?

A. It varies. Right now I have a full-time project, but normally my engagements are just on the order of a few hours.

Q. Other than your consultant work, are you engaged in any other -- do you have any other jobs? Are you attached with any research entities or academic, any university schools, that sort of thing?

A. Right now, I mentioned that I was -- I was -- have a full-time project now. I'm working for an organization called the University Space Research Association, which is a

consortium of universities that provides technical expertise to -- primarily to NASA. The project that I'm working at now is a project at NASA.
Q. If I can ask, what's the connection between the space research and your field of expertise?
A. Their organization is primarily a contractor -- an organization that provides resources to NASA. So the project that I'm on now is a NASA project. And it's -- it's more on the aeronautical side than the space side. It's voice control of drones.
Q. Okay. Understood. If you want to take your expert report, I think on page 13, there's a section that starts "Qualifications." Let me know when you're there.
A. Yes. Yes, I'm there.
Q. Is there anything -- I'm sorry.
A. I just said, yes, I'm there.
Q. Oh, okay.



Does this accurately summarize your qualifications as an expert witness in this case?
A. Yes.
Q. Anything you'd add to that?
A. I might add the NASA project. That's started since I wrote this.
Q. So let's flip to the second page of your report. I want to talk about the opinions you were asked to provide in connection with this case.
And there's a section here on page 2 that says, "Questions to be addressed."
Do you see that?
A. Yes, I see that.
Q. Okay. And it looks to me -- if I can sort of summarize here -- that there were four principal questions that you were asked to address. I'm going to list what I think the four questions are, and you can tell me whether you agree or not.



The cost to develop the GMAX today. The likely value of the GMAX technology if it had been developed to the specifications. Your opinion about the technical specifications provided by a company called Vyasil. And then an opinion about whether ontological semantics was necessary to extract meaning as opposed to statistical machine learning.
Does that fairly summarize the four questions you were asked to address?
A. I think -- I'm not sure why you didn't include the uniqueness and novelty of GMAX, that's question 1.3.
Q. I'm sorry, I didn't quite understand you through the video connection.
Can you repeat that?
A. You asked -- said that I was asked to address four questions. It looks like -- as I recall what you said, it looks like you didn't ask me about



question 1.3, how novel and unique was GMAX.
Q. I'm sorry, can you point to where you see -- I don't see the words "novel" and "unique" in any part of section 1, "Questions to be addressed."
Could you point me to where that's found?
A. Do you see section 1.3 in the "Questions to be addressed."
Q. Yeah?
A. The question is, how unique and novel was GMAX at the time it was sought to be developed in 2010.
Q. I'm sorry, maybe you could --
A. What --
Q. Could you hold -- part of the problem is here -- my question 1.3, it says, "A critical analysis and assessment of the technical specifications produced by Vyasil."
A. Sorry. You're correct.
Q. Okay. I'm sorry, what were

Page 26

you looking at?
A. I think I was looking at an earlier draft of the report. I'm looking at the correct one now.
Q. Okay. Do you want to start this again? I mean, the long and short of what I think I'm trying to do here is summarize without -- it looks like there are four primary questions. A couple of them have subparts. But what I'd like to do is just get an overview here of what the -- basically the four general opinions you were asked to address.
I understand that it -- in the report itself it goes into great detail, but I just want to see if we can sort of establish the four questions that you were asked to address.
So I'll start this over.
Again, tell me if I'm incorrect, but it appears to me that you were asked to provide your opinion about four primary questions. The first one is the cost to develop GMAX today; the

Page 27

second question is the likely value of the GMAX technology if it had been developed according to specifications; the third one is your opinion, your analysis or assessment of the technical specifications produced by a company called Vyasil; and then the fourth is an opinion about whether ontological semantics was necessary to extract meaning as opposed to statistical machine learning?
A. That's correct.
Q. Is that fair to say those are the --
A. That's correct. Yeah.
Q. Sorry. Go ahead.
A. Yeah, that's correct.
Q. So the answers to those questions are the opinions that you're prepared to present at trial in this case?
A. That's correct.
Q. So let's focus on the first question or the first issue, the cost

Page 28

estimate to develop GMAX today.
So if I understand this correctly, GMAX was supposed to be both an operating system and an application; is that correct?
A. That's correct.
Q. Now, as I understand it -- and again, I'm just talking about GMAX as envisioned, because I understand in your report that you provide an estimate about something that may not be exactly what was envisioned. But just so we're clear, as envisioned, the GMAX technology, both the operating system and the app, didn't exist in 2010; is that right?
A. GMAX did not exist. Is that --
Q. In 2010. I can restate the question?
A. Yeah.
Q. As envisioned, as GMAX was envisioned, right, with all of its features both with respect to the operating system and the application,

Page 29

that technology did not exist in 2010. Right?
A. That's correct.
Q. Okay. And again, as envisioned with all of its features, GMAX, both the operating system and the application, doesn't exist today?
A. That's correct.
Q. So as the product was envisioned, there really isn't anything out there that could be considered to be a replacement product for GMAX. Is that fair to say?
A. I would say there's nothing that's an exact replacement for GMAX.
Q. So in some sense, it's really not possible to estimate the actual cost to replace GMAX or to create GMAX, because GMAX as envisioned hasn't been created yet?
MR. LONDON: I'm going to object. Assumes facts not in evidence. It also calls for speculation the way -- and also form

of the question.
BY MR. FRIEBUS:
Q. You can answer.
A. I would say that we're -- we have to look at the -- all of these kinds of systems, like GMAX or Siri or Cortana or Alexa. They all consist of specific parts. So the fact that there's nothing exactly as GMAX as a product now doesn't mean that the components that would be -- go into GMAX, that means that they don't exist. If you --
Q. Do all of -- I'm sorry. Go ahead.
A. There were two -- well, there were two components that I thought don't exist yet having to do with the emotion recognition, but many of the other components do exist.
Q. You said two components don't exist but you just said emotion recognition.
Is that meant to be two components or is that one and there's



something else?
A. Emotion recognition from face and emotion recognition from voice.
Q. Understood. Right. So -- and again, we'll get into this when we get into the cost estimate that you do provide, but strictly speaking, as the product was envisioned, there really isn't anything that has all the features that GMAX was supposed to have. Right?
MR. LONDON: I'm going to object again, asked and answered and assumes facts not in evidence.
BY MR. FRIEBUS:
Q. You can answer.
A. I guess I'm wondering what I didn't answer already.
I think that -- wasn't that just the same question you just asked?
MR. LONDON: That's correct. It was already asked and answered.
MR. FRIEBUS: I'm sorry. Mr. London, you can make your objection for the record, but I'm



going to ask you not to make a speaking objection.
BY MR. FRIEBUS:
Q. Dr. Dahl, he's allowed to make his objections, and he'll make them for the record. You're required -- unless your lawyer directs you not to answer a question, I'm going to ask you to answer the questions that are asked.
So I just would like to get some clarification, but -- a yes or no answer to the question, which is, GMAX as envisioned with all of its features doesn't actually exist today. Right?
MR. LONDON: I'm going to object again. Your question is vague and ambiguous. Clarify your question and be specific.
MR. FRIEBUS: Mr. London, you can make -- excuse me, Mr. London, I don't mind if you make an objection for the record, but I don't want to get into a dialog back and forth here, so you --



MR. LONDON: I'm making my objection.
MR. FRIEBUS: Fine.
BY MR. FRIEBUS:
Q. Dr. Dahl, I can have the court reporter read the question back if you need it read back.
A. I believe the question is, is there a product currently available with all of the features of GMAX as envisioned. Is that correct?
Q. Yes, that's the question.
A. No, there's not.
Q. Okay. And so because that product does not currently exist, there is no way to accurately estimate the cost for creating the product. Right?
A. That's not true.
MR. LONDON: Object.
BY MR. FRIEBUS:
Q. So go ahead. Why is that not true?
A. Because many products are composed. There's no -- if that was the

Page 34

case, you could never make anything new or you could never estimate the cost for anything new, because there wouldn't be anything existing to compare it to. There are many potential products that you can estimate the cost for because -- based on general software engineering principles and also because some of the component technology has existed and has been implemented.

So there's no reason to say that because something doesn't exist, you can't estimate the cost, especially in very innovative technical areas, like speech and language technology.

Q. Okay. And we'll discuss this in a little bit more detail, but your expert report does not attempt to estimate the actual cost to create a product with all of the features of GMAX. Correct?

A. I believe I did attempt to estimate the cost of creating a product like GMAX.

Page 35

Q. Okay. Well, let's just do this right now.

Let's turn to page 6 of your report. I would direct your attention to section 3.2, "Cost to develop the GMAX application today."

Do you see that?

A. Yes.

Q. So I'm going to read this paragraph to you that you've written in your report and then ask you the question I just asked you again.

"These estimates assume that the goal of GMAX application development is to develop a Minimal Viable Product (MVP); that is, a product with sufficient features that it can be offered to customers. It does not have to include all the ultimate envisioned capabilities. For the purposes of this estimate, we assume that the MVP of GMAX only covers the English language and only includes one application."

So I'll ask you again, the

Page 36

cost estimate that you provided in this report is not for the GMAX product as envisioned with all its features. Right?

A. Yeah. That's correct. That -- yeah.

Q. So have people been trying to create products like GMAX? And when I say like GMAX, I mean like GMAX as envisioned.

A. I'm not sure if I've ever seen anything with all of the features of GMAX. There's a lot of technologies, as I'm sure you can appreciate, in a system like this. I'm not sure I've seen anybody try to do something exactly like GMAX.

Q. I mean, for example, like Apple, the Knowledge Navigator concept, that was supposed to be something similar to GMAX. Right?

A. That was -- that's correct. That was only -- that was never a product, it was only a movie, so who knows what features it had.

Page 37

Q. Sure. Let me -- yeah. Let me try to clarify the question here.

All I mean to say is in concept, not necessarily in execution, but in concept, there have been companies that have been trying to create a product like GMAX for a while. Right?

A. That's correct.

Q. Okay. And the idea is -- the functionality of GMAX as envisioned had all been proposed by sometime in 2010. Right?

A. I don't know if I would say all.

Again, going back to the emotion detection, I don't think I've seen -- I don't even think that was in the Knowledge Navigator. But the Knowledge Navigator is kind of irrelevant. It's a movie, so I don't --

Q. I guess, let me ask you this -- sorry. Go ahead.

A. I don't think I've seen proposals for anything exactly like GMAX.

Q. Okay. Well, let me ask you this question in a slightly different way.
In all of the materials that you reviewed regarding the GMAX technology, was there anything novel that you saw?
A. I'm trying to think.
I think that there was the emotion detection. There was some speech recognition work that I wasn't -- or some speech recognition ideas that I wasn't familiar with or some kind of hierarchical models. And the other novelty was putting everything together into one, one application.
Q. Okay. So just to be clear, you say the speech recognition models, is that something that you believe was a novel idea or is just something you were not familiar with?
A. It's more likely something that I wasn't familiar with. It seemed novel to me.



Q. And the emotion recognition, that was a novel concept? Nobody had ever proposed computers having some kind of emotional recognition or interactions with humans?
A. I'm sure there were -- there was fiction. There was also -- certainly was work on emotion detection in the abstract, not as part of a system, just a detection of emotion from a voice in -- from a telephone call or a tape, but I don't recall seeing anything that had it as part of a system.
Q. And why do you think that that's a novel concept? I guess what I'm trying to have -- what I'm struggling to understand is it seems to me that this idea that computers could interact on an emotional level with human beings has been around for some time. Why would it be novel in 2010 to propose that that be integrated with a system?
A. I think that you have to distinguish between fiction and



technology. I don't know why people wouldn't have thought to put it into a system before 2010. Maybe they didn't think of it. Maybe they thought it would be too hard. I can't really speculate about that.
Q. And then I think that there was a third idea, putting it into one system or one application.
Is that a fair summary of what you thought -- the third thing you thought was novel about the GMAX technology?
A. Right. So the GMAX as fully envisioned included many, many technologies, speech recognition, natural language understanding, dialect management, machine translation, emotion detection. Having all of those -- and others, text to speech.
Having all of those together in one system, and not as fiction but as an actual product, that -- I believe that was new in 2010.



Q. Is that new because it stretches -- again, help me understand this. But is that novel in the sense that nobody had -- it's only novel because other people realized the impossibility of such a task?
A. I don't think people realized -- it was certainly not impossible. It was -- it would have been expensive, and maybe people -- I guess I'm speculating. People prefer to have products that they can start selling more quickly and they don't want to make the -- or they were -- didn't -- weren't interested in creating the ultimate system because they could get something that they could sell without being -- including all of those techniques.
Q. Okay. Well, how is that -- again, let me ask this in another way.
How is that different than the systems that you describe in your report as being underway in 2010, such as Siri or I think Cortana or some of the

Page 42

other speech recognition systems that included, I think as you said earlier today, a lot of these features, how is -- what distinguishes those systems from the kind of combination putting everything in one application as you just described with GMAX?
A. So are you asking me what's the difference between Siri and GMAX?
Q. I guess what I'm asking is that you said that it was novel to combine a lot of these features into one application. Right?
A. Okay. So let me tell you the difference between Siri and GMAX. That's a good example because Siri is well -- we're all familiar with it.
Siri does not -- when it first came out, it only spoke English, and I think the vision for GMAX was to have many more languages. Now Siri has a few more languages.
Siri does not really engage in a conversation. It basically -- you

Page 43

ask it a question and it gives you the answer. It doesn't translate between languages.
I think the primary -- the biggest difference between Siri and GMAX is the lack of an ability to actually have a conversation with you. It just responds to your questions and comes back with an answer.
Q. Okay. I appreciate that. I guess what I'm trying to understand is it seems like the -- with respect to the third thing you thought was novel about GMAX, right, the putting it all together into one application, again, why is that something that other companies were trying to do as of 2010?
MR. LONDON: Objection, calls for speculation.
THE WITNESS: Yeah. I can't -- I can't really answer what other companies are thinking about or trying to do. It -- I don't know what they were doing internally. They may

Page 44

have been trying. I don't know.
BY MR. FRIEBUS:
Q. Okay. Let me see if I can get at this a different way.
So I want to focus -- because there's two parts to GMAX. One was an operating system, and one was an application. Right?
A. That's correct.
Q. So I want to look -- let's focus on the application right now. And I want to look -- refer you to section 2.2.1 of your report. It's on page 3.
And it appears to me that in this section of the report, you discuss some of the challenges to creating an application like GMAX. Is that fair to say?
A. I guess I'm talking about the difference between GMAX and the older, traditional spoken dialog systems.
Q. Right. But I think you say at one point on page 3, these differences -- and I'll quote you here --

Page 45

"increase the complexity and technical risk of development."
A. That's correct.
Q. Do you see that in the second paragraph of 2.2.1?
A. Yes.
Q. In short what you're saying is these differences from traditional commercial spoken dialog systems, this will increase the complexity and technical risk of development. I'm shorthanding that and calling that a challenge.
A. Okay. Okay.
Q. Okay. So well, here. We can agree that the following things -- and we'll talk about them one by one. The following differences that you list in your report would increase the complexity and technical risk of developing a system like GMAX over and above a traditional commercial spoken dialog system. Right?
A. Yeah. That's correct.

Page 46

Q. Okay. So the first one is what you refer to -- is adding additional domains.
What do you mean by that?
A. A domain is a term of art. It means the -- sort of the area of knowledge that a system can deal with.
So domain might be banking, healthcare -- well, not even healthcare, something more narrow than that, like neurology, making restaurant reservations, home control, like turning your lights off and on, automobile control. These are circumscribed areas of expertise.
Q. I think you say in your report that it would require a solution to the problem of domain disambiguation?
A. That's correct.
Q. And that's another way of saying that if you want a system to be able to address several different domains, the system needs a way to figure out what subject you're talking about.

Page 47

Right?
A. That's correct.
Q. What domain you're talking about.
Did that technology exist in 2010?
A. Certainly the -- it was technically feasible. I don't know how much was used in actual systems. Certainly there was research on that area. There's a -- kind of a gradation from some research prototype concepts all the way through to commercial consumer products, but I would say domain disambiguation was certainly feasible in a research context in 2010.
Q. Maybe I'll ask this a slightly different way.
Did that technology exist in any commercial application in 2010?
A. I don't think -- I'm not aware of anything.
Q. Does that technology exist in any commercial application today?

Page 48

A. Yes, certainly.
Q. Okay. What commercial applications use that technology?
A. Well, I would say a very good example is the Amazon Alexa Echo, the Echo application. It can answer questions about many, many different domains. And it takes -- it understands enough of your question so that it can say, oh, is he asking about the weather or is he asking about -- he wants to play music, he's asking about the news, sports scores. It works very well with Alexa.
Q. Any other commercial applications?
A. Cortana. Microsoft's Cortana. I think Siri to some extent can do that. I think that's a pretty -- pretty well understood technology now.
Q. So just to summarize, the technology in commercial application didn't exist in 2010, but as of today, there are at least a few examples of it in commercial practice?

Page 49

A. That's correct.
Q. So I want to skip a paragraph and go to subparagraph 3 on page 4.
And you discuss a -- you say "GMAX had a goal of supporting a mixed-initiative dialog style."
Do you see that?
A. Yes.
Q. Did that technology exist in 2010?
A. It certainly existed in research. I don't believe it existed in commercial products in 2010.
Q. Okay. So there were no commercial applications that utilized a mixed-initiative dialog technology in 2010?
A. Not to my knowledge.
Q. Do any commercial applications used a mixed-initiative dialog today?
A. Again, I would say that Alexia is a good example of that. It can

both wait for you to ask it things, and it can initiate topics on its own.
Q. Any other commercial applications?
A. I can't think of any commercial applications. Again, there's a lot of research literature on this topic, though.
Q. I want to skip down to paragraph 6. This is face recognition.
In a commercial setting -- or strike that.
With respect to commercial applications, did this technology exist in 2010?
A. Not to my knowledge.
Q. And again, in commercial systems, does this technology exist today?
A. Yes. There's at least two good examples I can think of. One is -- it's a Google application that helps you organize your pictures, your photographs. And there's another application that I



don't remember the name of it, but it's a Microsoft application with the same goal. It looks at your photographs and says, okay, this is person X, this is person Y after looking at a few other pictures.
Q. Is this different than the emotional recognition that we discussed earlier?
A. This is -- face recognition is recognizing a particular individual. Emotion recognition is recognizing the emotion that's being expressed.
Q. So it's different?
A. Yes.
Q. And then jump back up to subparagraph 4 where you talk about commercial systems running on servers and GMAX being -- running on a mobile device.
Do you see that?
A. Yes, I see that.
Q. Okay. Could smartphones support a system like GMAX in 2010?
A. Well --
MR. LONDON: Objection,



assumes --
THE WITNESS: -- I can't -- I don't know. I'm not a mobile phone expert.
BY MR. FRIEBUS:
Q. Okay. So that would be beyond your scope of expertise?
A. That's correct. I know that they've improved since then, but I can't -- I don't know their exact capabilities.
Q. Now, you mentioned a couple technologies here.
Does Alexa run on a mobile phone?
A. No.
Q. Does Cortana run on a mobile phone?
A. Well, I believe so. I haven't seen it myself, but -- I know it runs on Windows phones. I think it does run on more widely used phones.
Q. Well, let me ask this question a different way.



The GMAX application was meant to be hosted on a phone; is that right?
A. I'm not sure what you mean by hosted.
Q. Well, I guess what I mean is, as I understand it -- and again, correct me if I'm wrong -- that one of the goals of GMAX was to be able to exist on a mobile device rather than interfacing remotely with a server, you know, through either an internet connection or some kind of telephonic connection.
Is that an accurate understanding or summary of the goal of GMAX?
A. I'm not sure what the exact architecture was envisioned for GMAX. All of the applications that we know now, like the Siri and Alexa and Cortana, all have components that are server based and components that are locally based. So there are many different ways of

Page 54

architecting a virtual assistant application.
Q. Okay. So that's exactly what I'm trying to get at.
So Alexa, Cortana and Siri, they all have some components that parts of them are server based and parts of them are hosted on the mobile phone; is that right? Or some other device in the case of Alexa?
A. Right. There's different ways of architecting that division of labor.
Q. Okay. Well, just to be clear, the ways that Cortana, Alexa and Siri do it is that a portion of the processing is done on a server, and a portion of the application resides on either a mobile phone, in the case of Cortana or Siri, or some other device, in the case of Alexa; is that right?
A. Yeah, that's correct.
Q. And you don't have an understanding as to the architecture that

Page 55

GMAX was going to use vis-a-vis the mobile device and any server, back-end server?
A. No. I don't recall seeing anything about how that was supposed to work.
Q. Okay. Would that be an important component to making a product like GMAX work? Is that an important detail?
A. You mean how the functionality was architected?
Q. Yeah.
A. It would be important to make -- to do that design work and to make GMAX work, it would be critical.
Q. But I just want to focus here, maybe you can help put into words or explain or unpack your opinion in paragraph 4.
As I read it, you seem to be expressing a concern that the GMAX application as envisioned would be difficult to run on a mobile device,

Page 56

given the memory and CPU limitations on mobile hardware?
A. These traditional systems that I'm thinking about run entirely on servers, 100 percent on servers. And the only interaction the user has is over the telephone.
At least portions of GMAX were intended to run on the mobile device. And if any part of it is running on a mobile device, then the engineers would need to be concerned about memory and CPU limitations.
Q. But you don't -- and again, forgive me if I've asked this before, but I just want to make sure that I get an answer.
You don't have any understanding as to the systems architecture between which portions of GMAX would actually run on the device, and which, if any, would run on a back-end server.
MR. LONDON: Objection, also

Page 57

calls for speculation.
THE WITNESS: I know that at least some parts of it would have to, and have to run on the local device because of the nature of an application like that. For example, there would need to be some voice detection, some ability to start the speech process.
Also, on a mobile device, there may be other applications being shared with the virtual assistant application.
BY MR. FRIEBUS:
Q. Sure. Let me make sure I'm asking -- maybe I can ask a better question.
I think we can all agree, right, that some portion of the GMAX application would have to be run on the mobile phone itself, because that is the way in which GMAX is envisioned to interact with the user. Right?
A. Right.

Q. Okay. And so my question is, in terms of a system architecture, you're not aware of how much of that architecture, whether all of it was intended to be run on the mobile device or only a portion of it run on the mobile device and the rest of it run on some kind of back-end server?

MR. LONDON: Objection, asked and answered.

THE WITNESS: I would just say that I don't know how that was -- the division of labor was envisioned. There would need to be some part on the device, but that people have very -- maybe you've heard of thin clients. You can have very little running on the device, or you could have a lot running on the device.

BY MR. FRIEBUS:

Q. Right. And you just don't know how that allocation was intended to be designed with respect to GMAX?

A. No, I don't know that.



MR. LONDON: Objection, asked and answered.

BY MR. FRIEBUS:

Q. I'm sorry, I just want to make sure for the record we've got your answer. You said no?

A. I said I don't know how the architecture was envisioned.

Q. Okay, thanks.

So staying in this section, it appears that there were a couple other differences that would increase the complexity and technical risk.

In numbered paragraph 2, you talk about GMAX intending to connect to many applications.

How does that increase the complexity and technical risk of development?

A. It doesn't -- it doesn't increase the risk. It increases the complexity, because if you have -- let's say you have -- let's say you have several applications. You have, let's



say, a movie database and a sports score providing database that you're going to -- there has to be an integration to each one of those applications. So it's more of an additive complexity than -- it's kind of an additive complexity.

So we have to do the sports scores, we have to do the movies, we have to do the restaurant reviews. It's just adding more and more capabilities, but it's -- I would say it's not -- it doesn't increase the technical risk, but it does increase the complexity.

Q. Another way of saying that is that to the extent that you want to have access to that information, you need to have arrangements with the owners of those other applications to be able to access that information?

A. In some cases that's true. In other cases the information is open. You don't need an arrangement.

Q. So in some cases it would only be a matter of resolving the



technical issue of accessing that database. In other cases, it would be also resolving what I'll call a business issue with obtaining permission to access that database.

Is that fair to say?

A. That's right. As an example, music streaming services, I'm sure that is a business question.

On the other hand, you have things like weather information that's freely available, government-provided databases. So yes, it could either be open or it could be a business relationship.

Q. What about search engines like Google or Bing, would those require licenses from Google or Microsoft to connect, or is that open source?

A. I don't know. I doubt that they would require licenses, but I don't know.

Q. Okay. You don't think that Google or Microsoft would require a

license from another operating system to access its search functions?
MR. LONDON: Objection, assumes facts not in evidence and it calls for speculation.
THE WITNESS: Yeah. I don't know.
BY MR. FRIEBUS:
Q. And then there's another -- paragraph 5. You talk about hardware permissions.
And as I understand it, what you're discussing in this section is that for GMAX the application to be able to access the hardware features on a mobile phone, it would need permission from the hardware manufacturer in order to do so; is that right?
A. That's right. That's what I was saying.
Q. And you say, obtaining permission from device manufacturers can be time-consuming and complex?
A. That's correct.



Q. Can you describe what you mean by that? Why is it time-consuming and complex?
A. Well, Apple in particular is very cautious about their brand and getting -- and this is getting away from technology, but they want to approve -- they approve every app that goes on an iPhone. So the thinking would be if you're going to control hardware on an Apple device, there would need to be some careful vetting by Apple of exactly what you were going to do.
Q. And that's just with respect to the GMAX app. Right? I mean, you're only talking about a mobile application?
A. What do you mean?
Q. Okay. Let me try and clarify.
One of the questions we started out with today was, GMAX as envisioned was supposed to be both an application and an operating system. Right?



A. Okay. So you're saying just to be able to do things like tell the phone to take a picture by voice, that's part of the application. That's not part of the operating system. But you would still need some permission from Apple to be able to control the hardware.
Q. Okay. So right. And I guess what I'm -- where I'm -- what I'm asking or ultimately getting at is that what you described in your report is just with respect to gaining access to the hardware device for the application feature of GMAX. Right?
A. That's correct.
Q. Do you have an opinion as to how difficult, whether it would be more difficult to get a hardware manufacturer to allow them to put an entire operating system on the phone?
MR. LONDON: Objection, calls for speculation.
THE WITNESS: I think that -- just to look at examples, I



think that it would be very difficult for Apple -- to get permission from Apple, I think might be different for different -- other kinds of phones, that they're not known to be as strict as Apple.
The one example of an operating system was -- a new operating system was put on a phone recently is called Firefox OS. I don't know what hardware they use, but it was developed by Firefox. I don't know what hardware they used, but presumably they were able to get permission to put their OS on -- I don't think Firefox is making hardware.
So it depends on the manufacturer, I guess.
BY MR. FRIEBUS:
Q. Okay. So maybe I'll ask this a different way.
For any manufacturer that already currently has its own proprietary

operating system, either Android or Apple, would you expect those to allow another manufacturer or another operating system like GMAX to be used on their phone?

MR. LONDON: I'm going to object. Objection, assumes facts not in evidence, specifically that GMAX would have -- wanted their operating system on an Apple device.

THE WITNESS: You have to make a distinction between Android. Android is an operating system, not a phone. So saying that -- let's say Samsung would be the entity that would be comparable to -- they're developing a hardware that could have operating systems on it. They happen to use Android. But I don't think it's impossible for Samsung to entertain another operating system, for example.

BY MR. FRIEBUS:

Q. But in any event, if you were to put an operating system on a



phone, that would be something -- you would also need permission from a device manufacturer in order to do that?

A. Well, I don't know. You would need permission or you would need to work with them to get them to sell your phone with the operating system on it. I don't know how open they are to new operating systems that you just put on yourself.

Q. So I want to keep working through your report here.

So you go on in section 3 to provide a "Cost estimate to develop GMAX today."

Do you see that? It's on page 5.

A. That's correct.

Q. And it's broken down into two sections. The first one is the "Cost to develop a mobile operating system" and then the second, which I believe starts on the following page, is the "Cost to develop the GMAX application"; is that



right?

A. Yeah, that's correct.

Q. Okay. So let's focus on just the application. We'll come back to the operating system.

And again, I think we talked about this a little bit before, but just for orientation purposes, I want to start with section 3.2 of your report where you say "These estimates assume that the goal of GMAX application development is to develop a Minimum Viable Product...; that is, a product with sufficient features that it can be offered to customers. It does not have to include all the ultimate envisioned capabilities. For the purposes of this estimate, we assume that the MVP of GMAX only covers the English language and only includes one application."

Then you go on to say, "The GMAX application includes a standard spoken dialog system as well as interfaces to device functions and



external web functions via API's."

So tell me if I'm wrong, but if I understand the cost estimate that you then go on to prepare, you're drawing certain parallels or drawing parallels, rather, between a certain subset of the GMAX functions and current technology and then estimating what it would cost to create or recreate that current technology. Is that fair to say?

A. I see -- when I'm looking at this, I see that there's unfortunate multiple senses of "application" that I'm using in section 3.2. I want to make sure that we clarify that.

Q. Okay.

A. As -- the GMAX application, as we've been talking about, is the -- what I would call the virtual assistant application, the overall system for interacting with your phone by voice and natural language.

In our field, application means something else. It means something

Page 70

like get sports scores or do your banking by phone.
Q. Like a domain?
A. Or do your banking by phone. It's very close to the meaning of domain.
Q. It --
A. So I --
Q. I'm sorry.
A. I'm using it both ways in this section, unfortunately.
Q. So let me make sure I understand what you're saying.
In this section what you're saying is that the estimate that you're providing is for a virtual assistant application that includes only one domain such as get sports or banking?
A. That's correct.
Q. Okay. So just to be absolutely crystal clear, when you use "application" at the end of the first paragraph of section 3.2, you mean something like a domain, like a get sports or banking?

