IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VEOXO, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 12 cv 9058 |
| | ) | |
| v. | ) | Honorable Judge Edmond E. Chang |
| | ) | |
| VYASIL, LLC et al., | ) | Honorable Magistrate Judge Maria Valdez |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S RESPONSE TO
<u>PLAINTIFFS' MOTION TO BAR TESTIMONY OF JONATHAN HOCHMAN</u>**

Defendant Vyasil, LLC, by its attorneys, respectfully submit this response to plaintiffs' motion to bar the testimony of Jonathan Hochman:

**ARGUMENT**

"Federal Rule of Evidence 702 appoints district courts as gatekeepers of expert testimony based on scientific, technical, and other specialized knowledge." *Blue Book Servs., Inc. v. Amerihua Produce, Inc.*, 337 F. Supp. 3d 802, 815 (N.D. Ill. 2018). Rule 702 allows opinion testimony if the witness is qualified based on "knowledge, skill, experience, training, or education" in the pertinent field. But "[e]ven if the witness qualifies as an expert, the district court still must ensure that the evidence is sufficiently reliable to qualify for admission." *Blue Book Servs., Inc.*, 337 F. Supp. 3d at 815 (quotation marks omitted). "Under Rule 702, the three requirements for reliability are: '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702). "Whether to allow expert testimony rests within the discretion of the district court." *Id.*

In this case, plaintiffs' motion to bar defense expert Jonathan Hochman should be denied because: (1) Hochman is qualified to provide opinion testimony; and (2) Hochman's opinions qualify for admission under Rule 702.

### A.      Hochman Is Qualified To Render Opinion Testimony.

As set forth in his expert reports, Hochman received a Bachelor of Science *summa cum laude* and Master of Science in computer science from Yale University. *See* Hochman Expert Report, attached as Exhibit A; Hochman Second Expert Report, attached as Exhibit B; Hochman Third Expert Report, attached as Exhibit C; Hochman CV (Sept. 2019), attached as Exhibit D. He has taken courses in algorithms, theory of computation, artificial intelligence, systems programming, and operating systems. *See* Ex. A at 1.

Hochman has been building and marketing websites since 1994. *Id.* He regularly attends and speaks at industry conferences and forums, and publishes articles on website development, search engine optimization, search engine marketing, and online marketing. *Id.* He is also the chairman of Search Engine Marketing New England (SEMNE), a professional association of search engine marketers. *Id.* Furthermore, Hochman has served as an expert witness in nearly 20 matters with respect to search engine optimization, online marketing, website development, and online security. *See* Ex. D at 3.

In addition, Hochman has substantial experience with respect to founding and developing successful software companies. In addition to Hochman Consultants, an internet marketing firm, Hochman co-founded CodeGuard, a website security company that was recently acquired by Comodo, and the UNS Project, a computer user authentication service. *Id.* at 1.

In short, Hochman has the education, knowledge, and experience to provide opinion testimony in this matter. *See* Fed. R. Evid. 702.

### B. Hochman's Opinions Are Admissible Under Rule 702.

Furthermore, Hochman's opinions are sufficiently reliable to be admitted under Rule 702. The opinions and plaintiffs' challenges to them are grouped by subject matter, below:

#### 1. GMAX

Hochman has advanced several opinions about the GMAX project, both in his original expert report and in response to the opinions set forth by plaintiffs' witnesses Jordan Cohen and Deborah Dahl. *See* Ex. A & Ex. B. These opinions include, but are not limited to:

- If London's business plan was to build the GMAX product to be better than Siri, he would have faced sizeable technical challenges with a high risk of failure. The chance of using cheap offshore developers to build a product better than Siri seems extremely unlikely.

- It would not be reasonable to build a product worth $200M for $2M-$3M. The market for software development has many buyers and many sellers. In his experience, it is an efficient market.

- The proposal for GMAX app and GMAX operating system did not include sufficient specifications for a competent developer to build either software product. Because the things to be built were not specified, there is no way to fix a price for them.

- The "wildly different" price estimates provided by Dahl and Cohen reflect the fact there was no clear definition of what was to be provided.

- The purported GMAX specifications and project plan were "garbage." No reasonable technology entrepreneur with a degree in computer science would have relied upon those documents.

- With a project costing several million dollars, it would be a normal business practice to speak with several vendors and receive several quotations to verify that the budget is reasonable, and that the project is technologically feasible.

- The GMAX software project was almost certain to fail because it would have (a) required the development of novel technology as of 2010, (b) required tens or hundreds of millions of dollars of budget that wasn't available, and (c) had an extremely high risk of commercial failure due to competition from Apple and Google.