Page 71

A. In the last sentence of section 3.2, I mean that generic virtual assistant.
Q. No. The last sentence of the first paragraph of 3.2. When you say, "only covers the English language and only includes one application."
A. Oh. That's correct. That's correct.
Q. When you say "only includes one application," that means only one domain, such as get scores or banking?
A. That's correct.
Q. So let me ask this again and see if this -- you think if this is a fair characterization.
But if I understand what you're doing in the following section to prepare the cost estimate, what you're doing is you're drawing a parallel between certain functions -- a subset of the functions of GMAX as it was originally envisioned and a parallel between that and current technology and

Page 72

then estimating what it would cost to recreate that current technology?
A. You mean estimate what it would cost to recreate the GMAX technology with current technology? Is that what you're saying?
Q. Let me see if I can put this a different way.
It looks to me that what you're doing is you're saying if we sort of strip down GMAX to a minimum viable product, we can compare that to a product like Siri and then estimate what it would cost to develop that functionality based on that kind of comparison.
A. That's correct.
MR. LONDON: Let me object.
BY MR. FRIEBUS:
Q. Okay. So just to make sure -- let's see here.
Okay. So then I'm not going to walk through everything in the next few pages, but as you go on then in section 3.3, in pages 6, 7, 8 and 9, this

Page 73

essentially is a cost estimate that you've prepared to create this minimum viable product; is that right?
A. That's correct.
Q. And then in section 3.5 -- and I'm just looking here at the first paragraph in 3.5, you have a conclusion that says, "it would not be realistic for a general software development organization to complete this task."
When you say this task, you mean create a minimum viable product as you described?
A. That's correct.
Q. Okay. So -- and because the minimum viable product is not quite as complicated as GMAX, in your opinion, would it have been reasonable to believe that a general software development organization could create a more complicated product like GMAX?
MR. LONDON: Objection to your characterization of general software. It also assumes facts not

Page 74

in evidence, that a general software company can't obtain the type of developers or expertise from third parties.
THE WITNESS: So could you repeat your question?
BY MR. FRIEBUS:
Q. Sure. My question is, your conclusion in your report is that -- and again, correct me if I'm wrong -- that even for a minimum viable product as you've described, it wouldn't be reasonable to believe that a general software development organization could create a minimum viable product. Right?
MR. LONDON: Objection again. It's vague. What is general software development? It's ambiguous and vague, what you mean by that.
THE WITNESS: What I said is it would not be realistic for a general software development organization to complete this task.
BY MR. FRIEBUS:

Page 75

Q. So if it's not realistic for a general software development organization -- I'll take this in a couple steps.
So would it be realistic for a general software development organization to build something more complicated like GMAX than the minimum viable product that you described?
A. No, it would not be realistic.
Q. Okay. In fact, it would be even less realistic, because it's a more complicated product. Right?
A. That's correct.
Q. So would it have been reasonable for someone to assume that a general software development organization could build a minimum viable product as you've described in your report?
A. I don't know what you mean --
MR. LONDON: Once again, it assumes -- let me just finish my

Page 76

objection.
It assumes facts not in evidence, that the general software development company cannot work with third parties and obtain the resources that it needs.
THE WITNESS: My question was, what do you mean by reasonable?
BY MR. FRIEBUS:
Q. Well, what I guess you're saying is your opinion is it's not realistic for a general software company to provide a minimum -- to create a minimum viable product.
At what point would somebody look at this and say, well, it's not reasonable for me to believe -- if you say it's not realistic, then would it be reasonable for someone to believe that a general software development company could create a minimum viable product?
MR. LONDON: Objection, calls for speculation and assumes facts not in evidence.

Page 77

THE WITNESS: Different people might have different opinions. I don't think we can say reasonable for anyone in the world.
BY MR. FRIEBUS:
Q. Okay. So let's break this down.
Would it have been reasonable -- I mean, I think this is a safe question.
You said it's not realistic, so it wouldn't have been reasonable for you to assume that a general software development company could create a minimum viable product. Right?
A. I would -- I would not expect that to be possible myself. I can't speak for anybody else.
Q. Sure. Does it take a Ph.D. to come to that conclusion, or would a lesser degree of education also come to that conclusion?
A. Well, I can't --
MR. LONDON: Excuse me.

MR. FRIEBUS: Let me ask a better question. Let me ask a better question. You can strike that.

MR. LONDON: Let me state -- you're going to restate your question?

MR. FRIEBUS: I'm going to restate my question, yeah.

BY MR. FRIEBUS:

Q. My question is, does it take a Ph.D. -- and forgive me, I'm not sure that I remember what your Ph.D. is in.

But would it take a Ph.D. in computer science to know that it's not realistic for a general software development organization to build a minimum viable product?

A. I --

MR. LONDON: Let me please state my objection.

Once again, first of all, it's been asked and answered. Second of all, calls for speculation. Third, it assumes facts not in evidence. It assumes that the general software



development company is unable to work with other companies that can provide the core functionality, as well as retain outside third-party developers that it may need who have the expertise.

MR. FRIEBUS: All right. Just for the record, Mr. London, I'm going to ask you not to make any more speaking objections.

MR. LONDON: It's not a speaking objection. I've made my objection.

BY MR. FRIEBUS:

Q. Do you need the question read back?

A. Yeah, that would be good.

- - -

(The court reporter read the pertinent part of the record.)

- - -

THE WITNESS: Okay. So I would say it doesn't take a Ph.D. or -- in computer science, or in my



case, my Ph.D. is in linguistics. It takes someone with expertise in this field.

So in fact, there can be many Ph.D.s, and in fact, many of my clients have Ph.D.s in other fields, and they don't know what is or isn't possible with speech technology. Someone like myself, who has many, many years of both engineering and research in this area, and I'm very familiar with the industry, that that is a good background for deciding what is or isn't reasonable with the technology. I'm very surprised sometimes at how very-well-educated people don't know what the state of the art is.

BY MR. FRIEBUS:

Q. When you say don't know what the state of the art is, what do you mean by that?

A. Well, take my example of the client that wanted speech technology to



be able to give him public speaking coaching. Speech recognition really isn't -- the technology isn't ready for that.

Q. Sure. But he didn't come to you and ask if you could build that for him, did he?

A. He did.

Q. Did he ask you whether it was possible or did he ask you specifically to create it for him?

A. Well, he wanted someone to build it. And then I told him it was impossible and I couldn't say that I would be able to do that.

Q. So just getting back to this, your opinion that it wouldn't be realistic for a general software development organization to build a minimum viable product, let me ask you this: It's not possible to simply contract with a company to, say, build GMAX, can you?

MR. LONDON: Objection, form

of the question.
THE WITNESS: Yeah. I don't understand what the question was.
BY MR. FRIEBUS:
Q. Well, here. Let's move on to the next sentence in your report.
You say, "Very few companies could develop this product today entirely with internal resources."
A. That's correct.
Q. Do you see that?
A. Yes.
Q. So I guess my question is -- well, let me follow that up.
Which companies could have developed a minimum viable product like you described in 2010?
MR. LONDON: I'm going to object. What --
THE WITNESS: You mean who -- what companies could entirely build GMAX in 2010? Is that what you're saying?
BY MR. FRIEBUS:



Q. Yeah. You said very few companies could have developed this product.
So which are the companies that you're referring to there?
MR. LONDON: I'm going to object, calls for speculation.
MR. FRIEBUS: I'm just asking her what she meant in her report, Mr. London.
THE WITNESS: I think I said -- I said what companies could develop the product today, not in 2010.
But I -- but today, I'm talking about companies like the ones I've listed in the first point, IBM, BBN, SRI, SAIC, Mitre, AT&T and DFKI. And probably Apple would be in there too, or Google.
BY MR. FRIEBUS:
Q. Okay. But just to be clear, the point 1 in your report talks about system integrators. Right? Those are a



list of what you're calling prime contractors. Right?
A. Okay. That's true.
Some of them are both system integrators and also prime contractors. Probably, I would only say Mitre would need to contract out something.
Q. So let me just understand this. The -- because this a little bit different than what you've got in your report.
So you're saying that the companies listed in your report on sub 1, with the exception of Mitre and with the addition of Apple and Google, could develop that product, the minimum viable product, today entirely with internal resources?
A. Well, maybe I should have said no companies could develop this product entirely with internal resources, because of the very cutting-edge technologies like emotion recognition from faces. They could -- the companies



in 1 could develop the -- I would say the preponderance of the system with internal resources.
Q. So there's no company today that could develop the GMAX product entirely with internal resources. Right?
A. Not to my knowledge.
MR. LONDON: Objection, calls for speculation.
BY MR. FRIEBUS:
Q. I think what you're suggesting is that in order to create a product like GMAX, you would have to -- well, here. Let's just go right to your report, although this is a little bit earlier in your report, on page 4.
You say -- and this is towards the bottom of the page -- "It would have been necessary to recruit a large team of very highly specialized, highly paid engineers and scientists. The CALO team which developed much of the technology behind Siri...was an example of such a team, including team members

from 22 organizations."
Do you see that?
A. That's correct, yeah.
Q. So if fair to say that in order to develop a product like GMAX, you would need a team like the CALO team?
MR. LONDON: Objection, mischaracterizes her testimony.
THE WITNESS: No. I wouldn't say that at all. CALO was a research project, not a -- they weren't trying to produce a product. They were developing technology from scratch.
BY MR. FRIEBUS:
Q. I'm sorry. So help me then understand what you say in your report when you say "It would have been necessary to recruit a large team of very highly specialized, highly paid engineers and scientists. The CALO team" is an example of such a team.
A. That's correct.
Q. Okay. So if I'm



understanding you correctly, it would have taken a team similar to the CALO team to develop a product like GMAX?
A. Right, right. This is 2009.
Q. Okay. Well, in 2010, does that change?
A. It's different now.
Q. Okay. Is it different in 2010?
A. Well, probably to some extent. A little bit different, maybe not quite 22 organizations.
Q. I mean, is it fair to say that, look, it's different today because much of the technology -- much of the component technology has already been developed, and so in that sense, it would be different. But in 2009 or 2010, it would be functionally the same, because at that point in time, the component technology that exists today didn't exist back then?
A. Well, be careful of exist versus not exist. Technology doesn't



come into being immediately. It's a gradual process.
So I would say in 2010, there would need to be a large team of specialized technologists to be able to create something like GMAX. It wouldn't -- that wouldn't necessarily be the case now.
Q. Okay. What would be the case now?
A. That would be going back to -- where were we? Page 9.
Now we could have system integrators with expertise in the area. Some of the other companies that could be involved in the development of the components, companies like Google and Apple, because this is seven years later, things change really fast.
Q. Okay. So it's a little easier today. Or it's easier today than it would have been in 2009 or 2010?
A. Yes.
Q. Now, I think you said it



would cost at least $35 million and I think time-wise five years to create a minimum viable product; is that right?
A. Where did I say five years?
Q. Well, I'm getting that because the only time example that I have in the report is on page 7 when you compare it to Microsoft Cortana in section 3.3.2.
A. That's correct. Microsoft -- it's not 3014, by the way.
Q. I figured that was 2014.
A. Yeah, that's correct.
Remember that Cortana was also starting from this -- this era when the research was emerging into technology. And we don't -- I don't know if Microsoft has ever called Cortana a minimum viable product.
Q. All right. Well, why don't you just give me a time -- how long -- so let's break this down.
It's your opinion that it would have cost at least $35 million to

create a minimum viable product today. Right?
A. For the GMAX application, yeah.
Q. Again, that's just a minimum viable product as you described in your report?
A. That's correct.
Q. How long, in today's time frame, would it take to develop a minimum viable product?
A. Well, this is a guess. I would guess two years, two to three years.
Q. And that's just a guess?
A. That's correct.
Q. Do you think it would have been reasonable to believe that any version of the GMAX app could have been built for $50,000?
MR. LONDON: Objection, calls for facts not in evidence.
THE WITNESS: Reasonable for who to believe that? I can only speak



for myself.
BY MR. FRIEBUS:
Q. Okay. Well, would it have been reasonable for you -- do you think it was reasonable -- speaking for yourself, would it have been reasonable to believe that any version of the GMAX app could have been built for 50,000?
A. I would not think so. I think it's conceivable that some kind of very simple prototype could have been built, not a minimal viable product. But I'm only speaking for myself.
Q. Because your estimate for a minimum viable product is 700 times that amount?
A. What amount?
Q. $50,000.
A. Right. $50,000 to me is enough to maybe build a desktop application that can answer a few questions. It's nowhere near a minimal viable product. And just to --
Q. Right. And --



A. We need to be careful to distinguish between the costs of engineering and the costs of all the business people around engineering. To make a minimal viable product is a lot more than engineering.
Q. But you're talking about in today's time frame, not in 2009-2010?
A. That's correct.
Q. Okay. What could you have built for $50,000 in 2010?
MR. LONDON: Objection. Now, you keep referring to $50,000. It's completely irrelevant.
THE WITNESS: I could build --
MR. LONDON: That was --
THE WITNESS: I could build a screenshot that showed how the product might be used, something like the Knowledge Navigator, not as slick as the Knowledge Navigator.
BY MR. FRIEBUS:
Q. And that's a film. Right?



A. Yeah.
Q. Okay. We're not talking about the product that was envisioned as Knowledge Navigator?
A. No. That was never built.
Q. Right. Okay. Do you know how long it took to develop Siri, start to finish?
A. Let me see. I think I may have had that. I'm not sure what the start is.
Q. Let me put it this way: Start to when it was acquired by Apple?
A. It looks like in section 2.3 I was saying it was about 2007, development of it began on a new type of spoken language system, a virtual assistant. And then I believe it was actually a product -- I think it was in -- I'm not sure of the exact dates. It could have been around 2010 that the product was launched by the company Siri. And then I'm not sure of the exact date when it was acquired by Apple. It was

fairly soon after. It's probably only about six to nine months after the independent product was launched. So that would be roughly three, three years.

Q. Three years, okay. In terms of the cost estimate to develop a minimum viable product, does that amount of money go up if we're talking about trying to create a minimum viable product in 2010 as opposed to now?

A. I think I already answered that. It's -- because so much of the groundwork has been laid between 2010 and now, the amount in 2010 would have been much more than that, than what we're talking about now.

Q. Can you give me an idea as to how much more?

A. I believe that DARPA spent -- I'm not sure of the exact amount. It was probably in the order of $100 million on the CALO technology. That was what Siri spun off from.

Q. So let me see if I can kind



of summarize what we've been talking about here in terms of what would have to happen to develop a minimum viable product.

I'm assuming the starting point would be some kind of technical specification, at least as a starting point?

A. You mean now? You mean going forward?

Q. I'm just saying, if you were to build this thing -- and we'll talk about both in terms of today and in 2010. Right? But I want to break down the steps and see if I can kind of summarize all of the things that would have to happen to get you to a minimum viable product.

And I think some of them might change from a money standpoint, but tell me if I'm wrong if the steps would change.

You need to start with some sort of something.



What would be the starting point? Some kind of technical specification?

A. Not at all. The starting point would probably be with some kind of overall goal and mission statement and a very high level of functionality that would not be at all a technical specification.

And the second step that would be very important before you get to technical specification is requirements, so what capabilities does this envisioned product need to have. It needs to be able to do all of these things. It has to have certain performance characteristics. It has to be -- operate at a certain speed and some applications, we have power requirements. So the requirements are the -- absolutely must be completed before technical specification work even starts.

Q. What would be the next step after the requirements?



A. It depends on your software engineering philosophy. I personally would start developing a high level technical specification and then possibly intermix that with some prototyping and iterate over the requirements and the technical specification. That would be a spiral model. There are other approaches that are -- where the stages are more or less interleaved. But I would -- especially in a very technical area -- or very -- not technical, but a cutting-edge technical area, it's important to iterate on the requirements and technical specification implementation usually at least more than once in the engineering process.

Q. Okay. At what point would you get either a team like CALO or a prime contractor, a system integrator involved? Once you have the requirements or further down the road or would you go to them with a mission statement?

A. I have worked with people

Page 98

that started with mission statements.
People like system integrators are very capable of working with a client to help them understand the requirements. They'll help you with the requirements. If you come with requirements, they'll probably tell you what is and isn't feasible. But I've certainly started working with a mission statement. But the first thing I do with a mission statement is make sure that we're both clear on what the requirements of the product are.
Q. So let me see if I can sort of summarize this at a high level.
Starting with a mission statement, right, a stated goal, you would need a set of requirements -- so let's build this -- let's talk about -- just to be clear, I want to summarize what steps you would have to take to develop an application for a general conversational personal assistant. And we'll stay in 2010. And then I'll ask

Page 99

you the same question in 2016 so we can get two kind of parallel answers.
In 2010, start with, I'm assuming, the same thing, a mission statement. Right?
A. Right.
Q. You would develop a set of requirements. Right?
A. Right.
Q. Either at some point in there you would need to put together a team like CALO. Right? CALO?
A. That's correct.
Q. Okay. And putting together a team like CALO would require a number of different entities collaborating on a number of different technologies. Right?
A. That's correct. I personally would not start with a full CALO-scale team. I would start with a smaller team and ramp up to the full team. But that's really -- that's a matter of timing, not really -- the stage when you start implementing is when you

Page 100

start needing the developers.
Q. Okay. So maybe rephrase this.
So you go mission statement, requirements, small team, larger team. Right?
A. Right.
Q. And then at least in this case, roughly speaking, $100 million if you're going to compare it to CALO?
A. I guess one thing that we have to be careful about is CALO, as I said, was a DARPA project. DARPA's mission is to support research. So part of their mission is -- their mission is to develop technology, but they also have a mission to support research. So I would say CALO -- maybe I -- maybe comparing CALO directly to GMAX in terms of its goal is a little bit different. So DARPA is interested in developing technology. GMAX is interested in developing a product.
Q. Okay. And so how does

Page 101

that impact -- I guess what I'm trying to do is understand all the steps that would have to take place between a mission statement and a minimum viable product for a general conversational assistant?
A. Right. So --
Q. So --
A. So there would be a mission statement or -- go ahead.
Q. Well, so there would be a mission statement, requirements, small team, a larger team, and a not insignificant amount of money in your estimate that you provided before in the 2010 context would be around $100 million?
A. To duplicate CALO.
Q. Well, we can ask this a couple different ways, but I think the question that I asked you was, is how much do you think it would cost to develop a minimum viable product in the 2010 time frame?
MR. LONDON: I'm going to

Page 102

also to object -- hold on.
It assumes that the product could be developed in -- the entire thing in 2010, so it assumes facts not in evidence.
MR. FRIEBUS: I can clarify the question.
BY MR. FRIEBUS:
Q. Starting in 2010, not today, how much money would it take to develop a minimum viable product for a general conversational personal assistant?
A. I really don't know. There's -- certainly there was a lot of money was spent on CALO. I don't know how much of that was spent on research projects that weren't really directly in line to a product. Usually engineering is much more efficient than DARPA projects in terms of getting something to work. I think I said $35 million was what we'd have to spend now, so I would -- in 2010, I think it would be more than that, but -- so somewhere

Page 103

between 35 and $100 million.
Q. Okay. All right. So without quantifying it, maybe we can simplify this a little bit.
So in order to develop a minimum viable product, it would be contingent on a number of events. Right? Developing a -- starting with a mission statement, you need to develop workable requirements, you need to have a --
I'll start that question over. We got a phone ring, I think, or something in the background.
So again, what I'd like to do is just try to understand the events that would have to take place and see if you agree with me at kind of a high level here in order to go from a mission statement, which -- you know, an idea for a product, in order to actually have a minimum viable product for a general conversational personal assistant.
You need to develop a set of workable requirements. You need to

Page 104

develop -- you need to have -- find a scaleable team or a large team. And you need to have a significant amount of capital somewhere I think you just said in the order of 35 to $100 million. Right?
A. That's to go from the mission statement to the minimum viable product.
Q. So creating a minimum viable product is contingent at least on those events happening. Right?
A. I think it's not a good thing to call those events. I think I would call those milestones, because they aren't necessarily in the waterfall order of doing things one at a time, but those are certainly milestones.
Q. Essentially I think what I'm trying to get at here is these are contingent milestones. Right? It's not like going out and buying a car or buying a -- something, a product that exists. You would have to -- there are a number

Page 105

of contingencies that would have to take place between going from an idea for a product and the actual product development?
A. Well, generally. I don't know if I would say it quite so sharply, but think about, you go to buy a car, to take your analogy, you have some things in mind that you want and then you go in and buy an actual car, maybe it's missing some of the features that you thought you wanted and it has extra features that you didn't know you wanted.
So when -- the requirements are not necessarily cast in stone. They can -- as you understand more about what the situation is, they can be modified.
Q. Well, let me ask you this a different way. And I think we've talked about this earlier. Right? The GMAX product doesn't exist --
A. Correct.
Q. -- today?
Okay. So its very

Page 106

existence, because it doesn't exist from any starting point, it would be a contingent event. Right?
MR. LONDON: Objection. It mischaracterizes her testimony.
THE WITNESS: What do you mean by contingent event?
BY MR. FRIEBUS:
Q. Well, in order to create a product that does not exist, it would depend -- the ultimate existence of the product would depend on a number of contingencies. Right?
A. Right. That's no different from any product, whether or not it exists.
Q. Oh, sure.
A. There's always contingencies in engineering.
Q. Right. No. I understand that. I'm not trying -- all I'm saying is that there's a difference between the cup, for example, that's sitting in front of you. It exists right now. Right?

Page 107

You can put your hand on it?
A. Right.
Q. So whether or not that product exists is not contingent on anything, right, because it already exists?
A. In this kind of technology, it's much more like -- the requirements are much more like the car example, I think. You could start out with a mission statement and have requirements for it, and then maybe those requirements are not realized 100 percent for whatever reason, whatever contingency. But you find out in the end that you have a very viable product.
Q. Right. I think we're maybe missing each other here. I don't think it's as complicated a concept.
If I -- let me try to put this in a different kind of -- draw a different analogy here.
If I wanted to go out and buy a 2017 Toyota Corolla, for example, I

Page 108

can go out and do that. Right? That car exists, it's on the lot someplace, and so I can go purchase that car. Right?
A. Right.
Q. We can agree on that.
Now, if I'm sitting here in my chair and I want to build a 2017 Toyota Corolla. Right?
A. Right.
Q. That -- the outcome of that happening, of me successfully building a 2017 Toyota Corolla or a car identical to it, would be dependent on a number of contingent events. Right?
A. Right.
MR. LONDON: I'm going to object to this entire line of questioning as completely irrelevant and mischaracterizing her testimony.
BY MR. FRIEBUS:
Q. I'm sorry, I think your answer was "right"?
A. There are -- any kind of engineering project, there will always be

Page 109

contingencies that require a change of direction.
Q. I'm not talking about changing direction or changing requirements. All I mean to say is that in order to get from an idea for a product -- and we've been talking about GMAX -- to the actual product in existence, there are a number of contingencies. Right? Developing the right requirements, finding the right people, having the right amount of resources, the right amount of capital, all of those things would be contingencies to developing a product that doesn't exist. Right?
MR. LONDON: I'm going to object, vague and ambiguous, contingency.
THE WITNESS: Well, if you take an example of finding the right team is a contingency, that's true whether the product exists or not. If you're going to build something, you

Page 110

still need to have the right team. It
doesn't --
BY MR. FRIEBUS:
Q. Sure. And again, all I'm talking about is when -- I think this is a very simple concept, but I'll try it again.
That taking a product from an idea or mission statement to actualizing it in the world depends on a number of contingencies. And in this case, for a piece of software for a generally conversational personal assistant, it would require things like having the right team, having the right kind of requirements, having the right amount of capital. But in addition to however many other things, but it would at least require those three contingencies. Right?
A. That's correct.
Q. Okay. And I guess just to kind of complete the thought, to build something for GMAX as it was envisioned,

Page 111

right, not the minimum viable product we've been talking about with respect to the report, but GMAX as envisioned would be even more difficult or even more contingent because you're talking about technology that didn't exist in 2010 and doesn't exist today, at least with respect to some of its features. Right?
A. Well, I think -- right. You need to -- we need to be clear that there's many, many technologies in GMAX. It's not just technology that existed and didn't exist and all at different levels of maturity. So it's not just the technology didn't exist and now it exists. There is --
Q. I guess what --
A. There's like maybe 15 technologies at different levels of maturity.
Q. Right. But at least some of them don't exist today. Right?
A. They don't exist as products.

Page 112

Q. Well, you said the emotion recognition doesn't exist, period. Right?
A. Oh, no. There's plenty of research -- I think I said there was plenty of research on emotion recognition. And in fact, there are standalone emotion recognition products. I just don't know of any example where it's been actually integrated into a system like GMAX.
Q. So you're aware of emotion recognition.
Is that with respect to voice or face or both?
A. I'm actually more familiar with face, but I know of two products. One is a system that people use in product like focus groups and they put a camera on people and they say, did you like this product. And sometimes people will lie if they -- if they're asked a question like that, they don't want to hurt the feelings of the person that's

Page 113

asking them a question. So this product compares what they say to what they look like. So that's one. But it's a completely standalone product, as I said.
The other example, it's not really a product, except it's -- I think it's -- it's from Microsoft. And it's -- you send it -- it's a service rather than a product. You send it a picture, and it will tell you what emotion is being expressed. So there are standalone emotion recognition products and services. I don't know about integrated ones.
Q. Okay. And so maybe to put it differently, part of the challenge for something like -- again, we've been talking about the minimum viable product in your report. Maybe it's not so much that it's -- well, maybe put it a different way, it would be even more contingent because what you're trying to do is integrate a number of at least presently disparate technologies into one

Page 114

application. Is that fair to say?
A. Adding a lot of different technologies into one application will make the project more complex, if that's what you're asking.
Q. That's what I'm asking.
A. Yeah, yeah. Certainly.
Q. Just to take it back to the other -- what we've talked about here are there are a number of contingencies in going from a mission statement to a minimum viable product. And all I'm adding to that discussion of that question is, well, when you step beyond a minimum viable product and you talk about a product like GMAX that brings together a number of presently disparate technologies, that's an additional kind of contingency or complexity. Right?
A. Yeah. That's true.
Q. See, I think it was simpler than we were making it out to be.
Okay. So you don't quantify in your report the probability that GMAX

Page 115

would have succeeded in developing even a minimum viable product. Right?
A. No. We have to also make sure that we're clear on talking about business success versus technical success. I think we should focus on technical success because business success I think is a different question. But I didn't quantify the probability that we would have a technical success.
Q. Okay. That's a better --
So just to be clear, you didn't quantify the probability of a technical success for a minimum viable product? Right?
A. Right, right.
Q. And I think if I'm understanding what you just said correctly is that an additional -- when you're talking about a commercial product, right, like GMAX was envisioned to be, you not only have a technical component, but you have a business component as well?

Page 116

A. That's correct. You have to have -- no matter how technically successful it is, you have to get people to buy it. It's not automatic.
Q. So that's an additional -- when you're talking about trying to have a commercially successful product, that's an additional requirement or contingency or hurdle or level of complexity than merely the technical requirements. Right?
A. That's correct.
Q. Okay. And you're not offering any opinion, and I don't see it in your report, but just to be clear, you're not offering any opinion as to the business viability of a product like GMAX?
A. Yeah. I don't -- I mean, I don't know anything more than the average layperson. You know, I see people using Siri and I see people using Alexa, but I really only have expertise in the technical area.

Page 117

Q. I want to ask you about something. This is jumping a little bit to one of the questions, I think it was the fourth question you were asked to answer, which is the necessity of using ontological semantics for extracting meaning. And I think that's at page 12 of your report.
- - -
(Court reporter interruption.)
- - -
MR. FRIEBUS: I'm sorry, Dr. Dahl. We've been going for a while. If at any point you need to take a break or if you want to use the restroom -- we'll take a five-minute break right now for everyone to stretch their legs.
- - -
(A recess was taken from 12:49 p.m. to 12:57 p.m.)
- - -
BY MR. FRIEBUS:

Q. So we were talking about the section of your report where you offer an opinion about the "Necessity of using ontological semantics for extracting meaning." And I think that is on page 12.
Do you see that?
A. Yes, yes.
Q. Now, this approach using ontological semantics for extracting meaning, that was the same approach that GMAX as envisioned was going to use. Right?
A. I believe that it was planned to use that, yes.
Q. Okay. And your opinion about that was, if I can sum up your opinion on -- well, let me just ask a bridge question.
That ontological semantic approach that GMAX was going to use, you refer to it in your report as the Nirenburg and Raskin approach; is that right?



A. That's right. That's right.
Q. If I can kind of bottom-line your opinion, you don't think that that approach would have been successful. Right?
A. I said that approach would have been required.
MR. LONDON: Object --
BY MR. FRIEBUS:
Q. I'm sorry?
A. I said that --
MR. LONDON: Can I just make the objection?
MR. FRIEBUS: Go ahead.
MR. LONDON: Mischaracterizes her statement.
THE WITNESS: I didn't say that it would have been unsuccessful. I said that it would not have been required.
BY MR. FRIEBUS:
Q. It would not have been required?
A. Right.



Q. Okay. Well, let me direct you to the second full paragraph under section 6.
Is it fair to say you criticize Nirenburg and Raskin's approach?
A. I criticize it in the sense that no one is using it, so it hasn't been successful in the research community. Could have any --
Q. Are people in the --
A. I don't have any evidence that anyone's ever used it except for them.
Q. All right. And are there people in the research community looking about for solutions for natural language understanding?
A. Yes.
Q. And in fact, a number of companies and entities and research organizations are looking for solutions in the natural language understanding sphere. Right?



A. That's correct.
Q. And does it suggest to you that not one of them has turned to Nirenburg and Raskin's approach in the last 12 years suggest that these organizations don't think it's viable?
MR. LONDON: Objection, facts not in evidence, calls for speculation.
THE WITNESS: I don't know. I don't know why they haven't used it. It could be not technically viable. It could be not very well documented. It could be expensive. There's lots of reasons that they might not use it. They might not have been able to explain it.
BY MR. FRIEBUS:
Q. I'm sorry, what?
A. They might not have been able to explain it well enough. Other people often have their own proprietary approaches. They aren't interested in trying something -- there are many, many

reasons.
Q. Okay. Well, in your experience, the fact that -- is it -- strike that. Let me ask a better question.
If the Raskin/Nirenburg approach was viable, would you have expected some entity in the natural language research field to have adopted it or pursued it?
A. I wouldn't say that. I would say that if it had been adopted, that would be evidence that it was viable, but that no one hasn't adopted it could be many reasons, like the reasons that I just went through: They didn't know about it, they had their own proprietary approach, it was expensive, it was too time-consuming to implement. There's a lot of reasons other than just pure technical superiority that you might go with one or another approach.
Q. Are you familiar -- based on your report, I'm going to presume you're



somewhat familiar with Raskin and Nirenburg's approach. Right?
A. I'm not deeply familiar with it. It's not very well known.
Q. Do you have an opinion as to whether it would have been able to accomplish the functionality that GMAX had envisioned?
MR. LONDON: Objection, assumes -- hold on. Calls for speculation.
Go ahead.
THE WITNESS: I guess I -- to the extent that I'm familiar with it, it doesn't -- I don't see that it's particularly different from the generic idea of ontological semantics, which just means using ontologies in natural language understanding, which is -- it can be useful in natural language understanding. It's not necessary and it's not sufficient for a natural language understanding system.



So I guess just to reiterate my points, I don't think that they have anything different from the generic idea of ontological semantics, which is neither necessary nor sufficient for natural language understanding.
BY MR. FRIEBUS:
Q. So is one -- another way of putting that, that this Nirenburg/Raskin approach wouldn't necessarily -- wouldn't have moved the ball forward much in terms of achieving the goals that GMAX as envisioned had?
MR. LONDON: Objection, mischaracterizes her testimony and calls for speculation.
THE WITNESS: Yeah. Ask your question again, please.
BY MR. FRIEBUS:
Q. Well, what I'm trying to do is kind of unpack what you just said.
And part of what I picked up on -- and I'm asking you if this is fair



or accurate to say -- that this Nirenburg/Raskin approach wouldn't have moved the ball forward in terms of advancing the goals that GMAX as envisioned had?
A. I don't -- I think it could have -- it could have been not harmful. It -- I don't see any reason to think that it would have been a problem. I don't think it was -- would have been particularly important.
I guess I'm saying it could have been used. It wouldn't have hurt anything. But I don't think it would have given you any advantages over the generic ontological semantics.
Q. Again, I didn't ask if it would hurt or, you know, delay development. It's just in your opinion, it would not have advanced the ball forward much in terms of developing a system that would accomplish the features that GMAX as envisioned had?
MR. LONDON: Objection, once

again, asked and answered,
mischaracterizes her testimony and
assumes facts not in evidence.
THE WITNESS: If we're
comparing what would have happened
with the Nirenburg and Raskin's
ontological semantics versus generic
use of ontologies, I don't think it
would have been particularly useful.
BY MR. FRIEBUS:
Q. I'm not trying to compare
one to the other. What I'm saying is
that we have -- GMAX has stated goals
about what kind of natural language --
its natural language systems could
accomplish. And if I'm understanding
your answer correctly, and again, tell me
if I'm wrong, I think what you're saying
is this Nirenburg/Raskin approach
wouldn't have materially advanced GMAX in
achieving those goals?
MR. LONDON: Once again I'm
going to object, asked and answered
and mischaracterizes her testimony.