*See* Ex. A at 4-5; Ex. B at 6-7.

Plaintiffs challenge Hochman's opinions with respect to GMAX on two primary grounds: (1) Hochman does not have expertise in the technologies required to develop GMAX, including mobile app and OS development, speech recognition, computational linguistics, natural language processing, and machine learning; and (2) Hochman did not opine on "the computation of the replacement costs of the systems and applications and the value of lost intellectual property." Mot. at 3, 4. Both challenges fail.

With respect to the first point, "the notion that *Daubert* requires particular credentials for an expert witness is radically unsound." *Blue Book Servs., Inc.*, 337 F. Supp. 3d at 816 (*quoting Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)). The question is only whether Hochman's qualifications allow him to testify on the matters at hand. And in this case, Hochman has sufficient education and experience in both computer science and the software business to render an opinion as to the viability of a project such as GMAX; the likelihood that such a project could succeed given the record evidence of the resources at hand; the quality (or lack thereof) of the GMAX technical and business documentation; and general business practices with respect to developing software projects requiring substantial investments.

To the extent that Hochman does not have expertise in subjects such as natural language processing or speech recognition, it is difficult to see how this would prevent him from opining on the general viability of a project such as GMAX. In any event, the lack of expertise goes to weight, not admissibility, since the issue to be addressed is not of a technical nature, but rather more generally about whether there is any basis to award as damages anything more than the actual payments made to Vyasil. And on this question, Hochman is qualified to opine that in his experience, the software services market is efficient and that the value of any services that Vyasil did not provide would be equivalent to the price London paid.

With respect to the second point, as Vyasil explained in its own motion to bar plaintiffs' experts, there is no legal basis that would permit a plaintiff in these circumstances to recover the "replacement cost" of GMAX as damages. There is no question that a novel technology such as GMAX would have required the investment of tens, if not hundreds, of millions of dollars. Yet London likely paid only $15,000 towards this effort. In such circumstances, the appropriate measure of damages, if any, is at most the benefit conferred upon Vyasil, if any. *See Herbert W. Jaeger & Assocs. v. Slovak Am. Charitable Ass'n*, 156 Ill. App. 3d 106, 109-10 (2nd Dist. 1987) ("[W]here a party's performance has been less than substantial, he may recover the value of the benefit his good faith partial performance has conferred upon another.").[1]

However, if London is somehow permitted to seek the "replacement cost" of GMAX-like technology as damages (which he should not for many obvious reasons), the probability of successfully developing such technology becomes critical. It is not enough to simply state, as Cohen and Dahl have tried to do, that an investment of $30-$50 million (Cohen) or $35 million (Dahl) would result in valuable technology. Instead, as Cohen and Dahl concede, any estimated "replacement cost" of a GMAX-like technology depends entirely on successful development of a product. *See* Dkt. No. 414 at 10. And on this point, Hochman's experience starting and selling successful software companies allows him to opine on the likelihood Vyasil would have created anything of value, which is almost certainly zero.

In sum, if this Court concludes as a matter of law that London cannot pursue damages for GMAX under a "replacement cost" theory, then there is likely no need for expert testimony on this issue because any damages should equal the amount of money that London paid toward the project. However, if London is somehow allowed to seek damages beyond those amounts,

---

[1] London made all the payments for GMAX to Vyas personally. Thus, it is questionable whether Vyasil received any benefit from these payments.

5

including the "replacement cost" of a GMAX-like product, then Hochman is qualified to render opinion testimony on this subject and his opinions should be admitted.

### 2. LinkEpic

Hochman has also advanced several opinions about the LinkEpic webstite, both in his original expert report and in response to the opinions set forth by plaintiffs' witness Rick Reitz. *See* Ex. A & Ex. C. These opinions include, but are not limited to:

- If Vyasil was invoicing London monthly for work performed, London should have received deliverables (documents and or code) before paying invoices. London's failure to take this basic precaution appears to have amplified any losses.

- Reitz's estimate of $602,000 to $1,053,500 to "replace" the LinkEpic website was unrealistic.

- The specifications set out in the documents titled Linkepic SRS and Contract, Linkepic UML, and Linkepic SRS do not require the work plan or features that Reitz sets forth in his "Linkepic Estimate." The only fixed requirement is that the system cost $7,000 to build.

- The system Reitz describes and the one described in the LinkEpic documents are not the same because the price difference is so large. Reitz is imposing additional requirements, and thus additional work, and additional costs, that were not set forth in the LinkEpic documents.