THE WITNESS: I think you
could use it. I think you could have
used it. So I think it would have
been usable in achieving the goals of
GMAX. It wouldn't have been
necessary.
BY MR. FRIEBUS:
Q. Well, let me ask it this
way: You just said it would have been
usable to achieve -- so GMAX could have
achieved its natural language goals by
using the Nirenburg/Raskin approach?
A. The Nirenburg/Raskin
approach could have been part of a
solution. It would be one option. Like
I said, it wouldn't have hurt, but it
wouldn't have particularly been -- I
don't know. It would have been usable to
achieve the solution if it --
Q. I'm sorry, I didn't catch
that last part?
A. It would have been usable.
It wouldn't have been necessary.
Q. Okay. I'm sorry, so let me



just see if I can understand this
correctly.
So GMAX had goals of using a
natural language system in a certain way.
Is it your opinion that GMAX
could have achieved its goals for a
natural language system using the Raskin
and Nirenburg approach?
MR. LONDON: Objection,
asked and answered.
MR. FRIEBUS: I just want an
answer to that simple question.
MR. LONDON: No. Objection,
asked and answered. Hold on.
It's objection, asked and
answered, mischaracterizes her
testimony, the way you're forming, and
also the form of your question.
THE WITNESS: If the GMAX
system had used the Raskin and
Nirenburg technology, that wouldn't
have been sufficient to achieve the
goals of GMAX.
BY MR. FRIEBUS:



Q. Okay.
A. It could have been part of
the solution.
Q. So let me follow up on that
answer.
When you say part of the
solution, how far would it have advanced
GMAX in achieving its goals, a little
bit, a lot, halfway, more than three
quarters? Or --
MR. LONDON: Objection,
calls for speculation.
MR. FRIEBUS: Excuse me, Mr.
London, I'm not finished with my
question.
BY MR. FRIEBUS:
Q. Or only in an incremental
way?
A. I think it would be -- I
guess it depends on what we think would
be there instead of ontological
semantics.
Would it be the best
solution? Or the best pieceable

solution? I can't say that. I think it could have done a useful job, but I don't think it would have been particularly better than any of the alternatives.

Q. Right. And I guess what I'm trying to get an answer to is how useful would it have been?

MR. LONDON: Objection, asked and answered. She's answered the question.

MR. FRIEBUS: No, she actually hasn't answered the question of how useful it would be.

BY MR. FRIEBUS:

Q. You said it's not hurtful, and you've said it wouldn't be any marginally better than a general semantic approach, but I'm just trying to get an answer to the question, well, how useful would it have been. I get that it could have been part of the solution. I get that it would not have solved the problem, but just how useful would it have been?



MR. LONDON: Objection, calls for speculation.

THE WITNESS: How do you quantify -- it would be a little bit useful. Is that what you're looking for?

BY MR. FRIEBUS:

Q. If that's what your opinion is. I just -- or if you can't quantify it, I mean, that's fine too. I'm just trying to get a sense of when you say useful, what do you mean by that?

MR. LONDON: If you don't -- I just -- the witness is not expected to speculate.

MR. FRIEBUS: I'm just trying to understand an answer she's given.

MR. LONDON: Calls for speculation, and the witness is asking -- you're asking her to speculate.

If you know, Dr. Dahl, you can answer; but if you have to



speculate, you're not expected to do that.

BY MR. FRIEBUS:

Q. Just to be clear, I'm asking for, in your mind, when you say it would be useful, what do you mean by that? How useful would it be?

A. I guess now that I think, I don't think that it would have provided any incremental value over some alternatives that could have been put in place.

Q. And I think just to circle back to what you said --

A. Maybe I'd say no.

Q. -- when you say alternatives, you mean -- you mean a general -- I'm sorry, what was the phrase you used before?

A. General use of ontologies in natural language processing.

Q. Okay. So you're saying it wouldn't have any incremental benefit than a -- it wouldn't have been any more



useful than anything else, a general -- I'm sorry, I keep missing that phrase. General ontological --

A. General ontological semantics.

Q. Is that another way of saying there's nothing special about the Raskin and Nirenburg approach?

A. Yes, I would say that.

Q. So I want to turn to another topic now, and that's the cost estimate to develop the GMAX operating system.

Now, you provide a cost estimate to develop -- well, let's start this way. I think we'll go to page 5 of your report, section 3.1.

A. Okay.

Q. You say, before providing a cost estimate, "I do not have specific expertise in developing mobile operating systems." Is that right?

A. That's correct.

Q. And I think earlier today you said something along the lines of,

I'm not a mobile phone expert?
A. That's correct.
Q. Do you have any experience in developing mobile operating systems?
A. No.
Q. I'm just going to ask you this frankly, and I don't mean it in any kind of offensive way, but do you feel that you're qualified to render an expert opinion about the cost to produce a mobile operating system?
A. I've not -- I haven't had that specific expertise, but I have developed a lot of software and I've worked in a lot of big software projects. So I'm not an expert in mobile operating systems, but they are software, so I bring that software development expertise to this question.
Q. Have any of the software development projects that you've worked on involved mobile operating systems?
A. I've developed apps that run on mobile operating systems, but that's



different from developing the operating system itself.
Q. I'll just ask the question again.
Have any of the software development projects that you've worked on involved the development of a mobile operating system?
MR. LONDON: Objection, asked and answered.
THE WITNESS: No. No, they haven't.
BY MR. FRIEBUS:
Q. Now I want to turn to another portion of your report. And this has to do with the -- in section 4 on page 10, the "Likely value of the GMAX technology."
A. Okay.
Q. So the first question I have is, you don't render an opinion in your report about the value of the GMAX operating system, do you?
A. That's correct.



Q. So the next series of questions I'm going to ask you are really just focused on the GMAX application.
You say that the technology -- and I can point you to -- under bullet point 1, you say, "The technology would very likely have found a buyer at some price."
Do you see that?
A. Yeah.
Q. Now, does that opinion assume that the GMAX application was able to realize some or all of its goals?
A. That's correct. Assuming that it was -- there were some goals, some part -- at least parts of it was implemented. Yeah. I think it would have found a buyer at some price.
Q. And you also say that had GMAX "resulted in a general conversational personal assistant, it probably would have been worth $200 million."
Do you see that?



A. Yeah, that's correct.
Q. And the basis for that estimate is the estimated price that Apple paid for Siri?
A. That's correct.
Q. Do you know exactly how much Apple paid for Siri?
A. No.
Q. That price isn't actually publicly available, is it?
A. No.
Q. And you don't have any special knowledge --
MR. LONDON: Go ahead. Can I please state my objection?
MR. FRIEBUS: Sure. Go ahead.
MR. LONDON: You're assuming facts not in evidence. You stated that it's not publicly available. I believe that information to be in Apple's quarterly reports, SEC reports. In fact, it would have to

be.
MR. FRIEBUS: Okay.
Mr. London, I'm going to ask you one more time. I would appreciate if you refrain from making speaking objections.
BY MR. FRIEBUS:
Q. So let me ask you this: You don't have any special knowledge about the price that Apple actually paid for Siri. Right?
A. I have no definitive information. This is the amount that is generally believed to be correct in the industry.
Q. Understood. Do you know exactly what Apple acquired when it bought Siri?
A. I believe they acquired the software that was used to develop the independent Siri app.
Q. Do you know if they acquired any patents in connection with buying Siri?



A. They bought the entire company, so I would assume that they bought the patents. I don't know for sure.
Q. Do you know if there was any other intellectual property that would have been conveyed along with the Siri acquisition?
A. You mean other than patents?
Q. Right.
A. I, well, expect there would be some trade secrets involved as well.
Q. But you don't know?
A. No.
Q. Do you know how many people, you know, in terms of talent, were acquired with the acquisition of Siri?
A. I don't know. I don't think it was very many. I think it was on the order of 20, but I can't say definitively.
Q. And then a similar question, do you know what, if any, licenses Apple acquired when it purchased Siri?



A. No, I don't know of anything like that.
Q. Now this $200 million estimate, that represents the revenue that the company obtained from its sale to Apple. Right?
MR. LONDON: Objection, mischaracterizes -- can you repeat back the question?
MR. FRIEBUS: I can reask it.
BY MR. FRIEBUS:
Q. All I'm getting at is the $200 million that you've stated here is the amount that Apple paid to buy Siri. Right?
A. That's correct.
Q. And it's revenue that the company realized from its sale to another company. Right?
A. I don't know how that works.
MR. LONDON: I'm going to object to the --
BY MR. FRIEBUS:



Q. I guess --
A. If the company ceased to exist when it was sold, I don't know how it can have revenue.
Q. No. I guess what I'm driving at here is that the $200 million figure isn't the replacement cost for Siri. It's the cost that Siri was -- or it's the amount of money that the company was sold for. Right?
A. That's correct.
Q. Okay. And you don't provide an estimate or an opinion on the cost to develop Siri in your report, do you?
A. Only with respect to the costs of developing CALO, because Siri was built from CALO.
Q. Just forgive me, but can you point to the place in your report where you provide that figure?
A. Yes. I guess I'm not seeing that.
I think it was about $100 million, the DARPA program.

Page 142

Q. Right. You've testified that. But you don't see that figure anywhere in your report. Right?
A. I may not have mentioned that.
Q. So in the following section of your report, excuse me, you go on to provide -- it's a section titled "Assessment of the technical specifications produced by Vyasil."
Do you see that?
A. Yes.
Q. Okay. So now we're going to turn to the binders here. And if the court reporter could mark the binder with the title "Dahl Expert Report Section 8 Exhibits (Volume 1)" as the next exhibit, I think that would be Exhibit 2. And then we'll mark the second volume as Exhibit 3. That would be great.
- - -
(Deposition Exhibit No. 2, Dahl Expert Report Section 8 Exhibits (Volume I) Binder, and

Page 143

Deposition Exhibit No. 3, Dahl Expert Report Section 8 Exhibits (Volume II) Binder, were marked for identification.)
- - -
BY MR. FRIEBUS:
Q. There's a few housekeeping exercises here before we get into substantive questions.
I was looking at your report, and you identify a couple exhibits to your report. And we can kind of flip here between section 5 and then section 8, which contains a list of the exhibits. I just want to make sure we're all working from the same page here.
A. Okay.
Q. So on page 10 of your report on section 5.1, you say "Exhibit D: Technical specification," but in Exhibit 8, and you can work with the binders here, I think it's the larger of the two binders that has Exhibit E in it, tell me if I'm wrong, but I think what

Page 144

you're really referring to by "Exhibit D: Technical specification" is Exhibit E. There's a few reasons I think that, but we can maybe clear this up a little bit faster.
A. Yeah. I think that's correct.
Q. So would it be okay if we just made a -- kind of a change to the report here and say rather than Exhibit D, call it Exhibit E, just so we're all on the same page?
A. Yeah.
Q. And then similar question. So in section 5.2, you refer to Exhibit E as "GMAX Mobile Web Resource Management." I think that's Exhibit F.
Does that sound right?
A. Yeah.
Q. So if the title of this section is "Assessment of the technical specifications produced by Vyasil," when you're referring to technical specifications produced by Vyasil, do you

Page 145

just mean these two exhibits, Exhibit E and Exhibit F, or are you referring to a larger, you know, number of documents?
A. I think we also should look at application software requirement specification. I think that was another one that I was referring to.
Q. Any others?
A. Well, yeah, possibly the GMAX operating system software requirements.
Q. Okay. So you think you were referring to in this section Exhibits C, D, E and F to your report. Is that fair to say?
A. Yeah. That's my recollection.
Q. How do you know that these documents were produced by Vyasil?
A. Mr. London told me that they were produced by Vyasil.
Q. So let's take a look at these binders here, because I want to -- and I think probably the easiest way to

Page 146

do this is to have you turn to page 13 where you have the list of exhibits to your report. Because what I want to do is understand, these two binders contain documents that we were provided with by Mr. London as the exhibits to your report.

And what I want to make sure is that these binders that are to your right accurately represent or contain the documents that are identified in your list of exhibits. Okay?

A. Okay.

Q. So the first one, it's pretty easy. We'll go Exhibit A. So you're going to have to -- I think let's start with Volume 1. And we'll just flip through this. We'll flip through the binders, and we'll just compare the binder to what you've got listed in your expert report.

A. Okay.

Q. And we'll just make sure the documents are the right ones.

Page 147

So Exhibit A, "GMAX Business Plan."

Is this the Exhibit A referred to in your report?

A. My binder is coming apart. Let me fix that.

That's correct.

Q. Okay. So you'll see in Tabs 1 and 2 that we were provided by additional documents with Mr. London. They're identified by file name as GMAX Pro Formas Updated, GMAX Projections.

I didn't see those listed separately among the exhibits in your expert report.

Did you consider these documents in forming your opinion?

MR. LONDON: Yeah. I may have -- I just want to be clear. I may have -- those specific documents may not have been provided to her. I'm not sure.

MR. FRIEBUS: So we'll just get an answer from Dr. Dahl. And then

Page 148

if they haven't been provided, we can just make sure that that's clear for the record. And if you did consider them, then we'll get that answer too.

THE WITNESS: I think that I saw these, but I didn't see the relevance, so I didn't examine them.

BY MR. FRIEBUS:

Q. So that's -- and when you say "these," you mean Tabs A1 and A2 in what we've marked as Exhibit 2, right, the binder in front of you?

A. I'm not sure what you mean by A -- Tab 1 and Tab 2.

Q. I'm sorry?

A. I'm talking about Tab 1 and Tab 2 of Exhibit 2.

Q. Okay. Thanks. Because we're doing this by video, we kind of have to be extra explicit. It would be easier if we were sitting in the same room, you could just point. So I just want to make sure it's clear for the record.

Page 149

So Exhibit B, I think this one is easy because it's got the "GMAX requirements." This is the exhibit -- the document that is behind Tab B in Exhibit 2 is what you describe as Exhibit B in your report?

A. That's correct.

Q. Same question, Tab C, the document behind Tab C is what you described as Exhibit C in your report?

A. That's correct.

Q. Same question with respect to Tab D, the document behind Tab D is what you identify as Exhibit D to your report?

A. Yeah, that's correct.

Q. Sorry, but we'll do the same exercise for the Volume 2, the larger binder to your right.

So same set of questions, the document behind Tab E in Exhibit 3 is what you've listed as Exhibit E to your report?

A. That's correct.

Q. Okay. So here's where we get a bit of -- this is a question for me.
Your counsel or Mr. London, rather, provided us with an Exhibit E2, which is behind Tab 2 in the binder you're looking at. It says GMAX Technical Specifications, but I don't see that document listed in your expert report.
A. I don't remember seeing that.
Q. Okay. So the document that's behind Tab 2 in Exhibit 3 was not considered by you in connection with your expert report?
MR. LONDON: Just to be clear, which document are you referring to?
MR. FRIEBUS: I'm referring to the document that is behind Tab 2 in Exhibit 3, which is Section 8 Exhibits, Volume 2. So it's the one that immediately follows Tab E.



For further clarity, it has a banner at the top that says GMAX Technical Specifications Version 1, Date: May 28, 2010.
THE WITNESS: I think -- I don't remember this -- I kind of remember -- I'm not sure if I saw this for sure or not.
BY MR. FRIEBUS:
Q. I'll ask you a simpler question.
Is it identified as one of the exhibits in your expert report?
MR. LONDON: I'm sorry, what is the date? I don't know which document you're referring to still.
MR. FRIEBUS: It is -- Mr. London, I'm in Exhibit 3 for the deposition, which is the binder that has the cover page "Dahl Expert Report Section 8 Exhibits (Volume 2)."
We are looking at Tab 2 or Tab E2 because it immediately follows Tab E.



MR. LONDON: Okay.
MR. FRIEBUS: It's identified in the index of the report or index of the exhibit as technical specs operating system, and then the document itself -- Mr. London, have you found the document?
MR. LONDON: If it's the one that discusses the operating system?
MR. FRIEBUS: The document says GMAX Technical Specifications -- I'm sorry, Mr. London, whatever you're doing near your microphone is causing some interference.
So just to be clear, the document has an aqua banner at the top that says GMAX Technical Specifications.
MR. LONDON: Yes. I see it. I see it.
MR. FRIEBUS: Okay.
BY MR. FRIEBUS:
Q. So now that we've all identified the document, the question on



the table is, Dr. Dahl, did you identify -- is this document, the GMAX Technical Specifications dated May 28, 2010, identified in your expert report?
A. I don't think so.
Q. Okay.
A. No, there's no document with that date in the list.
Q. And your recollection is that you didn't review this document in preparing your report. Right?
A. I don't remember this document.
Q. So let's move to Tab F.
A. Okay.
Q. Same series of questions, Tab F, "GMAX Mobile Web Resource Management (June 2010)."
This is the document that you identify as Exhibit F in your report?
A. That's correct.
Q. Then moving on to Tab G, it looks to be a series of PowerPoint slides. The document in Tab G, that's

the document that you identify as Exhibit G to your report; is that right?
A. That's right.
Q. Okay. Now, the same question, Tab H, the document behind Tab H is the document you identify as Exhibit H, "GMAX Investor Presentation"; is that right?
A. I -- something happened to the copying. There's not anything left.
It was the document that I intended to identify as the investor presentation.
Q. So the document that is physically -- that you're reviewing right now doesn't -- it's not the same document that you identified in your report?
A. I can't tell because of the way it was printed. It's missing most of its content.
Q. Right. And your recollection is that the document that you reviewed was not missing most of its content?



A. No.
Q. So this suggests to you that the document that you're looking at physically right now is not the same document as you identified, or is at least not a complete version of the document that you identified in your report?
A. No, it's not.
Q. So let's turn to Tab I.
A. Okay.
Q. I think I know the answer to this, but is the document in Tab I the same exhibit that you identify as Exhibit I in your report?
A. That's correct.
Q. Now, I have reason to believe that you might be wrong about that.
And the reason that leads me to think that is if you look at your report on page -- and again, I could be wrong about this, but if you look at your report on page 9, under section 3.3.2.1.8



"Total Cost."
It appears in your report that you describe Exhibit I as a cost estimate that you put together.
A. I did put together a cost estimate. It's not this one. I sent my estimate --
Q. So would you --
A. I sent my estimate to Mr. London as an Excel spreadsheet, but this reference --
Q. So would you --
A. This reference is not to the cost estimate in Exhibit I.
Q. So would you correct your answer then to say that the document in Tab I of Exhibit 3 is not the same cost estimate that you identify as Exhibit I to your report?
A. That's correct.
MR. FRIEBUS: So obviously, Mr. London, we're going to have to get from you the correct Exhibits H and I at some point.



BY MR. FRIEBUS:
Q. So let's go back to the first volume of these exhibits, the document that's been marked as Exhibit 2 to the deposition.
And I'm just going to ask you -- we're going to go through each of the exhibits.
You're on the right binder, I believe.
A. Okay.
Q. And I'm just going to go through each of the exhibits to your report and ask you a series of hopefully straightforward questions about the exhibits.
So let's start with Exhibit A, which is the business plan.
A. Okay.
Q. Does this document contain anything other than a description of technologies?
Maybe I can ask a better question.

Obviously it contains some projections about business plans and that sort of thing.
But purely from a technological point of view, does the document contain anything other than a general description of technologies?
A. You mean as opposed to business?
MR. LONDON: Take a look at the document.
BY MR. FRIEBUS:
Q. No. I mean as opposed to something more specific.
Could you build anything with that?
A. I think -- no.
MR. LONDON: I don't know what you're asking. I'm going to object. Your question doesn't make any sense.
BY MR. FRIEBUS:
Q. I'll ask the question again.
Could you build anything



with the business plan from a technological standpoint?
MR. LONDON: I'm going to --
THE WITNESS: That's not the purpose of a business plan.
MR. LONDON: Yeah.
BY MR. FRIEBUS:
Q. I'm not asking you what the purpose of a business plan is.
I'm just asking you, in the business plan, is there a sufficient description of the technology that you could build something using it?
A. No.
MR. LONDON: I'm going to object. The question makes no sense.
BY MR. FRIEBUS:
Q. Just to make sure that we're not talking over each other, your answer to that question was no, Dr. Dahl?
A. That's correct. The answer is no.
Q. So let's look at Tab B.
The same question, does the



document in Tab B contain anything other than a high level description of technologies?
MR. LONDON: Which tab?
MR. FRIEBUS: Tab B, B as in boy.
THE WITNESS: It includes some requirements which are not what I would call a description of technologies.
BY MR. FRIEBUS:
Q. Okay. Could you build anything with it?
MR. LONDON: Objection. What does that mean, build? Vague and ambiguous and confusing. It's not the purpose of the document.
MR. FRIEBUS: You know, Mr. London, I'm going to ask you yet again not to make a speaking objection. You made your objection to form. Duly noted.
MR. LONDON: Because it's confusing. Nobody can -- it's



unintelligible as to what you're asking.
THE WITNESS: I could not take this document and build a system from it, no.
BY MR. FRIEBUS:
Q. Okay. So let's look at Exhibit C.
A. Okay.
Q. I'm sorry, just to be clear for the record, let's look at Tab C.
A. Okay.
Q. I think you're in the same place. I just want to make sure that the written record accurately reflects what we're looking at.
And this is the "GMAX Operating System Software Requirements Specification"?
A. That's what I'm looking at.
Q. Okay. And you reviewed that document as part of -- in preparation for -- in connection with preparing your opinion in this case. Right?

Page 162

A. That's correct.
Q. Now, does this document raise a concern for you about the capability of its author to produce the GMAX operating system?
A. Well, as I said --
MR. LONDON: Objection.
THE WITNESS: -- I'm not an expert on operating systems.
BY MR. FRIEBUS:
Q. Okay. But even putting that aside, in your capacity as someone who has expertise in developing software programs, does the document -- does this particular document raise any concern for you about the capability of its author to produce an operating system?
A. If I were looking at this, yes, I would be concerned.
Q. I mean, just to kind of maybe put it bluntly, would this raise a concern that the person who authored the document didn't know what they were doing?

Page 163

MR. LONDON: Objection, assumes facts not in evidence. The deponent is not expected to testify as to the knowledge that someone else thought or knew.
THE WITNESS: I would certainly believe that they didn't know how to prepare a document.
BY MR. FRIEBUS:
Q. Would that lead you to have a concern about their ability to actually create the operating system itself?
MR. LONDON: Objection, assumes facts not in evidence, that the person or persons who prepared this document are the same people who would develop this system.
THE WITNESS: If I got this document, I would need to dig more deeply into their capabilities. It would make me want to find out if there was just a problem with their document or is there a problem with their expertise.

Page 164

BY MR. FRIEBUS:
Q. Let's turn to Tab D as in David. And this is the document titled "GMAX Application Software Requirements Specifications."
A. Okay.
Q. So same set of questions, does this document raise a concern for you about the capability of its author to create or produce a GMAX application?
MR. LONDON: Objection, assumes facts not in evidence, the person or persons who created this document are the same people who would develop the system.
THE WITNESS: I would be concerned with this document not describing clearly what -- that there is an understanding between Mr. London and the document preparer of what they needed to do.
BY MR. FRIEBUS:
Q. Can you expand on that answer a little bit for me?

Page 165

A. The point of requirements is for the customer and the developer to both have the same understanding of what needed to be done in a technical development. And I can't -- I can't see anything here that demonstrates that kind of understanding.
Q. So if there's not a kind of understanding, would you expect there to be some kind of -- I mean, would you follow up then in order to make sure that everyone was on the same page? I'm not asking you to put yourself in somebody else's shoes, I'm just asking you --
A. If it were me, I would follow up.
Q. Because if I'm understanding you correctly, the point of a document that purports to be a requirement specification is to ensure that there is a shared understanding between a client and a developer as to what is going to be developed?
A. That's correct.

Q. Okay. So let's turn to Exhibit 3, the big binder. And we'll start with Tab E.
Now, you discussed this document in your report, so I think I know the answer to this question, but I'll ask it anyway.
Does this document raise a concern for you about the capability of the author to produce the GMAX application?
MR. LONDON: Once again, same objection. It assumes facts not in evidence, that the person or persons who prepared this document are the same people who would develop the system.
THE WITNESS: So I would -- on seeing this document, I -- this is extremely unprofessional and plagiarized and -- I don't know. I would certainly believe that whoever prepared the document did not know what requirements are -- well,



technical specifications were, and I would have to find out -- again, I would have to find out what they -- I would have made them produce real technical specifications.
BY MR. FRIEBUS:
Q. Okay. I tried to put this in kind of a layman's terms, but would this document have raised a big red flag for you?
A. I think I can say that.
Q. All right. Let's go to Tab F.
A. Okay.
Q. And this is the "GMAX Mobile Web Resource Management" document dated June 2010.
A. That's correct.
Q. Now, okay. And this I think is -- I do have a couple questions about this.
I'll ask you the same question I've been asking you with respect to all the other documents, is,



does this document raise a concern in your mind about the capability of its author to produce the GMAX application?
MR. LONDON: Once again, assumes facts not in evidence, calls for speculation that the person or persons who produced this document are the same people that would be developing.
MR. FRIEBUS: You know, Mr. London, you keep making the same speaking objection. I find it curious, because Dr. Dahl was specifically asked to provide an opinion about this document in her report, so I'm having a hard time understanding what any kind of objection you could have to this line of questioning.
BY MR. FRIEBUS:
Q. But Dr. Dahl --
MR. LONDON: Because you're assuming -- because you're making -- because your question assumes a fact.



The objection is a valid one. You're assuming that the person who prepared this is identical to the same -- the people that would be developing it. And it's often the case in software development that they're different. The people who prepare specs are not the people who do the coding.
BY MR. FRIEBUS:
Q. Well, then let me see if I can ask a slightly different question.
When I say -- when I ask the question "produce," I mean have any role whatsoever in the production of the piece of software, the GMAX application or the operating system.
So is that a different understanding of the word "produce" than you may have understood me to ask in connection with the previous exhibits?
A. I think that it's very frequent that there's a different person producing documents than developers. The fact that they did produce these

Page 170

documents, someone in the organization produced these documents, would make me want to investigate the capability of the organization as a whole to do this work. But I -- certainly common, in fact normal, that people who produce documents to be different than the developers.
Q. So let me just -- we can do this -- let me see if I can shortcut this.
Even assuming that a different person would produce the document than, say, write the code or produce the application, would any of your answers to my previous series of questions have changed at all when I ask you whether it would raise a concern in your mind?
A. No. I would -- I think my answer was always, I would have to look into what exactly was going on with the documents, because looking at the documents, they seem very poor.
Q. So even assuming that

Page 171

somebody -- that there would be different people producing the documents than creating the product, so to speak, you would still have a concern about the entity's capacity in any respect to create the product?
A. I would have a concern about their ability to create any software whatsoever.
Q. Okay. Just --
A. Including --
Q. I'm sorry, go ahead.
A. Including GMAX.
Q. Okay. And just for the sake of clarity for the record, that answer holds true with respect to the previous exhibits, C, D and E that we looked at just now; is that right?
A. That's correct.
Q. So -- and just to make sure, again, for the sake of completeness, the document in Tab F, regardless of whether the person who produced the document is the same person who would write the code

Page 172

or develop the product, would this document have raised a concern for you about the capacity of the company to produce the GMAX application?
A. Yes, it would.
Q. I want to ask you, if you look at your report on page 12.
The last paragraph in the section 5 that starts -- somewhat confusingly for purpose of this question -- "Section VI 'Budget Details,'" where you go on to say, "is missing subtotals for the budget to be spent on all the different resource types."
Do you see that?
A. That's right.
Q. So I'd like you to take a look at the Exhibit in Tab F, and specifically at pages 7 and 8, the last two pages of the document.
A. Okay.
Q. I don't see any subtotals or any budget totals whatsoever. I don't

Page 173

see any figures in this document, do you?
MR. LONDON: If I could just object. There are -- I don't know. This may be -- I don't know what -- the version in this document. There were several versions. There is definitely a version that has the totals. So you may have been sent erroneously the incorrect version.
BY MR. FRIEBUS:
Q. So Dr. Dahl, I'm looking at your report. I'm comparing the document that was provided by counsel that was supposed to be Exhibit F.
What I'm gathering here is that the version of the document that you looked at in preparing your report had some figures, some dollar figures, in the total column, or at least somewhere in the budget, that gave you some idea as to what the thing would cost?
A. I remember seeing total figures in the version that I saw.
Q. Okay. So the document

Page 174

that's actually sitting in front of you as Exhibit F is not the same document that you prepared in connection -- or excuse me, that you considered in preparing your report?
A. I don't believe so.
MR. FRIEBUS: Okay. So Mr. London, let's add that to the list of documents that we'll need.
BY MR. FRIEBUS:
Q. So let's turn to page -- or excuse me, Tab G.
A. Okay.
Q. How did you -- what role did this document play, if any, in forming your opinions?
A. You mean my opinions about ViaSem and ontological semantics?
Q. Just your opinions that are in your report.
A. I didn't think it added very much to -- it didn't really explain what ontological semantics was in the Raskin sense. It was very high level and

Page 175

superficial. So I don't think it really added anything to my understanding of that technology.
Q. Okay. So it sounds like it didn't play -- well, strike that.
And same question for the document in Tab H, the investor presentation.
What role, if any, did this play in your forming your opinions in connection with this case?
A. It didn't really play a role. It's an investor presentation. It's not technical. It's mostly business related.
Q. And I think you said earlier, you're not providing any kind of opinion as to the kind of business side of GMAX?
A. No, no.
Q. Okay. So one other housekeeping matter here. And while you're doing the housekeeping matter, I'm going to see if I have any other

Page 176

additional questions.
MR. FRIEBUS: Ms. Court Reporter, if you could mark the remaining binder as Exhibit 4, the one that says "Dahl Expert Report Section 11 References."
- - -
(Deposition Exhibit No. 4, Dahl Expert Report Section 11 References, was marked for identification.)
- - -
BY MR. FRIEBUS:
Q. So Dr. Dahl, what we've done here is take -- there's a section of your report -- I'm sorry.
So there's a section of your report entitled -- it's section 11, "References."
A. Okay.
Q. So what we've done here is take -- and the references appear to be, you know, various articles that were available online and then a few books.

Page 177

And what we've done here is collected them in this binder, with the exception of the books and I think one article that are noted in the index as saying document placeholder.
And so basically all I'd like you to do is take a look through what's been marked as Exhibit 4 and just confirm for me that the articles that are identified -- that are actually in this binder are the same ones you considered and that are identified in your expert report in section 11.
A. Say that again?
Q. I just want to make sure that the documents that are in Exhibit 4 here in this binder --
A. Okay.
Q. -- are actually the same articles that you identify in section 11 of your report.
A. Okay. That will take a minute.
Q. Yes. Go ahead. It will

take a few minutes. I'm going to put this on mute. I'm going to take a moment here to see if I have any additional questions.
Like I said, the only omissions from this should be the ones in the index that say document placeholder, and those are books. And I think there's one article that might be missing.
So why don't you take a few minutes to look through that, and I'll take a couple minutes to see what other additional questions I might have.
- - -
(A recess occurred from 2:05 p.m. to 2:37 p.m.)
- - -
BY MR. FRIEBUS:
Q. So Dr. Dahl, when we went off the record about a half an hour ago, you were looking at Exhibit 4, section 11, "References." And I had asked you to confirm that the documents that are in this binder with the exceptions noted in



the index are the same documents that were considered in section 11 of your report.
Have you had a chance to look at the binder?
A. Yes. It looks like it's complete, except for one missing page in the document 5.
Q. Perfect. Now, we had just taken a break, like I said, of about half an hour because there were some documents that were identified in your expert report that turned out to be different -- that were provided to us by counsel that were different than the ones you actually looked at.
So let's go through this exercise now where we replace the exhibits to make sure we've got the right ones.
The first one I believe is the Tab F. It's the "GMAX Mobile Web Resource Management" document.
A. Okay.