- Reitz's estimate represents a system with far greater capabilities than what is required by the specifications set forth in the LinkEpic documents.

- As of 2010, the system described by the LinkEpic documents could have been built for approximately $7,000.

- Vyasil made some progress in developing the LinkEpic website.

*See* Ex. A at 32; Ex. C at 2-5.

Plaintiffs again challenge Hochman's opinions on two primary grounds: (1) Hochman does not have expertise in "enterprise web development"; and (2) Hochman did not opine on the "replacement cost" of the LinkEpic website. *See* Mot. at 3. Again, both challenges fail.

6

With respect to the first point, Hochman's expertise (or lack thereof) in "enterprise web development" goes to the weight of his testimony, not its admissibility. Although plaintiffs point to Hochman's supposed ignorance of "N-tier architecture" (Mot. at 3), they provide no basis to think that such knowledge is relevant, much less necessary, to providing an opinion about the LinkEpic website. Moreover, it is clear from Hochman's report that he took his own education and experience, applied it to the description set forth in the LinkEpic documentation, and concluded that not only was it wholly unreasonable for Reitz to conclude it would have cost $600,000 to $1,000,000 to build such a website, Vyasil could have built it for $7,000 in 2010 using readily available technology. *See* Ex. C at 4-5. Hochman also provided a specific sample of how a website described in the LinkEpic documentation could be built for this amount. *Id.* Thus, his testimony more than meets the standards of admissibility under Rule 702.

With respect to the second point, again, as Vyasil explained in its motion to bar plaintiffs' experts, there is no legal basis that would permit a plaintiff in these circumstances to recover the "replacement cost" of LinkEpic as damages. However, if London is somehow permitted to seek the "replacement cost" of LinkEpic, despite plaintiffs' assertion that "Hochman does not provide any opinion to quantify or specify the replacement costs" for LinkEpic (Mot. 3), it is clear from Hochman's report that he has done so and that the amount is $7,000. *See* Ex. C at 4-5.

In short, once again, if this Court concludes as a matter of law that London cannot pursue damages for LinkEpic under a "replacement cost" theory, then there is likely no need for expert testimony on this issue because any damages should equal the amount of money that London paid toward the project. However, if London is somehow allowed to seek damages beyond those amounts, including the "replacement cost" of a LinkEpic website, then Hochman is qualified to render opinion testimony on this subject and his opinions should be admitted.

7

### 3. Search Engine Optimization (SEO)

Finally, Hochman has offered opinions on Vyasil's SEO work. These opinions include, but are not limited to:

- If Vyasil was invoicing London for SEO work, London should have demanded to see the deliverables (documents, code, logs of actions taken with suitable proof), before paying such invoices. London's failure to take this basic precaution appears to have amplified any losses.

- London's view that "SEO cannot work and be effective unless a site is active for a long time" is not necessarily true.

- Whether SEO work was done is a testable fact.

- London was sufficiently qualified to check whether the work was done before paying for it.

*See* Ex. A at 3.

Plaintiffs do not challenge the admissibility of these opinions under Rule 702. Instead, they argue only that the opinions are "irrelevant and immaterial" in light of the Rule 55(a) entry of default and the fact "[t]here is no dispute about the contractual amounts that the plaintiffs paid to Vyasil for the SEO work." Mot. at 4-5. But even if plaintiffs are only trying to recover their payments to Vyasil on these claims, they still have to prove that they suffered these damages at the prove up. In other words, they must show that some or all of the SEO work was not performed in exchange for the payments. Hochman's opinions are both relevant and material to rebutting any evidence that plaintiffs may introduce to that effect.

### CONCLUSION

WHEREFORE, for the foregoing reasons, defendant Vyasil, LLC respectfully requests that this Court deny plaintiffs' motion to bar the testimony of Jonathan Hochman and grant any such other relief as the Court deems fit.

8

Dated:  September 6, 2019                                  Respectfully submitted,

/s/ David M. Friebus
John M. Touhy
David M. Friebus
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 4500
Chicago, Illinois 60606
(312) 416-6200
(312) 416-6201 (fax)
jtouhy@bakerlaw.com
dfriebus@bakerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that he caused the foregoing **RESPONSE TO PLAINTIFFS' MOTION TO BAR TESTIMONY OF JONATHAN HOCHMAN** to be filed electronically on September 6, 2019.  Notice of this filing will be sent to all parties registered on this Court's ECF system.  Parties may access this filing through the Court's system.

/s/ David M. Friebus