Q. Let's stop a second. Just to be clear --
- - -
(A discussion off the record occurred.)
- - -
MR. FRIEBUS: Let's put this to the side.
We'll mark these as new exhibits.
Let's do this. Let's mark the document that was just printed out that says "GMAX Mobile Web Resource Management June, 2010," let's mark that as Exhibit 3F.
- - -
(Deposition Exhibit No. 3F, GMAX Mobile Web Resource Management June, 2010, was marked for identification.)
- - -
BY MR. FRIEBUS:
Q. So Dr. Dahl, can you take a look at what's been marked as Exhibit 3F



and confirm that this was actually -- that this document was in fact the document that you looked at or considered in connection with your report and that's identified as Exhibit F to your report?
A. Yeah, that --
Q. I believe this -- I'm sorry. Go ahead.
A. That looks like the correct document.
Q. And this one has the budget totals at the back of the document that were missing from the previous document that we had talked about?
A. That's correct.
Q. So let's turn now to the other document that was just printed out. It appears to be a spreadsheet of some sort.
We'll mark this as Exhibit 3I.
- - -
(Deposition Exhibit No. 3I, Spreadsheet, was marked for

Page 182

identification.)
- - -
BY MR. FRIEBUS:
Q. The same question, Dr. Dahl, is the exhibit that's been marked as 3I the exhibit identified in your report as Exhibit I?
A. That -- yeah, that's right.
Q. Okay. And this is the cost estimate that breaks down your analysis of estimated cost to create the -- let me just make sure I got this right -- the minimum viable product that we discussed earlier?
A. Right. For the GMAX application.
Q. Now, in the exhibits that are identified to your expert report, the ones A through I believe I, we'll say A through H, could you have built anything with those documents or any portion of those documents?
MR. LONDON: Once again I'm going to object to your

Page 183

characterization, and the question is confusing.
BY MR. FRIEBUS:
Q. You can answer.
A. I don't think they would have been very helpful in building something. They're not specifications, no.
Q. In exhibits -- I'm sorry. I think I you cut you off.
Did you say no?
A. No. Yes, I said no.
Q. So the same -- with reference to the same set of documents, Exhibits A through H to your report, is there anything patentable in there?
MR. LONDON: Objection, calls for speculation without knowing all the prior art. And what time frame are you talking about?
MR. FRIEBUS: I'll clarify the question to say from 2010 to the present.
MR. LONDON: And which

Page 184

document are you looking at?
MR. FRIEBUS: The question is with reference to Exhibits A through H to her expert report.
MR. LONDON: With that one specific document?
MR. FRIEBUS: I'm sorry, Mr. London, I think the question was clear enough.
THE WITNESS: I don't think I can tell from those documents if there would have been something patentable.
BY MR. FRIEBUS:
Q. You can't tell from those documents if there would have been something patentable?
A. No, I can't tell.
Q. I want to make sure, because of the video connection, that I'm understanding your answer.
Your answer is you can't tell from those documents if there would have been something patentable in there;

Page 185

is that right?
A. That's right.
Q. I want to turn back to an opinion you gave about the value of the GMAX application when you compare it to the price that Siri was sold for.
Do you remember that?
A. Yeah. Yes, I remember that.
Q. Okay. That's section 4 of your report.
Siri was sold in 2010.
Right?
A. I believe so.
Q. Or thereabouts?
A. Yeah.
Q. Would the value of that technology now -- well, strike that.
Would the purchase price of that technology, if it were sold today, be more or less than the purchase price of the technology six or seven years ago?
MR. LONDON: Objection, calls for speculation.
THE WITNESS: I don't think

I can answer that. There's many factors.

BY MR. FRIEBUS:

Q. You don't think that -- sorry. Go ahead.

A. I don't know the -- there's a lot of factors that go into the purchase price of technology and companies and -- so it would -- I don't know how much similar companies have sold for in recent acquisitions. So yeah, it would be hard to tell.

Q. Let me ask you a more general question.

Would the purchase price of technology, that is -- strike that.

Does the purchase price of technology generally go -- of the same technology, okay, identical technology, generally go up or down as time passes?

MR. LONDON: Objection, calls for speculation, the question is vague. What technology?

THE WITNESS: I can't say.



There have been some acquisitions of similar technologies recently, but I don't have any insight into the purchase price. I can say of software-based products in general, they seem to be going -- the price seems to be going up, just from public -- publicly available information.

BY MR. FRIEBUS:

Q. I think we may be missing each other here.

Does software age like wine, in that it gets more valuable as time progresses?

MR. LONDON: I'm going to object to the question.

THE WITNESS: If you mean software that was written 10 years ago and never changed or developed, I imagine it would have a lower price than when it first came out.

BY MR. FRIEBUS:

Q. Right. That's what I'm



getting at. What I'm asking is for the exact technology that was acquired by Apple in 2010 for $200 million, would it be reasonable to expect that acquiring that same technology now would cost less money because the technology is now six or seven years old?

MR. LONDON: Objection, completely speculative and assumes facts not in evidence regarding the changes in code.

THE WITNESS: For something like Siri, I -- and I am speculating -- I think, let's say you were a competitor of Apple, you might be delighted to have seven-year-old technology that would let you compete with Apple and pay a lot for it. But again, this is just a complete speculation.

BY MR. FRIEBUS:

Q. When you say pay a lot for it, I'm just asking whether it would be more or less than the purchase price that



Apple paid?

THE WITNESS: I could speculate that it would be more.

BY MR. FRIEBUS:

Q. And why would that be? Why would it be more than 200 million?

A. Because compare that to the cost of developing that technology yourself from scratch, it would certainly give you a start.

Something like Siri isn't like -- there's a lot of basic -- good basic science in there, even if the software is old, as opposed to something old like your 1996 Quicken that you wouldn't pay very much for that.

Q. So there's something unique about Siri that would make it difficult to value -- strike that question.

MR. FRIEBUS: I think that's all I have, Dr. Dahl.

THE WITNESS: Okay.

MR. LONDON: I have to do my redirect. Can you just give me two

minutes? Let's go off the record for two minutes.

- - -

(A discussion off the record occurred.)

- - -

EXAMINATION

- - -

BY MR. LONDON:

Q. Dr. Dahl, you had a chance to look at Mr. Hochman's rebuttal report?

A. Yes, I did.

MR. FRIEBUS: I just object to scope.

BY MR. LONDON:

Q. Take a look at it.

Is that --

MR. FRIEBUS: I'm sorry. I'm going to object. If you're going to ask her to take a look at any document, I'd ask that it be marked as an exhibit.

MR. LONDON: That's fine. I'm trying to find out --



MR. FRIEBUS: I'm also just going to tell you, Mr. London, Dr. Dahl did not disclose any kind of rebuttal report for Mr. Hochman, and so any line of questioning that asks her about the report is going to get stricken by the Court. We're going to object to any questioning about the report, and we're going to move to strike it. So just as a heads-up.

MR. LONDON: To strike -- wait. To strike what?

MR. FRIEBUS: Anything that's not disclosed -- I'm going to say that Dr. Dahl was not disclosed as a rebuttal expert to Mr. Hochman. And so if you're going to ask her questions about his report --

MR. LONDON: Yes, she -- excuse me. What do you mean, it wasn't disclosed? Yes, she was.

MR. FRIEBUS: I'm sorry, I don't see anything in her report that says that she was disclosed as a



rebuttal expert. And I'm not aware of actually -- just let me get it out.

I don't see anything in her report, and I'm not aware of a Rule 26 disclosure, that identifies her as such. If you want to send me the Rule 26 disclosure with the certificate of service that discloses her as such, that will be fine.

I'm not going to stop you from asking the questions, I'm just giving you a heads-up that I'm not aware that she's been disclosed as such, and so --

MR. LONDON: Clearly -- wait a minute. Wait a minute.

If Mr. Hochman is making -- has made rebuttals to Dr. Dahl's report, she is certainly entitled to respond to that. Otherwise, I'm going to have his opinions regarding her report stricken. She has every right to rebut and reply to them.

MR. FRIEBUS: That's your



position. I understand it. You can go ahead. I'm just making our position known for the record.

MR. LONDON: I'm making my position known for the record.

MR. FRIEBUS: The other thing I would ask you to do, because these documents, could you please send me whatever documents you intend to ask Dr. Dahl about so that I have them.

MR. LONDON: You already have them, sir.

MR. FRIEBUS: I want to make sure -- excuse me, Mr. London, we've already been through this and we've wasted a lot of time talking about --

MR. LONDON: No, you've wasted my time. I bent over backwards to get you every document that you needed, taking hours of my time.

MR. FRIEBUS: Mr. London, we've taken time during the deposition today straightening out the wrong

Page 194

documents.
If you're going to ask the witness about certain documents, I ask that you provide them and e-mail them to me, all right, so that I know exactly what documents you're asking Dr. Dahl about. I don't want there to be any confusion about which documents are which. And this is particularly important -- and I'll state this for the record -- given that the three of us are in different locations: Dr. Dahl is in Philadelphia, I'm in an office building in Chicago, and you're located I don't know where, I assume at your offices in another place in Chicago. So that's why I'm asking you, just send me the documents that you want to ask Dr. Dahl about that haven't already been introduced as exhibits so we're all on the same page.
MR. LONDON: The only document that would be -- that -- I

Page 195

think you should have it is Jonathan Hochman's report.
MR. FRIEBUS: Which report?
MR. LONDON: His rebuttal report.
Hold on one second.
MR. FRIEBUS: Thank you.
MR. LONDON: Do you have Mr. Hochman's rebuttal report?
MR. FRIEBUS: I have a rebuttal report from Mr. Hochman.
MR. LONDON: That's what I want Dr. Dahl to take a look at it.
If she doesn't have it, I'm going to e-mail it to you, and you can send it to your office.
THE WITNESS: I have it.
MR. LONDON: Take --
MR. FRIEBUS: Here's the thing. Because I'm not in Philadelphia, Dr. Dahl, I don't know exactly what document you're looking at.
THE WITNESS: That's

Page 196

correct.
MR. FRIEBUS: This was provided to you by Mr. London at some point.
Just so that we're all on the same page, what I would like Mr. London to do is e-mail the document to me and I can get it printed out in Philadelphia, and you can at least confirm that they're the same document. I want to make sure we're all on the same page.
MR. LONDON: All right.
MR. FRIEBUS: If there's -- thank you.
If there's any additional documents that you want to ask Dr. Dahl about, send them and I'll print them out.
MR. LONDON: I'll do that right now.
MR. FRIEBUS: I'll step out of the room -- and we'll go off the record, but let me step out of the

Page 197

room so I can print the documents and have them delivered to the conference room in Philadelphia. Okay?
THE WITNESS: Okay.
\- - -
(A discussion off the record occurred.)
\- - -
(Deposition Exhibit No. 5, Second Expert Report of Jonathan E. Hochman, was marked for identification.)
\- - -
BY MR. LONDON:
Q. Let me know when you're done looking at it.
A. I've finished.
Q. Have you seen this document before?
A. Yes.
Q. If you turn to page 5 of his report, Ms. Dahl states: In addition, on projects of this size, the developers would be -- normally be divided into

multiple teams with distinct responsibilities. The fact that this was not done suggests that the team which prepared the document was not making a good faith effort to plan a realistic project.

And Hochman states: Dahl assumes bad faith when mere incompetence is an equally viable explanation.

Do you see that?

A. Yes.

Q. Is it reasonable for somebody to assume that the company that -- the software development company that you contract with is not going to defraud you?

MR. FRIEBUS: Objection to the extent it calls for Dr. Dahl to testify to anything other than her personal knowledge, her beliefs.

You can answer.

THE WITNESS: Would you state the question again?

MR. LONDON: If you can



repeat back the question.

- - -

(The court reporter read the pertinent part of the record.)

- - -

THE WITNESS: Okay. Yes, it's reasonable to assume that you're not going to be defrauded in any transaction.

BY MR. LONDON:

Q. Right. And would you assume that one would expect that at least a line of code would have been written in a project like this?

MR. FRIEBUS: Objection, form, foundation.

THE WITNESS: Code is written at certain points in the project, not necessarily at the beginning. So at some point, certainly there would have been a need -- I mean, there would have -- you would expect there to be code. There could be design and planning



before that.

BY MR. LONDON:

Q. Right. But as part of the development, at some point there are deliverables, are there not?

MR. FRIEBUS: Objection, form, foundation.

THE WITNESS: There are deliverables in software projects.

BY MR. LONDON:

Q. Right. And other than -- have you seen any code related to GMAX that was written? Or let me rephrase that.

Have you seen any prototype or any code whatsoever related to GMAX?

A. No, I haven't.

Q. And do you know why you haven't seen any code?

MR. FRIEBUS: Objection, form, foundation.

BY MR. LONDON:

Q. Or what is your understanding of why you haven't seen any



code?

MR. FRIEBUS: Objection, scope.

THE WITNESS: I don't know why I haven't seen any code. It could be that the project was ended before the code was required to be written. My understanding is the project did require code, and I haven't seen any.

BY MR. LONDON:

Q. In contracting with a software development company, do you think it's important to know who's managing the project and who the managers in the software development company are as part of due diligence?

A. Yes, I would expect to know that.

MR. FRIEBUS: Objection -- excuse me. Objection, scope. It's beyond the scope of her report.

Go ahead.

MR. LONDON: Your objection has been noted.

Page 202

BY MR. LONDON:
Q. You saw the ViaSem cost --
MR. FRIEBUS: I'm sorry, Mr. Mr. London, before you go ahead, I don't believe Dr. Dahl answered that last question.
Was there an answer?
MR. LONDON: Repeat back the question.
- - -
(The court reporter read the pertinent part of the record.)
- - -
BY MR. LONDON:
Q. Just from the technical specs -- from the documents that you looked at in Exhibits E through I, is it readily -- putting aside whether the documents -- I'm sorry, strike that. Let me rephrase it.
Is it readily apparent from the documents that the company or the people that wrote these documents were committing fraud?

Page 203

MR. FRIEBUS: Objection, form, compound.
THE WITNESS: I couldn't tell from the documents that there was fraud being committed. These certainly were not competent documents.
Aside from the plagiarism, although that's not fraud, but -- there was plagiarism, which is disturbing.
BY MR. LONDON:
Q. From the documents, would it have been -- was it readily apparent to you that -- well, strike that. Let me rephrase it.
Previously counsel had brought up Dr. Victor Raskin, who was a co-founder of a company known as ViaSem. Correct?
A. That's correct.
MR. FRIEBUS: Objection, foundation.
BY MR. LONDON:

Page 204

Q. Are you aware that Dr. Raskin is a professor at the Purdue University?
A. That's correct.
Q. And you saw -- have you done any research on Dr. Raskin?
MR. FRIEBUS: Objection, beyond the scope.
THE WITNESS: I haven't done any research on Dr. Raskin as an individual. I have read his technical work.
BY MR. LONDON:
Q. And is it the work of somebody that appears to be competent?
MR. FRIEBUS: Objection, form.
THE WITNESS: Yes, it does appear to be competent.
BY MR. LONDON:
Q. Does it appear to be somebody who knows what he's talking about?
A. Yes.

Page 205

MR. FRIEBUS: Objection, form.
BY MR. LONDON:
Q. Was it your understanding that ViaSem was going to be one of the companies that was going to provide -- build the core engine for GMAX?
A. I understood that ViaSem was going to provide natural language understanding technology, which is only a small part of GMAX.
Q. Right. If Dr. Raskin and his team had represented that GMAX was feasible, that they could help build it, you think it would have been unreasonable for -- do you think it would have been unreasonable to -- let me rephrase that.
If Dr. Raskin and ViaSem had represented that the GMAX vision was possible and they -- using the ontological semantic framework that they had developed, do you think it would have been unreasonable to not believe what -- those representations?

Page 206

MR. FRIEBUS: Objection, form, foundation, calls for a legal conclusion.
THE WITNESS: Should I go ahead and answer the question?
BY MR. LONDON:
Q. If you can.
A. Well, I would say, Dr. Raskin was an expert in natural language understanding. His opinion about GMAX goes quite a bit beyond that, so I would -- I personally would say how -- I would take it with a grain of salt, what he said. I think he is going outside of his expertise to make a claim like that. But I would investigate it.
Q. Is it your understanding that the cost of software development in India is cheaper than in the United States?
MR. FRIEBUS: Objection, beyond the scope.
THE WITNESS: I believe it's cheaper in India than in the United

Page 207

States.
BY MR. LONDON:
Q. Right. And if you take a look at the resource document, the new one that you were sent that has the figures in them, Exhibit I. Or I'm sorry, Exhibit H.
MR. FRIEBUS: Just to be clear, this is Exhibit 3 to the deposition, Tab H?
MR. LONDON: Yep.
MR. FRIEBUS: I think you mean Tab F.
THE WITNESS: This is the one that was replaced. Right?
MR. FRIEBUS: 3F I think is the exhibit that you're referring to, Mr. London.
MR. LONDON: Yeah.
\- - -
(A discussion off the record occurred.)
\- - -
THE WITNESS: Okay. I have

Page 208

the GMAX Mobile Web Resource Management Exhibit 3F.
BY MR. LONDON:
Q. Right. And if you would turn to page 8. I'm sorry, page 7.
Do you see where it says the total for the resource for application development, total $350,000?
A. That's correct.
Q. Do you see that?
A. I see that.
Q. Is it fair to say that in India, $350,000 would probably be well over a million dollars in their currency if you converted it?
MR. FRIEBUS: Objection, form, foundation, beyond the scope.
THE WITNESS: I can't -- I don't know anything about the currency conversion.
BY MR. LONDON:
Q. Okay. But it -- would it be fair to say that $350,000 is a higher amount in India?

Page 209

MR. FRIEBUS: Objection, form, foundation.
BY MR. LONDON:
Q. Since the cost of -- let me rephrase that.
In the United States -- is it fair to say, is it your understanding that the cost of development in the United States would be much more than in India?
MR. FRIEBUS: Objection, form, foundation, beyond the scope.
THE WITNESS: Software development in India is less than it is in the United States.
BY MR. LONDON:
Q. Right. And in fact, many major companies, like Microsoft, outsource their work to India. Correct?
MR. FRIEBUS: Objection, foundation, beyond the scope.
Mr. London, none of this was disclosed in Dr. Dahl's expert report, so you can ask your questions --

MR. LONDON: It's related to your questioning.
MR. FRIEBUS: All I'm saying, Mr. London, as you go through this, is, you know, Dr. Dahl has expressed no opinions about software in India. She wasn't disclosed as an expert in that. I didn't ask her any questions about it.
MR. LONDON: Sir, you asked her about costs. I have a right to clarify.
MR. FRIEBUS: You can ask all the questions you want, Mr. London. I'm not going to stop you from asking her questions.
MR. LONDON: Then raise your objection.
MR. FRIEBUS: I'm just saying that this is all well beyond the scope of what was disclosed in her expert report.
MR. LONDON: Okay.
BY MR. LONDON:



Q. You saw the ViaSem -- do you recall the initial ViaSem costs, which was the first Exhibit I, before I sent you yours, you saw that document. Correct?
A. Yes, I saw that.
Q. And --
MR. FRIEBUS: As a housekeeping matter, Mr. London, if you're going to ask her questions about that, one, I'm going to object because it's not one of the materials that she was -- that she had disclosed as part of her expert report.
Two, I'd ask that you have it marked as a separate exhibit, because we've now replaced it with the document that was actually considered by Dr. Dahl as part of her expert report.
MR. LONDON: That's fine.
BY MR. LONDON:
Q. Well, just to be clear, Dr. Dahl, had you ever seen -- do you recall



if you were provided the ViaSem cost estimate?
A. Do you -- can you clarify which exhibit that is?
Q. It was the initial exhibit I that got replaced with your costs.
MR. FRIEBUS: Again, Mr. Mr. London, I'm going to ask that if you're going to ask the witness a question about a document, that you have it specifically marked as an exhibit.
MR. LONDON: We'll have it marked if we figure out she knows what document we're referring to.
MR. FRIEBUS: Just again, for good form, I would ask that you ask the court reporter to take the previous Exhibit I, have it marked as a separate exhibit, you can give it to Dr. Dahl and then she can answer any questions about it that you want to ask her.
MR. LONDON: The court



reporter can mark that as I guess Exhibit J.
MR. FRIEBUS: I'd ask that it be marked as Exhibit 6 so that we keep it in the same numeric series as the rest of the exhibits in the deposition.
MR. LONDON: Whatever, 6. I thought you were using letters.
MR. FRIEBUS: The exhibits --
COURT REPORTER: We're using numbers.
MR. FRIEBUS: Right. So Dr. Dahl, if you want to pull that document out of the binder and then the court reporter can mark it, because we're going to replace it anyway.
THE WITNESS: This is the original I, that's Personnel for ontological semantics work? Is that the document you're talking about?
MR. LONDON: Yeah.

Page 214

- - -
(Deposition Exhibit No. 6, Personnel for ontological semantics work, was marked for identification.)
- - -

BY MR. LONDON:
Q. Do you recall if you had seen this document before?
A. I saw this document before.
Q. So you would qualify, I had provided it to you?
A. Yes.
Q. Okay. And it was your understanding that based on this, it says that this was going -- they were going -- ViaSem was going to develop the -- as you can see where it starts -- the PMG -- PNGE engine. Right? And they quote, the total 1.1 -- 1 million, 100 thousand, 666,250 dollars.
Do you see that?
A. Yes.
Q. Do you think it would have

Page 215

been unreasonable for someone to think that roughly $1.2 million could be -- to develop their part of the GMAX? Would that have been unreasonable?
MR. FRIEBUS: Objection, form.
Sorry, go ahead. Complete your question.
I'll make my objection now.
Form, foundation, calls for a legal conclusion, beyond the scope.
THE WITNESS: I think it would be very difficult to answer that question without more detail about exactly what the work was that they were planning to do.
BY MR. LONDON:
Q. Right. But it's not -- is it fair to say that 1 million -- that this roughly 1.2 million, that that's not a trivial sum of money, is it?
MR. FRIEBUS: Objection, form, beyond the scope.
THE WITNESS: It depends on

Page 216

what you're asking them to do.
BY MR. LONDON:
Q. Right. Let me ask you this: Is it your understanding that if a software development company or a team of software engineers provides a quote, that they -- that somebody can rely upon that in deciding whether to contract with them?
MR. FRIEBUS: Objection, form, foundation, beyond the scope.
THE WITNESS: I think any quote for any service, you have to decide what you think of it and whether you want to proceed with the work or not.
BY MR. LONDON:
Q. Right. But is it your understanding that the software development company that -- or the team that gives you the quote, like ViaSem, that they're the ones who are quoting you what they're going to charge to do the work. Correct?

Page 217

A. That's right.
MR. FRIEBUS: Objection, form.
BY MR. LONDON:
Q. Right. So is it your understanding that the software development company, based on the information they have based on the requirements that they have received, are the ones that determine what the quote should be or what they're basically willing to do the work for. Correct?
MR. FRIEBUS: Objection, form, foundation, beyond the scope.
THE WITNESS: Right. You have a job to do. You tell them what it is. And it's their job to tell you how much it will cost.
BY MR. LONDON:
Q. Right. So if somebody underestimated the complexity or didn't -- let me rephrase that.
If somebody underestimated the complexity or gave a quote lower than

Page 218

maybe it should have been, that's -- that
would -- that's their -- strike that.
Let me strike that.
It's the responsibility of the development company to determine what they want to quote the work for. Correct?
MR. FRIEBUS: Objection, form, foundation, calls for a legal conclusion and well beyond the scope.
THE WITNESS: Could you repeat the question?
MR. LONDON: Yeah. If you could repeat it back.
- - -
(The court reporter read the pertinent part of the record.)
- - -
THE WITNESS: I think that's correct.
BY MR. LONDON:
Q. And so -- and it's also your understanding that software, especially large projects and complex projects, are

Page 219

developed over time. Correct?
A. That's correct.
Q. It's not built in one day. It's not built in a short period of time. It's built in phases. Correct?
MR. FRIEBUS: Objection, form.
THE WITNESS: It's often built in phases. The more cutting-edge technology is likely to be built in a phase. Something very cut and dried may not be.
BY MR. LONDON:
Q. So it would be reasonable to expect that the GMAX application and OS would have been built over quite a bit of a period of time, possibly several years in phases. Correct?
MR. FRIEBUS: Object to the extent it calls for a legal conclusion.
THE WITNESS: It could take a while to develop complex software.
BY MR. LONDON:

Page 220

Q. Right. And one would reasonably expect at some point the software development company to develop something. Correct?
MR. FRIEBUS: Objection, form and foundation.
THE WITNESS: I would expect to see software developed as part of a software development project.
BY MR. LONDON:
Q. Let me ask you, in your experience, have you ever heard of a project in which a software development company was paid money for a project and didn't write a single line of code? Have you ever heard that in your experience?
A. Not if the agreement was to develop software. I've heard of efforts that were design efforts or requirements effort where the understanding was that software would not be developed. But if there was an agreement that there would be software, then I don't think I've ever seen software not developed, at least to

Page 221

some extent.
Q. If you would take a look at Exhibit -- going back to -- if you would go back to Exhibit B in Dahl Expert Report Section 8 Exhibits (Volume 1).
A. Okay.
Q. This is a document that -- you've seen this document. Correct?
A. That's correct.
Q. It says: High level business requirements, systems specifications.
Do you see that?
A. Yes, I see that.
Q. Dated as of January 10, 2009. Correct?
A. That's correct.
Q. That was before Siri ever hit the market, in fact, quite a bit of time. Correct?
A. That's correct.
MR. FRIEBUS: Objection, form.
BY MR. LONDON:

Page 222

Q. If you would take a look, this document basically gives a high level -- a high level -- provides a high level view of what GMAX is supposed to do. Correct?
A. I'm just refreshing my memory for a second.
Yes. This is very high level.
Q. Right. Let's go to section 5.1.2 where it says Command Response.
Do you see that? Page 8 of 18, do you see that?
A. Yes, I see that.
Q. It says: The user can recognize -- I'm sorry. I think it should be -- it's a mistake, it should say the system can recognize many commands and respond to them as instructed, colon. Then you say, for example, if the user says tell a joke, the application will tell a joke. So the application will come preprogrammed with numerous jokes.

Page 223

The next one says, if a user says play Dave Matthews Band MP3, if there was more than one, the application would read which one are stored in the phone. When the user says the name of the song or "that one" if the app is reading them, the MP3 will load and play. The app will say cannot find, please download to GMAX if it cannot find it.
Siri can do that. Correct? If you say to Siri, play -- play this song, Siri can do that. Correct?
A. I believe so.
Q. So back in 2009-10, this type of functionality was possible. Correct?
MR. FRIEBUS: Objection to form.
THE WITNESS: Yes.
BY MR. LONDON:
Q. Going to the next one, it says: Call name of person, the app will look up the phone number in the user's list of contacts and dial the number.

Page 224

Siri can do that. Correct?
A. That's correct.
Q. If the user says, YouTube URL, the application will load YouTube in the web browser. If the user says Dave Matthews Band, the app can search YouTube for Dave Matthews Band videos. If it finds videos, it will read them off until the user says yes. Through learning, the app will eventually associate YouTube as a URL and the user may not have to say the URL command.
Siri can understand certain commands. Correct?
A. That's correct.
MR. FRIEBUS: Objection, form.
BY MR. LONDON:
Q. The next bullet point, the app recognizes and attaches different meanings to find, search, load, read, play, call/dial, get, browse, help.
Siri can do all that. Correct?

Page 225

MR. FRIEBUS: Objection, compound.
THE WITNESS: I'm not sure it can do all of those.
BY MR. LONDON:
Q. Can it do some of them? It can call. Right? If you say call someone, it can do that. Right?
MR. FRIEBUS: Objection, form. It's unclear whether you're talking about Siri as the product today or Siri at any point in time previously.
BY MR. LONDON:
Q. Well, when Siri came out, do you recall whether it could understand certain voice commands?
A. It could understand certain voice commands. It could understand "call."
Q. Right. So back around the time -- is it fair to say that at least based on what -- on these few bullet points, that it was possible to have an

application that could do some -- that could do this specific functionality that I have bullet pointed here?

MR. FRIEBUS: Objection, form. It's unclear whether you're talking about the bullet points in the exhibit or the bullet points you've just asked Dr. Dahl to talk about.

BY MR. LONDON:

Q. The bullet points in the high level specs on page 8, do you have any reason to believe that with -- let me rephrase that.

Do you believe that the bullet points shown on page 8, in the high level business requirements for GMAX, could have been developed back in 2010?

MR. FRIEBUS: Object to the form.

THE WITNESS: I think for the most part, many of them could have been developed in 2010.

BY MR. LONDON:



Q. In fact, based on your experience and expertise, is it your understanding that over time, additional functionality and more advanced features are added and it's not done, that it's possible for an application to have functionality added on later that is not there initially?

MR. FRIEBUS: Objection, form.

THE WITNESS: It's certainly true that applications can get better over time. If you think about the Siri and the Google systems, they do improve. That's probably part of the rationale behind the idea of a minimal viable product, is that you have a product and then improve it.

BY MR. LONDON:

Q. If you look on part -- 5.13. It says, artificial intelligence, intelligentsia and artificial neural networks, page 9.

Do you see that?



A. Yes, I see that.

Q. It says on the third paragraph -- well, let's -- there is a requirement that an artificial intelligence engine be developed that could handle essentially any type of query and respond appropriately with a rational response and enable interactive dialog between the user and app. Moreover, the AI engine separates itself from other apps like Google mobile web with voice that rely on Google search engine.

The application can speak to the user and ask questions using AI algorithms and heuristics. The AI engine part associates thousands of preprogrammed or prerecorded human statements with user phrases, commands and statements so there is a rational relationship between questions and answers.

Using AI in algorithms, the app properly processes voice input and



computerized voice human preprogrammed output. This can be accomplished by creating an artificial neural network. The artificial neural network is an adaptive system that changes its structure based on external or internal information that flows through the network during a learning phase.

The system will learn through training algorithms. There are many algorithms for training neural networks. Most of them can be viewed as a straight forward application of optimization theory and statistical estimation. They include back propagation by gradient dissent, art prop, BFGS, CG, et cetera. Computational methods, simulated annealing, expectation maximization and nonparametric methods are among other commonly used methods for training the neural network.

Do you see that?

A. Yes, I see that.

Q. Based on your experience and

expertise, is it possible that this type of artificial intelligence engine could have been developed at least in part to do some, if not all, of what -- in other words -- let me rephrase that.
In other words, could a learning engine or artificial intelligence engine have been developed back in 2010 as part of the GMAX system?
MR. FRIEBUS: Objection, vague, and foundation, and beyond the scope, quite frankly.
Go ahead.
THE WITNESS: It's possible. It was possible in 2010 to develop artificial neural nets. I would say the very first sentence, I don't think that would be possible to handle essentially any type of query and respond appropriately with a rational response. That's -- that means it's independent of any particular domain, so I don't think that could be possible. It could -- it would be



possible to develop a neural net that could handle many specific types of queries.
BY MR. LONDON:
Q. Right. And if you go back to the previous Exhibit, Exhibit 6, with ViaSem, go back to that cost estimate?
A. Okay. Yes, I have that.
Q. Do you see how it says that it says three -- it's to start off with three domains?
A. Yeah, I see that.
Q. And then so the first six months and then add up.
Is that a fair -- is that a reasonable -- in your opinion, is that reasonable to start off with just one or two or three domains and then to add more over time as the proof of concept is validated?
A. Yes.
MR. FRIEBUS: Objection to form.
BY MR. LONDON:



Q. Initial --
A. Yes. It would be the recommended way to proceed, by adding domains incrementally.
Q. Going back to the high level requirements, if GMAX had come out with the -- we went over some of the bullet points on page 8.
If the GMAX app, or at least a prototype or at least a prototype that could have handled maybe one domain, in your opinion, is that -- was that feasible?
MR. FRIEBUS: Objection, form.
THE WITNESS: Well, we can -- if we pick a domain, for example, voice dialing, that was certainly feasible.
BY MR. LONDON:
Q. If it had come out before Siri, it would have been one of the first -- is it fair to say, it would have been one of the first apps that could



have done that?
MR. FRIEBUS: Objection as to form. I don't know what you mean by "come out."
BY MR. LONDON:
Q. If the GMAX app had -- with some -- at least some of this functionality, it included some of the functionality that was possible, would that have novel back in 2010 prior to -- if it had come out before Siri?
MR. FRIEBUS: Again, same objection as to "come out before Siri."
BY MR. LONDON:
Q. If it had been in the market before Siri?
MR. FRIEBUS: You mean commercially available in the market?
BY MR. LONDON:
Q. Do you understand the question, or do you need more clarification?
A. So you're saying, had an

application with some of these features been on the market before Siri?
Q. Yes.
A. Would it have been the first of its kind?
Q. Would it have been -- yes. Prior to Siri, if -- if a GMAX application with some of this minimal functionality to be able to understand voice commands, to be able to say call friends by voice, basically you had developed a virtual -- a minimal virtual assistant that could do some of these things, would it have been novel in 2010?
MR. FRIEBUS: Just for clarification -- sorry. Just for clarification, you mean on a mobile phone?
MR. LONDON: We'll assume, yes, on a mobile device.
THE WITNESS: I don't -- I don't know about all of these applications. I think some of them would have been -- would not have been



preceded by another system. But I know that voice dialing is -- it's a pretty old application, just as one example. I think that probably was available before Siri.
BY MR. LONDON:
Q. How about the ability to book a trip or to do stock trading by voice?
A. I think there were -- I have seen application -- old applications for stock trading. I haven't seen old applications for booking trips.
Q. So you've seen -- back in 2010, there were applications where you could trade stocks by voice?
A. Yes.
Q. Do you know what the name of them are?
A. So I'm thinking of two. So the first one was not on a mobile device. It was from about 1994. It was developed by Nuance for Schwab, and it was voice -- it was telephone voice stock trading.



The more recent one on a mobile device, I think -- I'm guessing at the year, but I'm guessing maybe about 2005 developed by a company called Openstream.
Q. I believe your report -- it's your opinion that GMAX likely would have -- or at least there were novel features or aspects of GMAX that would likely have been patentable, in your opinion?
MR. FRIEBUS: Objection, foundation, form, beyond the scope of the report.
THE WITNESS: I believe I did say that. I thought it's likely there would have been novel aspects to the development effort. I don't know what they would have been without seeing the development effort, but most cutting-edge software activities in this area do result in a patentable intellectual property.
BY MR. LONDON:



Q. Opposing counsel previously asked you about the GMAX business plan. You reviewed that. Correct?
A. Yes. I went over it.
Q. And he -- is it fair to say based on your review of that that in fact the business plan provides a strategy for GMAX to differentiate itself from the competition?
MR. FRIEBUS: Object as to form.
THE WITNESS: There -- I think there is a strategy laid out to differentiate GMAX from Siri, for example.
BY MR. LONDON:
Q. Well, actually, if you turn to page 35-36 --
A. Which one are we looking at?
Q. If you look on Exhibit A as part of volume 1.
A. Okay.
Q. Page 35 and 36.
In fact, at the time that

this business plan was written, these were the at least known potentially competing products to GMAX, if you take a look at that.
A. Okay. I see that.
Q. Do you think -- are you familiar with some of these products like Vlingo?
A. Yes.
Q. Tell Me, Ribbit?
A. Yes. I'm not familiar with Ribbit.
Q. Back in 2010, Google didn't even have -- they had voice search, but they didn't have a personal assistant for their mobile devices. Correct?
A. No.
Q. So based on the competitive landscape that's documented in the business plan, based on what you know about GMAX and the documents you've reviewed, do you have any opinion one way or the other about whether GMAX would have had a competitive edge or been an



improvement or even a potentially substantial improvement over what was in the market at the time?
MR. FRIEBUS: Objection, vague, compound, lack of foundation and beyond the scope not only of the report but of what Dr. Dahl has identified as her particular expertise.
THE WITNESS: I can't make any -- I can't give you an opinion about business success. It looks like there are some features differentiating GMAX from some of these other competitors that doesn't relate to business success.
BY MR. LONDON:
Q. Is it fair to say that a lot of the features in GMAX since this was developed have now -- are in the market in one form or another, whether -- between Siri, Amazon's Alexa, Google Now? Would that be a fair statement?
A. Yeah, that's correct.



Q. Right. So the novelty of what GMAX wanted to do back in 2010, as of today, a lot of it's already been done. Correct?
A. You mean at this time, many of this functionality is available?
Q. Yeah. I mean, putting aside things like face recognition and other stuff, and a lot of the -- for example, the bullet pointed stuff that was in high level requirements back in January 2009, that's already been -- most of the large companies are -- competitors already have those features in one form or another?
MR. FRIEBUS: Objection, form, vague, compound.
THE WITNESS: Some of those features are still I don't think anyone has yet. Some of them do.
For example, I've never seen the ability to learn that a URL is YouTube. That was one of the bullet points.
BY MR. LONDON:



Q. So that would be -- so that feature is still -- it would be novel today?
MR. FRIEBUS: Objection, form.
THE WITNESS: I haven't seen anything like that.
BY MR. LONDON:
Q. Did you have an opportunity to review any of the Skype communications between myself and any of the people at ViaSem?
A. No, I didn't see any of those.
Q. So there was a Skype conversation.
Do you recall if you saw any communications between myself and a purported developer named -- or project manager named Sanjay Patel?
A. No, I didn't see that.
Q. Okay. I know you had testified that, you know, your expertise really is not in mobile operating

systems, but is it -- based on your expertise and experience in software development and speech recognition, is it possible that GMAX would have overcome a lot of the issues that were addressed, such as being able to access hardware on, say, an Apple device if in fact an OS that was specifically designed for the application had been developed? In other words, if the GMAX application ran on a GMAX OS that had been designed to handle the CPU and memory requirements, is it possible that that would have overcome some of the issues that GMAX might have encountered had it needed, you know, permissions from third parties?

MR. FRIEBUS: Objection, vague, compound, lack of foundation.

THE WITNESS: I don't think that using an operating system would overcome Apple's objections to running GMAX, because it would just push the problem back to now you have to get Apple to let you run another operating



system on its hardware.

BY MR. LONDON:

Q. What I'm saying is, let's hypothetically say that GMAX could have -- let's say GMAX had been able to enter into a licensing agreement with, say, Samsung in which Samsung would have developed a line of phones that would have had the GMAX OS. And the GMAX OS would have run the GMAX application.

If GMAX basically had its own environment, just like Android is its own environment for Google applications, would that in your opinion have allowed GMAX to, I guess, overcome, given that it has its own environment and not that it wouldn't be dependent on other OSes?

A. You mean in the case of Samsung?

Q. Yeah. In other words, part of GMAX was to have its own -- putting aside the issues and complexity and costs of developing the OS, the question is, if an OS had eventually been developed that



could have been designed to take into account, to basically build and say -- one of the ideas was to build an artificial intelligence into the OS, or to basically work directly with the GMAX application, if it has its own OS-- if the GMAX app has its own OS and GMAX was able to work with the hardware manufacturer like Samsung or Nokia, would that have possibly overcome the issues it would have faced if it had -- as opposed to being dependent on third parties, like Apple?

MR. FRIEBUS: Objection, form, foundation, beyond the scope.

THE WITNESS: I don't know what Samsung's -- I don't know what Samsung's policies are about what runs on their phone and has access to hardware.

So -- yeah, so I don't know.

MR. FRIEBUS: Mr. London? Do you have a lot left? If you do, I would like to take a five-minute



break.

MR. LONDON: I only have a few questions left, but let's take a break. I'm almost done.

MR. FRIEBUS: It's up to you. If you're almost done, we can keep going.

MR. LONDON: No. I need to take a quick restroom break.

MR. FRIEBUS: Okay.

\- - -

(A recess was taken from 4:08 p.m. to 4:17 p.m.)

\- - -

BY MR. LONDON:

Q. If you could turn to page -- Exhibit D in Dahl Expert Report Section 8 Exhibits.

Do you see the document?

A. That says software requirement specifications?

Q. Yeah, yeah. So if you could turn to page 4.

A. Okay.

Q. Actually, pages 4, 5, 6 and 7.
Do you see that?
A. Yes.
Q. And it talks about use cases. Correct? Basically this is the functionality of what people are supposed to be able to do with the application.
Do you see that?
A. Yeah, that's right.
Q. And so essentially -- and if you turn to page 9 -- actually, pages 9, 12 and 13 actually have some UML use case diagrams.
Do you see that?
A. Yes, I see those.
Q. As well as page 15.
Based on these documentation for the use cases, do you think that if a software development company understood what the functionality was, and if the use cases were properly documented, that a software development company should be able to develop some, if not all, of the



functionality that's documented here, where it says under --
MR. FRIEBUS: Objection -- objection, form, compound, calls for speculation, foundation, beyond the scope of the report.
THE WITNESS: I think some of these are probably well defined enough to develop a functionality, or at least to get started.
BY MR. LONDON:
Q. Right. So opposing counsel had asked you, you know, that nothing could be developed from any of these documents.
But in fact, while the documentation, while it may not be the quality one would expect for a project of this complexity, the documentation does document at least the core functionality of what the application is supposed to do. Correct?
MR. FRIEBUS: Objection, form, foundation, beyond the scope.



THE WITNESS: I think some of them would be -- need some more work going down to the next level of requirements.
BY MR. LONDON:
Q. Right. It's fair to say that each of these requirements would require quite a bit more detail. In other words, you could have separate -- for each of the functions, use cases, you would possibly have its own set of documentation and use cases. Correct?
A. Yes. I think that --
MR. FRIEBUS: Objection, form, foundation.
THE WITNESS: I think that's fair.
BY MR. LONDON:
Q. Right. So it's not completely -- it's not accurate to say that from these documents nothing could have been developed. Correct?
MR. FRIEBUS: Objection, form, foundation.



THE WITNESS: Yeah, I think some of the easier ones probably -- you probably could get started on. But this would just be a start.
BY MR. LONDON:
Q. Right. But if a general software development company -- let me rephrase that.
Is it your understanding that a software development company can always hire additional expertise that it may need on a specific project? In other words, what I'm asking is just because a project -- just because a general software development company doesn't specialize in a given type of software development, it's possible for that development to subcontract some of that work. Correct?
A. That's correct.
MR. FRIEBUS: Objection, form, foundation, goes beyond the scope of the report.
BY MR. LONDON:

Page 250

Q. And in fact, if the general software development company represented to the client that they were hiring the type of speed recognition experts, natural language experts and experts needed, that that wouldn't necessarily be unreasonable to believe. Correct?

MR. FRIEBUS: Objection, form, foundation, calls for speculation, calls for a legal conclusion and is well beyond the scope of the report.

THE WITNESS: I personally would have to ask some more questions about a claim like that. Hiring people, especially with that expertise, is not something that happens overnight.

BY MR. LONDON:

Q. Sure. If you were told by the project manager that they were hiring these resources in India, and they were getting them from places like the Indian Institute of Technology, which is --

Page 251

would you have any reason to necessarily doubt that, based on -- it's one thing -- I'm sorry. Go ahead?

MR. FRIEBUS: No. Just -- you can finish your question. I just -- I thought you were done. I'll object when you're done.

Was your question complete?

MR. LONDON: I guess.

MR. FRIEBUS: I'm sorry, I can't hear you, Mr. London. Was your question --

MR. LONDON: Let me -- I'm going to rephrase the question.

BY MR. LONDON:

Q. Is it possible for a general software development company to contract with third-party developers and subcontract work that it may not be able to handle in-house. Correct?

MR. FRIEBUS: Objection, form, foundation, goes beyond the scope of the report.

THE WITNESS: It is possible

Page 252

to hire subcontractors with expertise that the prime contractor doesn't have.

BY MR. LONDON:

Q. And it's also possible for different soft -- different experts to have -- to come up with different cost estimates of what the replacement costs of GMAX would be. Right? If -- like in your case, you had given a quote of what a minimal -- is it a minimal functional -- I'm sorry, what is the term?

A. Minimal viable product?

Q. Yes. So your cost -- so clearly, based -- you gave a quote for the minimal viable application, but another developer -- I'm sorry, another expert, like Dr. Cohen, if he gave a number that was much higher, that could be because his is based on not the minimal but if it had all the functionality. Correct? They could still be consistent with one another.

Page 253

Correct?

MR. FRIEBUS: Objection, form, foundation, goes beyond the scope of the report.

THE WITNESS: There could be differences in estimates based on things like the exact features that would be in the product and exactly what functionality was required or was included. I don't know what Dr. Cohen was assuming.

BY MR. LONDON:

Q. Is it fair to say that GMAX -- that the value of a completed project is worth more than the cost of development, merely because of the time and skill it takes to develop that?

MR. FRIEBUS: Objection.

BY MR. LONDON:

Q. In other words, what I'm asking -- let me -- what I'm asking is, if GMAX had been developed, would the value -- do you believe that the value of the intellectual property, including the

source code, or proprietary features, would be worth more than what it costs to develop?

MR. FRIEBUS: Objection, form, foundation, goes beyond the scope of the report.

THE WITNESS: If it had been developed and was a quality working product, then in general, software would be worth more than the cost of development. That's not 100 percent the case, but there are often cost overruns, but it's likely that it would have been worth more than the cost of development.

BY MR. LONDON:

Q. And whether the cost of -- the cost of what -- the cost of development is a completely separate issue from whether the product would be successful in the market. Correct?

MR. FRIEBUS: Objection, form, foundation.

THE WITNESS: I don't know



about the market. Sometimes, but -- sometimes a -- there are many cases of acquisitions where some app was acquired for a lot more than I would have expected. It's certainly possible.

BY MR. LONDON:

Q. Right. I guess what I'm getting at is that because GMAX was never developed, nobody knows whether it would have succeeded in the market or not. Is that a fair statement?

A. Well, again, I don't know about success in the market. There's a lot of factors involved in that that aren't technical. Something like Siri, in the same general area of technology like Siri, was at least successful enough to be bought.

Q. But since Siri was bought, Apple -- there's been a lot more features and enhancements. In other words, Siri is much more powerful than it was when it initial was released. Correct?



A. That's correct.

MR. FRIEBUS: Objection, form, foundation.

BY MR. LONDON:

Q. Right. And so, even if GMAX was not -- didn't have all the features back in 2010 or even 2011, it's possible that more advanced features could have been developed in phases over time, over several years, so that GMAX could be -- would be much more powerful today than what it would be when it -- when -- the first iteration of it. Correct?

MR. FRIEBUS: Objection, form, foundation, goes well beyond the scope of the report.

THE WITNESS: Software can always be developed in phases. It's probably the more common development path. You don't even need to look at Siri. You could look at something like Microsoft Word. The whatever, 1995 version is quite different from the 2016 version.



BY MR. LONDON:

Q. Does your cost estimate -- just to be clear, does the cost estimate in your report, that doesn't include lost -- that's just the cost of development. That doesn't include any lost -- the value of any lost IPs, such as patents. Correct?

A. It's just development. That's correct.

Q. Development, right. And is it fair -- also based on your experience, is intellectual property an important part of the value of technology for a technology company?

MR. FRIEBUS: Objection, form, beyond the scope of the report.

THE WITNESS: I don't know how intellectual property impacts the value of a company.

BY MR. LONDON:

Q. But if you -- let me ask you this: Is it your understanding that if a company obtains patents related to its

technology, that that can give it a competitive edge in the market so that --
MR. FRIEBUS: Objection.
BY MR. LONDON:
Q. Well, so that other companies can't duplicate its innovations?
MR. FRIEBUS: Form, foundation, beyond the scope of the report.
THE WITNESS: It's possible. I don't think it's very common, but I think about something like the Amazon 1-Click, 1-Click buying patent that --
BY MR. LONDON:
Q. Right.
A. Amazon certainly took advantage of that. But that's only one example that I can think of.
Q. Well, taking -- as you know, there has been a lot of litigation between Google and Apple and Samsung, right, over their patents.
Are you familiar with some



of the litigation between those companies?
MR. FRIEBUS: Objection. Mr. London, this is getting well beyond the scope of Dr. Dahl's report. And it's also going quite long for, you know, clean-up for a deposition. So I don't know how much more you have on this, but, you know, I would ask you to really stick to Dr. Dahl's report, because her testimony is going to be circumscribed by that disclosure, because it impacts my time, your time and Dr. Dahl's time.
MR. LONDON: Your -- just for the -- I'm sorry, I was just going to say for the record, these questions are related -- you've asked questions related to all these issues. You were the one who brought up patents with Siri. You're the one who brought up the value of the patents when Siri was bought. So I think this is relevant, and it is not beyond the scope. I'm



allowed to ask questions -- okay.
MR. FRIEBUS: I'm not going to argue with you, Mr. London. I'm just telling you that Dr. Dahl's testimony is circumscribed by the report, as you know, prescribed by the Federal Rules. So when we're talking about patent litigation between Apple and Samsung, we're getting a little far afield.
MR. LONDON: You've asked her questions that are completely unrelated. I mean -- in any event, if you want to answer the question, you can. We're almost done here.
THE WITNESS: I'm not familiar with that litigation.
BY MR. LONDON:
Q. Based on your -- based on all the documents you've reviewed as part of your expert report and what you understand about GMAX, is it your opinion that GMAX did have novel and nonobvious features or functionality that was --



could have been potentially patented?
MR. LONDON: Objection, form, foundation, asked and answered.
THE WITNESS: I think that as sometimes -- in fact, what usually happens in a software development that results in patentable ideas, it usually comes out of the development effort. And so we don't really -- we can't really tell from what we've got. I think there usually is patentable material, but I don't think it's explicitly -- there's nothing explicitly that I can identify.
BY MR. LONDON:
Q. Take, for instance, the -- you had previously mentioned that you had worked with me on the Avia (ph) patent. Correct?
A. That's correct.
Q. And that technology -- that -- well, let me ask you, did you think that what was in the Avia patent was novel and nonobvious?

A. There were some aspects that were novel and not obvious.

Q. So if GMAX had utilized or had been able to utilize features along the lines of Avia or -- well, I don't want you to speculate.

The fact, the bottom line is, you don't know one way or the other whether the number or the -- what would have been patentable or what wouldn't?

A. That's right.

MR. LONDON: Okay. I don't have any further questions.

MR. FRIEBUS: I've just got one.

\- - -

EXAMINATION

\- - -

BY MR. FRIEBUS:

Q. Dr. Dahl, were you provided with any documents by Mr. London that are not identified in your expert report? And just to be clear, aside from the Cohen expert report and the Hochman



expert report that you identified at the beginning of the deposition as documents you looked at in preparation for your deposition today.

A. We're not talking about the documents for the Avia patent. Right? We're talking about documents that are relevant to this?

Q. No. In connection -- right. Just documents in connection with this litigation.

A. There were the documents that I didn't look at, the Skype conversations. He gave me those. I can't think of anything else.

MR. FRIEBUS: All right. That's all I have. Thanks so much for your time.

MR. LONDON: Thank you. And just Dr. Dahl, prepare your invoice and then I'll send it to opposing counsel.

THE WITNESS: Okay. I'll do that.



MR. LONDON: There's just one last thing for -- I just want to be clear, your rate -- you did raise your rate since the report was -- since you prepared the report; is that correct.

THE WITNESS: That's correct.

MR. LONDON: Okay. Thank you.

(Witness excused.)

(Deposition concluded at approximately 4:41 p.m.)



CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was not requested before completion of the deposition that the witness, DEBORAH A. DAHL, PhD, have the opportunity to read and sign the deposition transcript.

ANN MARIE MITCHELL, a Federally Approved Certified Realtime Reporter, Registered Diplomate Reporter and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# EXHIBIT G

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VEOXO, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | No. 12 cv 9058 |
| | ) | |
| VYASIL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Deposition of RICHARD P. RIETZ, taken before DONNA L. POLICICCHIO, C.S.R., and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 3100, 191 North Wacker Drive, Chicago, Illinois, commencing at 10:00 a.m., on the 2nd day of March, 2017.

There were present at the taking of this deposition the following counsel:

LAW OFFICE OF JUSTIN LONDON by
MR. JUSTIN J. LONDON
1920 North Maud
Apartment A
Chicago, Illinois 60614
(312) 909-6170
jlondon@ameritech.net
on behalf of the Plaintiffs;

BAKER & HOSTETLER LLP by
MR. DAVID M. FRIEBUS
191 North Wacker Drive
Suite 3100
Chicago, Illinois 60606-1901
(312) 416-6200
dfriebus@bakerlaw.com
on behalf of the Defendants.

* * * * * *



DEPOSITION OF
RICHARD P. RIETZ
March 2, 2017


| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Friebus | 4 |
| Mr. London | 106 |


* * * * * *

EXHIBITS


| | PAGE |
|---|---|
| Deposition Exhibit 1 (Expert Opinion of Rick Rietz) | 5 |
| Deposition Exhibit 2 (Curriculum vitae of Rick Rietz) | 5 |
| Deposition Exhibit 3 (Linkepic SRS and contract) | 11 |
| Deposition Exhibit 4 (Linkepic component/functionality document) | 11 |
| Deposition Exhibit 5 (UML Diagrams for Linkepic) | 11 |
| Deposition Exhibit 6 (Report of Gary Hunt) | 12 |
| Deposition Exhibit 7 (Expert Report of Jonathan E. Hochman) | 12 |
| Deposition Exhibit 8 (Invoice dated 12/29/09) | 105 |
| Deposition Exhibit 9 (Third Expert Report of Jonathan E. Hochman) | 124 |


* * * * * *



RICHARD P. RIETZ,
called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

EXAMINATION

BY MR. FRIEBUS:
Q Could you please state and spell your name for the record.
A Richard P. Rietz, R-I-E-T-Z.
Q Great. Have you ever given a deposition before?
A I have not.
Q All right. Have you given any other kind of sworn testimony before?
A No, I have not.
Q So I'm just going to go over a couple of ground rules and requests at the outset of the deposition, hopefully make things go a little smoother.
My role is to ask you questions and your role is to answer them truthfully and completely. Pretty straightforward. If you would please wait to answer -- wait until I'm finished with the full question before answering, it will be a lot easier



for the court reporter to take down your answer. Also, if you could answer questions verbally rather than with a nod of the head or an uh-huh, uh-uh because it makes it, again, more difficult for the court reporter to take down. If you can't hear or you don't understand a question of mine, please ask me to either repeat the question or clarify. If you do answer a question, I'm going to assume that you both heard and understood it.
Is that fair?
A Yes.
Q And if you answer a question, I'm also going to assume that your answer is complete.
Is that fair?
A Yes.
Q Is there any reason you're not able to testify truthfully today, medication, strange medical condition?
A No.
(Exhibit 1 and Exhibit 2 marked as requested.)
BY MR. FRIEBUS:
Q Great. So I'm going to show you what's been marked as Exhibit 1.

Is this the expert report you prepared in this case?
A Yes.
Q I'm sorry. I think I handed you two exhibits.
Can you look at the second one?
A That's my résumé.
Q Your résumé?
A Yes.
Q Fantastic. So let's stay with Exhibit 1, the expert report.
MR. LONDON: I believe you're missing part of the report, which includes the cost estimates.
MR. FRIEBUS: Oh, is the -- can we go off the record for a second?
(Recess was taken.)
BY MR. FRIEBUS:
Q Let's take a step back.
So, Mr. Rietz, could you please take a look at Exhibit 1 and just confirm that that's a complete copy of your expert report in this case including the cost summary?
A Yes, it is.
Q Perfect. So I'm going to summarize what I think the four opinions are you're here to give in this case, and just tell me if they're accurate and my summary is accurate.



The first opinion is that it would have cost between roughly 600,000 and $1,000,000 to develop Linkepic?
A That is correct.
Q The second opinion is that Vyasil doesn't have the expertise to deliver a web application of the scope and complexity?
A It would seem so based on the information I reviewed.
Q The third opinion is that the code on the servers was not desirable for reuse?
A For reuse today, that is correct.
Q Okay. And then you have a set of opinions about Mr. Hochman's expert report?
A Yes.
Q And essentially those are all the opinions that you're going to -- I know that there is some detail contained in the report, but essentially those are the four opinions that you're prepared to give at trial?
A I think so, in addition perhaps -- just I



think that the -- what was delivered is not what was supposed to be delivered.
Q Okay. Could you point to -- just orient me to where in your expert report that opinion is, and if it's not in your expert report then, you can just tell me that as well.
A I guess since the information on the damaged server or corrupt server isn't available to be used, it's not a system that's workable, and it's not what could be delivered.
Q Okay. So just -- maybe I can put this in a different way. Is it your contention that that opinion is contained in the final paragraph of the section -- well, that finishes just before Mr. Hochman's report in your report?
A Correct.
Q Okay. Now, are all the facts and data you considered in forming your opinions disclosed in this report?
A These were the five documents I received.
Q Okay. But I guess what I'm asking is, there is no other facts or data that you considered in forming your opinions that is not identified in this report?



A Perhaps one assumption I've made is that this is to be a system built to build a business upon, so I would assume this is an enterprise software development project. Given the fact that UML diagrams were used, those are typically used in enterprise software development. You would not find those in small prototypical applications. They also use sequence diagrams, activity diagrams. That's enterprise development documentation.
Q So you said that was an assumption that you made. Let me just step back. You said that you assumed that this would be a system built -- a system to be used to build a business upon?
A Yes.
Q Okay. And that was an assumption that you made in forming your opinion?
A Yes.
Q Now, putting aside that assumption, are all the facts and data that you considered disclosed in this report?
A In addition to the content of these items I reviewed. Maybe I'm not understanding your question.
Q Sure. I guess what I'm asking is, you didn't consider any other facts or data that aren't

identified there?
A That's correct.
Q Okay. And then other than -- let's talk about the assumption you just described. Were you asked to make that assumption by somebody or did you simply make that assumption on your own?
A I assumed that on my own.
Q Were you asked to make any assumptions by counsel in this case?
A No.
Q So let me ask you about -- I was going to ask you later, but since you brought it up, what is enterprise -- did you call it enterprise development?
A Software development.
Q Enterprise software development, what's that?
A It's referred to by many names. That's one name. You often hear of a methodology called waterfall development. These are approaches you take to build sustainable systems that are maintainable and scaleable.
Q I'm sorry. What and scaleable?
A Maintainable.
Q Maintainable.
And you said that there was something in the



documents that you reviewed that led you to this conclusion.
Could you identify what it is in the documents that led you to this conclusion, and just -- I can give you the -- let's do this. We're just going to go through and I want you to -- just make sure that we accurately are identifying the documents that are disclosed on the first page of your report.
(Exhibit 3 marked as requested.)
BY MR. FRIEBUS:
Q I'm showing you what's been marked as Exhibit 3.
Is that the document that you've identified as Linkepic SRS and contract?
A This is that document, yes.
(Exhibit 5 marked as requested.)
BY MR. FRIEBUS:
Q We're out of order here a little bit.
This is Exhibit 5. Is that the document that you've identified in your expert report as UML diagrams?
A Yes, it is.
(Exhibit 4 marked as requested.)



BY MR. FRIEBUS:
Q And then I'm showing you what's been marked as Exhibit 4.
Is that the document you identify in your expert report as Linkepic/component functionality document?
A Yes.
(Exhibit 7 marked as requested.)
BY MR. FRIEBUS:
Q And just for the sake of good order, I'm showing you what's been marked as Exhibit 7.
Is this the document that's been identified in your expert report as Jonathan Hochman report?
A Yes.
(Exhibit 6 marked as requested.)
BY MR. FRIEBUS:
Q And I'm showing you what's been marked as Exhibit 6.
Is that the document identified in your expert report as Gary Hunt report?
A Yes.
Q Just for the record, what we marked as Exhibit 6 is just the report itself but not the attachments to the report.



Do you recall if you also reviewed the attachments to that report in forming your opinion?
A I can't say. I'm not sure which attachments those are.
Q Did you review attachments -- other than what's sitting in front of you marked as Exhibit 6, did you review additional materials in connection with Gary Hunt in forming your opinion?
A I can't say for certain. I want to say there may have been a screen shot of something, like a list of files perhaps that was attached.
Q Did the attachments to the report --
A It wasn't very relevant. I guess I didn't -- it was nothing to make of it, just the memory I have of seeing a list of files as if it was -- taken as a screen shot.
Q Okay. Yeah, the attachments to the report are quite voluminous and I'm just interested in knowing whether you looked at them or not and if you have a memory of looking at them or not. It sounds like it didn't kind of move the needle, so to speak.
A No.
Q So I want to get back to this idea of enterprise software development. So -- I'm sorry.

Just to step back once again.
These are all the documents that you considered in forming your opinion that you provide in your report, right?
A That's correct.
Q Okay. So what in these documents led you to believe that -- led you to assume or conclude that there would be some kind of enterprise software development as part of this Linkepic project?
A Primarily the use of UML diagrams.
Q And just for the record, where would you find the UML diagrams in the documents that you considered in forming your opinion?
A They were embedded, I think, in the original contract -- they were preliminary ones -- and then there is a formal document in Exhibit 5 that basically contains activity diagrams, use cases, sequence -- I don't know if this one has sequence diagrams. Yes, there are sequence diagrams in there too.
Q So let's take this kind of document by document. So I think you identified Exhibit 5 as the source of -- as one of the sources for that assumption, is that right?



A That's correct.
Q Okay. And then was there another document?
A Exhibit 3 also contains UML documentation.
Q Can you just point out for me which pages contain the UML documentation that you are referring to?
A In Exhibit 3?
Q Exhibit 3, yeah.
A Page 6 through 21.
Q And those are the pictures or the figures in the report?
A That's correct. And then a complete document would include some narrative, which this does as well.
Q When you say complete document --
A So you have -- to complete a segment of requirements or design, you will often diagram it and include some narration, so that would typically constitute a UML diagram for a particular feature or function.
Q Okay. Now, does a -- let me strike that and back up.
So if I'm understanding you correctly, the use of the UML diagrams in Exhibits 3 and 5 led you



to assume that the piece of software under discussion would have certain features related to maintainability and scaleability?
A Correct.
Q Now, does the use of the figures in Exhibit -- well, I'll just stick to Exhibit 3 -- does the use of the figures you identified in Exhibit 3 require a certain level of maintainability in a piece of software?
A Could you say that again?
Q Sure. Do the figures that you've referred to in Exhibit 3, does that require a certain level of maintainability?
A I guess I'm a little stumped by the question. The diagram doesn't require -- are you asking if any of these diagrams require maintainability or -- it certainly implies you set out to make it maintainable so that other people can build something off of your diagram. It makes it easier to understand so somebody else can come along and participate in development in the future or concurrently.
Q Sure. And I guess I'm just trying to understand and sort of take it in steps.
So the use of a UML diagram is not a --



doesn't set any kind of requirement for maintainability or scaleability.
Would you agree with that?
A Yes.
Q And you say it implies to you that it would have a certain level of maintainability or scaleability.
A Yeah. I guess you wouldn't go through the trouble to create these unless you intended to create something that's maintainable.
Q What about -- you used both maintainable and scaleable.
A Uh-huh.
Q So I'm trying to -- I want to make sure -- are those two separate concepts?
A No. They are two separate concepts, yes.
Q Okay. And so you say you wouldn't go through the trouble of creating -- using UML diagrams if you weren't going to create something that was maintainable.
Why is that?
A It takes time to create these, and if you absolutely, positively knew exactly how something was to be built and you did it -- you were an independent

person, nobody else participating, you might be able to do that without any such documentation. However, if you intend to include additional people in it in the development process, you would use a diagram like these to communicate what was to be built, what the design -- how the design of the system is supposed to work.

**Q Okay. And then same question with respect to scaleability.**

A Scaleability meaning that certain modules of the system could be duplicated as needed, and so you have a blueprint from which to duplicate functionality or reuse certain features from certain components of the system in other subsystems of the system.

**Q Okay. I want you to -- you can pick any one of the diagrams in Exhibit 3 that you like, but I'm a lawyer, I don't build web pages or web applications, so using whatever diagram you think best illustrates the concepts that you're talking about, walk me through how that diagram supports the statements you just made about maintainability and scaleability.**

A Sure. So Page 9 has a sequence diagram for login.



**Q Uh-huh.**

A So this diagram shows the different components of a software module and how those individual software components will interact with one another, so the user needs to log into a website, so the user module will send a message to the website, says I'd like to log in. The website says, well, you need -- I need to redirect you to a login page. The login page displays to the user. The user then enters their username and password. The login page accepts that information and sends it to the database. The database makes a decision in this example that if it's valid it will redirect them and allow them to go to the home page; if not, they'll be reprompted with a login. If they fail three times, the system is going to lock them out.

**Q Okay.**

A And so if you wanted to change things to say, okay, we're going to change the failed attempts to ten, you would put that in this document so somebody else understood where I need to go to change that setting.

**Q Okay. I guess what I'm still struggling to understand is what about this figure tells me**



**anything about scaleability or maintainability.**

A Maintainability, you would have -- if you didn't have a diagram like this, you would probably have to open up each of these six components of the software and look inside to see where is the logic that tells me this, and so oftentimes if somebody wants to make a system change or a mistake was made, you want to go back to find out, okay, where is that rule, where do I find that in the system. If you have a document like this, that could be a very quick change. If you don't have a document like this, that could take a very long time and that leads to maintainability. For a simple change, you can't wait a week for somebody to dig through code and, ooh, I thought I found it; nope, that wasn't it. So if you have an accurate document like this, that will help you with the maintainability. In addition, you can find, oh, well, in this -- we're doing this in a couple different places, so there may be a few sequences going on that involve a particular setting or component that you've reused in the system.

**Q Okay. So maybe a different way of putting this is kind of it's -- one way of thinking about it, like a -- I'm thinking about like a car repair guy,**



**right, so rather than having to -- something is wrong with your car, you've got a map as to how all the parts fit together in some ways to -- it's easier to diagnose problems and fix them or make changes?**

A Make changes mostly --

**Q Okay.**

A -- and fix.

**Q All right. So what about scaleability, what about this document tells you anything about scaleability or about this figure. I mean, you can use a different figure if you'd like, but I'm just trying to understand how do these pictures, these UML diagrams tell me anything about scaleability.**

A So if you have -- if the software is developed in components and certain components of the system end up getting exercised and used a lot more than other components, you can take that component and duplicate it and add some hardware or server resources so that you can have more of those components running at the same time. So this will help you realize which features -- where the features that are being used the most are and you can then take that module and duplicate it. This is typically often done also with the technical architecture

assessment as well as far as what components are expected to be -- expected to require scaleability.

Q And so let me see if I'm understanding you correctly. By breaking down the way that the software works into these UML diagram components, it's easier to focus on specific pieces of the software as it gets used more or less and then either scale up or scale down that component to address use?

A Yes.

Q Okay. Do any of these diagrams tell you about how many users the system should have?

A No.

Q Do any of these diagrams tell you anything about how large the website should be in terms of -- the metric I would think of is gigabytes or megabytes. You may have a different metric. Let me stop there.

Is that the right metric to think about a piece of software?

A No, probably not. It's going to be -- you're going to estimate number of page views or uses of certain functions within an application, so it's an expectation. It's not a technical thing. You want to understand that before you build the software, but



it's not something this document would ever -- these diagrams would ever tell you.

Q Okay. I guess what I'm trying to get at is, being a layperson here, I'm trying to think of an analogy. The analogy that comes to mind is a house and that you can have --

A These are kind of blueprints.

Q Blueprints for a house. But -- and I guess what I'm trying to understand is, does this tell you how big the house needs to be?

A I don't think the analogy works in that case, I guess, as far as what exactly does the house represent. If it's representing the system, how big the system is could be measured in a lot of different ways, how many components does it have, how much data is there, how many users of the system. There is a number of metrics that could be used to say how big a system is, how much data does it spew out.

Q So maybe -- I'm thinking about this in a different way then. What other -- I don't want to use the word features because I understand that there may be certain features to the system, a login page, a home page, what kind of database, but what other -- other than number of users, what other kind of



flexible features are there in software, right, or in a web application specifically.

A Yeah, so you can often create multiple instances of a particular page, let's say there is -- we're going to offer multiple login pages from multiple servers so sometimes you can duplicate those. You can have that stuff be driven off of a database, and you pass various parameters to say I'm going to use this module over and over again, but I'm going to always pass it -- a certain piece of information to say display the login page, display login page logic, and in another case I might say display home page logic.

Q Sure. I think maybe we're missing each other here, because I guess what I'm trying to understand is, it's easy for me to understand a piece of software like a web application in terms of the number of users.

A Uh-huh.

Q And maybe that's the only criteria that really drives how big or small or how robust or -- the web page -- so I guess what I'm trying to understand is, what are the requirements here. What I'm trying to get at is, and maybe -- let's do it



this way. We can do it more specifically, and I think it might be easier to just walk through the criteria that you put together in your estimate, and then we can do that, and that might be a better way to understand it.

A Okay.

Q Before we do that, I just want to focus on one piece of your expert report, and this is in the fourth paragraph from the top. It starts, I was asked to review the specifications for Linkepic to provide a cost estimate to develop Linkepic based on the technical and system specifications provided to me, and then you go on to say, I was provided five documents that I reviewed that were prepared by Vyasil for Mr. London.

Do you see that?

A I do.

Q I'm assuming that the -- you meant to say that the -- only the first three documents identified in your expert report were prepared by Vyasil for Mr. London, but presumably Gary Hunt's report and Jonathan Hochman's report weren't prepared by Vyasil for Mr. London.

A That would sound correct to me.

Q All right. So we're really talking about -- and then you go on to say, Based on my review and analysis of these documents, I'm assuming we're talking about the first three documents identified in your expert report, right?
A That's correct.
Q Okay. How do you know that these three documents were prepared by Vyasil?
A I guess Exhibit 3, specifically Page 23, they say they authored it.
Q Okay.
A Who prepared Exhibit 5 is not explicit in the document.
Q Were you told to assume that Exhibit 5 was prepared by Vyasil?
A I don't think I was told that. I may have assumed that just given -- I was given this packet of documents and I think the first one I read was the contract, so I assumed this had been done by the person -- the organization that had done the contract.
Q Okay. And then for Exhibit 4, it's in that stack.
A Yeah.



Q Same question.
A Yeah, I assumed it was prepared by them in conjunction with the client.
Q Do you know anything about that document?
A It would appear to me to be a vision document kind of, sort of outlining what features the system was supposed to have, and from this very high-level document, the other documents were prepared I assume through interviews or discussions of some sort.
Q Okay. So if I'm understanding you correctly, you believe that Exhibit 4 is kind of a vision document that would then lead to the creation of the materials in Exhibits 3 and 5?
A That's correct.
Q But you don't know who prepared Exhibit 4?
A Explicitly, no. Again, I did make an assumption that the other documents came from the person who the contract was with.
Q You don't know who it was from or who it was given to or anything about the document?
A I do not. The items in that document match up with a lot of what's in these other docs, so I assumed it was the origin of it.
Q I don't know where the document came from



either, so we're in the same place.
So I do want to get back to what we were talking about, but like I said, I think it might be easier to talk about it in the context of the estimate that you provided. So let's keep working through your report. You say based on your review and analysis of these documents -- and, again, I think that's Exhibits 3, 4, and 5 -- I estimate that version 1.0 of the system would cost between $602,000 and $1,053,500 to develop.
What's version 1.0? What do you mean by that?
A That would be a system that delivers the functionality described by requirements of design.
Q Okay. So it's the -- is it the most basic system, is it the --
A It's the live version, the version you would go live with in production. Production is the term we use for being a live system.
Q And so this -- your estimate is then set forth in the last page of your report, which is this Linkepic estimate, is that right?
A Correct.
Q And does this show all the analysis as to how



you arrived at the conclusion with respect to the cost?
A Generally, yes. I typically cross-check against -- kind of a baseline, what it typically takes, what percent of a project gets completed or how much time a project takes, how much effort goes into a project to complete requirements, how much effort might go into design, build, test, deployment. It's just -- it's like a check sum, if you add numbers across and add them down, do they equal the same thing.
Q Okay. Is it an internal cross-check or is it something you're referencing with respect to objective criteria about kind of phases of development?
A Objective criteria based on my experience building systems over the last 20-plus years, those ratios typically pan out. They're not perfect. They're always a little bit off, but generally speaking.
Q But is this something that's just kind of your own internal clock of, oh, I think this should take this much time or is this a document that you prepared or a summary or something else out there?

A It's something I do after this -- the document you have in front of you was created. I then in my head went through and said, okay, what percent is requirements, what percent is design, and does that sound right.

**Q I'm just trying to get a sense of whether it's something that's kind of an internal cross-check that you're performing based on your own experience or if there is something out there, right, that's sort of metrics for system development that you then compare the two documents.**

A I didn't explicitly compare it to any industry standard, but I think my internal metrics are very much aligned with what --

**Q Oh, no, sure. I'm just trying to get a sense of which one or the other.**

A Yep.

**Q Then you go on to say here that the estimate assumes that the e-commerce, video, mail/messaging, forum, learning management system components are licensed and integrated with the system, not built from scratch, just to complete the sentence.**

**Where -- if you could just point me to in the Linkepic documents and just -- if it's okay, I'd**



**like to just refer to Exhibits 3, 4, and 5 as the Linkepic documents.**

A Okay.

**Q That way we can kind of -- I don't think the answers to any of these questions are going to be found in Hunt's or Hochman's report. If they are, tell me.**

A Okay.

**Q I'll just call them the Linkepic documents.**

**But where is the e-commerce component identified in the Linkepic documents?**

A I know that in Exhibit 4 there is a reference to payment for subscribing particular -- I'll have to go through this.

**Q Sure. And if it will save you time, what I want to ask you is, for each of these components, e-commerce, video, mail/messaging, forum, learning management system, I'm just going to ask you the same question, which is, please identify in the Linkepic documents where those components are.**

A So should we tackle these one at a time or just kind of as I go through where I see some of these.

**Q Whatever you would like to do.**



A So Exhibit 3, there is reference on Page 3 to videos, forum, e-learning, which equates to learning management system. Page 4 refers to payment management system, so that would equate to the e-commerce. And Page 5 refers to mailbox. Page 12 refers to videos. Page 14 refers to mail and forums. Page 18 could potentially be included as learning management as well as video. Exhibit 5 on Page -- they aren't numbered -- the last -- there is a diagram in Section 2 that also appears in Exhibit 3, and this describes the e-learning or learning management as well as videos, blog, mailbox, forum. I could assume there is a use case diagram for group management, which more broadly discusses the concepts of messaging, video.

**Q Can you identify that by figure?**

A AC 00.

**Q Okay. AC --**

A Figure 11. Sorry, Figure 11.

Functionality of Figure 12 would be forum related, as does -- Figure 13 is forum. 3.5, video services. It's immediately after Figure 15. Figure 16 is videos. Figure 18 is about mail. Figure 19 includes video as well as making payments, so



e-commerce. Figure 21 refers back to video. Figure 22 is billing information and payment information. Figure 24 is video. Figure 27 is e-mail. Figure 30 confirms the order but doesn't specifically mention payment. There is a little bit more about messaging in Figure 3.16. Messaging in Figure 32. Figure 36 discusses payment management, as does Figure 37.

**Q Okay. Is it fair to say that there is more detail contained in Exhibit -- let me just make sure we got the right ones -- in Exhibit 5 than Exhibit 3?**

A Yes.

**Q Does the e-commerce component identified in the -- the portions of the document that you say reference the e-commerce component, for example, what level of detail does that provide in terms of the system that needs to be built? Does it talk about what is bought or sold or what kind of payment forms are accepted or what the transaction is going to look like or what -- for example, what kind of interface it will be, whether it's a Craigslist interface or an eBay type interface?**

A No, I think it lacks sufficient detail, but it gives you context for where a payment system would be required.

Q But I guess what I'm saying is that it could be -- is it fair to say that the level of detail set forth in the Linkepic documents could be anything from a kind of Craigslist interface up to an eBay type of interface in terms of level of sophistication?

MR. LONDON: I'm going to object on grounds of -- form of the question.

BY MR. FRIEBUS:

Q You can answer. Just for the sake of clarification, Mr. London can object to my questions. They will be noted on the record. Unless he directs you not to answer a question, go ahead and answer the question.

A It does not describe the level of sophistication, but it should be defined somewhere.

Q Same question with respect to the video component, does anything tell you about what kind of video the system should support, whether it's streaming video, live video, HD video, lower resolution, how big a library of videos should be?

A There are some feature, I think -- right after Figure 15 it describes the features the video component needs to support, but I don't think --



specific to your question, does it say streaming or not, I don't think it identifies one or the other.

Q I guess what I'm driving at is, is there a range of levels of -- I'm calling it sophistication, but if there is a better word, just let me know -- that could be encompassed by what we'll shorthand as the video component?

A Because there is also -- they talk about live classes, so live online classes, so that would indicate it's streaming. Whether it's a video stream, I have to make that assumption.

Q Right.

A So I assume there is also a video available for download based on the general descriptions here.

Q Why would you make that assumption?

A Given that you can add -- diagram -- Figure 19 includes downloads so you can download the video.

Q Okay. So that's where you get the downloading video --

A Correct.

Q -- piece of it?

Now, there are lots of different ways to do that?

A It kind of -- yes, there is many ways to do



it.

Q Same thing with the mail messaging, lots of ways to create a mail messaging component consistent with the Linkepic documents?

A Yes.

Q When I say lots of ways, I mean cheap ways and expensive ways, big ways, little ways?

MR. LONDON: I'm going to object, vague and ambiguous. What do you mean by cheap ways, expensive ways?

A There are lots of ways, and costs can vary.

BY MR. FRIEBUS:

Q Fair enough. Same question for the forum. In order to accomplish the forum descriptions that are set out in the Linkepic documents, there is lots of ways to accomplish that?

A Yes.

Q And the cost would vary depending on the choice of approach used?

A That's correct.

Q Same question for the learning management system, lots of ways to accomplish that functionality?

A That's correct.



Q And, again, there are varying costs incurred with the choice of the approach used?

A Yes.

Q So let's look at the Linkepic estimate that you prepared. So I just want to go through these and kind of work through the work plan that you put together here and we'll just kind of work our way down the document. So we'll start with the requirements portion you have at the top there. First I'm just going to ask you a math question.

Isn't the estimate -- how did you get the 160 estimated hours if the -- what I assume you're doing is taking nine modules at 12 to 16 hours each.

A Right. And then on top of that there will be time added for documenting, revealing, and refining what was learned about the functional requirements during the interviews.

Q I see. So that's a separate kind of category?

A Yep.

Q All right. And, again, where did you get the nine modules from?

A That was in -- it's Figure 1 of Exhibit 3.

Q So it's basically --

A You got home, but the nine other modules, the nine modules not including home.
**Q Okay. So help me, when you say requirements, is that requirements design, requirements specifications, requirements --**
A Requirements. So if you take a look at the user -- use case diagrams -- they call them user -- yeah, they call them use case diagrams in here. So Section 4 of Exhibit 3. That would be the time you take to interview, how the system is supposed to behave, document it, review it, make up dates based on that review, and then finalize the document for that particular section.
**Q So if I'm understanding you correctly, what you're doing is you're saying here is -- there is a --**
A There may be more than one use case for a module. There often are many.
**Q And what's the use case -- which module is this?**
A The Section 10?
**Q The one that you were just referring to.**
A I guess it's listed as sign-in under user module; description, Page 5. That's one piece of the



functionality.
**Q I guess what I'm wondering here is -- so you've got for each module, my understanding is you want to develop a set of -- with this first line, right, functional requirements, what you're doing is you're saying we will create a set of functional requirements for each of the modules that are identified in Exhibit 3.**
A Uh-huh.
**Q Is that yes?**
A For each of the modules defined in Section 3, yes.
**Q In Exhibit 3?**
A Exhibit 3 on Page 3, yes.
**Q Now, is there any requirement in Exhibit 3 that you take this approach for each of the modules, or for any of the modules for that matter?**
MR. LONDON: Repeat the question, please.
BY MR. FRIEBUS:
**Q Sure. I guess what I'm asking is, where in Exhibit 3 does it require you to spend any amount of time, much less 12 to 16 hours, defining the functional requirements for each module?**
A This document does not specifically say that,



no, it doesn't.
**Q Okay. And this is -- it's your opinion about -- the amount of time it would take is -- maybe just to shorthand it -- it would be the way you would approach the problem of the project?**
A That's correct. If I'm asked to build this based on these modules, this is the approach I would take.
**Q Okay. And if somebody came to you with the idea for a website and said our budget is $7,000, would you take the same approach?**
MR. LONDON: I'm going to object. That assumes facts not in evidence, that somebody said the budget is $7,000, but if you want to do hypotheticals.
A If someone -- could you repeat the question?
BY MR. FRIEBUS:
**Q Sure. I mean, with respect to the functional requirements -- we'll just stay there -- would you -- and somebody said, look, I've got a budget of $7,000, would you take the same approach as you've outlined here or would you take a different approach?**
A I would take the same approach but also, counsel, that I don't think you can get this done for that.



**Q What I mean is, I guess what I'm driving at, is there a way that you could create, either through using existing software or some other means, create a website that had nine modules as described in Exhibit 3 for less money than you're proposing?**
A I don't think that's possible. I don't think you can deliver a complex system like this for $7,000.
**Q This is what I'm getting at. What in this document tells you that it's complex?**
A The number of subsystems, the number of use cases, the number of sequence diagrams altogether tells me this is a complex system.
**Q Okay. But, I mean, can the same system -- let me ask you this. Can the same system be built more simply?**
MR. LONDON: I'm going to object on grounds -- vague. What do you mean by more simply? Relative to what?
A I think the choices you make later are more susceptible -- are easier to select something, maybe less expensive, less fully featured perhaps. I think requirements are requirements. It's not a -- when you gather requirements, you have to go through this

activity, you have to document things, so I don't think there is a cheap way to do things in requirements. After requirements are defined, then you could say, okay, you asked the system to do these ten things, here are your options for how to do each of these things.

BY MR. FRIEBUS:

**Q Let me ask you a similar question a different way. If somebody came to you and asked to build a $7,000 piece of software, would you necessarily go through a requirements planning phase?**

A I would probably suggest to them that they do their best to document those requirements before we get involved.

**Q Okay. But you wouldn't necessarily say, okay, with a $7,000 budget I'm going to suggest that you spend 12 to 16 hours preparing requirements documents for each module?**

A Uh-huh. I would recommend that, yes.

**Q With a $7,000 budget you would recommend spending 12 to 16 hours?**

A Oh, no, I'm saying I would recommend to who is coming to me that you go do that yourself because you're not going to get a requirements -- you're not



going to get your requirements defined for $7,000.

**Q Right. That's kind of my point is that given a budget of $7,000 this piece of it kind of goes out the door?**

A What piece?

**Q Sorry. The functional requirements piece.**

A Yeah, I could not complete the functional requirements for this system for $7,000.

**Q Could you do functional requirements for -- you kind of keep coming back to this system, and again, I guess I want to press you a little bit. What -- other than the use case diagrams, is it only the use case diagrams that suggest it has to be done a certain way?**

A Or the modules. You have to have -- if there is nine modules, you have to have nine conversations, you have to create nine documents that describe the requirements you discussed.

**Q Is there software that exists that replicate the functionality of any of the modules identified on Page 3 of Exhibit 3?**

MR. LONDON: I'm going to -- I'm sorry. Can you repeat the question, the court reporter?

(From the record above, the reporter read



the following:

"Q Is there software that exists that replicate the functionality of any of the modules identified on Page 3 of Exhibit 3?")

MR. LONDON: I'm going to object. The question is vague and ambiguous, what he means by replicate and specifically software. Are we talking about enterprise systems, off-the-shelf software?

MR. FRIEBUS: I'm going to make the same -- Mr. London, you're fine to make your objection and --

MR. LONDON: I'm clarifying what my objection is.

MR. FRIEBUS: When you ask a question, that's not clarifying. When you make a statement, that's the objection. When you go on to ask questions about it, you're coaching the witness --

MR. LONDON: I'm not coaching the witness.

MR. FRIEBUS: I'm going to ask you not to raise your voice or talk --

MR. LONDON: I'm not raising my voice.

MR. FRIEBUS: Mr. London, I'm going to ask you, please don't ask any further follow-up questions because it's coaching the witness and it's a leading objection -- or it's a speaking objection, so I have



no problem if you make your objection for the record, but as we went through this yesterday, please just confine it to the objection without the commentary.

MR. LONDON: The objection is clarifying what -- specifically what the problem with your question is. It's not -- if I just say vague and ambiguous, it doesn't clarify what the issue is.

MR. FRIEBUS: Right.

MR. LONDON: I'm trying to clarify what the problem with the question is.

MR. FRIEBUS: All you need to do is state your objection for the record. If I feel like it needs to be clarified, I will make that judgment.

MR. LONDON: Well, it's not necessarily clear for the record. Go ahead.

THE WITNESS: Yeah, I think in Exhibit 1 I did explain, I think, some of these modules are best served to be prebuilt ones being incorporated into the system. It does not make sense to build them from scratch.

BY MR. FRIEBUS:

**Q But I guess what I'm saying is that if you had a -- for example, looking at the user modules on Page 3 of Exhibit 3, is there software that exists**

today that could replicate, for example, the "about us" functions or the blog functions or the profile functions or the connection functions?

MR. LONDON: Again, I'm going to make the same objection. The question is vague and ambiguous.

A Some of them I do believe you would probably be able to use them. Many of these probably would need some modification or extension, but you could get the base capability through acquiring in some fashion these modules.

BY MR. FRIEBUS:

Q Okay. And is there software that exists that is either free or inexpensive that would duplicate the functions required or the functions anticipated by these user modules?

A The core functionality of these -- almost for anything there is some core functionality available today that has, let's say -- that meets at least half of what is necessary, and then you may have to extend -- build something custom on top of that in order to meet the requirements for this particular system.

Q Just to make sure I'm understanding, there is freeware or very inexpensive software that would



replicate the core functionality available?

A There is.

Q Okay. So let's look at the -- let's just keep working our way down the work plan. Technical requirements. Again, where -- you have 80 hours for security, performance, availability, data backup, network/infrastructure.

Can you just show me where in Exhibit 3 those requirements are found?

A They're not here, but they should be part of any web system.

Q So it's kind of a best practice as opposed to what's called for in the Linkepic documents?

A Yeah. I don't see how you can build a web application without addressing these in some fashion.

Q But, I mean, just to be clear, it's not something that you're gaining -- you're not taking the technical requirements set out in the work plan from the Linkepic documents, you're using -- you're saying this is what I would do and what you think is best practice in the industry?

A That's correct. At the requirement stage you should define these things.

Q And then at the same -- by the same token,



the project management line entry for 60 hours, again, is that called for at all in the Linkepic contract or the Linkepic documents?

A No. Again, best practice and project management in general is about 25 percent of the effort going on throughout the project.

Q Sorry. Just to make sure I understand that. The calculation is 25 -- you take the overall time and then you add 25 -- you take 25 percent of that overall time and --

A It comes to what you're allocating for project management activities.

Q Thanks. So if you look at Exhibit 3 on Page 23, there is a project price there of $7,000, right?

A (Nodding.)

Q Now, you estimated -- I think if I add these columns up, 160, 80, and 60, you get to 300 hours, so that's 300 hours of requirements work for a $7,000 project?

A That's to define requirements based -- more or less I think the root thing is the modules, the nine modules.

Q I'm sorry. Say that again.



A The nine modules identified --

Q Right.

A -- if you told me these are the nine modules I would like built, this is what I would spend, how much time I would spend building the requirements for that system.

Q Okay. But, again, that's how much time you would spend building those requirements, not necessarily how much time is either required or stated to be required in Exhibit 3, right?

A It -- there is no such -- there is no description of any effort on here, so I don't know if they're paying their people a dollar an hour, $100 an hour, $500, that I don't know. It should be -- a much better measure perhaps rather than dollar value would be effort.

Q What I'm saying, there is no effort requirement set out in Exhibit 3.

A No.

Q It doesn't say how much time needs to be spent, right?

A No.

Q It doesn't say how many hours need to be spent?

A No. The only thing is on Page 3 it says project timeline, 90 days, so usually requirements gathering will take somewhere between 10 and 20 percent of the time of a project.

**Q Okay. But, again, would it take between 10 and 20 percent of a $7,000 project?**

A I would think it would.

**Q Okay. So you would think that it would be that even for a $7,000 project you should look at requirements planning is about 10 to 20 percent of that?**

A Yeah.

**Q And, again, that's not something that's found in Exhibit 3, but that's based on your industry experience and practice?**

A That's correct.

**Q So if somebody came to you with a budget of $7,000, would you say that 300 hours of requirements planning was realistic?**

MR. LONDON: I'm going to object. Assumes facts not in evidence, that somebody said that their budget was $7,000, but go ahead.

A Could you repeat the question?



BY MR. FRIEBUS:

**Q Sure. If somebody came to you with a budget of $7,000, would you say that 300 hours for requirements planning was realistic?**

A Could not define the requirements for $7,000 if I was going to -- if it needed 300 hours to be completed, it could not be done for $7,000.

**Q Right, okay. So if you had a $7,000 project, the requirements for that would be much less than 300 hours?**

A I guess -- the approach I would typically take is you have a scope for the project, which Exhibit 3 is -- I would consider a robust scope document. Based on that scope document, I would move into requirements. If you're looking to do a fixed price project, you will complete a full requirement stage before quoting the remainder of the project.

**Q So if I'm understanding you correctly, you would do -- you would go through your requirements planning and then you would make an adjustment at some point if you thought that it needed to cost more money?**

A That's correct.

**Q And is it customary in the software industry**



**that initial quotations for software development need to be adjusted along the way as the software is developed?**

A You have several levers. Your levers are the scope of the project, so if you realize, wow, this is going to cost a lot more, you put certain features on the table to be removed from the system. They've been planned to be built, but the fact is there is not enough budget to build those features. You can deal with timeline as well. As I mentioned before, project management time is often a factor of complexity of the system as well as how many people need to be managed to complete the project, so if you reduce the number of people on the project, you could extend the timeline then, and that would reduce the cost of the project as well. And then the other option is spend additional money.

**Q Okay. But, I mean, in terms of -- I guess what I'm trying to get at is that if there is a -- if somebody came to you with an initial budget of however much money that is and you said, okay, we think we can do the system for that and then you got into requirements planning and you said, no, it's going to be ten times that or even a hundred times**



**that, would you then say, okay, now we need to take a look -- another look at the budget and you say, well, shoot, you said the initial budget was X and so we're going to have to -- even though it's going to really cost ten times or a hundred times this, we're stuck with X?**

A That's assuming it's a time-and-expense project, that's correct.

**Q Sure. Well, which is correct, that you would then renegotiate the price?**

A I would say yes -- we'd say let's pause, let's take a look at this again, and let's decide if we really need all these features, if you're going to come up with more money, because right now based on the constraints we have of time, money, and scope, this can't be done.

**Q Okay. And is this -- as far as you can tell from the Linkepic documents, is this supposed to be a time-and-hours project?**

A No. There is no reference to effort at all, so it seemed fixed.

**Q So it's a fixed fee?**

A Uh-huh.

**Q Okay. If the fee is fixed, then what else**

changes? Did the requirements change if the fee is fixed?
A If you're fixed, you're stuck, so that burden is on whoever is building the system.
Q I thought you just told me earlier that there are lots of different ways you can build the system.
A Uh-huh.
Q Sorry. Is that a yes?
A Yes.
Q So if there are lots of different ways to build the system, then the system that would be built, assuming that the cost is fixed, would be the system you get for $7,000, right?
A That meets the requirements of the system and satisfies what you set out to build.
Q Okay. But assuming that you could build the system -- strike that.
So let me see if I'm understanding this. So if the cost is fixed at $7,000, right, then the only requirement is that you have a system that meets the documentation that's built for $7,000?
A I don't understand the last, that's built for $7,000.
Q Sorry. If the only fixed requirement is that



the system cost $7,000, but then -- I'm sorry. If the fixed price is $7,000, then the only --
A What's described in that same document has to be delivered for that amount.
Q Okay. But if there is lots of ways of delivering that, as long as you deliver a product that checks the boxes described in the document, you could do it lots of different ways.
A That's true.
Q And that the way that you described couldn't be done for $7,000, right?
A That's correct.
Q Okay. It is one way of checking the boxes in the document, but it's not the only way of checking the boxes in the document, right?
A That's true.
Q It's the way you would have built this system had you been presented with these requirements?
A To build a successful system, yes.
Q Is the -- stepping back from these particular documents, what would you say -- again, this is stepping back from this -- what would you say is the replacement cost of a $7,000 piece of software?
MR. LONDON: I'm going to object. Assumes facts



not in evidence.
A Any system or --
BY MR. FRIEBUS:
Q Any system. What I guess I'm asking is, is software generally a pretty efficient market for software development?
A What do you mean by efficient?
Q Well, what I guess I mean is that the -- is the cost to develop software -- let's see if I can find a better question.
Do you often find it's the case or is it the case that you can find software developers willing to build you a million dollar software system for $7,000?
A No.
Q Okay. Generally speaking, would most software development companies come within a certain range in terms of development costs if you were talking about the same product deliverable?
A Yes.
Q Based on your experience, what do you think that range is, 5 percent, 10 percent?
MR. LONDON: Before you answer, I'm going to object. Are we assuming in the United States, India,



where?
A I'm --
MR. LONDON: No, no, I'm just saying the question isn't clear, is he talking about where it's being developed, but okay.
THE WITNESS: Varies quite a bit. I would say 50 percent or more.
BY MR. FRIEBUS:
Q Again, talking about the same deliverable. If you were delivering the same piece of software, not different pieces of software, the same piece of software, the prices for that would vary between 50 percent in your experience?
A They could vary that much. I think a big component of that is where development is done and how much you're paying people, the approach you take to the project.
Q Sorry. Go ahead. Same approach, same deliverable.
A Then it's a factor of rates it should be if you're following industry best practices.
Q And, again, what -- for the same product, the same deliverable, same approach, what do you think is the range of prices you would get? Is it -- are they

all within 5 percent, 10 percent of each other or, like you said, could it vary?

A It could vary 50 percent, a company like an Accenture. They themselves, depending on how they decide to deliver that project, it would probably vary by 50 percent, I think, depending on which resources they're going to apply.

Q Okay. Let me see, maybe we can shortcut this a bit.

So let's go back to Exhibit 1, the high-level work plan that you have.

A Uh-huh.

Q You have a component here for design.

A Uh-huh.

Q And, again, where are those design -- and I'll -- rather than step through each one one by one under the heading design, the component of design and the hours that you've estimated and the tasks you've estimated for each, where are those found in Exhibit 3?

A So functional design would generally include the sequence diagrams, which describe how the system is supposed to behave, as well as it builds upon the functional requirements. It's hard to say exactly



what's in there, but typically because -- until you have fully featured requirements, you can't necessarily know how much design effort is going to be required.

Q Let me ask you this question a different way. There is nothing in the Linkepic documents that you've seen or the Linkepic contract that requires 280 hours of functional design or 160 hours of technical architecture design or 80 hours of data to your design or 160 hours of user experience design, is there?

A There is nothing that would say that's required.

Q Okay. And, again, this is your approach to the -- sorry. Strike that.

This is how you would build the piece of software if somebody approached you and asked you how to build it?

A Correct. I would add, though, that I don't think you can cut out these steps. You can accomplish them maybe in a different way than I would approach it, but you cannot cut out, for example, the data tier design. There is a database. They even refer to a database on Page 4 of Exhibit 3 that if



there is a common database behind all these modules you have to design that.

Q Oh, sure. I guess what I mean is that the amount of time for detail devoted to each task.

A Yeah. It's a function often of maintainability and how scaleable you want to make this thing.

Q And, again, the way that you put this together is -- maybe I'm oversimplifying it, but again, tell me if I'm inaccurate -- but the way you put this estimate together is to say this is the way I would approach the problem and how much time I would devote to it to get a certain product?

A Correct.

Q And then one other question, I guess. So you've got a time approximation here, I think one month for requirements and two months for design.

Do you see that?

A Yes.

Q Okay. So obviously you've got other additional steps that need to take place past this?

A (Nodding.)

Q One of the things that you noted in what's being referred to as the Linkepic contract is the



project timeline of 90 days.

So if the timeline is 90 days and the requirements and design have taken three months, which is essentially 90 days, but you've still got build tasks to deploy, doesn't that tell you that maybe your work plan is too robust or doesn't meet the timeline set forth in the contract?

A It tells me somebody is mis -- you know, is mis -- I guess they have misunderstood the effort required to deliver this.

Q Well, it seems like there is two -- to me it seems like there are one of two answers, right. Either the person who put together the proposal or described what was going to be built was wrong, right?

A Uh-huh, yep.

Q I think that's what you're suggesting.

Or you've overdesigned or overestimated the amount of time it would take to build what was contemplated in the contract, right; those are the two possibilities?

A Or -- yeah, I would feel mine is more realistic than what they have laid out here.

Q I'm not asking you -- obviously I understand

which side you come down on, but you would agree with me that those are the two options here, right?
MR. LONDON: Can you repeat the question, the court reporter?
(From the record above, the reporter read the following:
"Q I'm not asking you -- obviously I understand which side you come down on, but you would agree with me that those are the two options here, right?")
MR. LONDON: Can you repeat the one before that?
MR. FRIEBUS: I can re-ask the question. That's fine.
BY MR. FRIEBUS:
Q What I'm driving at is that we have a -- we're just talking about time now. We have a project timeline that's set forth in Exhibit 3 of 90 days and that in some way circumscribes the work that's going to be done. We have a timeline in the work plan wherein you projected or you set out a work plan that in 90 days you've only accomplished the requirements and design but still need to do the further steps of build, test, and deployment. So what I'm saying is that either -- there seem to be one of two options,



and again, I have a sense of which one you would come down on, but either -- the one option is that the folks who put together or agreed upon the 90-day timeline in Exhibit 3 had underestimated the time for the project or that you have overestimated the time for the project.
A I'll go back to kind of the three factors of a project.
Q I'm just asking you -- just to be clear.
A No. The answer is no.
Q Sorry. Let me just make sure we get the -- so you don't agree with me that those are the two options, either one person underestimated or one person overestimated?
A That's correct, I do not agree with it.
Q Okay. Explain why, please.
A Okay. There is also a staffing plan. There is a technique called crashing the schedule, so you add more people to a project in order to bring in the timeline. I have no idea what staffing plan they're planning to use here. I used this staffing plan. I could bring this down to one developer, one person the entire time and extend this to a couple years. I could put five people on it and bring it -- or double



the number of people in the first stage, and that takes two weeks instead of a month.
Q Okay. I'm just asking --
A Potentially it's just often I would not recommend that because there is often -- you're going to have to increase the project management time on top of it, so you increase the cost as well. This is a good size team based on my experience to define requirements.
Q Right. I'm just saying that in the work plan that you put together -- strike that.
If I'm understanding your answer correctly, what you're saying essentially -- when you're talking about a project that is essentially a function of the number of people working a certain number of hours, you can always shorten the timeline by throwing more bodies at it, right?
A Yeah. It's not always a direct --
Q One to one.
A -- factor, but yes.
Q Okay. And so what you're saying is that in the work plan you set out you could, I think as you used the term, crash the schedule by taking certain steps, including more project management or adding



other people to shorten the time frame for completing the project?
A That's correct.
Q And that would have, I'm assuming, some effect on cost?
A Yes.
Q Probably increase the cost?
A It would increase the cost.
Q Okay. That being said, the work plan that you set forth here is clearly longer than 90 days, right?
A Yes.
Q So for the amount of money that you've estimated or for the tasks you've estimated, it's more than 90 days?
A Yes.
Q So back to the question, either -- when we compare your work plan to what's in Exhibit 3, it seems to me, again, there are one of two options, either the folks who agreed upon or put together Exhibit 3 either underestimated the time by saying this will take 90 days or you overestimated the amount of time to spend on this project in your work plan?

MR. LONDON: Objection. Asked and answered. You already answered the question.
A Yeah, I'll say no. Again, it's the same question we just talked about. I do think crashing the schedule can have a significant impact on schedules. You can really put people in schedules 24 hours a day. It's not an eight-hour workday. I've worked in many situations where we had around-the-clock development going on in order to meet a deadline.
BY MR. FRIEBUS:
**Q Well, let me ask you this again. So would then the cost for the work plan that you put together, if you were to truncate that into a 90-day work plan as opposed to a -- and I'm assuming these are consecutive, so we've added up --**
A It's a nine-month schedule.
**Q A nine-month schedule. If you were to crash that into a third, I'm assuming that the cost would go up?**
A It would.
**Q Okay. So keeping the cost that you've estimated fixed -- strike that.**
**So we're just going to work through this a**



**little bit and same set of questions. The next step in the project would be build?**
A Yes.
**Q And, again, you set forth a number of tasks within the build, infrastructure setup, data tier, back-end services, third-party service integrations, front end, administration tools, and project management with a corresponding number of hours and then a description of the activities for each, right?**
A Correct.
**Q Okay. And, again, those specific number of hours or activities are not actually called for in Exhibit 3, that's the way you would put the project together if it was presented to you; is that fair to say?**
A I don't think that's quite fair to say, you have to do these things. In this case actually the build stage I think is something that you have flexibility -- more flexibility in how things get done, and that's usually driven by how you did the technical architecture design activity. If you did that well, you have much more flexibility in the build stage.
**Q Well, I guess what I'm saying is that there**



**is nothing in the Linkepic documents that say you need to spend 160 hours building a database and data access layer, right?**
A No, but you have to build a database.
**Q Okay. And same thing, back-end services, there is nothing in the Linkepic documents that say you need to spend 160 hours building security, service maintenance/scheduled jobs, logging and monitoring, integration of custom components, right?**
A Correct.
**Q In fact, is that description, is there anything in the Linkepic documents that say you need to have security, service maintenance, logging and monitoring, or integration of custom components?**
A Again, it's a web application, so you do need security. It has to run on a server. And I guess we -- I guess that's probably the biggest thing, it's security and the fact that it has to run on a server with -- that needs to be monitored.
**Q Okay. So I'll ask the same question or maybe we can do this in one question rather than repeating them, but same thing for the third-party service integrations, front end, administration tools, there are no specific requirements in the Linkepic**



**documents that you spend 160, 840, and 80 hours, respectively, on each of those steps?**
A Correct.
**Q You've got a figure here for infrastructure setup, 40 hours for setup server and network infrastructure.**
**What do you envision for 40 hours? What are you doing to set up a server? What kind of server and network are you setting up?**
A Yeah. You're going to either acquire a server or you're going to host the server somewhere, so that's part of what you decided previously, but once that's been acquired, you need to configure that server, so you have to install any required software on there, any required patching that has to go on there. You have to make sure that each server talks to the other servers and then you set up what are called administrative accounts so that you can do all these things on them. So those kinds of activities need to take place as part of the infrastructure setup.
**Q What kind of server would be required for the software that you're proposing here?**
A You would have to complete the technical

architecture to really figure that out. You're going to have to understand what technologies have been selected for it. That will drive what kind of servers you're going to need.

**Q Okay. I mean, can you give a range of -- is there a minimum server that you would need for a project of this complexity, and when I say -- of the one that you've described in the work plan here?**

A I think -- you probably have a bare minimum, I think, of two servers at least. You have the application server and the database server. That would be a flat minimum as far as the general architecture. Probably more than that, but that would be a base.

**Q Okay. And then what are the requirements of those servers?**

A There is no way to tell. Based on this, I could not tell you. They do rely on the technical architect to define that for you based on what components are selected. So, for example, I mean, you can -- what's a good example for this. A computer from ten years ago ran Windows -- go back to Windows 95, whatever. That kind of computer required very little RAM, very little storage, very little CPU



power. If you were to run Windows 10 on that computer today, you can't. It won't work.

**Q Right.**

A At the same time, though, today you can run things on a very inexpensive Linux computer, let's say, that can do a lot of things but still has more power that costs less than what that computer used to cost. A Linux device today could cost a bit more and have more processing too. My point being that what the application running on the server does dictates how much CPU, RAM, and database is required, and which software you use will drive that. If you use something like Oracle as a database back end, you're going to need a lot more processing power than you are if you're going to use a Microsoft SQL Server database, for example.

**Q Well, I guess what -- maybe another way to ask this question, it seems clear that you have a concept here of how much time of the product that's supposed to be built, right?**

A (Nodding.)

**Q You said -- I'm sorry. You have to say yes for the court reporter.**

A For the product --



**Q What I'm saying is that, when we started this deposition, you said I've looked at these documents and there are certain requirements -- there are certain features that I see in here -- let me see if I can get -- check my notes. It says that this was going to be a --**

A Enterprise software development project.

**Q Right, an enterprise software development project, and that you set out a work plan for achieving that goal that's going to create a piece of software, right?**

A Correct.

**Q Okay. So I'm assuming that you have in your mind's eye a kind of piece of software that would require the steps that you've set out in the work plan, right?**

A Right.

**Q Okay. So what's the minimum server requirement to host the software that you built here?**

A Couldn't tell you.

**Q Okay. So would it have to be -- could you run this on a five gig server?**

A Couldn't tell you. Five gigs of RAM, five gigs of storage? But it doesn't matter. I couldn't



answer that even if you were more specific.

**Q So you could not say that there is a minimum server requirement to run the software that you're building?**

A I could not tell you that question. I would need a technical architect to answer that question.

**Q Okay. Could you run the piece of software that you're building on a mobile phone?**

MR. LONDON: I'm going to object. First of all, what software -- are you assuming that he's using the OS on the mobile phone? So I'm going to object that it's vague and ambiguous and confusing. Go ahead.

A That would be unheard of, but I don't know -- if it's technically feasible, maybe, but never heard of such a thing happening.

BY MR. FRIEBUS:

**Q I guess what I'm struggling to understand is that why is it -- what the difficulty of -- strike that.**

**What I'm having a hard time understanding is that if there is a work plan that you put together to create a piece of software that will meet what you view as certain requirements set out in the Linkepic documents that you can't tell me anything about the**

**kinds of servers that it would have to run on either from a minimum RAM requirement or a minimum storage requirement.**

A No, because I don't know what third-party components we're going to use in the system. Each component, if you're going to take something a third party developed, they have very specific specifications as to what the server specs need to be. I don't know what services are going to be employed in this, so I cannot -- nobody can tell you until you understand what third-party complaints are going to be developed and then on top of that what are you going to develop with --

**Q Okay.**

A -- and run. It's --

**Q Let me ask you this.**

A It can't be answered.

**Q Sure. Let me see if I can keep trying to see if I can get an answer here.**

**Does storage capacity and memory on a server affect scaleability?**

A Yes.

**Q Does it affect the number of users that can be supported by a system?**



A Yes.

**Q How much -- you don't have to give me a number of users, but would you get a lot of user experience from two gigabytes of RAM?**

A I can't answer -- again, that's not enough information to answer that kind of a question. No one can answer that. Again, it depends on what the third-party requirements are for the system. The number of users will affect how many resources that computer needs to have from a RAM and a CPU perspective as well as I don't know how much data is going to be generated, so I can't tell you how much storage. Each user is going to generate how much data. I don't know.

**Q In your experience have you -- let's say in the last three years -- let's say in the last five years, how many projects have you done that were hosted on -- how many enterprise software development projects have you hosted on servers with four gigabytes of RAM?**

A A handful probably.

**Q How many is a handful?**

A Six; five, six.

**Q And would that be -- it's a large period of**



**time. How many of those projects have been hosted on servers of four gigabytes of RAM in the last year?**

A Maybe one.

**Q And in the last five years how many enterprise software development projects have you hosted on servers with 80 gigabytes of memory?**

A RAM you mean?

**Q No, gigabytes. I'm sorry, gigabytes of storage.**

A A server in the solution might have 80, one or more might have 80, but we'll also have servers that have more than that.

**Q Okay. I guess I'm just asking how many projects in the last five years have you hosted on a single 80 gigabytes storage server.**

A None.

**Q And then you said one in the last year or so on a four gigabyte memory?**

A Correct.

**Q Tell me about that, what were you hosting on that.**

A It was a SharePoint portal that included --

**Q What's that?**

A SharePoint is a tool used for collaboration.



Microsoft -- it's a third-party software platform Microsoft developed. We extended the platform to do additional things. The end client had a four gigabyte server to work with. Embedded in it was the application and the database and our custom code.

**Q And was that -- how many users were using that or was it just point to point; for example, my office here to another office in another location?**

A It was Internet enabled with authentication, but they had controlled user I.D.s and passwords. They have about 120 users.

**Q Okay. Just to make sure I've captured the question. When I'm asking how many networks -- sorry -- how many enterprise software development projects you host on an 80 gigabyte server, did you understand me to mean 80 gigabytes or less?**

A Yes, I did.

**Q And is the reason you haven't hosted any because 80 gigabytes of storage capacity just isn't a lot?**

A It's not a lot and that's the bare minimum you can even get. That's like a magic number you hit is 80. I don't know how you pick that, but it's a magic number.

Q What do you mean it's a magic number?
A If you order a server, they'll come with 80 gigabytes because the operating system is going to eat up 80 gigabytes of storage.
Q Okay. So you can't put anything else on the server because it's already full.
A For new software, that's correct.
Q Okay. See, we got an answer to the question.
A I guess.
MR. FRIEBUS: All right. Why don't we take a five-minute break because we've been going a while.
(Recess was taken.)
BY MR. FRIEBUS:
Q I think we left off -- we were looking at the work plan that's part of your report in Exhibit 1, and I think we left off with the build component.
A Yes.
Q And so I had been asking you a series of questions about whether the estimated hours and the tasks associated with those were set forth in the Linkepic documents, the Linkepic contract, or whether that's how you would approach the project. And so I think I just want to -- I think we can fill this out by just looking at the other two components --



A Sure.
Q -- we haven't talked about yet, the test and deployment parts. Same sort of questions. You've got 8 hours for deploy to test environment, 672 hours for author and execute test scripts, 40 hours for module communication, 168 hours for user acceptance testing, and 222 hours for project management.
None of those hours in the associated tasks are set forth as requirements in the Linkepic documents, right?
A They say they're going to test, but that's all.
Q Okay. So, again, so the answer to my question is the number of hours and the associated tasks aren't set forth in the Linkepic contract?
A They are not.
Q This, again, is how you would approach the problem if it was presented to you?
A Correct.
Q One section left, deployment. You got 8 hours for deploy to production environment, 80 hours for test production environment, 40 hours for train support staff, 80 hours for -- sorry -- 32 hours for project management, and 80 hours for go live.



Again, the estimated hours and the tasks associated with which are not set forth in the Linkepic documents. That's how you would approach the problem, right?
A That's correct.
Q Is it fair to say that a piece of software that costs 600,000 to a $1,000,000 to build would be a more robust piece of software than one that costs $7,000 to build?
MR. LONDON: I'm going to --
A That is highly likely. That's highly likely.
BY MR. FRIEBUS:
Q Okay. You get what you pay for?
MR. LONDON: I'm going to object on your characterization that you get what you pay for. Assumes facts not in evidence that what's developed in different countries is the same.
A Can you repeat the question?
BY MR. FRIEBUS:
Q You get what you pay for in software development, right?
A In many cases that's true.
Q There is -- I see here, staying with the work plan, that you have a blended rate of $175.



A Yes.
Q Do you identify -- can you show me where in your expert report you come up with the blended rate, what components go into that blended rate?
A I did not identify that in my document. For different roles there are different rates.
Q So let's just stop there. So you didn't identify that in the expert report, right?
A Correct.
Q So can you tell me what goes into that blended rate, how did you come up with a blended rate of $175?
A A user experience designer, we charge 135 an hour for; a business analyst and application developer, we charge 175; and then a project manager or principal will be 195.
Q So these rates are based off of the rates that your company charges?
A Generally, yeah. There's different rate cards, but yes.
Q Sure.
A Standard rate card.
Q But, I mean, they originate from -- what you're using as a reference point are the rates that

your company charges?
A Yes, I am.
Q Where do you put yourself in the market of software development services companies kind of rate-wise?
A Middle of the road.
Q Middle of the road?
A Uh-huh.
Q So I want to look at a phrase in your report. It starts at the bottom of Page 1. It's really just the last paragraph on the page. I'm not going to read the whole thing into the record. But the phrase in that paragraph I want to focus on is, If the cost estimate for the next phase goes up, the client is given an opportunity to decide if they want to accept the cost increase or cut features from scope to stay within the budget previously estimated.
Do you see that?
A Yes.
Q Okay. So if somebody came to you with an idea for a $7,000 website and you started looking at it and started planning, for example, in the requirements work that you've laid out in your work plan and you come up with X number of hours that



would cost far in excess of the $7,000, is what you're saying here that you would then go back to the client and say we can't do this for $7,000, it will cost this much money, and then have a conversation with the client about whether you remove features or add to the budget?
A Correct.
Q Okay. Would you ever in your experience just go ahead and -- again, in this example, if the client came to you with a $7,000 budget, say, okay, build a project that costs a million dollars and then bill the client for a million dollars?
A Could you repeat that again?
Q Sure. In your experience if a client came to you for a project that they said we would like the budget to be $7,000 --
MR. LONDON: And I'm going to object. It assumes -- is this a hypothetical?
MR. FRIEBUS: I'm not done with the question yet.
MR. LONDON: Okay. Go ahead.
BY MR. FRIEBUS:
Q If a customer came to you in your experience with a budget of $7,000 for a piece of software and you said -- you nodded your head okay -- would you



ever then go off and build -- spend a million dollars building a piece of software and then turn around and hand the client a bill for a million dollars?
A No. Kind of an extreme example, but I get your point. No. The answer is no.
Q So we'll just keep working down the -- would that answer change if rather than $1,000,000 in that example it was $600,000?
A No.
Q So just working back -- continuing through your report, you say -- and this is the first full paragraph on Page 2 -- The documents reviewed suggest Vyasil does not have the expertise to deliver a web application of this scope and complexity.
And, again, when you say the documents reviewed, you mean exhibits -- what we've marked as Exhibits 3, 4, and 5, right?
A Yes.
Q Now, this next portion of your report, is it an opinion about cost to replace Linkepic or is it an opinion about Vyasil's capabilities to create a piece of software?
A It's a little bit of both for the reason that there are key steps, and you don't have to use the



diagrams I would use necessarily, but you have to do certain steps in the process. You have to design the database before you implement it. You have to design the user experience before you build the web pages. There are certain things you have to do. I don't see any of that evidence -- no evidence of such activity was provided. There are no test plans. There are -- none of that stuff exists, so I feel like they didn't do those things.
Q No, I understand that from your report. I guess -- I think I'm asking a slightly different question. I'm just asking, does that portion of your report or your opinion have to do with the replacement cost of the system or does it have to do with a different question, which is does Vyasil have the technical capability to create the system.
A I feel they don't because they didn't do those things. Some of these things should have been done when these UML diagrams were being created. They didn't do it.
Q I understand that. I think we're missing each other here a bit. All I'm trying to get at and answer the questions here -- all I'm trying to get an answer to is this. Your opinion that Vyasil didn't

**have the expertise to deliver the product, is that a separate opinion than what the replacement cost for the product is?**
A I'm not sure -- I don't understand how the two questions are tied together.
**Q I don't either. Aren't they separate opinions; one opinion, this is how much it cost to build -- to replace the product?**
A My work plan is what it would take to replace the product, to build that product today, yes.
**Q And then you also offer a different opinion, right, a separate opinion, which is I don't think Vyasil could have pulled this off?**
A Correct. I don't think they knew all the steps that need to be completed to do a project like this.
**Q And all I'm saying is those are two different opinions. One is a replacement cost.**
A Okay.
**Q I'm asking -- I just want you to confirm -- one is -- this is what it would cost to replace the product, right?**
A Uh-huh.
**Q That's one opinion.**



A Yep.
**Q And then a second separate opinion is I don't think Vyasil could have pulled this off.**
A Correct.
**Q Now, getting back to what you have written in the report, you used the phrase scope and complexity twice in that paragraph.**
**Do you see that there?**
A Yes.
**Q And when you use the phrase scope and complexity, do you mean the project that's outlined in the work plan that you attached to Exhibit 1?**
A No. I'm talking about the scope as identified in the Exhibits 3 and 5.
**Q Okay. And, again, not to quibble, but you mean as you read the requirements in Exhibits 3 and 5?**
A That's correct.
**Q How much expertise in your opinion would it take to deliver a web page that cost $7,000?**
A Again, I don't know. What measure would you like as far as expertise?
**Q I just mean does it take -- if you're delivering a product, a web page that costs $7,000 --**



MR. LONDON: I'm going to object.
MR. FRIEBUS: I haven't gotten to the question yet. You can object when I'm done with the question.
MR. LONDON: Go ahead.
BY MR. FRIEBUS:
**Q What I'm saying is that if you have a web page that costs $7,000, is that generally a technically sophisticated product or is that generally a simple product?**
MR. LONDON: I'm going to object. A web -- I'm going to object on the characterization of a system as a web page and also what you mean by expert as vague and ambiguous to be clarified.
A I'm sorry. The question again?
MR. FRIEBUS: Could up please read it back?
(From the record above, the reporter read the following:
"Q What I'm saying is that if you have a web page that costs $7,000, is that generally a technically sophisticated product or is that generally a simple product?")
THE WITNESS: Generally, I guess, more on the simple end.



BY MR. FRIEBUS:
**Q Does it take --**
A There's variations to that, of course.
**Q Sure. In your experience does the -- does it take a relatively lower level of expertise to produce a $7,000 web page than it would to produce a million dollar page?**
MR. LONDON: I'm going to object on your repeated use of web page.
MR. FRIEBUS: Is there a phrase you would like me to use?
MR. LONDON: It's not a web page. I've made my objection.
MR. FRIEBUS: And I'm asking you to clarify. If you think it's a bad question, what do you think should --
MR. LONDON: You're referring to it as a web page. It's not a web page. It's a system. It's a web system, as he has explained. It's an enterprise web system.
MR. FRIEBUS: Enterprise web system, okay.
BY MR. FRIEBUS:
**Q Is the level of expertise, would you generally say -- strike that.**

**Does it require a certain level of expertise to deliver a $7,000 web enterprise system?**
A No. Again, it depends on what it's supposed to do. That's the factor. It's not the price. It's what it's supposed to do. One feature in a system -- just one feature, that costs $7,000. You need someone with a lot of expertise. It may only take them a week to do it, but you need super expertise to do it, whereas you can get someone junior with very little expertise and they might take three weeks to do it. And, again, that's why you have often variation in rates.
**Q Okay. What in the documentation suggests that Vyasil could not -- couldn't deliver a $7,000 web system?**
A The fact that there is lack of documentation that they completed certain essential steps to developing a system.
**Q Well, didn't you testify earlier today that you thought that there was quite a bit of documentation in UML documents and the Linkepic -- I'll just call it Exhibit 3?**
A Uh-huh.
**Q I'm sorry. Was that a yes?**



A There was a lot of documentation, yes, but not all the documentation required to deliver a system.
**Q Okay. I guess what I'm having trouble understanding is that if you thought there was a substantial amount of documentation provided in Exhibits 3 and 5, why that suggests a lack of capability to deliver a product that costs $7,000.**
A It's incomplete.
**Q What's missing?**
A There is no user interface design, there is no database design. You can't deliver a system without those things.
**Q Do you generally put a user interface design and database design in contracts that you execute with customers?**
A That would be a line item of activity very similar to the work plan provided as part of this.
**Q Sure. But there wouldn't be a description of how that task would be completed, would there?**
A A database design document would be a deliverable of this project. That would be there. Again, that's for maintainability reasons so people have a map to go to. Okay, where is the address



stored. You have a map to know where that goes.
**Q Right. So it would be a deliverable. It wouldn't necessarily be part of a contract.**
A The contract would say you're going to get a database design document as part of this contract. You wouldn't see that, absolutely. You are going to get a user interface design and you're going to sign off on it.
**Q Right. What are the deliverables that are set forth in Exhibit 3?**
A They did not specifically create a deliverable section.
**Q So there are no specific deliverables set forth in the exhibit?**
A I can look through it, but I don't recall there being any such thing.
They do not identify specific deliverables.
**Q Do you know whether Vyasil provided any -- excuse me.**
**Is it fair to say that you assumed that no product was ever delivered by Vyasil to Linkepic?**
A I assumed that just based on Exhibit 6 that there was no product to hand over to the end client.
**Q Do you know if any kind of deliverable or**



**product or anything was ever delivered in connection with the Linkepic documents?**
A I don't know.
**Q Did you ask Mr. London or anyone on behalf of plaintiffs whether any deliverables -- anything had been delivered by Vyasil?**
A I think I asked if this -- based on this Exhibit 6 if there had been a working system or do you have any evidence to see an application that worked. I think I asked that question.
**Q What was the answer?**
A No.
**Q The answer was no?**
A Right.
**Q You go on to say that there was a -- at one point in your report you say, My understanding is that the plaintiffs did receive documents that were prepared by Vyasil before paying them any money.**
**How did you come to that understanding? I can point you to the specific place in your report.**
A Yeah.
**Q It's at the top of Page 3. It's the last sentence of the paragraph that breaks over on to that page.**

A Must be a conversation I had with the plaintiff.

**Q Do you know what kind of documents they received before paying money?**

A Exhibit 3, which is the contract, so there was documentation within Exhibit 3.

**Q Okay. So just -- if I'm understanding you correctly, what you're saying in that portion of the report is that your understanding is that the plaintiffs did receive a contract prepared by Vyasil before paying them any money?**

A Right, which work had gone into -- basically the system, scope work, and requirements work had been done when this contract -- there is no way you could have done this without having requirements discussions, unless you just pulled something -- I don't know where --

**Q So if I'm understanding you correctly, Vyasil did do some work in terms of understanding the system that was to be provided?**

A It would appear to me that's a true statement.

**Q Would you put a value on the amount of work that had been provided?**



A Do you want me to do that now?

**Q Sure.**

MR. LONDON: Before you do, I'm going to just object. It calls for speculation. But go ahead.

BY MR. FRIEBUS:

**Q And I'll ask for an answer in terms of hours.**

A Right.

**Q And we'll convert that into money using your rates later.**

A I would say somewhere between 20 and 40 hours.

**Q And that's with respect to Exhibit 3?**

A Correct.

**Q How much, if any, time would you add if you included Exhibit 5?**

A Probably 80 or so hours.

**Q 80 on top of the 20 or 40 or 80 --**

A I don't know if there is some overlap, so maybe a little less. I would say 80, roughly 80, I think.

**Q I guess I'm just wondering if you're saying 80 for Exhibit 5, roughly 80 for Exhibit 5 --**

A Uh-huh.

**Q Is that right?**



A Yes.

**Q Okay. So then between the two, and no one is holding you to this, but just as an estimate you would say that between Exhibits 3 and 5 we're talking maybe on the order of somewhere between 100 and 140 hours?**

A 100 to 120 probably, yeah.

**Q Oh, I'm sorry. Yeah, 100 to 120. My math is bad.**

A Right.

**Q Sorry. One question. You make reference here, and this is in the second full paragraph of Page 2 of your report, to a custom video conferencing module.**

A Yes, uh-huh.

**Q I didn't see that in the Linkepic documents. Can you show me where that is?**

A I didn't say it needed one. I just was using that as a point of reference.

**Q Oh, okay. So just to be clear, you're not saying that the Linkepic system would require a custom video conferencing module, you're saying that as a reference point for a piece of software like a custom video conferencing module that would cost more than $7,000?**



A Right, correct, which is why -- yeah. Say it again. I'm sorry.

**Q I guess all I'm just saying is that you're not saying there is a requirement in the Linkepic contract for a custom video conferencing module and that piece of it would cost more than $7,000, you're just saying, for example, if you were to build something like a custom video conferencing module, that would cost more than $7,000?**

A Just to design something like that would be 7,000 to go ahead and build it.

**Q You're not saying that's required as part of the Linkepic project, you're just using that as a reference point?**

A A video conferencing module is required. Whether it needs to be customized is unclear.

**Q Okay. And the video conferencing module, where is that? Is that in the presentation portion of the -- I'm just trying to orient where do you find that in the Linkepic scope.**

A Oh. I know it's in Exhibit 4.

**Q Where is that -- oh, is that the video conferencing?**

A Yes. I'll have to go through this to pinpoint if there is other places. Okay. Figure 25, taking live classes, I guess that would indicate it could be part of an LMS, but I don't know. It depends on which LMS you might choose, it may or may not have such a feature.
**Q Okay.**
A Okay.
**Q So just working down through your report here, and this is -- I want to focus on the paragraph that's right before it gets to the section titled Mr. Hochman's Report.**
A Uh-huh.
**Q You say -- or your opinion is that the code on the servers is not desirable for reuse, is that right?**
A Correct.
**Q Okay. And that opinion -- correct me if I'm wrong -- is based on the representation that the code was written 2010 or 2011 in .NET?**
A Yes, that's the programming language.
**Q Okay. So I guess what I'm getting at, is your opinion that the code on the servers is not desirable for reuse based only on the representation**



**that it was coded in the 2010, 2011 version of NET?**
A In addition, it's no longer supported by Microsoft. Microsoft will not -- if you ever run into a problem, they're going to say tough, we don't use that anymore, we can't support you. So if you're building something and you run into a problem, you have no one to call.
**Q Right. But no one to call for 2010 or 2011 versions of .NET?**
A Yes.
**Q Is it .NET or NET?**
A .NET.
**Q .NET?**
A .NET.
**Q So I think we may be missing each other here, but I just want to be clear that your opinion that the code on the servers isn't desirable for reuse, that's based on the representation that it was coded in this 2010 or 2011 version of .NET and not anything else?**
A Correct.
**Q So if somebody -- were you provided with the representation? Did somebody tell you that the code was written in 2010 or 2011 .NET?**



A I feel like it was in one of the exhibits. I don't know if it was one of the expert reports provided. I do not see any reference to it. Must not have been shared with me.
**Q So your belief is that -- or, rather, your testimony is that you think you were provided with representation about the version of the .NET that was used probably by counsel?**
A Probably.
**Q Okay. And that your conclusion that the code is not desirable for reuse is based on that representation or that assumption, right?**
A Right.
**Q Okay. Now, if the code had been written in 2010 -- well, strike that.**
**Is there any requirement that you've seen in the Linkepic documentation that the code be updated at all?**
A When you say updated --
**Q What I mean is that -- I'm presuming that if you write it in 2010 or 2011 that the version of .NET that you cited, the 3.5 edition, was then current, right?**
A Right, right.



**Q So if you write it in 2010, is there any requirement in the Linkepic documents that that code be updated to stay current with what Microsoft is now supporting?**
A No, you don't know what -- at that time you would not have said that because you don't know what the future would bring for software development.
**Q Okay. So if the software was -- let's assume that if the software was written and completed, whole project completed in the 2010 version of .NET, given that Microsoft doesn't support that code anymore, is the product now more or less obsolete?**
A No. That would be part of what you develop in the operations guide is that when the .NET framework is updated, here is where you locate that on the server and here are the steps you use to apply the new version. You usually do that in a test environment first to make sure that the new version doesn't break any of the code that you've developed, and if it did, you fix it in the test environment before you put it into the production environment.
**Q Is there a way to sort of shorthand that? I mean, is that just updating the code? Is that a fair way to --**

A Depends on what's in the update.
Q I'm just trying to understand so we can talk about it without having to repeat all the words.
What would you call that as a shorthand?
A An update -- upgrade of the .NET framework. Is that helpful or is that too many words?
Q No. Upgrade of the framework?
A Yes.
Q Is an upgrade of the .NET framework called for at all in any of the Linkepic documents that you see?
A No, but you would define how you would do that should that -- that's a very common thing that you're going to have to upgrade something.
Q Right.
A There's security patches that can force a .NET framework update, for example.
Q That's something you would do in terms of building any kind of enterprise system project?
A Yes.
Q But, again, that's your view of it, but it's not necessarily called for in the Linkepic documents?
A Not specifically.
Q Just a few last questions.



How much time did you spend in preparing your expert report?
A About half a day.
Q How many hours would be half a day?
A Four.
Q And what did you charge the plaintiffs for that?
A 195 an hour.
Q So if my math is right, a little less than $800?
A Correct.
Q And what did you do to prepare for your deposition today?
A I read through -- I was on an airplane last night and I read through some of these deliverables I printed out here. That's all.
Q Sorry.
A These same exhibits you've provided I have copies of, and I reviewed these on an airplane last night.
Q Okay. So you reviewed the documents that were identified in your expert report?
A Yes.
Q Anything else?



A I sent Justin a note about my thoughts.
Q Did you talk with Mr. London at all?
A We had about a two-minute conversation while I was at the airport last night.
Q So you read through the exhibits, you sent Mr. London a note, you had a two-minute conversation with Mr. London.
Anything else to prepare for your deposition today?
A To prepare for the deposition, no.
Q And about how much time --
A An hour.
Q -- did you spend all in on --
A Probably an hour on the flight last night.
Q And what about sending the note?
A I just -- I didn't have an Internet connection on the plane so --
Q No. I just mean how much time.
A Oh, like five minutes. I wouldn't charge for that.
MR. FRIEBUS: That's all I have.
THE WITNESS: Okay.
MR. FRIEBUS: Thank you very much.
THE WITNESS: Thank you.



MR. LONDON: I have some questions. Can you print something out if I send it to you, counsel?
MR. FRIEBUS: Sure. Can we go off the record for one second?
(Recess was taken.)
(Exhibit 8 marked as requested.)
MR. FRIEBUS: Just before you get started, Mr. London, I'm going to put a request on the record that you provide the Bates numbers for the documents in Group Exhibit 8 or, in the alternative, identify the date of production for these documents so I can identify them in plaintiff's previous document production.
MR. LONDON: And I don't -- as I said, there have been thousands of pages of documents. I don't know that -- there were documents produced before the production -- there has been documents produced at different phases. I don't know that these were specifically produced. I'll check. But this is going back over four years. I don't know the specific dates.
MR. FRIEBUS: No. Just to be clear, I'm not asking you to tell me right now sitting here what the numbers are. I'm just asking you on the record to

look.
MR. LONDON: And to the extent -- I will check. As I said, there's 7,000 pages via supplemental production, but I don't think -- I believe they were produced, but I'll double-check.
EXAMINATION
BY MR. LONDON:
**Q If you would take a look back at Exhibit 3. If you look at the last page, Page 23, it says, Please note that this is a proposal.**
**Do you see that?**
A Uh-huh.
**Q And a proposal -- the items in a proposal can change, correct, between -- for example, if -- in your experience, if you give a proposal to a customer and it has certain features and they maybe want to change features or things change, the scope and requirements could change --**
A Yes.
**Q -- at a later time?**
MR. FRIEBUS: Sorry. Object to the form. Go ahead.
BY MR. LONDON:
**Q And if you take a look at -- and, in fact, if**



**you take a look at Page 22 where it says database server hardware requirements, application server hardware requirements, client hardware requirements, it's possible that whoever prepared this document just filled that in until the actual requirements could be ascertained, correct?**
MR. FRIEBUS: Objection. Form and foundation.
A Yes.
BY MR. LONDON:
**Q In other words, what is here doesn't necessarily mean that that's what would be used --**
A It's custom.
MR. FRIEBUS: I'm sorry. Objection. Form, foundation. Go ahead.
THE WITNESS: It's customary to put in some guidance as to here is what the likely minimum will be.
BY MR. LONDON:
**Q Right. And so -- exactly.**
**So it's possible that what they have here are minimum requirements?**
A Right.
**Q And so if you would turn to page -- the group exhibit.**



MR. LONDON: Are we on 8? The ones that I just had you mark.
BY MR. LONDON:
**Q If you would just take a look at those.**
A Okay.
**Q You haven't seen these documents?**
A I've never seen these before.
**Q Okay. If you would -- you'll see that two of these, they say invoices and it provides a description of servers.**
**Do you see that?**
A Uh-huh.
**Q And it talks about one has a dual Xeon 64-bit 3.8 gigahertz, 6 gigabytes of RAM, and then two HP U320 SCSI hard drive.**
**Do you see that?**
A Yes.
MR. FRIEBUS: Sorry. I'm going to object and I'll just make a standing objection, if that's okay with you, to the use of Exhibit 8 as beyond the scope of his expert report because Mr. Rietz has already testified that he didn't review these documents in connection with preparing his expert report.
MR. LONDON: Objection is noted.



BY MR. LONDON:
**Q And then you see on one of the documents where it talks about current configuration, it says, bandwidth, 1000 gigabytes; hard drives, dual 300 gigabyte drives, dedicated hosting Raid 1; RAM, 4 gigabytes.**
**Do you see that?**
A Yes.
**Q And those requirements are actually much higher than what's in this document, right --**
MR. FRIEBUS: Objection. Form, foundation.
BY MR. LONDON:
**Q -- on Page 22?**
A So there is two server requirements on Page 22. I assume that's these two. What is this?
**Q Well, that I believe just details in more detail about the servers. I don't think the invoices, where they describe the servers, say that the hard drives are dual 300 gigabytes, they just say U320. It just gives more details where it says the bandwidth of 1000 gigabytes.**
MR. FRIEBUS: I'm sorry. Mr. London, are you contending that the document in Group Exhibit 8 that doesn't have invoice at the top of -- I'm just

identifying it for the record -- that doesn't have invoice at the top of the document is somehow related to the two documents in Group Exhibit 8 that do say invoice?

MR. LONDON: They were part of the -- where they came from.

BY MR. LONDON:

**Q Let's just -- I'll tell you what, just let's look at the invoices, just from the invoices.**

**Based on your experience and expertise, do most enterprise development systems have dedicated servers?**

MR. FRIEBUS: Objection. Beyond the scope.

A Yes.

BY MR. LONDON:

**Q And do most -- and as you can see, if it says labor, you see $1,000 to install SQL Server -- install server 2008 in SQL.**

**Do you see that?**

A I do.

**Q So is it possible that there was work that was done beyond installation of configuring servers that was beyond what was shown in the proposal that you reviewed in Exhibit 3?**



MR. FRIEBUS: Objection. Form, foundation, well beyond the scope.

A Could you repeat the question?

BY MR. LONDON:

**Q Yeah. So part of the -- let's kind of go back.**

**Part of the process at some point in the development process is that there needs to be considerations for security, configuring the servers, there is typically redundancy, power backup. And so you'll see from this invoice there are two servers and you also see that there is a line item labor, install server 2008 in SQL.**

**Do you see that?**

A I do.

**Q So is it possible that -- in your experience can some of the work in part of the development process be outsourced? For example, if your company needs someone who is a networking expert and you don't have that for a project, do you -- could you contract for someone to do that work?**

MR. FRIEBUS: Objection. Form, beyond the scope of the report.

A Yes.



BY MR. LONDON:

**Q Okay. And so -- in fact, in this case there may have been, as you see, other third parties who may have performed work that were necessary to get Linkepic or get the web system?**

MR. FRIEBUS: Objection. Form, lack of foundation. There is no connection between the invoices and Linkepic project and well beyond the scope of the report.

BY MR. LONDON:

**Q Well, would you -- based on your experience and expertise as part of the development, the company that contracts at some point has to put this system on servers, correct?**

MR. FRIEBUS: Objection to form.

A Correct.

BY MR. LONDON:

**Q And so it would need -- and typically does the client provide the servers?**

A Rarely.

**Q Rarely. Are they -- typically who provides the servers?**

A Usually we will spec them out and we'll discuss whether or not we will order them or they



will order them. Sometimes it's split where production might be ordered by them, development might be ordered by us. It does vary.

**Q Okay. But just to be clear, for a large scale system that -- a large scale enterprise development project, typically those systems do utilize their own dedicated servers as opposed to shared hosting, correct?**

MR. FRIEBUS: Objection. Form, beyond the scope.

A Correct.

BY MR. LONDON:

**Q Okay. Do you have any knowledge or experience dealing with offshore development like in India?**

A I do.

MR. FRIEBUS: Sorry. Objection. Beyond the scope of the report.

BY MR. LONDON:

**Q And in India is the cost of labor for development lower than in the United States?**

MR. FRIEBUS: Objection. Beyond the scope.

BY MR. LONDON:

**Q Based on your experience.**

A Yes.

MR. FRIEBUS: If you could just wait a minute before and after he speaks. Objection. Beyond the scope of the report.
THE WITNESS: Yes.
BY MR. LONDON:
**Q And, in fact, you had -- in your estimate you had a blended rate of 175, correct?**
A Yes.
**Q So some people -- if your company was to build this, some people would have a higher rate than 175, some people would be lower than 175?**
MR. FRIEBUS: Objection. Asked and answered.
A That's correct.
BY MR. LONDON:
**Q And if -- and based on your experience, is the cost of labor for software development in India much lower than in the United States?**
MR. FRIEBUS: Objection. Lack of foundation, beyond the scope of the report.
A Yes.
BY MR. LONDON:
**Q And if you take the -- if the cost of labor -- strike that.**
**Is it typically the software development --**



**is it typically the software company's responsibility to spec out the amount of labor and work involved before quoting a system to a client?**
MR. FRIEBUS: Objection. Form, beyond the scope of the report.
A Yes.
BY MR. LONDON:
**Q And I believe, just to clarify, if a company quotes a fixed price, they assume the risk that they may have underestimated the work, correct?**
MR. FRIEBUS: Objection. Form.
A That's correct. Usually you will add a premium to your price for absorbing that risk.
BY MR. LONDON:
**Q Right. And if the cost of labor -- if you take the $7,000 figure and the cost of development is, say, $15 to $20 an hour and you divide that, you get roughly between 350 and 467 hours, and my question is, if -- it is possible that that $7,000 in India is actually doable compared to in the United States, which has much higher costs, correct?**
MR. FRIEBUS: Objection. Form, beyond the scope of the report.



BY MR. LONDON:
**Q Let me strike that. Let me rephrase it.**
**Is it fair to say that based on your experience and expertise the cost to develop this in India, assuming you could find a company that could -- had your capabilities, would be much less?**
MR. FRIEBUS: Objection. Beyond the scope.
BY MR. LONDON:
**Q Or would be less.**
MR. FRIEBUS: Objection. Beyond the scope of the report.
A Yes.
BY MR. LONDON:
**Q And would that be basically because of the labor costs?**
MR. FRIEBUS: Again, objection. Beyond the scope of the report.
A Primarily. And it's not a hundred percent certain, but generally, yes.
BY MR. LONDON:
**Q Based on your experience and expertise -- let me -- what specific expertise do you have or experience with offshore development?**
MR. FRIEBUS: Again, objection. Beyond the scope



of the report.
A I worked with offshore teams for a couple of years for a large e-commerce site for a major retailer.
BY MR. LONDON:
**Q In your -- based on your experience, even large companies like Microsoft source some of their work to India, correct?**
MR. FRIEBUS: Again, objection. Beyond the scope of the report.
A Yes.
BY MR. LONDON:
**Q Because it's much cheaper, correct?**
MR. FRIEBUS: Same objection.
A Yes, that is my understanding.
BY MR. LONDON:
**Q Do you have any idea -- and I don't want you to speculate, but based on your experience and expertise in software development, do you have any idea what the average differential in labor -- hourly labor rate of development in India versus in the United States?**
MR. FRIEBUS: Objection. Form, foundation, and beyond the scope of the report.

A It will vary, but I would say anywhere from five to ten times.

BY MR. LONDON:

**Q Right. So -- another thing. If a client is going to have multiple projects with you, let's say they were going to do more than one large development project, would you possibly discount, give them a break on the price maybe on one of the projects if they were going to do more than one -- going to do -- let's say they have several projects with you.**

MR. FRIEBUS: Objection to form and beyond the scope of the report.

A That has happened, yes.

BY MR. LONDON:

**Q Right. And if -- and, for example, if a company -- some companies might lower the price on a project that they'll make up through other services. For example, if, say, Vyasil was charging the client 60,000 for search engine optimization, that could offset maybe the lower costs that they quoted on the project, in the software development because they're making it up in other areas, correct?**

MR. FRIEBUS: Objection. Form, foundation, beyond the scope of the report.



A Yes.

BY MR. LONDON:

**Q Based on your expertise and experience, is it customary for software development companies to be able to configure and access the client servers?**

MR. FRIEBUS: Objection. Form and beyond the scope of the report.

A Yes.

BY MR. LONDON:

**Q Is it -- and, in fact, it would be necessary if the software development company needed to upload and install the system to go live, correct?**

MR. FRIEBUS: Objection. Form and beyond the scope of the report.

A Generally, yes, or you author various clear deployment instructions that they will execute.

BY MR. LONDON:

**Q Have you ever in your experience heard of a software development company locking their client out of the servers?**

MR. FRIEBUS: Objection to form and beyond the scope of the report.

A Yes, typically for not paying bills.



BY MR. LONDON:

**Q Right. But -- based on your experience and expertise in the software development industry, is it reasonable to assume that a client expects that they're not going to be defrauded by the software development company?**

MR. FRIEBUS: Objection. Form, foundation, calls for a legal conclusion, and beyond the scope of the report.

A Yes.

BY MR. LONDON:

**Q And going back to Exhibit 3 and 5, the UML diagrams, documents, just -- would it be readily -- from these documents would it be readily evident to you that the company that prepared this document was engaged in fraud?**

MR. FRIEBUS: Objection. Form, foundation, calls for a legal conclusion, and beyond the scope of the report.

BY MR. LONDON:

**Q In other words -- let me rephrase that.**

**Would it be reasonable to assume that a client who received these documents would know that -- have reason to know that they were being**



**defrauded?**

MR. FRIEBUS: Objection. Form, foundation, calls for a legal conclusion, and beyond the scope of the report.

A Probably not depending on how they were presented. As these are the requirements and design docs, that would be alarming, but if these were only partial deliverables, no.

BY MR. LONDON:

**Q You've testified previously that basically the requirements that have been produced here are incomplete, right, correct?**

MR. FRIEBUS: Objection. Mischaracterizes previous testimony.

A Does not include everything I would expect there to be.

BY MR. LONDON:

**Q Right. And, in fact, for each module you mentioned you likely would have a separate technical specification detailing the requirements of that module in detail, correct?**

MR. FRIEBUS: Objection. Asked and answered.

A Yes.

Case: 1:12-cv-09058 Document #: 414-1 Filed: 08/23/19 Page 205 of 209 PageID #:16387





BY MR. LONDON:
**Q Okay. Based on the fact that .NET -- strike that.**
**Based on your review of the documents, did you believe that basically this was a custom solution; in other words, proprietary code was being developed from scratch as opposed to using open libraries?**
MR. FRIEBUS: Objection. Form and beyond the scope of the report.
A I thought some were definitely custom, some were not.
BY MR. LONDON:
**Q And even if -- just to be clear, even when open libraries or source code is used, you still need to customize it. In other words, still you have to do coding work to get it to integrate and to work?**
MR. FRIEBUS: Objection. Form, beyond the scope of the report.
A Yes.
BY MR. LONDON:
**Q Okay. Is this a system that -- just to be clear, you do believe -- it's your opinion that at least parts of the system were to be developed from**



**scratch, that this was -- what I'm getting at is, this was not a system that was supposed to be off-the-shelf software?**
A That is correct.
**Q If you would take a look at -- strike that.**
**Before I get to that, you're familiar with sites like LinkedIn and Facebook, correct?**
A Yes.
**Q In your opinion was Linkepic just a replication of either Facebook or LinkedIn?**
MR. FRIEBUS: Objection. Form, foundation, and well beyond the scope of the report.
A I think there are features of Linkepic that you can find in each of them, but it is unique probably to have all of them in one.
BY MR. LONDON:
**Q Right. For example, do you know on Facebook or LinkedIn whether they provide online tutoring?**
MR. FRIEBUS: I'm sorry. Form, foundation. And, Mr. London, you're asking the witness to testify to things not contained in his expert report. You're well aware of the fact that Mr. Rietz's opinions are confined to the opinions he gave in the expert report. All of this stuff -- we will move to strike



all of this testimony because it has nothing to do with the opinions he gave in his expert report, and so you can ask the questions, but one, we'll move to strike it, and two, I think you're taking up a lot of time asking questions of your own expert of things that were not disclosed.
(Exhibit 9 marked as requested.)
BY MR. LONDON:
**Q Let's take a look at the -- if you would take a look at the last exhibit here, 9.**
MR. FRIEBUS: Same objection that Mr. Rietz is not a rebuttal expert to Mr. Hochman.
MR. LONDON: That's your opinion.
MR. FRIEBUS: I'm just stating the objection for the record that Mr. Rietz -- the plaintiffs have not been granted leave to disclose a rebuttal expert to Mr. -- at least Mr. Hochman's third expert report, and so any questioning about it we're going to object as beyond the scope of his report.
MR. LONDON: And, for the record, I notified you yesterday that I would be asking him questions, and you can state your objection, and that given that Dr. Cohen is a rebuttal expert regarding the GMAX system, there is -- we think that Mr. Rietz should be



able to be a rebuttal expert regarding Mr. Hochman, and we will seek leave to do so so that he can submit a rebuttal reply, if necessary.
BY MR. LONDON:
**Q But if you would take a look at the document.**
A Okay.
**Q Have you had a chance to look at it?**
A Yes.
**Q If you would turn to -- well, they're not numbered, but I guess number -- this, I guess, would be the third page.**
A Under opinion -- what are the numbers?
**Q No. 4. It says -- do you see where it says, As of 2010, the system described by the Linkepic documents could have been built for approximately $7,000.**
**Do you see that?**
A Yes.
**Q And he says, The following strategy is an example of how this could be accomplished: Allocate a single developer to work 14 days at $500 per day. Download free open source software -- all these.**
**In your opinion, is that reasonable?**
MR. FRIEBUS: Objection. Form, calls for a legal

conclusion.
BY MR. LONDON:
Q Or do you agree with his opinion in No. 4?
MR. FRIEBUS: Objection. Beyond the scope of the expert report.
A This is not a comprehensive list of features. And, again, I think that some of the core capabilities would be there. You do have -- probably would have to extend them to match requirements and then you do have to integrate them with the system.
BY MR. LONDON:
Q You think that a single developer could build this entire system in 14 days?
MR. FRIEBUS: Objection. Form, beyond the scope of the expert report.
A It's unrealistic.
BY MR. LONDON:
Q And so where he says that the system -- so all to where you say that it could have been built for approximately 7,000, you don't -- do you agree with that?
A I do not.
MR. FRIEBUS: Objection. Beyond the scope of the expert report.



THE WITNESS: I do not.
BY MR. LONDON:
Q Okay. If you look at No. 5. Do you agree with that statement?
MR. FRIEBUS: Objection. It's beyond the scope of the expert report.
A I guess it's not required, but if you want to do business with someone, you should follow this approach.
BY MR. LONDON:
Q Right. So is it fair to say that if somebody doesn't follow a recognized software methodology that the probability of failure is fairly high?
MR. FRIEBUS: Objection. Form and well beyond the scope of the expert report.
A Yes.
BY MR. LONDON:
Q Do you think that -- do you think the expertise to build the Linkepic site is minimal?
MR. FRIEBUS: Objection. Asked and answered.
A No.
BY MR. LONDON:
Q In particular, isn't video conferencing, isn't that a fairly -- based on your skill and



experience and expertise in the software industry, doesn't that require fairly sufficient expertise to work properly and to build?
MR. FRIEBUS: Objection to form.
A It's going to depend. I think there is -- there are existing components that can deliver that, but integrating them does require some expertise.
BY MR. LONDON:
Q Okay. If you can actually go back to your -- if you go back to Page 2 of your own report. You state that Hochman also states that plaintiff would need to have staff with time to supervise the work in India, maintain software specifications and documentation, and maintain safe custody of digital assets in case the Indian team failed and needed to be replaced. It should not be client's responsibility to manage the development team. That is the job of the project managers of the software development firm.
So the last statement I said was yours and the first statement was from Hochman, and I just want to clarify. It is not the client's responsibility to supervise the software development company that they contract with, correct?



MR. FRIEBUS: Objection to form.
A Correct.
BY MR. LONDON:
Q And, in fact, isn't the whole purpose of having a project manager so that he can manage the software development team?
MR. FRIEBUS: Again, objection to form.
A Yes.
BY MR. LONDON:
Q And so even for offshore development, that's still -- basically it's not the client's responsibility to supervise development even if it's offshore, correct?
A That is correct.
Q Ultimately the responsibility lies with the project manager and team to complete the work?
A That's correct.
Q And if there -- and based on your experience and expertise in the software industry, is it your understanding that if there are problems that arise; for instance, if there are unforeseen complications in development, that you notify the client and discuss, you know -- work around issues; for example, if there are going to be delays.

**Is it typically customary to notify the client that there is going to be issues?**
A Yes. Usually the project manager on at least a weekly basis, if not more often, will provide a general status on where things stand and, within that, any open issues that may require the client to weigh in in order to resolve.
**Q Right. And are you familiar with the term scope creep?**
A I am.
**Q What is scope creep?**
A Scope creep is when you set out to build something and all of a sudden new features come out of thin air that are added to what's supposed to be delivered.
**Q And how do software development companies typically develop with scope creep?**
MR. FRIEBUS: Objection. Beyond the scope of the report.
A Usually there is a change request process, and if a new requirement has been identified, you will estimate that change, give it back to the client, they will either accept or reject inclusion of that in the project.



BY MR. LONDON:
**Q Right. And so going back, if the requirements didn't change after they were provided to the software development company and they did it for a fixed price as opposed to time-and-materials basis, the risk, once again, is borne by the software development company?**
A You said the scope doesn't change?
**Q Yeah.**
MR. FRIEBUS: Sorry. Just objection. Beyond the scope of the report.
A (Nodding.)
BY MR. LONDON:
**Q If you look on the bottom of Page 2. And we're almost done. You say, Large software development projects are typically done in phases. Usually on fixed bid contracts, deposits for part of the total cost is paid up front prior to the completion of any deliverables. Thus, Mr. Hochman's assertion that "plaintiff should have received deliverables (documents and/or code) into plaintiff's custody prior to paying invoices" is incorrect. My understanding is that the plaintiffs did receive documents that were prepared by Vyasil before paying**



**them any money.**
**When you have a large software development project like this, do you typically -- it's customary to pay an up-front deposit?**
MR. FRIEBUS: Objection to form.
A Yes.
BY MR. LONDON:
**Q So let's assume the estimated cost was the median here, let's say three-quarters of a million dollars.**
A Yes.
**Q What percent of that would need to be paid down?**
A 40 percent is what we would use. It could vary, but if it's me, 40 percent.
**Q And a project like this you estimate could be developed in nine months?**
MR. FRIEBUS: Objection to form.
BY MR. LONDON:
**Q With five -- maybe five developers?**
A Varying team sizes. Nine months is the timeline.
**Q And so the remaining 60 percent, could you just -- how would that typically be paid? To be**



**clear, do you invoice the client as work is completed or when milestones are completed?**
A Most often there will be milestones. It will be 40 percent up front. Typically we would do 40 percent upon delivery of the system, which basically means it's available for user acceptance testing, and then the final 20 percent is held back until it's gone live.
**Q So, in fact, if -- in this case if Vyasil was paid as invoices -- well, if they represented -- would it be unreasonable if the client was in regular communication being told things that were being completed -- maybe they saw screen shots -- would it be unreasonable to pay an invoice, let's say, that was sent to the client on, say, a $7,000 contract?**
MR. FRIEBUS: Objection. Form, calls for a legal conclusion, beyond the scope of the report.
A Could you repeat the question?
BY MR. LONDON:
**Q Yeah. Let me rephrase it.**
**Putting aside the cost, if the client was in regular communication with -- like, for example, if someone was your client, they spoke to you regularly, and you said the work was being done, the team is**

working on it, you showed them some screen shots, obviously the system is under development so you can't -- and then you invoice them, would it be reasonable for the client to rely that the work is being done in paying that invoice?

MR. FRIEBUS: Objection to form, calls for a legal conclusion, and beyond the scope of the report.

A Yes.

BY MR. LONDON:

Q And unless -- and based on your experience and expertise, it would not be -- would it not be -- it wouldn't be appropriate for a software development company to start invoicing a client for work that they knew they hadn't performed, correct?

MR. FRIEBUS: Objection. Form, to the extent it calls for a legal conclusion, and beyond the scope of the report.

A No, they should not be invoicing for work not completed.

BY MR. LONDON:

Q Okay. Has there ever been a project, say, your company has undertaken which you got into the project and you realized you couldn't do it?

A Couldn't do it for --



Q To be clear, are you -- have you ever undertaken a project that you agreed to do but when you got into the project you realized maybe it was more complex than you anticipated or that you realized in fact you didn't have the expertise to complete?

A Yes.

Q And how did you handle that situation?

A Alerted the customer to what the concerns were and either that -- we would have to bring in outside expertise to assist or we tie off at an appropriate hand-off point so they can find someone else to pick up where we left off.

Q But you wouldn't leave them in the dark to believe that -- you would notify them that you couldn't do it?

A Yes.

Q And would you ever -- has it ever involved returning any money to the client?

A Very rarely.

Q Because you've done work up to that point?

A That's correct. We would be paid for what we delivered.

Q Right, for what you delivered.



Have you ever had any negative experiences dealing with Indian offshore development companies?

MR. FRIEBUS: Objection. Well beyond the scope of the report.

A Yes.

BY MR. LONDON:

Q Based on your expertise and experience, have you noticed any difference in the quality of the work between India and the United States?

MR. FRIEBUS: Objection. Beyond the scope of the report.

A Typically work done in the United States is better. Variety of reasons for that.

BY MR. LONDON:

Q Can you just name a few?

A Communication is the number one reason. They build something they weren't supposed to build or they built it wrong.

Q And so you've seen that?

A Technically usually they're fine. It's just more of the communication of what the requirement was and what they built doesn't match.

Q And my final question is, have you noticed a difference in software methodologies used in India as



opposed to the United States for enterprise web development?

MR. FRIEBUS: Objection. Beyond the scope of the report.

A Not really. The ones I have worked with do follow enterprise development methodologies.

BY MR. LONDON:

Q So just to be clear, in your Linkepic high-level work plan, it would not be unreasonable to expect a competent company in India to follow the steps that you've outlined here?

MR. FRIEBUS: Objection. Beyond the scope of the report.

A That's correct.

MR. LONDON: I have no further questions. Thank you very much.

You have the opportunity, if you wish, to review your deposition or you can waive, waive it -- it's up to you -- waive signature.

THE WITNESS: I'll waive.

(Whereupon the deposition concluded at 2:31 p.m. on the 2nd day of March, 2017.)

* * * * * *

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

The within and foregoing deposition of the aforementioned witness was taken before DONNA L. POLICICCHIO, C.S.R., and Notary Public, at the place, date and time aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer and Notary Public; and the within and foregoing is a true, accurate, and complete record of all of the questions asked of and answers made by the aforementioned witness, at the time and place hereinabove referred to.

The signature of the witness was waived by agreement of counsel.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.



Witness my official signature and seal as Notary Public in and for Cook County, Illinois, on this 16th day of March, A.D. 2016.

Donna L. Policicchio

DONNA L. POLICICCHIO, C.S.R.
License No. 084-003740
Notary Public
105 West Adams Street
Suite 1200
Chicago, Illinois 60603
Phone: (312) 386-2000